UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| LINDA SUSAN MULLENIX,<br>  *Plaintiff*<br><br>v.<br><br>THE UNIVERSITY OF TEXAS AT AUSTIN,<br>  *Defendant* | §<br>§<br>§<br>§  CIVIL NO. 1-19-CV-1203-LY-SH<br>§<br>§<br>§ |

**O R D E R**

Before the Court are Defendant's Motion to Exclude Opinions and Testimony of Plaintiff's Damages Expert Thomas Glass, filed July 14, 2021 (Dkt. 100); Defendant's Motion to Exclude Opinion and Testimony of Plaintiff's Expert Peter Glick, filed July 15, 2021 (Dkt. 101); Plaintiff's Motion to Exclude the Expert Testimony of Donald Deere and Hart Blanton, filed July 23, 2021 (Dkt. 105); Defendant's Motion to Strike and Exclude Amended Report by Plaintiff's Damage Expert Thomas Glass, filed August 11, 2021 (Dkt. 116); and the associated response and reply briefs. The District Court referred all motions in this case to the undersigned Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72, and Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas ("Local Rules"). Dkt. 106.

**I.  Background**

On December 12, 2019, Plaintiff Linda Susan Mullenix, a tenured law professor at The University of Texas School of Law ("UT Law"), filed this employment discrimination lawsuit against Defendant The University of Texas at Austin. Plaintiff generally alleges that she has been

1

paid less than her male counterparts because of her sex, in violation of the Equal Pay Act and Title VII of the Civil Rights Act.

Defendant now moves to exclude the opinions and testimony of two of Plaintiff's experts, Thomas Glass and Dr. Peter Glick, and to strike Thomas Glass's amended expert report. Plaintiff moves to exclude the testimony of Defendant's experts Donald Deere and Dr. Hart Blanton.

## II. Legal Standards

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that scientific testimony or evidence is not only relevant, but also reliable. Subsequently, Rule 702 of the Federal Rules of Evidence was amended to provide that a witness

> qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting FED. R. EVID. 702). The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that (1) the expert is qualified; (2) the evidence is relevant; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). The overarching focus of a *Daubert* inquiry is the "validity and thus evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 594-95). The proponent of expert testimony bears the burden of establishing the reliability of the expert's testimony. *Sims v. Kia*

*Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). Because the *Daubert* test focuses on the underlying theory on which the opinion is based, the proponent of expert testimony need not prove that the expert's testimony is correct, but rather that the testimony is reliable. *Moore*, 151 F.3d at 276. This determination of reliability includes a preliminary determination "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Trial courts ordinarily apply four factors when considering the reliability of scientific evidence: (1) whether the technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. *Id.* This test of reliability is flexible, and these factors "neither necessarily nor exclusively apply to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. "Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case." *U.S. v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (internal quotations and citations omitted).

Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### III. Analysis

Local Rule CV-7(g) provides that a court "may refuse to hear or may deny a nondispositive motion unless the movant advises the court within the body of the motion that counsel for the

parties have first conferred in a good-faith attempt to resolve the matter by agreement and, further, certifies the specific reason that no agreement could be made." Defendant's Motions to Exclude Experts Thomas Glass and Peter Glick and Plaintiff's Motion to Exclude Experts Donald Deere and Hart Blanton all lack certificates of conference; thus, both parties have failed to comply with Local Rule CV-7(g). The Court could deny the Motions on this basis alone. *See, e.g., Rodriguez v. Taylor, Bean & Whitaker Mortg. Corp.*, No. SA-12-CV-0039-OLG, 2012 WL 12888786, at *1 (W.D. Tex. Aug. 31, 2012) (denying motion to strike because movant failed to include certificate of conference). Mindful of its "special obligation" to act as a gatekeeper and exclude unreliable and irrelevant expert testimony, the Court addresses the merits of the Motions to Exclude nevertheless. *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). The parties are warned that failure to comply with the Local Rules may result in imposition of appropriate sanctions.

**A. Defendant's Motion to Exclude Peter Glick**

Plaintiff has designated Dr. Peter Glick, a social science researcher, as an expert to provide information on stereotyping and bias in the workplace. Plaintiff produced Glick's expert report on June 11, 2021,[1] and Glick was deposed on July 1, 2021.[2] Glick describes his report as follows:

> I will provide "social framework" testimony to inform the decision makers in this case about empirically validated principles concerning the operation of stereotypes and bias that can lead to workplace discrimination via double-standards toward women as compared to men. Social psychological and organizational research provides a scientific knowledge base illuminating the forms stereotyping and discrimination take, the circumstances that elicit stereotyping and bias, and their relation to discriminatory behavior. This information can substantially supplement decision-makers' knowledge, going beyond common assumptions about how stereotypes and biases operate.
> \* \* \*

---

[1] Dkt. 101-1.

[2] Dkt. 101-2.

> The current report includes separate sections corresponding to general causation (established scientific principles) and specific causation (application to the current case). The former section reviews research on stereotyping, bias, and discrimination, summarizing the current scientific consensus about how and when discrimination occurs and the forms it takes. The latter section considers how the principles reviewed in the first section can be applied to the current case while leaving the ultimate decision about whether or not discrimination occurred to the case decision-makers.

Dkt. 101 at 7, 10. Glick concludes in his expert report that Defendant's lower evaluations and alleged poor treatment of Plaintiff would be consistent with gender bias and backlash-motivated retaliation.

Defendant argues that Glick's testimony should be excluded as unreliable under *Daubert* and Rule 702 because (1) application of his "social framework" social science on stereotyping and bias to this case is not based on valid or reliable scientific principles and methods; (2) he failed to consider other causes; (3) his opinions will not assist the trier of fact; and (4) he is not qualified to provide expert testimony on Dean Farnsworth's behavior. Finding the first three of these arguments dispositive, the Court does not reach the fourth.

**1. Glick's Application of "Social Framework" Analysis to This Case Is Not Based on Reliable Scientific Method**

In order to decide whether expert scientific testimony should be admitted, the Court first must determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert*, 509 U.S. at 592.

> The subject of an expert's testimony must be "scientific knowledge." The testimony must be grounded in the methods and procedures of science and more than subjective belief or unsupported speculation. This is not to say it must be "known" to a certainty; arguably, there are no certainties in science. In order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method.

*Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (cleaned up) (quoting *Daubert*, 509 U.S. at 589-90).

Glick acknowledges in his expert report and deposition testimony that his specific causation opinions are not based on scientific principles and methodology. For example, Glick states the following in his report:

> For specific causation, as explained below, social frameworks experts often do not apply a scientific certainty standard because it may not be possible or not feasible to conduct a rigorous study to determine whether discrimination occurred in a specific case to an individual plaintiff. In such cases, experts cannot testify with scientific certainty about whether discrimination occurred.[3]
>
> * * *
>
> Although I point out ways in which general principles can be applied to the current case and opine about where case facts are consistent with the possibility of discrimination, I expressly note that because alternative explanations cannot be ruled out, my case opinions do not carry the weight of scientific certainty. In the end, the case decision-makers must decide whether discrimination occurred.[4]
>
> * * *
>
> Because alternative explanations offered by Defendant to explain their actions cannot be ruled out scientifically, case decision-makers must ultimately decide whether they believe discrimination likely did or did not occur.[5]
>
> * * *
>
> When an organizational study is not feasible alternative explanations to discrimination cannot be scientifically ruled out. As a result, it's not possible to pin down with scientific certainty whether a specific person experienced discrimination.[6]

Moreover, Glick admitted in his deposition that his specific causation opinions have not been tested, are not subjected to peer review or publication, and are not accepted by the relevant scientific community:

---

[3] Dkt. 101-1 at 7.

[4] *Id.* at 11.

[5] *Id.* at 49.

[6] *Id.* at 9.

> Q. And my question is, is there a scientific technique that supports the rendering of your judgment as to whether or not what occurred here would be consistent with potential bias and discrimination?
>
> A. No. As I say, the part about applying to the case does not itself represent a scientific conclusion. It's an opinion based upon a scientific framework and expertise in that scientific framework. And as a result, to make it not confusing, I hope, for the case decision-makers, I want to make it clear to them that this does not tread on their responsibility to come to their own conclusion, but their conclusion might benefit from being informed by the scientific framework.
>
> Q. And so just to be clear, the methodology you use in Section V to provide your judgments about possibilities and whether or not things may or may not be consistent with potential discrimination, has not been subject to peer review or publication; is that correct?
>
> A. Correct.
>
> Q. And it has—has that methodology that you use in Section V cannot be—and has not been tested in a scientific manner; is that correct?
>
> A. Well, yeah. I mean again, that doesn't even make sense to me, but—but correct.

Glick Tr., Dkt. 101-2 at 22:25-23:23. Glick also acknowledged that he did not perform any studies of UT Law regarding discrimination or harassment. *Id.* at 104:6-149:13. Accordingly, Glick acknowledges that his opinions as to specific causation in this case are not scientific conclusions. *See E.E.O.C. v. Bloomberg L.P.*, No. 07 CIV. 8383 LAP, 2010 WL 3466370, at *15 (S.D.N.Y. Aug. 31, 2010) (rejecting similar social framework testimony where expert "[b]y his own admission . . . did not conduct a scientific study that would meet peer review standards"); *see also Van v. Ford Motor Co.,* 332 F.R.D. 249, 267 (N.D. Ill. 2019) (excluding specific causation social framework testimony where plaintiff failed to identify any reliable methodology used by expert).

In the "Summary Opinion" concluding Section V of his report, titled "Application to Current Case and Opinions," Glick opines that:

7

> Scientific research suggests that behaviors similar to those Professor Mullenix exhibited typically elicit backlash, resulting in hostility that motivates retaliation and workplace penalties (e.g., lower evaluations). Colleagues' alleged behavior toward Professor Mullenix (e.g., sabotaging lateral moves) and lower evaluations of Professor Mullenix's teaching and scholarship would be consistent with backlash-motivated retaliation. Should backlash have occurred, UT's failure to institute practices known to safeguard against bias infecting personnel evaluations (relying instead on subjective judgments) made it more likely that bias would affect personnel evaluations and decisions. Evidence that the Budget Committee accorded more superlative descriptions to other faculty who had similar student teaching evaluations to Professor Mullenix is consistent with possible bias. Similarly, evidence suggesting admiration for Professor Mullenix's scholarship among scholars in her field suggests the possibility that Dean Farnsworth's disparaging characterizations may be due to gender bias. However, because alternative explanations cannot be scientifically eliminated, case decision-makers will ultimately need to judge whether they believe stereotyping and backlash led to discrimination toward Professor Mullenix.

*Id.* at 77-78. These are the type of social framework opinions that "have elicited criticism from the very scholars" Glick relies on for his social framework analysis. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 n.8 (2011) (citing Monahan, Walker, & Mitchell, *Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks,"* 94 VA. L. REV. 1715 (2008)).

> The originators of social framework science state that:
>> The very idea of a social framework is to supply fact-finders with information about general social science research to provide a context or "framework" for the fact-finder to use when evaluating the evidence in a particular case. Thus, a social framework necessarily contains only general statements about reliable patterns of relations among variables as discovered within social scientific research, whether communicated via jury instructions or testimony of a qualified expert, and goes no further.

*Id.* at 1745. These scholars further state that "Supreme Court's interpretations of [Rule 702] make it evident that unscientific speculation about the linkage of general research to a specific case is improper."

>> There is little doubt that those experts who purport to link findings from academic studies to behaviors in particular cases do not apply the same level of intellectual rigor used to produce the empirical studies from which they

8

> extrapolate. Any attempt to link basic research findings to specific organizational settings and outcomes requires that many assessments be made about the presence and operation within the organization of variables that have been found to be important within the basic research settings. To make these assessments in a scientifically reliable way, the variables must be clearly defined, measured, and their relationships systematically tested, with the definitions, measurements, and tests reported in a transparent way so that another researcher could attempt to replicate the assessments. To qualify as scientific, a system of measurement or testing cannot be a private system that only one researcher (or expert) can apply. A scientific paper that contained only a series of descriptive conclusions and did not disclose the particular methods used and measurements taken to reach those conclusions would be promptly rejected by a scientific journal. Unfortunately, some courts have allowed experts to link social frameworks to the facts of particular cases despite the experts' failure to meet these scientific requirements.

*Id.* at 1736, 1738-39. The authors conclude: "If testimony about a specific case is to be offered by an expert, that testimony should be based on valid 'social fact' research that involves the parties before the court, rather than on subjective, unscientific extrapolation from general research conducted outside the case." *Id.* at 1749.

In *Dukes*, 564 U.S. at 359, the Supreme Court relied on this law review article to find that evidence presented by members of a putative class did not rise to the level of significant proof that the Wal-Mart operated under a general policy of discrimination, as required to satisfy the commonality requirement and to permit certification of plaintiff class under Rule 23. Relying on social framework analysis, the plaintiffs' social science expert testified that Wal-Mart has a "strong corporate culture," that makes it "vulnerable" to "gender bias." *Id.* at 354. The expert could not, however, "determine with any specificity how regularly stereotypes play a meaningful role in employment decisions at Wal-Mart." *Id.* At his deposition, the expert conceded "that he could not calculate whether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking." *Id.* The Court did not rule on whether the expert's testimony

met the *Daubert* standards because the district court had not addressed that issue at the trial level, but stated that,

> even if properly considered, [the expert's] testimony does nothing to advance respondents' case. "[W]hether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking" is the essential question on which respondents' theory of commonality depends. If [the expert] admittedly has no answer to that question, we can safely disregard what he has to say. It is worlds away from "[s]ignificant proof" that Wal-Mart "operated under a general policy of discrimination."

*Id.* a 354-55. The Court further noted that the expert's "conclusions in this case have elicited criticism from the very scholars on whose conclusions he relies for his social-framework analysis." *Id.* at 354 n.8 (citing 94 VA. L. REV. 1715).[7]

Thus, even if the underlying social science evidence on which Glick bases his opinions is reliable and accepted in the relevant scientific community, he "may not extrapolate unfounded conclusions from that evidence." *Van*, 332 F.R.D. at 267. Expert testimony should be excluded when "there is simply too great an analytical gap between the data and the opinion proffered."

---

[7] To support her argument that Glick's testimony on specific causation should be permitted, Plaintiff relies on *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat 1071, *as recognized in Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009 (2020), and *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 215 (D. Mass. 2009). Notably, both of these decisions predate *Dukes*. In addition, both cases are easily distinguishable from this one. In *Price Waterhouse*, a female partnership candidate alleged that she was denied partnership because of her sex. 490 U.S. at 237. A social psychologist testified at trial that the partnership selection process at Price Waterhouse likely was influenced by sex stereotyping. *Id.* In finding that some of the partners' comments reflected sex stereotyping, the district court relied in part on the social psychologist's testimony. *Id.* at 255. On appeal, Price Waterhouse argued that the district court's factual conclusions were clearly erroneous and that it erred in considering the social psychologist's testimony, contending that "a social psychologist is unable to identify sex stereotyping in evaluations without investigating whether those evaluations have a basis in reality." *Id.* The Supreme Court found that Price Waterhouse had waived the argument by failing to object to the expert's testimony at trial. Thus, the Court did not address whether the expert's testimony was reliable under *Daubert*. In *Tuli*, 592 F. Supp. 2d at 215, the district court overruled a *Daubert* challenge to expert testimony by Glick. The Court does not find this ruling persuasive because the defendants argued that Glick had not "applied his research to the specific facts" of that case; they did not raise the same objections regarding reliability as Defendant in this case. *Id.* at 210; *see also* Dkt. 118-2.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Glick "may be a renowned social psychologist, but if he cannot explain how his conclusions satisfy Rule 702's requirements, then he is not entitled to give expert testimony." *Bloomberg*, 2010 WL 3466370, at *15 (internal citation and quotations omitted).

### 2. Glick Relied Only on Information Provided by Plaintiff

In addition, Glick's expert report is not reliable because it was based on unrepresentative data. By his own admission, Glick's opinions are based on selected documents provided to him by Plaintiff. Dkt. 101-2. Glick admitted in his deposition that he did not review UT Law's polices or practices regarding sex discrimination, harassment, and grievances. Glick Tr., Dkt. 101-1 at 148:6-149:13. Courts have excluded social framework expert testimony on this basis. *Bloomberg*, 2010 WL 3466370, at *14 (excluding social framework expert testimony and noting that relying solely on information provided by plaintiff "without independently verifying whether the information is representative undermines the reliability of his analysis"); *see also Childers v. Trustees of the Univ. of Pennsylvania*, No. CV 14-2439, 2016 WL 1086669, at *6 (E.D. Pa. Mar. 21, 2016) ("Much like the expert excluded in *Bloomberg*, 2010 WL 3466370, [the expert's] methodology of sifting through evidence to find passages that support the Plaintiff's theory of the case does not meet Rule 702's requirement of reliability.").

### 3. Glick's Opinions Will Not Assist the Trier of Fact

The Court further finds that Glick's testimony should be excluded because it could lead to prejudice and jury confusion. Because the majority of Glick's expert report focuses on gender stereotyping and bias throughout society, the jury may assume that such stereotyping and bias existed at UT Law. The burden is on the Plaintiff to prove that she was discriminated against because of her sex, not just that gender stereotyping or bias exists throughout society. *See E.E.O.C. v. Wal-Mart Stores, Inc.*, No. 6:01-CV-339-KKC, 2010 WL 583681, at *4 (E.D. Ky. Feb. 16,

11

2010) (finding testimony more prejudicial than probative where expert opined that gender stereotyping may be subconscious but identified no intentional act by defendant based on gender stereotyping).

Based on the foregoing, Glick's expert testimony is excluded under Rule 702.

**B. Defendant's Motion to Exclude Thomas Glass and Motion to Strike Amended Report**

Plaintiff has designated Thomas Glass as an economic expert for the purpose of offering testimony regarding her lost compensation from alleged discrimination and retaliation. Plaintiff produced Glass's expert report on June 11, 2021,[8] and Glass was deposed on June 30, 2021. Dkt. 100 at 1.

Defendant filed its motion to exclude on July 14, 2021, arguing that Glass's opinions and testimony are unreliable because they are (1) based on insufficient facts and data; (2) are not the product of reliable principles or methods; and (3) would not be helpful to the fact finder in this case. Plaintiff filed her response on July 28, 2021, arguing that Defendant's motion was an improper attack on the factual basis of Glass's report. In addition, Plaintiff attached an "Amended Expert Report" from Glass (Dkt. 107-1) which, according to Plaintiff, cures "a large portion of Defendant's factual quibbles" with Glass's original report. Dkt. 107 at 1. Defendant moves to strike and exclude Glass's Amended Expert Report, arguing that it is an untimely new expert report under the parties' Amended Scheduling Order. Plaintiff disagrees and contends that Glass's Amended Expert Report is merely a supplemental report under Rule 26(e)(2).

**1. Glass's Amended Expert Report is Timely**

Under the parties' Amended Scheduling Order, the deadline for submitting expert reports was June 11, 2021. Dkt. 87 at 1. Plaintiff timely submitted Glass's Original Expert Report on June 11,

---

[8] Dkt. 100-1.

2021. Dkt. 100-1. After Glass was deposed on June 30, 2021, Plaintiff submitted Glass's Amended Expert Report on July 28, 2021. Dkt. 107-1.

Under Rule 26(e)(2), a party has a duty to supplement any expert reports disclosed under Rule 26(a)(2)(B) "both to information included in the report and to information given during the expert's deposition." FED. R. CIV. P. 26(e)(2). Rule 26(e)(2) provides that a supplement to an expert report "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." FED. R. CIV. P. 26(e)(2).

Defendant contends that Glass's Amended Expert Report is an untimely new expert report masquerading as a supplemental report because it "makes wholesale, significant changes to his damages calculations." Dkt. 116 at 4. Accordingly, Defendant contends that Plaintiff was required to disclose the new expert report by the deadline in the Amended Scheduling Order (Dkt. 87) to designate testifying experts, which was June 11, 2021. *Id.*

Glass's Amended Expert Report is not an entirely new report. Glass supplemented his Original Expert Report after he was deposed by defense counsel and made aware of some inaccuracies and deficiencies in his original report. Glass's Amended Expert Report compares the salaries and compensation of Plaintiff to three of her male colleagues and provides an estimate of lost compensation from alleged discrimination and retaliation. Dkt. 107-1 at 2-13. All of these issues also were addressed in Glass's Original Expert Report. Dkt. 100-1 at 2-10. Accordingly, Glass's Amended Expert Report is not an entirely new report, but was due by the deadline for supplemental reports under Rule 26(e)(2).

Rule 26(e)(2) provides that supplemental expert reports "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." FED. R. CIV. P. 26(e)(2). Rule 26(a)(3) provides that pretrial disclosures "must be made at least 30 days before trial." FED. R. CIV. P.

26(a)(3). The trial in this case is scheduled for February 28, 2022. Dkt. 106 at 1. Because Plaintiff filed Glass's Amended Expert Report on July 28, 2021, more than 30 days before February 28, 2022, it was timely. Accordingly, Defendant's Motion to Strike and Exclude Glass's Amended Expert Report (Dkt. 116) is **DENIED**.

### 2. Defendant's Substantive Objections to Glass's Amended Expert Report

Defendant argues that Glass's Amended Expert Report should be excluded under *Daubert* and Rule 702 because his calculations regarding loss compensation were based on flawed assumptions provided by Plaintiff's counsel without any basis in fact. Defendant further argues that "Glass's testimony is entirely unhelpful to a jury, as he simply parrots a variety of calculations he arrived at using simple math applied to assumptions he was asked to make by Plaintiff's counsel." Dkt. 100 at 2.

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987); *see also Moss v. Ole S. Real Est., Inc.*, 933 F.2d 1300, 1307 (5th Cir. 1991) (finding that appellant's "general complaint that the reports are incomplete and inaccurate are matters going to the weight of this evidence and not its admissibility"); *Koenig v. Beekmans*, No. 5:15-CV-0822-OLG, 2017 WL 7732833, at *4 (W.D. Tex. Aug. 16, 2017) ("[C]hallenges to the factual bases or underpinnings of an expert opinion usually go only to weight and credibility of the evidence, not admissibility").

The Court finds that Defendant's objections to Glass's opinions are the proper subject of cross-examination and not a basis for disqualification. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) ("The fact-finder is entitled to hear [the expert's] testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate."); *Nat'l Oilwell*

14

*DHT, L.P. v. Amega W. Servs., LLC*, No. CV 2-14-1020, 2020 WL 1692959, at *2 (E.D. Tex. Apr. 7, 2020) (concluding that defendant's "concerns about the document's accuracy is not a basis for excluding [expert's] testimony at trial"). As stated above, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. It is not the court's role to "judge the expert conclusions themselves." *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623 (5th Cir. 2018). Accordingly, Defendant's Motion to Exclude the testimony and opinions of Thomas Glass (Dkt. 107) is **DENIED**.

### C. Plaintiff's Motion to Exclude Donald Deere and Hart Blanton

Similar to Defendant's Motion to Exclude Thomas Glass, Plaintiff seeks to exclude Defendant's damages expert Dr. Donald Deere "because his report relies on facts that are indisputably wrong." Dkt. 105 at 1. As stated above, objections to the factual basis of an expert's opinion go to the weight to be assigned that opinion rather than its admissibility. Plaintiff is free to attack the factual basis of Deere's opinions on cross-examination. Accordingly, Plaintiff's Motion to Exclude Donald Deere is **DENIED**.

Finally, Plaintiff also seeks to exclude the testimony of Dr. Hart Blanton, a social science researcher Defendant designated to rebut Dr. Glick's testimony. Because the Court has granted Defendant's Motion to Strike Dr. Glick, Dr. Blanton's testimony is now moot. Accordingly, the Court **GRANTS** Plaintiff's Motion to Strike Dr. Blanton's testimony.

### IV. Conclusion

Defendant's Motion to Exclude Opinions and Testimony of Plaintiff's Damages Expert Thomas Glass (Dkt. 100) is **DENIED**. Defendant's Motion to Exclude Opinion and Testimony of Plaintiff's Expert Peter Glick (Dkt. 101) is **GRANTED**. Defendant's Motion to Strike and Exclude Amended Report by Plaintiff's Damage Expert Thomas Glass (Dkt. 116) is **DENIED**. Plaintiff's

Motion to Exclude the Expert Testimony of Donald Deere and Hart Blanton (Dkt. 105) is **DENIED IN PART** and **GRANTED IN PART**, in that the Court **GRANTS** the Motion to Strike Dr. Hart Blanton's testimony but **DENIES** the Motion to Strike the testimony of Donald Deere.

**SIGNED** on September 21, 2021.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE