IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

LINDA SUSAN MULLENIX,　　　　§
　　　　　　　　　　　　　　　§
　　　　Plaintiff,　　　　　　§
　　　　　　　　　　　　　　　§
-v-　　　　　　　　　　　　　§　Civil No. 1:19-cv-1203-LY
　　　　　　　　　　　　　　　§
UNIVERSITY OF TEXAS AT　　　§
AUSTIN,　　　　　　　　　　　§
　　　　　　　　　　　　　　　§
　　　　Defendant.　　　　　　§

******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF THOMAS O. McGARITY

MAY 3, 2021

(Reported Remotely)

******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF THOMAS O.

McGARITY, produced as a witness at the instance of the

Plaintiff, and duly sworn, was taken in the above-styled

and numbered cause on the 3rd day of May, 2021, from

9:08 a.m. to 6:13 p.m., before Cynthia Warren, Certified

Shorthand Reporter for the State of Texas, reported by

machine shorthand, from the residence of Cynthia Warren,

located within the state of Texas, pursuant to the

Federal Rules of Civil Procedure, the current Emergency

Order Regarding the COVID-19 State of Disaster, and the

provisions stated on the record.

1                    APPEARANCES

2

 FOR THE PLAINTIFF:
3
      MR. COLIN WALSH
4     MR. JAIRO CASTELLANOS
      WILEY WALSH, P.C.
5     1011 San Jacinto Boulevard
      Suite 401
6     Austin, Texas 78701
      Tel: 512-271-5527
7     Fax: 512-201-1263
      colin@wileywalsh.com
8     jairo@wileywalsh.com

9
 FOR THE DEFENDANT:
10
      MR. DARREN GIBSON
11    LITTLER MENDELSON, P.C.
      100 Congress Avenue
12    Suite 1400
      Austin, Texas 78701
13    Tel: 512-982-7259
      Fax: 512-982-7248
14    dgibson@littler.com

15

16 ALSO PRESENT:

17    Tamra English
      Linda Mullenix
18
      John Finley and Gavin Oram, videographers
19

20

21

22

23

24

25

3

1                          INDEX

2                                            PAGE

3  Appearances...................................   2

4  THOMAS O. McGARITY

5       Examination by Mr. Walsh...............    6
         Examination by Mr. Gibson..............  255
6

7  Changes and Corrections....................  264

8  Signature..................................  265

9  Reporter's Certificate.....................  266

10

11

12                        EXHIBITS

13 NO. DESCRIPTION                  PAGE REFERENCED

14 Exhibit 1..................................   27
        2019-20 Guidelines for Annual Review of
15      Faculty
        [No. D-0036286]
16
        Exhibit 2..................................   51
17      2020-2021 salary list by name
        [No. D-0037409]
18
        Exhibit 3..................................  179
19      5/15/2020 Memorandum, Re: Summary of
        Budget Committee Deliberations
20      [D-0002014]

21 Exhibit 4..................................  145
        January 2018 e-mails between Richard D.
22      Freer to Linda Mullenix, Re: FFF

23 Exhibit 5..................................  159
        Comparator Data sheets - RFP No. 3
24      [Mullenix 000915 - 000953]

25

4

1                    EXHIBITS (cont'd)

2  NO. DESCRIPTION                    PAGE REFERENCED

3  Exhibit 6...................................    204
       Listing of FII recipients
4      [No. D-0008642]

5  Exhibit 7...................................    221
       2017-18 Guidelines for Annual Review
6      of Faculty
       [No. D-0035193]
7
   Exhibit 8...................................    222
8      2018 salary raise chart and committee
       Notes
9      [No. D-0036733]

10 Exhibit 9...................................    223
       Listing of 2018-19 Total Compensation
11     with raises
       [Mullenix 002114 - 002115]
12
   Exhibit 10..................................    236
13     Listing of Default and Actual Raises
       [No. D-0036840]
14
   Exhibit 11..................................    249
15     Mullenix Interview Notes with UT Law
       Budget Committee Members
16     [Mullenix 002983 - 002992]

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2                THE VIDEOGRAPHER:  We are on the record at

3 approximately 9:08 a.m.

4                THE REPORTER:  Today's date is May 3,

5 2021.  The time is approximately 9:08 a.m.  This is the

6 oral and videotaped deposition of Tom McGarity, and it's

7 being conducted remotely in accordance with the current

8 Emergency Order Regarding the COVID-19 State of

9 Disaster.

10                My name is Cynthia Warren, CSR No. 4597,

11 and I am with The Legal Connection.  I am administering

12 the oath and reporting the deposition remotely by

13 stenographic means from my residence within the county

14 of Williamson, state of Texas.

15                And now will counsel please state your

16 appearances for the record.

17                MR. WALSH:  Colin Walsh for plaintiff.

18                MR. GIBSON:  Darren Gibson for University

19 of Texas at Austin.

20                THOMAS O. McGARITY,

21   having been first duly sworn, testified as follows:

22                MR. WALSH:  Well, thank you for being here

23 this morning, Professor McGarity.  Before we get started

24 I did want to ask Darren on the record a question

25 whether or not he would agree to something.  We've had a

1 lot of objections over the last several depositions that

2 I've taken and what I was wondering, Mr. Gibson, is if

3 you would agree on the record to limit your objections

4 to form or privilege.

5          MR. GIBSON:  Will you agree to the same

6 objection?  No, I would prefer not to.

7          MR. WALSH:  All right.

8                    EXAMINATION

9 BY MR. WALSH:

10    Q.   Okay.  Professor McGarity, can you go ahead and

11 state and spell your name for the record?

12    A.   My name is Thomas Owen McGarity, T-H-O-M-A-S,

13 O-W-E-N, M-C capital G, A-R-I-T-Y.

14    Q.   And what is your current position, Professor

15 McGarity?

16    A.   I'm a professor of law at the University of

17 Texas School of Law.

18    Q.   And how long have you done that?

19    A.   Been at the University of Texas?

20    Q.   Yeah.

21    A.   Since 1980, the fall of 1980.

22    Q.   And where did you work before you came to the

23 University of Texas School of Law?

24    A.   I was at the University of Kansas School of

25 Law.

1    Q.    And what did you do there?

2    A.    I was a professor of law at the University of

3 Kansas School of Law.

4    Q.    And how long did you work at Kansas?

5    A.    For three years.  From 1977 -- the fall of '77

6 through the spring of 1980.

7    Q.    And what about before that?

8    A.    I was at the Environmental Protection Agency.

9    Q.    What did you do there?

10   A.    I was in the Office of General Counsel in

11 Washington, D.C.

12   Q.    And how long did you do that?

13   A.    For about two years.

14   Q.    And before that?

15   A.    I clerked for Judge William E. Doyle and that

16 was in the 10th Circuit Court of Appeals in Denver.

17   Q.    And how long was that?

18   A.    Just for one year.

19   Q.    And before that did you work anywhere?

20   A.    No.  Oh, I had a brief two-, three-week -- I

21 clerked for a law firm in Denver.  After taking the bar,

22 I took the bar out in Colorado, and my wife was

23 expecting so I took a job briefly for about three weeks.

24   Q.    Oh, wow.  All right.  Well, like I said, thank

25 you so much for being here.  Have you ever had your

1 deposition taken before?

2     A.    Yes.

3     Q.    How many times?

4     A.    I would say around ten probably, somewhere in

5 that range.

6     Q.    And what was the purpose of your deposition

7 being taken in those cases?

8     A.    It was all in connection with expert testimony

9 I was delivering.

10     Q.    Have you ever had your deposition taken as a

11 fact witness and not an expert witness?

12     A.    Not that I can recall, no.

13     Q.    All right.  When was the last time you had your

14 deposition taken?

15     A.    Oh, many years ago, probably a decade ago.

16 Probably ten years ago, something like that.

17     Q.    Well, it's probably going to be a very similar

18 process to that.  You're under the same oath that you'd

19 be put under as an expert witness, under the same oath

20 that you'd be put under in court.

21             Are you on any kind of medication or

22 anything else that might prevent you from understanding

23 or answering the questions that I have today?

24     A.    No.

25     Q.    All right.  It is not an endurance contest so

1 if you ever need to take a break, feel free to go ahead

2 and ask.  My only request is that if there's a pending

3 question, you answer that before we go ahead and take

4 the break.

5     A.    Okay.

6     Q.    Mr. Gibson is probably going to object to some

7 of my questions, hopefully not but he probably will.

8 Unless he tells you not to answer you can go ahead and

9 answer those questions.

10    A.    Okay.

11    Q.    Let's see.  Do you have any questions for me

12 before we get started?

13    A.    No.

14    Q.    All right, perfect.  So how did you decide to

15 go into academia?

16    A.    I was an articles editor of the Texas Law

17 Review and I really enjoyed that work.  I wasn't sure I

18 wanted to go into academia at that point but I thought

19 that I might.  So I had the clerkship and I actually

20 started writing an article during the clerkship and

21 finished it while I was -- when I worked at EPA and then

22 started another article while I was at EPA.  At that

23 point I was pretty sure I wanted to go into academia.

24    Q.    And you enjoy it obviously?

25    A.    I do.

1    Q.   What do you like best about it?

2    A.   Oh, it's hard to say best.  I certainly -- I

3 certainly enjoy teaching and interacting with the

4 students, but I also greatly enjoy the research and

5 writing of it as well.

6    Q.   So what do you like about interacting with

7 students and teaching?

8    A.   Just the intellectual back and forth that's --

9 just to see particularly fresh laws, new students,

10 learning, picking up things, asking questions.  I teach

11 Socratically, so the Socratic dialogue, just I find that

12 very, very enjoyable.

13    Q.   What subjects do you teach at U.T.?

14    A.   I taught torts every year for 40 years, all the

15 years I've been teaching, which is more than that,

16 probably 43 years.  I teach environmental law

17 occasionally.  Most years I teach environmental law I

18 would say.  I teach administrative law occasionally and

19 then I teach a seminar.  Most recently the seminar has

20 been on food safety law.

21    Q.   So how did you decide -- how did you decide to

22 come to Texas?

23    A.   It was a pretty easy decision.  I was at

24 Kansas.  I enjoyed teaching at Kansas.  That's where I

25 got my start.  It was a young faculty there and I had a

1 great -- great time teaching there, but when I got the

2 offer to come to Texas, I'm a Texas graduate, I

3 graduated from U.T., so there was a going-home aspect of

4 it.  But as importantly, perhaps more importantly, my

5 parents just lived, oh, about an hour away in Gonzales,

6 Texas, and they had two grandchildren that -- up in

7 Kansas and it was a pleasure to get much closer to my

8 parents.

9     Q.   So what -- who was the dean when you joined

10 Texas?

11     A.   John Sutton.

12     Q.   What was -- so you've been through -- how many

13 different deans have you been through at U.T.?

14     A.    Well, let me see if I can recall them all.

15 Well, there was John, then I think Mark Yudof.  Then I

16 think after Yudof was -- it may have been Powers.  I'm

17 trying to remember the order.  Then I guess we had --

18 well, then we had Larry Sager.  I'm missing one in

19 there.  And then Dean Farnsworth, but I've missed one.

20 So let me see if I can remember.  I've got him -- I'm

21 picturing him now.  For some reason I'm drawing a blank,

22 but. . .

23     Q.   Don't worry about it.  It sounds like it was a

24 long time ago.  So how has --

25     A.   If I think about it I'll let you know.

1    Q.   Oh, sure.  So how has the law school changed or

2  not changed under these deans?

3    A.   Goodness.  The law school is much smaller than

4  when I went in terms of the number of students.  My

5  class had like 700 students in it.  Now our classes are

6  in the -- under 250 often.  So that's probably the

7  biggest change.

8           Another big change is we've added a

9  Commons Center and done a lot of work on -- the

10  buildings have changed a lot.  I'm trying to think

11  of. . .

12    Q.   What would you say the environment, like the

13  atmosphere at the law school, the collegiality or the

14  way people get along or treat each other, has that

15  changed over the course of your 40 years?

16    A.   I think yes to some extent, particularly in the

17  Farnsworth era.  Back in the old days the faculty was

18  invited to and I think to some extent expected to come

19  to coffee hour like at 9:00 and 3:00 or something like

20  that.  That was in the very old days, and so there would

21  be a lot of conversation there and a fair amount of

22  collegiality.  Not everyone came to those and to be

23  honest with you I didn't come to them very often.

24           So at some point that ended, that came to

25  an end.  I think it may have been during the Yudof or

1 maybe Powers era.  Mike Sharlot was the one that -- I

2 don't know why he was -- he escaped me.  He was the

3 other dean.  So it may have been during the Sharlot era,

4 and then we started -- I think during the Bill Powers

5 time started having more colloquia and things like that

6 a lot more, and that certainly increased likewise during

7 the Sharlot years and then also during the Farnsworth

8 years.

9         So there would -- by the -- before the

10 COVID there was something almost every day of the week

11 that one could attend.  We've have the drawing board

12 lunches on Monday.  We had the lunch.  That started I

13 think with Farnsworth, just a faculty invited to lunch

14 and you go and they have a nice catered lunch for you.

15 On Wednesdays and Thursdays there's always colloquia.

16         So I tried to arrange my schedule so that

17 I had the noon hour free so I could attend these things

18 to the extent that they interested me, but I attend most

19 of the time.  But -- until of course COVID and then

20 that's all -- we do have the colloquia still and we just

21 started having drawing board lunches this semester, so

22 that's happening again.

23         I would say the faculty when I first got

24 here was not as inviting as it was at Kansas, for

25 example.  It may have been I felt a little intimidated

1 because I was there with people who had taught me and

2 felt like maybe I wasn't up to their intellectual

3 standards.  I was worried that I wasn't maybe.  So it

4 might have felt a little less collegial to me at the

5 time, but in general I think we're a collegial faculty.

6 We get along and say hello to each other in the hallways

7 and things like that.

8    Q.   You said in the old days people were invited to

9 coffee and there might have been an expectation that

10 they attend these coffees.  Is there the same

11 expectation that faculty attend drawing boards or

12 faculty lunches or colloquia?

13    A.   There's some -- there's a bit of expectation

14 there, yeah.  I mean, it's not -- it's not like you're

15 blackballed or something if you don't -- if you don't

16 come, and there are certainly faculty members that don't

17 come to any of these.

18    Q.   Which faculty members don't go to any of these?

19    A.   Which ones?  Oh, my goodness, I couldn't tell

20 you which -- which ones.  I'd hate to say because then

21 it would turn out that maybe they did come to one of

22 them.  There are faculty members that are less frequent

23 attenders than others.

24    Q.   Which ones have you noticed less frequently

25 attend?

1          MR. GIBSON:  Objection, vague and

2  ambiguous.

3     A.   Again, I hesitate to speculate because my

4  memory is not that great.  I don't want to say, well,

5  here's somebody who didn't attend that does attend

6  sometimes.  So I'd hesitate -- I prefer not to speculate

7  or try to name names.

8     Q.   (By Mr. Walsh)  Well, I guess what would be the

9  problem with naming names?

10     A.   My memory.

11     Q.   Well, I know, but if people aren't blackballed

12  for not going, then why does it matter if you mistakenly

13  say somebody does or does not go to these?

14     A.   Oh, it matters.

15          MR. GIBSON:  Objection, calls for

16  speculation.

17     A.   It matters.  It's part of service.  It's part

18  of what the budget committee evaluates as part of

19  service is participation in the life of the law school,

20  and that's part of the life of the law school.

21     Q.   (By Mr. Walsh)  Okay.  So are colloquia, then,

22  required to be attended as part of --

23     A.   No.

24     Q.   -- service?

25     A.   No.

1    Q.   What other kinds of service opportunities are

2  there within the life of the law school?

3    A.   Well, serving on committees obviously.  Being

4  available for things like the -- what do they call

5  the -- the groups of students, the societies, working

6  with the societies, working with the students, advising

7  various law school student organizations like the Texas

8  Law Review or the Thurgood Marshall Society, something

9  like that, are all a part of service to the law school.

10    Q.   Now, are any of these things -- actually let me

11  rephrase that.

12             Are all of these types of service equal?

13             MR. GIBSON:  Objection, vague and

14  ambiguous.

15    A.   Let me think about that.  No, I would say

16  they're probably not equal.  I couldn't put a

17  quantitative number on it, but I think service on

18  committees, for example, is probably more important than

19  even -- probably even than regular attendance at the

20  colloquia or the drawing board, something like that, or

21  I guess it's certainly more important than advising a

22  student organization.

23    Q.   (By Mr. Walsh)  Okay.  Well, would it be

24  possible to put these things in order, at least with the

25  ones you just named?  So committee service is viewed as

1 the most important type of service at the law school?

2    A.   Now, I'm talking about my own personal view

3 here, but that would be my view, that the most important

4 of the service is committee service, yeah.

5    Q.   And then what would be just beneath that?

6           MR. GIBSON:  Objection, vague and

7 ambiguous.

8    A.   I guess I would say general participation in

9 various functions at the faculty that the faculty

10 undertakes.

11    Q.   (By Mr. Walsh)  That sounds like everything

12 else?

13    A.   Well, no, yeah, you're right.  That -- that is

14 more like everything else.  So I was thinking more like

15 the colloquia and the drawing boards.  And there are

16 lots of conferences, things like that that I didn't

17 mention earlier, but we have various conferences that I

18 think that we're invited to attend.  We're not expected

19 to attend conferences unless of course we're part of

20 putting the conferences together.

21    Q.   And what about after that?

22    A.   Well, again, this is just my thinking.  Others

23 may disagree, but I would say advising student

24 organizations probably is below that.

25    Q.   What about alumni events?

1      A.    Oh, I think that's there with probably about

2  the same level as advising student organizations.  I try

3  to attend some of them because no one could attend all

4  of them, maybe the dean -- not even the dean, but I

5  think that's -- you know, when we have, for example, the

6  annual reunion and usually in April, I try to go to that

7  and I think others do.  It's not -- I don't think it's

8  critical, but I think advising alumni is a good thing

9  and ought to be they're about the same level as advising

10  a student group, maybe slightly below that.

11      Q.    Okay.  You said that service is something

12  that's expected of tenured faculty at U.T. Law.  Is it

13  just service to -- within the university or is there any

14  kind of service external to the university that would

15  count?

16      A.    Oh, no, external counts as well.  And I've just

17  been talking about the law school.  There's service to

18  the university as well.  That would be serving on

19  university committees which I think is certainly

20  something that should be counted.

21      Q.    What kind of -- well, let me ask it this -- or

22  is service to the law school, service to the university

23  and service outside of the university, is that all

24  considered equal?

25      A.    I think more or --

1             MR. GIBSON:  Objection, vague and

2  ambiguous.  Excuse me.

3      A.   I think pretty much.  Yeah, I think service

4  outside the law school is counted.  Probably the service

5  to the law school may be slightly heavily -- more

6  heavily weighed, but again, I'm talking about my view

7  here.  But I think service outside of the law school

8  certainly is important, it counts.

9      Q.   (By Mr. Walsh)  Now, have you communicated --

10  so you've said several times that this is your personal

11  view and that other people might disagree with how you

12  rank this.  Have you communicated your personal view of

13  how these service activities stack up to --

14      A.   No, nobody has ever asked me how they -- to put

15  them in ordinal fashion.

16      Q.   Have you ever talked to anybody else about how

17  they view service?

18             MR. GIBSON:  Objection, vague and

19  ambiguous.

20      A.   In the context of budget committee meetings we

21  talk about service.  I don't think I talk much about

22  service outside of budget committee meetings.

23      Q.   (By Mr. Walsh)  It would probably be kind of

24  strange to do it outside of a budget committee meeting I

25  would think.  Well, so let's talk about that.  You've

1  been on the budget committee a bunch of times.  Is that

2  right?

3      A.   That's true.

4      Q.   Let's see.  How many years in a row have you

5  been on the budget committee?

6      A.   I couldn't tell you.  I just don't -- I was

7  trying to think of a year when I wasn't on the budget

8  committee and it goes back sufficient years.  Certainly

9  throughout the entire Farnsworth era and the Sager era I

10 was on the budget committee.  I think I might have been

11 off one year or two during the Powers years, and I think

12 I was on it mostly during the Sharlot years.  In fact, I

13 think I may have been the chairman the last Yudof year

14 and Sharlot asked me to stay on as chairman.  I have

15 some dim recollection of that.

16     Q.   So how does one get on the budget committee?

17     A.   You're appointed by the dean.  Except for one

18 year, Farnsworth's first year he asked the faculty to

19 put on a piece of paper the I think five people they

20 would like to see on the budget committee.  I don't know

21 whether he followed that or not, but there was sort of a

22 semi-election kind of aspect to things that one year.

23     Q.   And so what about under Dean Sager, was it the

24 same, appointed by the dean?

25     A.   Yeah.

1      Q.    And Yudof and Sharlot, they all just appointed

2  the members of the budget committee?

3      A.    That's my understanding.  I mean, I just got

4  requests from the dean to be on the budget committee and

5  I did.  Oh, you do have a process, I might mention this,

6  that we get a memo saying what committees -- I guess in

7  the spring what committees would you like to be on.  At

8  some point the first time I was on the budget --

9      Q.    Did you request --

10      A.    I don't think I ever put the budget committee

11  before I was on it, but once I got on it I would put the

12  budget committee because I like seeing what my

13  colleagues did and I also -- it was familiar to me.

14      Q.    Would you say that there are some committees

15  that are more important than others at the law school?

16      A.    Yeah.

17      Q.    So what would be the most important committee

18  at the law school?

19      A.    I think that there's -- it's hard to put

20  several of these committees in ranking order.  I think

21  three really important committees are the budget

22  committee, the appointments committee, and the tenure --

23  promotions and tenure committee.  Those are all three

24  pretty important to the faculty.  I don't remember all

25  of the committees, so I don't know.  I'm not going to be

1 able to put some kind of rank order like you asked me to

2 for the service, but I would put those three as sort of

3 co-equals at the top of importance.

4     Q.   What makes them equally important?

5     A.   The fact that they're all vital to the -- to

6 the law school and to its future.

7     Q.   Okay.  So how does the budget committee, how is

8 that vital to the law school's future?

9     A.   Well, the budget committee performs an annual

10 evaluation of the faculty for purposes of advising the

11 dean with respect to pay raises and various promotions

12 that -- or at least with respect to chairs.  I won't say

13 promotions because I think promotions and tenure does

14 the promotions part of it for tenured faculty.  And you

15 asked me -- repeat the question again.

16     Q.   And then there's the appointments committee and

17 the tenure committee.

18     A.   I'm sorry?

19     Q.   And then there's also the appointments

20 committee and the tenure committee you were just

21 talking --

22     A.   Oh, why are they -- and why are they important.

23 The appointments committee because that's determining

24 the future of the law school.  That's our -- they're

25 doing the job of putting before the faculty our future

1 colleagues.  I think that's very important.  And the

2 tenure committee because in years where we have

3 untenured faculty members they're deciding who are going

4 to be our permanent colleagues among those who at the

5 time are untenured.

6     Q.   Okay.  Do all of these committees meet every

7 year?

8     A.   I don't know.  I've been on the budget

9 committee.  I've been on the -- I guess I've been on the

10 promotions and tenure committee and I think one time on

11 the appointments committee.  The years I was on them

12 they met every year.

13     Q.   When were you last on the tenure and promotions

14 committee?

15     A.   It's been a while.  More than a decade since

16 I've been on it I think.  Well, maybe not.  Let me

17 think.  No, I'll take that back.  I think -- yes, Dean

18 Farnsworth asked me to be on the tenure committee one of

19 his early years, so I take that back.  It hasn't been a

20 decade -- or maybe it was appointments.  No, I think it

21 was appointments he asked me to be on, that's right,

22 not -- but I think I've been on promotions and tenure

23 fairly -- maybe during his time; but if not, during the

24 Powers years.

25     Q.   So you've been on the budget committee for --

1  through several different deans.  How much has the

2  composition of the budget committee changed during your

3  time between let's say Dean Sager and Dean Farnsworth?

4     A.   Between Sager and Farnsworth.  Go back to the

5  people who -- maybe slightly more -- I think it might

6  be -- it may have been slightly larger, more members

7  during the Sager years.  I know there was one year in

8  which a couple of members resigned and left just like

9  three or four of us.  That may have been an early

10  Farnsworth year.  I think it was the -- the composition

11  was somewhat smaller during the Farnsworth years.  The

12  personnel changed from year-to-year.  I think there may

13  have been more females during the Farnsworth years than

14  the Sager years, but you can check the records to see if

15  that were the case.

16     Q.   Is it mostly the same folks, though, that serve

17  on the budget committee year after year?

18     A.   No, I happen to be just an old fogy, I guess,

19  I've been on it so often.  Steve Goode is on it very

20  frequently.  I'm trying to think of others.  Lynn Baker

21  goes on and off of it.  She's been on it.  Wendy Wagner

22  has been on it quite frequently.  I'm trying to think of

23  others.  But there -- there's a fair amount of turnover.

24  This past year there was a good deal of turnover so

25  it -- and sometimes people go on and go off and then

1  come back on.

2      Q.   So you've been the chair of the budget

3  committee several times?

4      A.   Yes.

5      Q.   Were you chair of the budget committee in 2020?

6      A.   2020, yeah.

7      Q.   What about 2019?

8      A.   Yes, for part of the 2019.

9      Q.   Why only part?

10      A.   When you say -- we better get the ambiguity

11  straightened out here.  In my thinking I think of the

12  years fall and spring because you start in the fall and

13  you go to the spring.  So '19-'20 I was chair of the

14  budget committee.  And '18-'19 I was chair of the budget

15  committee.  Okay, fall of '18, spring of '19, fall of

16  '19, spring of '20.

17      Q.   Oh, I think this is actually really important.

18  This is going to hopefully make everything less

19  confusing.  So 2019, the academic year 2019 to 2020 you

20  were the chair of the budget committee?

21      A.   Yeah, for part of that year.

22      Q.   For part of that year.  And is that the year to

23  determine the salaries for the 2020?

24      A.   That would be the year that we determine the

25  salaries -- make recommendations for salaries for --

1  let's see, we're evaluating the year 2019, so we would

2  be making recommendations for the salaries for the fall

3  of 2020 and 2020-21 I think.

4      Q.   Okay.  And so now the academic year 2020 to

5  2021, are you on the budget committee?

6      A.   Yes.

7      Q.   Are you the chair of the budget committee?

8      A.   No.

9      Q.   Who is the chair?

10      A.   Chair is Derek Jinks.

11      Q.   Okay.  So then I know that I'm beating a dead

12  horse, I just want to make sure I have it all right in

13  my head.  So when I say you were on the 2019 budget

14  committee, you would be determining 2020 wages; when you

15  were on the 2018 budget committee, you were determining

16  2019 wages?

17      A.   Again, I don't know what you mean by the 2019

18  budget committee.  Are you talking about the 2018-19

19  budget committee?

20      Q.   So 2019 -- well, how do you refer to each year

21  of the budget committee?  Each year that you're on the

22  budget committee, each budget committee session, how do

23  you -- what do you call it?

24      A.   I call it the -- like currently we're in the

25  2020-2021 budget committee year, for the spring of 2021

1 and we started in the fall of 2020.

2    Q.   Okay.

3    A.   And we're evaluating the submissions for the

4 year 2020.  There is ambiguity kind of if you don't have

5 it really straight in your mind.  The 2020-2021 budget

6 committee looks at the publications during -- that are

7 published during 2020.  So we're making recommendations

8 for the salaries starting in the fall of 2021.

9    Q.   So I'm putting Exhibit 1 in the chat, if you

10 could go ahead and open it.

11    A.   Oh, it's in the chat box.

12    Q.   Yeah.

13    A.   There it is.  I see it.

14    Q.   Oh, yeah, so this is a headline 2019 to 2020

15 Guidelines For Annual Review of Faculty.  So what --

16 tell me what this is.

17    A.   Is this the university one or the law school

18 one?  I think this is the university one, right?  Yeah,

19 it is.

20    Q.   Tell me what this is.

21    A.   Yeah, if you scroll down a little more.  Yeah,

22 go back to appraisals.  I just want to -- stop.  That's

23 appeals, yeah.  No, these are the university guidelines,

24 yeah.

25    Q.   And then we come down to here.  So this is the

1 2019-2020 total compensation?

2     A.    This is what people were paid in 2019-20, okay.

3     Q.    I mean, that's what it looks like.  Do you

4 agree?

5     A.    Yeah, uh-huh.

6     Q.    And so this is what you would be looking at to

7 determine what they should be paid in the fall of 2020,

8 right?

9          MR. GIBSON:  Objection, misstates the

10 record.

11     A.    That's for 2019-2020.  So for the fall of 2020,

12 yeah, that's what we'd be looking at for the past year,

13 yeah.  I think that's right.

14     Q.    (By Mr. Walsh)  So, I mean, do these documents

15 look familiar to you?

16     A.    Uh-huh.

17     Q.    [Indiscernible] these about this time last

18 year?

19     A.    Uh-huh.  I mean, the format is familiar, yes.

20 I'm not familiar with the numbers obviously, but the

21 format is familiar, yes.

22     Q.    What is this?

23     A.    That's -- we call it the scatter plot.

24     Q.    And why is this created?

25     A.    That was created so that we get some visible

1  look at the faculty and where they stand

2  compensation-wise with respect to one another.

3      Q.   Okay.  Why is that important to see?

4      A.   Well, sometimes we deliberate and we sort of

5  look at this scatter plot towards the end after we've

6  deliberated over each faculty member and see when we're

7  talking about -- when the dean comes back to us with

8  suggested raises, we see whether that's where we want --

9  relative to others, that's where this person ought to be

10 positioned.  So sometimes we might recommend a greater

11 raise because we think, well, so-and-so is a little

12 below where they should be we think with respect to

13 people around him or her.

14     Q.   And what goes into that kind of determination?

15     A.   Well, the first thing that goes into it was our

16 earlier evaluation and then we come back and we see --

17 because we're doing it just -- we go through -- at least

18 every year I've been on the budget committee we go

19 through faculty members' seriatim.  Like one at a time

20 we look at -- we look at scholarship, teaching, and

21 service for each faculty member and we make an

22 evaluation, an overall evaluation.  Then toward the end

23 we come back -- the dean comes back with suggested

24 raises and we look at the scatter plot and we see if

25 maybe somebody will recommend, well, no, we think this

1  person ought to have a little bit bigger raise and we

2  discuss it, and then the dean takes our advice whatever

3  to the extent that he deems appropriate.

4      Q.   Okay.  So you kind of got a little bit ahead of

5  me, but why don't we go into that right now.  I guess

6  take me through the budget committee process.

7              MR. GIBSON:  Objection, there's no

8  question on the table.

9      Q.   (By Mr. Walsh)  Can you please take me through

10 the budget committee process?

11             MR. GIBSON:  Objection, vague and

12 ambiguous.

13     A.   I can tell you -- if you mean the process of

14 how we do our evaluations?  I mean, there's. . .

15     Q.   (By Mr. Walsh)  Yeah, so just take me through

16 like a hypothetical -- take me through a year.  We can

17 pick any year you want, but take me through how it all

18 happens.  So when do you find out you're on the budget

19 committee, when do you have your first meetings, how are

20 those set up, what happens at your first meeting, and

21 what happens at each meeting thereafter?

22             MR. GIBSON:  Objection, compound question.

23     A.   You find out you're on the budget committee in

24 the spring prior to the fall that you're going to be on

25 the budget committee when you find out all the

1 committees you're going to be on. It's usually the

2 spring, it could be early summer when the dean makes the

3 appointments. The first meeting of the budget committee

4 is usually in the fall and it's maybe one or two

5 meetings to -- if nothing unusual comes up. Just again

6 as the ordinary process would be, we do six-year

7 evaluations for the limited number, it's usually five to

8 eight, I think one-sixth of the faculty maybe, it may be

9 as many as ten.

10            We do an overall evaluation over a period

11 of six years for purposes of the university and there

12 we're applying the university criteria exclusively which

13 is -- I think it's above expectations, meets

14 expectations, below expectations, and there's one fourth

15 category which I'd have to see that -- see the six-year

16 memo to tell you. And we make recommendations to the

17 university along those lines. So that's in the fall.

18      Q.  (By Mr. Walsh)  How detailed are your

19 recommendations to the university?

20      A.  We just rank them in one of those -- one of

21 those categories. There's a -- there's a lengthy

22 massive kind of document for each of the faculty members

23 that are in that -- being considered that year and I

24 think all that goes forward to the university.

25      Q.  Okay.  And does the university ever reject your

1 recommendations, or no?

2     A.   I don't know.

3     Q.   You don't know the results?

4     A.   No, I --

5               MR. GIBSON:  Objection, asked and

6 answered.

7     A.   No, as a general matter we don't get back from

8 the university what they have to say, as far as I know.

9 I may be forgetting, but I don't recall having any

10 response from the university.  The dean may.  Of course

11 ultimately it's the dean that takes it forward to the

12 university.

13     Q.   (By Mr. Walsh)  Okay.  So that was actually

14 going to be my next question.  So you make the

15 recommendation to the dean who then passes it on?

16     A.   I think that's right.  Again, I'd have to look

17 at the -- there's guidelines for this, six-year

18 guidelines.  I know the guidelines specify that there

19 needs to be a committee.  I don't know whether the dean

20 just passes those recommendations along or the dean

21 makes the recommendations.  I can't recall what the memo

22 says about that.

23     Q.   All right.  So then what happens after that?

24     A.   Well, once we've completed that process, then

25 we're pretty much done for the semester unless something

1 comes up and things could come up. During the

2 Farnsworth era we might have a meeting in the fall that

3 he is about to make an offer to someone for a job. I

4 don't think that usually happens in the fall. I think

5 that's more frequently in the spring. But there could

6 be things like that where the dean comes to us and says

7 is this salary range sensible.

8     Q.   Tell me more about that. Why would the dean

9 come to you and ask whether a salary range is sensible?

10          MR. GIBSON:  Objection, calls for

11 speculation.

12     A.   You have to ask the dean about that. I don't

13 recall.

14     Q.   (By Mr. Walsh)  Now, wait a second, Professor

15 McGarity. I mean, you're on the budget committee,

16 you've been the chair of the budget committee. The dean

17 comes to you and says, hey, is this salary range

18 acceptable and you're like you have no idea why he is

19 coming to you?

20     A.   Oh, no.

21          MR. GIBSON:  Objection, asked and answered

22 and calls for speculation.

23     A.   I think the ultimate reason I guess -- again, I

24 don't know what he's thinking, but he does ask for us --

25 he does ask our advice when it comes to making offers to

1 other -- for lateral hires in particular.

2    Q.  (By Mr. Walsh)  Okay.  So he'll come to you and

3 ask about salary ranges for lateral hires?

4    A.  Yeah, that's what I was saying.  That's. . .

5    Q.  All right.  So, I mean, so that would be why he

6 would come to you then.  So you do know why.

7            MR. GIBSON:  Objection, calls for

8 speculation and asked and answered.

9    Q.  (By Mr. Walsh)  Would that be correct?

10    A.  That's my view of why he comes to us.  I

11 don't --

12    Q.  But you don't completely know and you don't

13 ask?

14            MR. GIBSON:  Objection; calls for

15 speculation, compound question, asked and answered.

16    Q.  (By Mr. Walsh)  You can go ahead and answer.

17    A.  That's why I think he comes to us is because he

18 wants our advice with respect to salary ranges.

19    Q.  All right.  You don't ask him why he has come

20 to you?

21    A.  No.

22    Q.  Does anybody else ask him?

23            MR. GIBSON:  Objection, calls for

24 speculation.

25    A.  Not that I can recall.

1    Q.   (By Mr. Walsh)  Why don't you ask?

2    A.   It didn't occur to me to ask what was

3 motivating him.

4    Q.   You didn't want to know why you were being

5 asked to do something?

6    A.   It seemed to me like -- it was pretty clear to

7 me at least that he wanted our advice on the appropriate

8 salary ranges.

9    Q.   Well, I mean, I agree, Professor McGarity, the

10 way you describe it, it does sound pretty clear and so

11 that's why I keep wondering why you're hedging your

12 answers and qualifying your answers; saying, well, I

13 think this is why, I don't know why, nobody asks my

14 perception of why he comes.  I mean, that seems like a

15 weird way to answer a question when it seems pretty

16 clear to --

17    A.   Well --

18              MR. GIBSON:  Hold on.  There's no question

19 on the table.  What's the question on the table?

20    Q.   (By Mr. Walsh)  So, Professor McGarity, why are

21 you so unwilling to commit to why Dean Farnsworth asks

22 you about salary ranges?

23              MR. GIBSON:  Objection; misstates the

24 record, calls for speculation, asked and answered.

25    A.   Because I don't know what's in Dean

1 Farnsworth's mind.

2     Q.   (By Mr. Walsh)  How can you ever -- well, is

3 there any way to know what's in somebody else's mind?

4             MR. GIBSON:  Objection, calls for

5 speculation.

6     A.   Not precisely.

7     Q.   (By Mr. Walsh)  How would you determine what

8 somebody -- what's in somebody's mind?

9             MR. GIBSON:  Objection, calls for

10 speculation.

11    A.   I interpret what they say or what they do.

12    Q.   (By Mr. Walsh)  Okay.  So you --

13    A.   [Indiscernible] into tort law here, if you want

14 to -- if we want to talk about intent and how one

15 manifests intent, we could do that.

16    Q.   Yeah, let's do that.  How does one manifest

17 intent?

18    A.   The theory --

19             MR. GIBSON:  Objection; calls for a legal

20 conclusion, calls for speculation.

21    A.   You look at their actions, you look at what

22 they say, you look at what they -- what they express by

23 way of desire, and you look at what a reasonable person

24 would know with substantial certainty.

25    Q.   (By Mr. Walsh)  What does that mean, what a

1 reasonable person would know with substantial certainty?

2    A.   Well, that's for a jury to decide.

3    Q.   Well, I mean, are you a reasonable person,

4 Professor McGarity?

5    A.   I hope so.

6    Q.   So how would you determine whether you know

7 something with a substantial certainty?

8          MR. GIBSON:  Objection, calls for a legal

9 conclusion.

10    A.   What do I -- what do I think?

11    Q.  (By Mr. Walsh)  Yeah, what would --

12    A.   Ask the question again.  I'm not sure I

13 understand your question.

14    Q.   Well, you said one way that you determine or

15 people manifest intent is by what a reasonable person

16 would know with substantial certainty.  I'm trying to

17 figure out what that means.  You said that's for the

18 jury to decide, but in everyday life we can't just say

19 all right, jury, you decide now, right?  So how do

20 you -- how do you get through your days?

21          MR. GIBSON:  I'm sorry, is the question

22 how do you get through your days?  Is that the question

23 that's on the table?

24          MR. WALSH:  Is there an objection, Darren?

25          MR. GIBSON:  Objection, vague and

1 ambiguous.  In addition, calls for speculation.

2    Q.  (By Mr. Walsh)  So then what does that mean,

3 then, if it -- what does it mean to -- what does it mean

4 for a reasonable person to have substantial certainty?

5              MR. GIBSON:  Objection, calls for a legal

6 conclusion.  Objection, calls for speculation.

7    A.  That aspect of it is an objective test that is

8 applied when we -- for the very reason that we can't

9 actually know what's going on in someone's brain.

10    Q.  (By Mr. Walsh)  So you just said that is an

11 objective test, so what are the factors?

12             MR. GIBSON:  Objection, calls for a legal

13 conclusion.

14    A.  Factors are reasonableness, reasonable person,

15 ordinary prudent person in the same or similar

16 circumstances.

17    Q.  (By Mr. Walsh)  Yeah, but what is an objective

18 factor to show whether somebody is reasonable?

19             MR. GIBSON:  Objection, calls for a legal

20 conclusion.

21    A.  We just call the reasonable person test the

22 objective test, an objective test.  And you're asking me

23 how do I know that somebody is being objective?

24    Q.  (By Mr. Walsh)  Well, what does it mean for

25 that to be an objective test, a reasonable person test

1  is an objective test?

2           MR. GIBSON:  Objection, calls for a legal

3  conclusion.

4      Q.   (By Mr. Walsh)  If it's objective, that means

5  anyone can apply; regardless of whether it's you, me, or

6  somebody on the other side of the world, they're able to

7  apply the test in the exact same manner.  That's what

8  objective means.  Do you agree?

9           MR. GIBSON:  Objection, calls for a legal

10 conclusion.  Objection, compound question.  Objection,

11 asked and answered.

12     A.   No, I wouldn't agree with that.

13     Q.   (By Mr. Walsh)  Well, how would you describe an

14 objective test?

15     A.   There's one that one can provide to a

16 decision-maker, in my case often the jury, to determine

17 what's going on in someone's mind when you can't really

18 know.

19     Q.   Well, what factors should they be looking at?

20          MR. GIBSON:  Objection, calls for a legal

21 conclusion.

22     Q.   (By Mr. Walsh)  [Indiscernible] objectively

23 determine what's going on in somebody's mind?

24          MR. GIBSON:  Objection, calls for a legal

25 conclusion.  Objection, calls for speculation.

1  Objection, asked and answered.

2     A.   And the question was what factors?

3     Q.  (By Mr. Walsh)  Yeah.

4            MR. GIBSON:  Same objections.

5     A.   That would depend on the circumstances.

6     Q.  (By Mr. Walsh)  Well, so let's use kind of a

7  silly example, the one where Dean Farnsworth comes to

8  you and asks you the proposed -- or asks whether a

9  salary range is reasonable.  What objective standards

10  would a jury need to consider to determine why he did

11  that?

12            MR. GIBSON:  Objection, calls for a legal

13  conclusion.  Objection, calls for speculation.

14     A.   First, I don't know that he asked us for what's

15  a reasonable salary range.  It's more like appropriate

16  he asks.  But I just don't recall his question to us

17  that precisely.  But reasonable means reasonable.

18     Q.  (By Mr. Walsh)  Can people disagree on what's

19  reasonable?

20     A.   Sure.

21     Q.   Okay.  If people disagree on what's reasonable,

22  does that mean somebody is right and somebody is wrong?

23            MR. GIBSON:  Objection, calls for

24  speculation.  Objection, vague and ambiguous.

25     A.   I think there can be differing views and we

1  often say reasonable minds may differ, which I -- in my

2  view I agree with that.  In my view that means that two

3  people could have different views and still be within

4  the range of reasonableness.

5      Q.  (By Mr. Walsh)  All right.  So are there any

6  other things that Dean Farnsworth would come to the

7  budget committee about during the fall semester besides

8  lateral hires and the six-year reviews?

9      A.  Yeah, one other thing possibly that could come

10 up any time during the year that's not part of our

11 regular process and that is if someone on the faculty

12 has an offer from another school and the question is do

13 we match that offer or how do we respond to that offer,

14 Dean Farnsworth would come to the budget committee for

15 advice there as well.

16     Q.  What advice is he seeking?

17         MR. GIBSON:  Objection, calls for

18 speculation.

19     A.  My impression is that he was seeking advice as

20 to appropriate range of salaries to offer the person who

21 has received the offer from another institution.

22     Q.  (By Mr. Walsh)  Now, when you've been on the

23 budget committee has Dean Farnsworth come to you seeking

24 that kind of advice regarding an offer for a faculty

25 member at another institution?

1    A.   Yes.

2    Q.   So how did you evaluate what to do or what

3 advice to give to Dean Farnsworth?

4    A.   We first look at what the other institution has

5 offered --

6    Q.   How do you --

7    A.   -- if that's available.

8    Q.   -- look at what the other institution has

9 offered?

10    A.   Well, obviously the faculty member had to tell

11 the dean that and the dean tells us.  We don't always

12 know.

13    Q.   Is there any kind of documentary evidence

14 required?

15    A.   I'm sorry?

16    Q.   Is there any kind of documentary evidence

17 required?  So, for example, does the faculty member have

18 to provide a written letter offer to the dean or an

19 e-mail to the dean showing that the school has offered a

20 certain amount to him or her?

21         MR. GIBSON:  Objection, calls for

22 speculation.

23    A.   You'd have to ask the dean that.  I've not seen

24 a letter like that that the dean has showed to us.

25    Q.   (By Mr. Walsh)  Okay.  So you find out what

1 the -- the dean tells you what the offer is and --

2      A.    If he knows.  Sometimes we -- I think there's

3 been the situation -- I can't say for sure that we

4 always know that number.  I'm not sure that the faculty

5 member always shares that with the dean, but in the

6 case -- the most recent case that I'm thinking about

7 there was a number.

8      Q.    What's the most recent case you're thinking of?

9      A.    Well, there's been a couple.  One was Richard

10 Albert and I think there was Cary Franklin.

11     Q.    All right.  So then what happens?

12     A.    Then the committee deliberates.  We talk it

13 over, talk about it and talk about some range that we

14 would recommend that the dean go back to the faculty

15 member with.  And the dean of course takes some number

16 out of that range, right, and we don't know I think what

17 that number is.

18     Q.    So what does -- how does the committee

19 deliberate on what range to recommend to the dean?

20            MR. GIBSON:  Objection, vague and

21 ambiguous.

22     A.    We talk about how valued the faculty member is,

23 and I think sometimes we get that scatter plot and we

24 see where that's going to put that person with respect

25 to other colleagues that might be in his or her range on

1  the scatter plot and see if that -- how far out our

2  range that's going to put this person.  Because at least

3  in my thinking it may mean that if we do that to secure

4  that faculty member, then we're probably going to have

5  to in future years think about providing raises to the

6  people in that range that are equally valuable.

7      Q.    Okay.  So how do you determine whether these

8  people are equally valuable?

9            MR. GIBSON:  Objection, vague and

10  ambiguous.

11     A.    Based on the same conversations that we use

12  when we recommend the raises to the dean:  scholarship,

13  service, and teaching.

14     Q.    (By Mr. Walsh)  Okay.  And so this person -- so

15  you guys are deliberating, you look at how valuable that

16  professor is and use those same scholarship, service,

17  and teaching requirements.  Is there anything else that

18  you look at?

19     A.    No, other than, as I mentioned, the comparison

20  of where they are with respect to their cohorts.

21     Q.    So how do you determine who's in a cohort of

22  faculty members at U.T. Law?

23     A.    I think there's a couple of scatter plots.  I

24  think the one is based on years out of law school or out

25  of your last degree, and the other is -- no, I think

1 it's just years out of law school and then the other one

2 is based on years in teaching.  You've got the scatter

3 plots there.  You could see that.

4     Q.    I'm trying to share my screen here.  All right.

5 So here's a scatter plot.  Would this be the one for

6 years since law school?

7     A.    Yeah.  JD year it says there, yeah.

8     Q.    Okay.  Well, let's see.  So this also says

9 total years teaching.

10     A.    That may be the total years teaching then.

11     Q.    Total years teaching and then the next one --

12 I'm sorry, this is the graduation.

13     A.    Yeah.  So I remembered that correctly.

14     Q.    So which one of these determine -- so is it

15 like a combination of both of these charts?

16     A.    Yeah, I mean, they're -- they're pretty similar

17 if you look at them.

18     Q.    Yeah.  So which one, though, do you use?

19     A.    Well, it depends on the circumstances, depends

20 on the faculty member.  We could have a faculty member

21 that graduated from law school, they spent 15 years in

22 the practice and then started teaching.  If we're

23 looking at that faculty member we'd probably look at the

24 years in teaching.  If we're looking at a faculty member

25 who, like me, spent a clerkship and a couple of years

1 before going into teaching, we might look at the JD,

2 whatever the years since graduation.

3    Q.    Okay.  And so the people that have been

4 teaching longer get higher salaries?

5    A.    Not necessarily.

6    Q.    They're just grouped together with the others?

7    A.    Yeah.

8    Q.    Okay.  So like, let's say, if you look down

9 at --

10    A.    They're not grouped together.  As you can see

11 on the scatter plot, they're spread out by the years

12 since they've -- in this one since the years they've

13 been teaching.

14    Q.    But this would be like the scatter shot that

15 you would look at to determine whether or not, let's

16 say, if somebody had another offer from another school,

17 whether you wanted to meet that, what the salary

18 increase might do --

19    A.    Yes.

20    Q.    -- where they're located?

21    A.    Exactly.

22    Q.    So is there any significance -- like is it a

23 five-year period?  Is that why this is divided into five

24 years of teaching, so everybody between 30 and 35 are

25 kind of similar?

1    A.   I think that's just to give us --

2              MR. GIBSON:  Objection -- objection, calls

3  for speculation.

4    A.   No, I think that's just to give us some sense

5  of where we are, then those lines going up so that we

6  can measure it.  I don't think that they -- those five

7  years don't determine categories, no.

8    Q.   (By Mr. Walsh)  Okay.

9    A.   Cohorts.

10   Q.   So how would you -- how do you determine

11 categories based on this chart?

12   A.   Well, you can see a cohort toward the end there

13 ten years out, a bunch of people there bunched up right

14 in there.

15   Q.   Right here, SCM, JRF, CC, like these guys right

16 here?

17   A.   Uh-huh.

18   Q.   Okay.  And so let's just -- hypothetically

19 speaking, if SCM came to you -- Dean Farnsworth came to

20 you regarding SCM, you would look at this chart to see,

21 well, if we gave him $20,000 what would that do in terms

22 of these other people in the same area?

23             MR. GIBSON:  Objection, calls for

24 speculation.

25   A.   Yeah.  Yes.

1    Q.   (By Mr. Walsh)  Okay.  And so then how do you

2  determine whether that change is worth it?

3             MR. GIBSON:  Objection, calls for

4  speculation.

5    A.   It's a judgment call.  The dean is asking for

6  our judgment.

7    Q.   (By Mr. Walsh)  And what goes into your

8  judgment?

9             MR. GIBSON:  Objection, calls for

10  speculation.

11    A.   The criteria I mentioned, the value of the

12  faculty member.  I mean, in this instance if we're

13  talking about someone being hired away where we have a

14  good chance of losing the faculty member, so we're

15  thinking about, well, what are the costs to the

16  institution of losing this faculty member versus what

17  are the costs or the -- of retaining that faculty

18  member.  It's a judgment call.

19    Q.   (By Mr. Walsh)  Well, what factors do you and

20  the budget committee consider in terms of making that

21  judgment call, though?

22             MR. GIBSON:  Objection, asked and

23  answered.  Objection, calls for speculation.

24    A.   A general assessment of scholarship, teaching,

25  and service.

1    Q.   (By Mr. Walsh)  So here's the years since law

2  school.  Do you ever look at this as well in determining

3  what to recommend?

4    A.   It's there.  I mean, that's always there before

5  the committee in our deliberations.  Which one I look at

6  again depends on the situation.  If it's somebody who's

7  been -- was out of law school a long time before

8  becoming a teacher, you might look at this chart or give

9  more weight to it, have it be a little more weighty in

10  your consideration.

11             MR. GIBSON:  Colin, we've been going for

12  an hour and 15 minutes approximately.  Is now a good

13  time?  I know we've all had a bunch of coffee this

14  morning.  Is now a good time to take a break?

15             MR. WALSH:  Yes, this is actually perfect

16  because I'm looking for something.  So yeah.

17             MR. GIBSON:  Great.

18             THE VIDEOGRAPHER:  We are off the record

19  at 10:17 a.m.

20             (Recess taken from 10:18 a.m. to

21  10:30 a.m.)

22             THE VIDEOGRAPHER:  We are back on the

23  record.  The time is 10:29 a.m.

24    Q.   (By Mr. Walsh)  Okay.  So we're talking about

25  budget committee duties and we were talking about the

1  scatter shot charts and reasons that Dean Farnsworth

2  would come to the budget committee during the fall

3  semester and what advices they would seek.  So you

4  mentioned two different professors that you can remember

5  Dean Farnsworth coming to the budget committee about

6  regarding offers from other institutions.  You mentioned

7  Cary Franklin and Richard Albert.

8       A.   Yes.

9       Q.   What institution did Richard Albert get an

10  offer from?

11      A.   I don't recall.  I would be speculating.

12      Q.   Well, go ahead and tell me what your thought

13  was.

14           MR. GIBSON:  Objection, calls for

15  speculation.

16      A.   I think it may have been the University of

17  Virginia.

18      Q.   (By Mr. Walsh)  And do you remember what the

19  number was for that?

20      A.   No.

21      Q.   Did the budget committee recommend giving him a

22  raise?

23      A.   Yes.

24      Q.   What was the amount that the budget committee

25  recommended?

1    A.   I don't remember.

2    Q.   Do you remember when this happened?

3    A.   Yeah, it was within the last year or so, last

4 two years anyway.  Probably within the last year.

5    Q.   Within the last year, okay.

6    A.   Or the last two years.  It's got to be -- I

7 think it's probably the last two years because the last

8 year has been the COVID year, right, so we didn't meet

9 personally and I'm not sure whether we -- I think --

10    Q.   I'm putting Exhibit No. 2 into the chat and I'm

11 about to share my screen.  So here's what I have for

12 salaries for 2020.

13              MR. GIBSON:  Colin, you haven't -- the

14 Exhibit 2 hasn't come through but it's there now.  Thank

15 you.  Just give it a chance to download it and look at

16 Exhibit 2, please.

17              MR. WALSH:  And it should be on the screen

18 right now as well.

19    Q.   (By Mr. Walsh)  Do you see it?

20    A.   Yes.

21    Q.   All right.  So here if you look at Richard

22 Albert -- well, first of all, have you ever seen this

23 before?

24    A.   I don't recall it, no.  But, I mean, I see

25 the -- the form I've seen before.  I don't know if I've

1 seen these particular numbers.

2    Q.   Now, this is a portion of a much larger

3 document regarding 2019 to 2020.  And then the last four

4 columns -- no, five columns, as you can see, have to do

5 with 2020 and 2021.

6    A.   Uh-huh.

7    Q.   Now, you would have been the budget committee

8 chair for the year --

9    A.   Yes.

10    Q.   -- that determine these 2020 and 2021

11 compensations?

12    A.   Yes.

13    Q.   Okay.  So here if you look at Richard Albert,

14 he was awarded $43,250 listed as equity and retention.

15         MR. GIBSON:  Just for the record, I'm

16 going to just object in that this document is not Bates

17 stamped and I cannot tell where the source of the

18 document or what it's a part of.  So for the record it's

19 unclear as to what this document -- where it came from

20 and what it is.

21         MR. WALSH:  Well, Mr. Gibson, if you

22 actually look at the document title, it's D 0037409.

23    Q.   (By Mr. Walsh)  All right.  So, Professor

24 McGarity, we're talking about Richard Albert.  Is this

25 that retention bonus that you were talking about?

1      A.   It looks like it, yes.

2      Q.   Is this what you recommended to Dean

3  Farnsworth?

4      A.   I can't recall what we recommended.

5      Q.   Can you recall whether this was in the

6  ballpark?

7      A.   Not specifically.  I'm not surprised to see

8  that number, but I can't tell you if it was within the

9  ballpark or not.  My guess is it probably was, but

10 that's a guess.

11     Q.   This just happened recently, right?  You said

12 this happened within like the last year?

13            MR. GIBSON:  Objection, misstates the

14 record.

15     A.   Within the last year or two.  I was explaining

16 before you put this up that this last year everything

17 has been done electronically, and I can't remember

18 whether this conversation happened electronically or

19 live.  If it was live it would have been before last

20 year.  This was within the last two years I think I --

21     Q.   (By Mr. Walsh)  Well, does it -- how often does

22 Dean Farnsworth come to the budget committee with offers

23 from other schools for faculty members?

24     A.   Fortunately not too often.

25     Q.   Okay.  So Richard Albert was one of just a few

1 and he got a substantial raise, but you can't remember

2 what you recommended to Dean Farnsworth?

3          MR. GIBSON:  Objection, misstates the

4 record.

5     A.   I can't remember the range that we recommended

6 to Dean Farnsworth.

7     Q.   (By Mr. Walsh)  But you did recommend giving

8 him a retention bonus?

9     A.   I wouldn't have called it a retention bonus.

10 We recommended the dean offering him a salary to -- if

11 he remained at the law school.  If you want to call that

12 a retention bonus, I suppose it's just a matter of

13 nomenclature.

14    Q.   And the other person you mentioned was Cary

15 Franklin?

16    A.   Yes.

17    Q.   When did that happen?

18    A.   Again, within the last two years.  Probably

19 within the last year because I think they actually did

20 leave the faculty.

21    Q.   Okay.  So Cary Franklin is going to UCLA --

22    A.   That's correct.

23    Q.   -- [indiscernible] year, correct?

24    A.   That's my understanding.

25    Q.   Did the budget committee recommend that she get

1 a raise?

2     A.   Yes.

3     Q.   What did the faculty -- or the budget committee

4 recommend?

5     A.   I don't recall the number.

6     Q.   Do you remember anything about the number?

7     A.   I remember that our intent was to at least

8 match UCLA.

9     Q.   What was UCLA?

10    A.   I don't remember.

11    Q.   Do you remember generally where it was?

12    A.   No.

13    Q.   So I guess we probably know it was more than

14 270?

15          MR. GIBSON:  Objection, calls for

16 speculation.

17    A.   The recommended salary for this year had she

18 stayed would have been more than that, yes.

19    Q.   (By Mr. Walsh)  All right.  And so does that

20 help your memory at all regarding what UCLA offered?

21    A.   No.

22    Q.   So what factors did you consider when

23 determining what range to recommend to Dean Farnsworth

24 regarding Professor Franklin?

25    A.   The ones I mentioned earlier.  We were looking

1  at her value to the law school and both Richard and her

2  case that we valued them highly and that's based on

3  their scholarship, teaching, and service.

4      Q.   Okay.  Did you value them both the same?

5      A.   No, we valued them at different times so I

6  couldn't say whether it was the same.  We valued them

7  both.  I could -- that's about as much as I can say.

8  Different members of the committee may have had

9  different value or different valuation.

10     Q.   What is your -- what did you value Cary

11  Franklin and Richard Albert?

12     A.   I valued them both very highly.

13     Q.   Did you value them both the same?

14     A.   You're asking me to compare the two?

15     Q.   Yes.

16     A.   I would have valued Cary somewhat higher than

17  Richard.

18     Q.   Why is that?

19     A.   I think her scholarship is a little higher

20  quality.  This is me.  I can't say the whole committee

21  would have done that valuation that way.

22     Q.   Did you discuss this view with the committee?

23     A.   The comparison did not come up before the

24  committee, so no, I didn't.

25     Q.   Well, it would have happened about the same

1 time, wouldn't it?

2          MR. GIBSON:  Objection, misstates the

3 record.

4     A.   I don't know for sure.  Within the past two

5 years, within the two-year range, yes.

6     Q.   (By Mr. Walsh)  And then, let's see.  So then

7 you recommended it to Dean Farnsworth.  Do you know

8 whether Dean Farnsworth took the recommendation

9 regarding Cary Franklin?

10    A.   I do not know for a fact whether he did or he

11 didn't.

12    Q.   Now, let's see.  Now, earlier you had talked

13 about how you look at scatter shots and when you're

14 making determinations about what sort of salary range to

15 recommend --

16    A.   Can I amend my answer to your previous

17 question?

18    Q.   Sure.

19    A.   When you talked about Cary and Richard, another

20 reason I would have ranked -- regarded Cary more highly

21 is her teaching over Richard's.

22    Q.   What made Cary's scholarship better than

23 Richard's?

24    A.   I found it to be more analytical.  Richard's is

25 fairly -- his is analytical in the sense that he

1 categorizes things a lot, but her scholarship is very

2 analytical. It's very highly placed. She publishes in

3 the very best, the very top journals in the country.

4 Richard writes mostly books and chapters in books. So

5 there's a -- it's not easy to compare the scholarship,

6 but that's my general impression.

7          Teaching is easier because you can look at

8 the student teaching evaluations and get a good sense of

9 the comparison. That's why I modified the answer.

10 She's much -- the students regarded her more highly on

11 their evaluations than I think they have Richard.

12    Q.   Okay. So you said that it's difficult to

13 compare the scholarship, but you are able to do it. So

14 how do you go about comparing the scholarship between,

15 say, Richard Albert and Cary Franklin?

16    A.   Well, you look at Richard, in his genre he's

17 very well regarded, he's highly regarded.

18    Q.   What is his genre?

19    A.   His genre is comparative constitutional law.

20    Q.   And how do you know that he is highly regarded?

21    A.   He puts together conferences and the best

22 people in the world come to his conferences, and I've

23 spoken -- I've been to at least one of his conferences

24 and people speak highly of him.

25    Q.   Well, does that matter to the committee how

1 he's regarded outside of the law school?

2    A.   That's not a major consideration, no.  It has

3 to do with -- probably more with the retention side of

4 things.  But in terms of scholarship, we're evaluating

5 the scholarship on its merits.

6    Q.   Okay.  You don't look to anything outside the

7 university to determine whether something has merit?

8    A.   I wouldn't go so far as to say that, no.

9    Q.   Well, what would you say?

10    A.   That sometimes something that is outside the

11 university might be determinative of a merit that we

12 would consider.  What I'm thinking of in particular is a

13 publication, a peer-reviewed publication, then we know

14 that at least peers have regarded it as meritorious.

15 But we do do our own evaluations of it even when it's

16 published in a peer-reviewed journal.  That's something

17 outside the university that would enter in, I think, the

18 consideration.

19    Q.   Okay.  So Richard Albert is highly considered

20 outside the university and that matters -- I mean, it

21 obviously matters for setting his salary, correct?

22    A.   That has some -- some input, yeah.

23    Q.   Okay.

24    A.   And certainly in deciding whether to match

25 somebody else's offer.

1    Q.   Okay.  And Cary Franklin, how is she perceived?

2          MR. GIBSON:  Objection, calls for

3    speculation.

4    A.   My impression is that she's highly regarded and

5    perceived highly outside the university, outside of our

6    law school as well.

7    Q.   (By Mr. Walsh)  How do you know that?

8    A.   I think I've spoken with people who have

9    mentioned her from other universities.  I'm trying to --

10   I'm having a little bit of difficulty here on this

11   particular one because she's married to Joey Fishkin who

12   other people have talked to me about too and I don't

13   want to mix the two.  But I think -- I think you often

14   talk to them -- talk about them or I hear about them

15   from people in other schools kind of in a combination.

16   I'm trying to remember other. . .

17   Q.   Now, Professor Fishkin is leaving too, right?

18   A.   That's my understanding.

19   Q.   Was there any offer to raise Professor

20   Fishkin's salary?

21   A.   I do not recall.  I don't know that we talked

22   about him when we were talking about Cary.

23   Q.   Well, what is your opinion?  Do you think that

24   Professor Fishkin is as good as Professor Franklin or

25   Professor Albert?

1          MR. GIBSON:  Objection, compound question.

2    Objection, vague and ambiguous.

3      A.   You know, I would like to see the records

4    before me before I -- before I opined on that because

5    I'm just drawing on my memory here.  I value Joey

6    Fishkin very highly too.  He's written some very good

7    stuff.  I've read his stuff or some of his publications

8    and I think they're -- it's excellent scholarship as

9    well.  I don't think he has as strong teaching

10   evaluations, but I think they're fairly high when it

11   comes to teaching.

12     Q.   (By Mr. Walsh)  All right.  So you did mention

13   that outside perception of a professor's scholarship is

14   a factor considered by the committee.  So I want to go

15   through a bunch of different indicia and see if they

16   have any meaning.  So would appointment as an associate

17   reporter for an American Law Institute restatement be

18   any indication of good scholarship?

19          MR. GIBSON:  Objection, misstates the

20   record.

21     A.   Not per se.

22     Q.   (By Mr. Walsh)  Why not?

23     A.   Just the appointment I think is an

24   indication -- and this may be what your question was,

25   but it's an indication of they're being well regarded

1  outside the law school.  It's not indication of a

2  scholarship because it's not scholarship, it's just an

3  appointment.

4      Q.   Well, I guess what does it mean to be well

5  regarded outside the law school to such an extent that

6  you would be appointed as an associate reporter on an

7  American Law Institute restatement?

8              MR. GIBSON:  Objection, calls for

9  speculation.

10     A.   I think it means that the people at the

11 American Law Institute, which is a -- I keep using the

12 word highly regarded, but is a highly regarded

13 institution, thinks highly of the person to appoint that

14 person as an associate reporter.

15     Q.   (By Mr. Walsh)  Well, what do they think highly

16 of that person for?

17             MR. GIBSON:  Objection, calls for

18 speculation.

19     A.   Well, I don't -- I'm not a member of the

20 American Law Institute and I've never been on a

21 committee that selected someone for restatement, so I'm

22 not sure what it is that they highly regarded -- would

23 have highly regarded that person for.

24     Q.   (By Mr. Walsh)  Well, I mean, you've been a law

25 professor for a while, you know about the American Law

1  Institute, you say that they're highly regarded.  Why do

2  you regard them highly?

3      A.   My impression is that they -- that there are

4  good legal minds that are there, but that's kind of

5  based on hearsay.  Charles Alan Wright was the head of

6  the American Law Institute.  He was a very good friend

7  of mine when he was alive, and any institution that

8  Charles Alan Wright thought highly of, I think that

9  matters to me.  I have some -- I have some criticisms of

10  the American Law Institute as well.  So they are highly

11  regarded probably by others maybe more so than me.

12      Q.   So if the American Law Institute appoints a

13  professor as an associate reporter, would it be safe to

14  say that that means that they highly regard that

15  professor's scholarship?

16             MR. GIBSON:  Objection; calls for

17  speculation, misstates the record, asked and answered.

18      A.   I think it means that they highly regard that

19  person's -- I think scholarship would be part of it,

20  sure, but they may -- I think it's more they highly

21  regard that person's judgment.

22      Q.   (By Mr. Walsh)  And how do they -- well, I

23  mean, and so how would an institution or how would

24  anybody highly regard somebody's judgment or come to

25  highly regard somebody's judgment?

1              MR. GIBSON:  Objection; vague and

2  ambiguous, calls for speculation.

3      A.   I can tell you how I would.

4      Q.   (By Mr. Walsh)  Okay.

5      A.   And it would be based on my experience with

6  seeing that person exercise their judgment.

7      Q.   What about work on other American Law Institute

8  projects besides restatements, would that be any

9  indication of a professor's scholarship?

10              MR. GIBSON:  Objection, calls for

11  speculation.

12      A.   It would be an indication of their service for

13  sure, not necessarily scholarship.

14      Q.   (By Mr. Walsh)  Okay.  Well, would it mean that

15  at least the American Law Institute regards that

16  scholarship highly?

17              MR. GIBSON:  Objection, calls for

18  speculation.

19      A.   It means they would regard that person's

20  judgment highly, and scholarship I think would be part

21  of that.

22      Q.   (By Mr. Walsh)  What else would be part of

23  that?

24              MR. GIBSON:  Objection, calls for

25  speculation.

1    A.    Whatever is involved in judgment.  It might --

2  again, I don't know what the ALI, what criteria they use

3  for selecting people to be reporters so I really -- I'm

4  having a hard time answering that question without

5  knowing what their process is.

6    Q.    (By Mr. Walsh)  Do you think it could be

7  because of sartorial judgment?  Do you think they value

8  that highly at the American Law Institute?

9            MR. GIBSON:  Objection, calls for

10 speculation.

11   A.    I couldn't tell you.

12   Q.    (By Mr. Walsh)  Do you think it's possible that

13 the American Law Institute appoints reporters to

14 restatements or to other projects based on how they

15 dress?

16           MR. GIBSON:  Objection, calls for

17 speculation.

18   A.    I really don't know.  I know that Charles Alan

19 Wright dressed very well all the time.  They made him

20 their president.

21   Q.    (By Mr. Walsh)  And that is why you respect

22 Charles Alan Wright so much?

23           MR. GIBSON:  Objection.

24   A.    I'll be happy to -- I have -- I did have a high

25 regard for Charles Alan Wright, but I have a lot of

1 experience -- he officed next to me. I would say that

2 his sartorial appearance had very little to do with my

3 appreciation for the judgment of Charles Alan Wright.

4 I've seen him exercise his judgment over many years and

5 that gave me a high regard for him.

6     Q. (By Mr. Walsh) What about invitations to be a

7 speaker at academic conferences, would that be an

8 indication of the quality of a professor's scholarship?

9     A. Again, the invitation to participate or to give

10 papers is an indication of service, but I do think if

11 the invitation was to present a paper, then that would

12 be an indication that that entity thought highly enough

13 of the faculty member's scholarship to want to publish

14 it.

15     Q. Okay. What about invitation to be a keynote

16 speaker at an academic conference?

17          MR. GIBSON: Objection; vague and

18 ambiguous, calls for speculation.

19     A. Yes, I think that would be indicative -- again,

20 it's certainly indicative of service. If the nature of

21 the speech was academic, like based on a previous paper

22 written or a paper that's in progress, then I think it

23 would be an indication of that entity valuing that

24 speaker's scholarship.

25     Q. (By Mr. Walsh) What about an invitation to

1 contribute a chapter to a book?

2         MR. GIBSON: Objection, calls for

3 speculation.

4    A.  Yes, I think that would be an indication of

5 that -- whoever made the invitation's value of the

6 invitee's scholarship, yes.

7    Q.  (By Mr. Walsh)  What about an appointment to a

8 prestigious research institution?

9         MR. GIBSON: Objection; calls for

10 speculation, vague and ambiguous.

11    A.  When you say prestigious research institution

12 are you talking about law schools or are you talking

13 about things like a think tank?

14    Q.  (By Mr. Walsh)  Well, both or either.

15         MR. GIBSON: Objection; compound question,

16 vague and ambiguous, calls for speculation.

17    A.  And the invitation was to do what?

18    Q.  (By Mr. Walsh)  Be an appointment to a

19 prestigious institution to provide a service.

20    A.  An appointment, to like join the faculty of a

21 prestigious research institution?

22    Q.  Yeah, it wouldn't be faculty, but to join the

23 research institution to provide research, scholarship,

24 work.

25         MR. GIBSON: Objection, calls for

1  speculation.  Objection, vague and ambiguous.

2      A.    Research, just to do research with the

3  institution?  Is it a university?  Because I have a very

4  different view of think tanks than I do of universities.

5      Q.   (By Mr. Walsh)  Give me one second.

6             (Pause.)

7             Let's see.  What about something like a

8  scholar-in-residence at the Rockefeller Foundation

9  Bellagio?

10     A.    I don't know what a Bellagio is, but I know

11 various Rockefeller funds.  But that sounds -- I mean,

12 if -- again, rephrase your question again.

13     Q.    Would appointment as a scholar-in-residence at

14 the Rockefeller Foundation Bellagio Study and Conference

15 Center be an indication of how highly regarded a

16 professor's scholarship is?

17             MR. GIBSON:  Objection, calls for

18 speculation.

19     A.    Yes, I think so, how highly regarded it is by

20 that foundation, but yes.

21     Q.   (By Mr. Walsh)  Are there other foundations --

22 are there any prestigious research institutions that you

23 can think of besides universities that would be

24 impressive to you?

25             MR. GIBSON:  Objection, vague and

1  ambiguous.

2      A.   I was going to say that's a good question, but

3  of course that's why you're asking it.  And the reason I

4  say it's a good question is I've written a bunch about

5  think tanks and I -- they have all sorts of names,

6  highly regarded scholars and things like that, they call

7  them scholars.  They even have chairs in places like the

8  Cato Institute and The Heritage Foundation.  And I don't

9  personally regard those as anything resembling a

10 position of a research university.

11             But if you're talking about something like

12 the National Academy of Sciences, then yes, I think

13 that -- I have high regard and I think most people do

14 for the National Academy of Sciences.  And there are

15 other non-university, I guess, institutions out there

16 that I think that if I was told that someone had been

17 given a research position at that institution, I would

18 think that that meant that they thought highly of that

19 person's scholarship.

20     Q.   What about correspondence from like other

21 professors or judges or practicing lawyers praising a

22 professor's scholarship, would that be an indication of

23 how well regarded that scholarship is?

24             MR. GIBSON:  Objection, calls for

25 speculation.

1    A.   Yes, it would be an indication of how whoever

2  the author of the letter was regarded that person's

3  scholarship.

4    Q.   (By Mr. Walsh)  What about citation to a

5  professor's work in federal or state judicial opinions?

6           MR. GIBSON:  Objection, calls for

7  speculation.

8    A.   Yes, it would -- that would be an indication

9  that the judge or at least the law clerk thought highly

10  of the -- what was written in the article.

11    Q.   (By Mr. Walsh)  Did you just say that the law

12  clerk thought very highly of it?

13    A.   No.  My understanding is that sometimes these

14  opinions, particularly the citations, come as much from

15  the law clerks as from the judge themselves.

16    Q.   Interesting.  Does that make it any less

17  binding as precedent or any less important?

18           MR. GIBSON:  Objection, calls for a legal

19  conclusion.

20    Q.   (By Mr. Walsh)  Do you think a judge would

21  adopt a clerk's citation to scholarship that the judge

22  didn't agree with?

23           MR. GIBSON:  Objection, calls for

24  speculation.

25    A.   I don't know.

1    Q.   (By Mr. Walsh)  Well, when you were a clerk did

2  your judge ever say I don't agree with this scholarship,

3  I think this is a crappy writer, but I'm going to put it

4  in my judicial opinion?

5    A.   No, never said that.

6    Q.   Do you think that it's possible judges say

7  that?

8              MR. GIBSON:  Objection, calls for

9  speculation.

10    A.   I don't know.

11    Q.   (By Mr. Walsh)  What about visiting

12  appointments at T14 law schools, would that be an

13  indication of how well regarded a professor's

14  scholarship is?

15              MR. GIBSON:  Objection, calls for

16  speculation.

17    A.   Invitations to visit, it depends on the nature

18  of the visit.  There are a couple of kinds of visits out

19  there.  There are podium visits we call them that are

20  just come in and fill a need.  We need somebody to teach

21  torts and would you come teach torts for this year

22  without any indication that that institution was

23  considering that faculty member for their faculty.

24  That -- a podium visit of that sort would not be an

25  indication that that institution regarded the person's

1 scholarship necessarily highly.  They're looking for a

2 teacher, but --

3   Q.  (By Mr. Walsh)  So are you saying a T14 school

4 might hire somebody as a visiting professor even though

5 they don't respect that scholarship to teach future

6 lawyers at a T14 school?

7   A.  Yeah.

8   Q.  Does U.T. hire professors whose scholarship

9 they don't respect for podium visits?

10   A.  I think it's possible.  We certainly hire a

11 number of adjuncts who have no scholarship at all.

12   Q.  Okay.  So, I mean, that's different, though,

13 right?  An adjunct is different than a tenured faculty

14 member visiting an institution, correct?

15   A.  For just to come in and teach I don't know that

16 it is that different.

17   Q.  Which professors has U.T. Law hired whose

18 scholarship U.T. Law did not respect?

19          MR. GIBSON:  Objection, calls for

20 speculation.

21   A.  I can't tell you because I don't speak for U.T.

22 Law.

23   Q.  (By Mr. Walsh)  In your opinion which scholars

24 at U.T. Law -- which people has U.T. Law hired whose

25 scholarship you don't respect?

1    A.   On the permanent faculty?

2    Q.   For permanent faculty and for visiting

3 professorships or podium visits.

4              MR. GIBSON:   Objection, compound question.

5    A.   There are people on the faculty whose

6 scholarship I do not respect because there isn't any of

7 it.

8    Q.   (By Mr. Walsh)  Who are those people?

9    A.   Again, when I say isn't any of it, I'll say

10 there's very little of it.  That are currently on the

11 faculty?

12    Q.   Yes.

13    A.   There have been people in the past for sure.

14 People like --

15    Q.   Is there anyone currently on the faculty?

16    A.   Huh?

17    Q.   Is there anyone currently on the faculty that

18 would meet that description?

19    A.   Yes.

20    Q.   Who?

21    A.   Patricia Hansen.

22    Q.   Anyone else?

23    A.   Probably -- there's very little scholarship

24 from like Jane Cohen.

25    Q.   Anyone else?

1      A.   I'm trying to think.  I'm just -- there's a few

2  people that have left the faculty or have retired that I

3  would put in that category, but you said who's on the

4  faculty at the moment.

5      Q.   Well, here, let me ask --

6      A.   Those are the two that come to mind.

7      Q.   What did you say?

8      A.   Those are the two that come to mind at the

9  moment.

10      Q.   What about are there any faculty or any

11  professors on the faculty right now whose scholarship

12  you consider mediocre?

13      A.   If you're going to ask me to name them all, I

14  don't think I can name them all.

15      Q.   Well, name as many as you can think of.

16      A.   Well, that depends.  It depends on the year

17  really.  Over several years people that have published

18  kind of mediocre scholarship have published good pieces

19  once in a while.  So I hate to -- I hate to classify,

20  characterize a faculty member as well that's a mediocre

21  faculty member or that faculty member's scholarship is

22  mediocre.  In any given year any particular piece of

23  scholarship, certainly there's mediocre scholarship out

24  there and my guess is I've published some myself.

25      Q.   Can you go ahead and list all the faculty

1 members whose scholarship you consider mediocre?

2    A.   I just told you that I can't because it would

3 depend on the particular piece of scholarship or at

4 least a particular year.

5    Q.   So sitting here right now there's no faculty

6 member currently employed by U.T. Law whose scholarship

7 you would describe as mediocre overall?

8          MR. GIBSON:   Objection, asked and

9 answered.

10    A.   I'm saying that I can't make that assessment

11 overall.

12    Q.   (By Mr. Walsh)  Right.  So is there a faculty

13 member whose scholarship you find mediocre currently

14 employed by U.T. Law?

15          MR. GIBSON:   Objection, asked and

16 answered.

17    A.   I repeat that I can't do that, just say overall

18 this person's scholarship is mediocre.  Sometimes

19 there's a good work that comes out of someone who mostly

20 publishes mediocre scholarship.

21    Q.   (By Mr. Walsh)  Who are those professors?

22    A.   That was just a hypothetical.

23    Q.   Can you think of any professors who mostly

24 publish mediocre scholarship but occasionally hit it out

25 of the park?

1    A.   I didn't say hit it out of the park.  I said
2 publish --
3    Q.   Let me ask it this way.  Are there any
4 professors who mostly publish mediocre scholarship who
5 sometimes publish better than mediocre scholarship?
6    A.   Yes.
7    Q.   Who are they?
8    A.   Again, I don't have before me the past six
9 years of scholarship for everyone.
10    Q.   Would it help if I put up a list of the
11 professors at U.T. Law and we could go through each one
12 and I could ask whether or not that meets the criteria
13 of mostly publishing mediocre scholarship?
14    A.   Well, if that's -- if that's what you want to
15 do we can do that.
16    Q.   Would you be able to answer my questions if I
17 do that?
18         MR. GIBSON:  Objection, calls for
19 speculation.
20    A.   I don't know.  I truly don't.  I think that I
21 really couldn't say that about any particular professor
22 at any particular time.  I would want to look at what
23 particular -- particular scholarship.
24    Q.   (By Mr. Walsh)  Okay.  So it changes every
25 year.  Is that right?

1      A.    Sure.

2      Q.    Okay.  And there's nobody who you would overall

3  describe as mediocre in terms of scholarship?

4      A.    I just don't make that characterization.  I

5  characterize scholarship and articles as mediocre.  I

6  don't characterize a person as mediocre.

7      Q.    Well, what about a person's scholarship in

8  general?

9              MR. GIBSON:  Objection; asked and

10  answered, calls for speculation.

11      A.    Trying to think in general.  I would want

12  before me something concrete, like articles.  Like if I

13  had -- and this is hypothetical.  If I had three

14  articles and they were all three mediocre we'll say,

15  then I would say, well, this year this person's

16  scholarship is mediocre.  If I have two mediocre

17  articles and one really good article, I might not say

18  this year this scholarship is mediocre; I might say it's

19  a little better than -- it's a plus.  Sometimes we -- in

20  the budget committee we talk about an article being a

21  plus.  I would say, well, this is a better than mediocre

22  year for this person.

23              But to try to characterize a scholarship

24  overall over a career or something as mediocre, I'd need

25  a lot more information and a whole lot more time put

1  into it.

2     Q.   (By Mr. Walsh)  Okay.  So does Cary Franklin --

3  does Professor Franklin write in the same area as

4  Professor Albert?

5     A.   No.

6     Q.   What does Cary write about?

7     A.   She writes in discrimination, constitutional

8  law, that sort of thing.

9     Q.   So how can you compare Professor Albert's

10 scholarship to Professor Franklin's to the extent that

11 you said you thought Professor Franklin had better

12 scholarship?

13    A.   And I said that just in general, not for any

14 particular article or book.  That's just -- that's my

15 impression of having read a few of her articles and read

16 a few of Richard's chapters.  He doesn't write many

17 articles.  I guess I won't say that, but he writes a lot

18 of chapters and he wrote a recent book.

19    Q.   Do you -- do you teach in either of these

20 subjects for Professor Albert --

21    A.   No.

22    Q.   -- or Professor Franklin?

23    A.   No.

24    Q.   So how do you evaluate whether the scholarship

25 is good or not?

1          MR. GIBSON:  Objection, asked and

2 answered.

3     A.   I look at -- I read it, I read the article, I

4 see if there's -- what comes through there.  I look at

5 is it merely just descriptive, is it just describing

6 something, is it analytical in the sense that it

7 categorizes things, maybe categorizes cases or in

8 Richard's case he's categorizing constitutions.  I look

9 at the kind of analytical or evidence of analytical

10 thought being put into it by -- sometimes people use

11 economic analysis, sometimes people use various other

12 disciplines and work that into their scholarship.

13          And sometimes it's also how well it reads,

14 how well organized the article is and whether it's clear

15 that they've looked at -- when they take a position

16 they've looked at both sides, they recognize the

17 arguments of pro and con as they're looking at a

18 particular issue, and recognize the arguments on the

19 other side if they're taking a position, recognizing

20 that there are arguments on the other side and

21 addressing those arguments.  So legal analysis, and it

22 can vary on the -- by genre to some extent too.

23     Q.   (By Mr. Walsh)  Well, if it can vary by genre,

24 how can you compare them across genres?

25     A.    Well, it's not always easy, but you do the best

1 you can.

2    Q.  And you do that for all of the tenured

3 professors on the budget committee, correct?

4    A.  That's correct.

5    Q.  So I want to go back to this chart that I just

6 had. All right. Here's a scatter shot chart. Now, is

7 this ever provided to the faculty not on the budget

8 committee?

9    A.  I don't know. I've never received it in any

10 capacity other than as a member of the budget committee.

11    Q.  Okay. So would it be safe to say that faculty

12 outside the budget committee do not get to see this

13 chart?

14           MR. GIBSON: Objection, calls for

15 speculation.

16    A.  I don't know if somebody requested to see it

17 whether they would be allowed to see it or not.

18    Q.  (By Mr. Walsh) Well, how -- I guess how would

19 a faculty member be able to correct errors on this

20 chart?

21           MR. GIBSON: Objection; calls for

22 speculation, presumes facts not in evidence.

23    A.  I don't know.

24    Q.  (By Mr. Walsh) Do you know whether there are

25 any errors on this chart?

1      A.    Not to my knowledge.

2      Q.    Well, do you agree that the faculty should have

3  the opportunity to verify that the information the

4  budget committee is using to evaluate their salaries is

5  accurate?

6      A.    If the information that the budget committee is

7  using is accurate, if the information that they're using

8  to evaluate is accurate, I've never thought about that

9  question.  I don't know what I think about it.

10      Q.    Well, why don't you think about it right now.

11  Do you think that the faculty member should have the

12  opportunity to verify that the information the budget

13  committee uses is accurate?

14              MR. GIBSON:  Objection, calls for

15  speculation.

16      A.    Well, I think there's a couple of

17  considerations there.  As I mentioned, I'm not sure that

18  the faculty members don't have that opportunity.  But if

19  you're asking whether they should, there's a question

20  of, of course, confidentiality and the deliberations of

21  the committee itself.  We want the committee members to

22  be able to honestly evaluate people so we don't make

23  budget committee meetings open to the -- to members of

24  the faculty so that they can come witness our

25  deliberations, particularly our deliberations about

1 people other than them.

2    Q.  (By Mr. Walsh)  Yeah, but I'm just asking about

3 the information the budget committee uses to make those

4 evaluations.

5    A.  Right.

6    Q.  You don't think that that is something the

7 tenured faculty should have a say in at least in terms

8 of verifying that it's correct?

9    A.  Well, that's where I'm going.  I'm saying to

10 the extent that that information reveals confidences,

11 then I'm not sure.  This particular --

12              [Simultaneous speaking]

13    Q.  [Indiscernible] just about this chart right

14 here.  Is there anything on here that's confidential?

15    A.  Not really, no.  I think that it's. . .

16    Q.  So why shouldn't the faculty member be allowed

17 to verify whether the information on this chart is

18 correct?

19           MR. GIBSON:  Objection, calls for

20 speculation.

21    A.  Well, the members of the faculty I know can get

22 access to their -- other members' salaries, so any

23 member of the faculty could create this chart.  Whether

24 they should have access to the chart, that's not my call

25 to make.  I guess I could say I don't see any particular

1 reason why they shouldn't have access to that chart.

2    Q.  (By Mr. Walsh)  So I'm zooming in here a little

3 bit.  I don't know if you're going to be able to see

4 this that well.

5    A.  Yeah, I see it much better now that you've

6 zoomed in.

7    Q.  So here we have LSM, which are the initials for

8 Professor Mullenix.  Do you see that?

9    A.  Where is it again?

10    Q.  Right here where my curser is.

11    A.  Oh, yeah, right there.  WEF is right over it,

12 okay.

13    Q.  Right.  This is the total years teaching, and

14 if you go down to the bottom here what you see is it

15 lists her as, I don't know, maybe 36, 37 years of

16 teaching?

17    A.  Uh-huh.

18    Q.  And if you look over here you have Robert Bone

19 and DMR, which looks like in the same line.  And based

20 on this chart, if you go down to the bottom it looks

21 like they have more teaching experience.

22    A.  Yes.

23    Q.  Okay.  Do you know whether that's accurate?

24    A.  I assume that it's accurate.  I won't vouch for

25 it.

1    Q.   Well, I mean, you use this to base decisions on

2  salary.  Don't you think you should be sure if it's

3  accurate or not?

4    A.   Well, I think it's accurate.

5    Q.   All right.  That's what I was hoping you'd say

6  because now I'd like to show you Professor Mullenix's

7  resume.  So here's Professor Mullenix's resume.  And if

8  you go down here, you see that she started teaching at

9  Loyola of Los Angeles Law School in 1982.  And so then

10  if you do 1982 to 2019, you get 37 years.  If this chart

11  was created in 2020, and I'm talking about the scatter

12  shot chart, you would get 38 years.  Do you agree?

13    A.   I don't have any basis for knowing whether

14  that -- the Loyola teaching is accurate.  But if it's

15  accurate, that seems right.

16    Q.   All right.  So putting aside the fact that a

17  tenured law professor might be lying on her resume, you

18  would agree that that would be 37, 38 years?

19            MR. GIBSON:  Objection, calls for

20  speculation.

21    Q.   (By Mr. Walsh)  Depending on when the chart was

22  created?

23            MR. GIBSON:  Same objection.

24    A.   1982 to 2020 would be 38 years.

25    Q.   (By Mr. Walsh)  Right.  And then if you go down

1  to the bottom of her resume, just watch me scroll,

2  you'll see that she also taught elsewhere.  She taught

3  at American University, George Washington, Georgetown,

4  Fordham, going back --

5      A.   It says she's a fellow at Georgetown.  Is that

6  where she -- I don't know it would be teaching.  I'm

7  just having trouble reading it.

8      Q.   The course listed is legal research and

9  writing.  You don't think she taught that?

10          MR. GIBSON:  Objection, calls for

11  speculation.

12     Q.   (By Mr. Walsh)  But then if you go down to the

13  University of Maryland, you see that she was instructor

14  of political science in 1974.

15     A.   Yeah, I don't know that we -- I remember a

16  debate about this years ago, about what we take as

17  teaching, whether it's at law schools or not law

18  schools, so I'm not sure about that.  I just don't

19  remember how we resolved that.

20     Q.   You're the chair of the budget committee.  How

21  does the budget committee determine teaching years?  Is

22  it total teaching years like it says --

23               [Simultaneous speaking]

24     A.   We made -- we made a decision about that years

25  ago.  I think in connection with Professor Mullenix and

1  I think maybe Professor Dammann we had a similar
2  question about and we made a determination.  I guess --
3  I'm pretty sure it was the committee made a
4  determination about it, but I don't remember the -- how
5  we resolved it.
6      Q.   Okay.  Well, let's say just for the sake of
7  argument that it is just legal experience.  We all saw
8  that she started teaching in 1982, for Professor
9  Mullenix.  Do you agree?
10     A.   That's what the resume said.  I don't think
11 that she was probably lying about it, so yeah.
12     Q.   Well, I mean, so then if you go to Professor
13 Bone, and this is Professor Bone's resume, you go down
14 to where his experience is, it looks like he didn't
15 become an assistant professor of law until 1983, which
16 would have been a year after Professor Mullenix started.
17     A.   Yes.
18     Q.   Okay.  So then if you go back to the chart.
19     A.   Can you make it big again?
20     Q.   Yes.  You'll see that Professor Bone is listed
21 as having more teaching experience than Professor
22 Mullenix.  Even if you just discount all of her
23 undergrad teaching since 19- -- since the '70s, even
24 just looking at the law school teaching, this chart is
25 inaccurate and Professor Mullenix should be over here

1  where my curser is about.

2      A.   If what you're saying is accurate and we made

3  our -- I did the subtraction accurately, I suppose so.

4  I don't know.  I'd have to look into -- to that in more

5  detail, but that seems right.

6      Q.   Okay.  So don't you think Professor Mullenix

7  should have the opportunity to have that corrected for

8  future budget committee deliberations?

9      A.   Yeah, if it's wrong I think she should.

10     Q.   Okay.  So how does that -- how does teaching --

11  years of total teaching affect salary decisions at U.T.?

12     A.   Well, very slightly.  It only determines where

13  on this chart you are really.

14     Q.   Well, it determines your cohort, though,

15  correct?

16     A.   Yeah, to some extent that's right.  But if we

17  move Linda over a couple of years, that's not going to

18  make any significant difference in terms of evaluating

19  where she stands in her cohort.

20     Q.   Well, sure, but doesn't it -- I guess when

21  you're making determinations about whether or not

22  somebody should be moved up or down in their cohort,

23  right, what do you look at?

24          MR. GIBSON:  Objection, misstates the

25  prior testimony.

1    A.    Look at the -- this year's teaching,

2 scholarship, and service.

3    Q.    (By Mr. Walsh)  Okay.  But you also said that

4 you do a review to determine whether or not people need

5 to be moved up or down because of dislocation due to

6 other raises, right?

7    A.    Yes.

8    Q.    Is that a holistic review or is that just based

9 on the previous year?

10    A.    Oh, it's based on just the previous year, what

11 we have now.

12    Q.    Okay.  So does the budget committee ever do a

13 holistic review of faculty members?

14    A.    We do a six-year review, as I mentioned, for a

15 group of faculty members every six years, but we do -- I

16 mean, we do it every year but we're looking at six

17 years' worth of scholarship, not holistic over their

18 entire careers.  No, we don't do that.

19    Q.    Okay.  You've never done that as a faculty

20 member -- I mean on the budget committee?

21    A.    Done a holistic review looking at each faculty

22 member over their entire careers?

23    Q.    Right.

24    A.    Yes, we've not done that.

25    Q.    Well, then, so how do you determine based on

1 the previous year only whether somebody should be moved

2 up or not?

3       MR. GIBSON:  Objection, misstates prior

4 testimony.

5   Q.  (By Mr. Walsh)  In terms of their place within

6 their cohort?

7       MR. GIBSON:  Objection, misstates prior

8 testimony.

9   A.  All I can say is we look at the chart and we

10 say, you know, this person probably, given this year,

11 deserves a higher raise than that.  The other thing, we

12 did go into this, somebody gets an offer from another

13 school and we match that offer, so they wind up getting

14 put higher up, right.  Then we start thinking about,

15 well, look at this, we need to -- we value this person

16 who is now lower than that person highly or at least as

17 highly as that person based on their scholarship,

18 teaching, and service, and we think maybe that person

19 should get a bigger raise.

20   Q.  (By Mr. Walsh)  Now, you said that you do that

21 evaluation in the next few years.  Is that right?

22   A.  What do you mean in the next --

23   Q.  In the next several years you decide that this

24 person needs to be moved up?

25       MR. GIBSON:  Objection, misstates prior

1 testimony.

2     A.   We do it based on what we've learned this year.

3     Q.   (By Mr. Walsh)  Okay.  Well -- okay.

4 Previously you had testified that you would look at

5 where somebody was within their cohort, within this

6 chart, and you would decide whether or not offering them

7 a higher raise, say, to keep them at U.T. Law would

8 dislocate folks so that you needed to raise the salaries

9 of the other people around that person.  Is that right?

10     A.   That we would -- yeah, we would face that

11 possibility if we offered this person that higher salary

12 than the one that's --

13     Q.   So when would the decision to raise the other

14 people's salaries take place?

15     A.   It would come in subsequent year evaluations,

16 not during the year -- the subsequent year.

17     Q.   So why not do that immediately?

18     A.   I think it probably has to do with budgetary

19 considerations.  I don't know how -- I guess the offers

20 that somebody departing would get would be for a

21 subsequent year.  So while we don't do it immediately at

22 that point and just sort of iron everything out at that

23 point, I don't know.  Probably just because it would

24 take a whole lot of time and we're going to be doing it

25 or looking at it when we do that spring's evaluations.

1    Q.   So doesn't that mean that some professors are

2  not being paid equally to other professors?

3    A.   I don't know what you mean by equally.  We're

4  not all getting the same salary, that's for sure.

5    Q.   Right.  But you agree that there are certain

6  faculty members who should all be kind of grouped

7  together, right?

8            MR. GIBSON:  Objection, misstates prior

9  testimony.

10    A.   I say the budget committee looks at cohorts,

11 people that are, according to either years in teaching

12 or years past their JD, in the same -- in the same

13 group.  But we don't treat them all equally, no, in any

14 cohort.

15    Q.   (By Mr. Walsh)  Right.  But you did say that

16 there is attention paid to where they all stand in

17 relation to those factors, right?

18    A.   Yes.

19    Q.   And sometimes you look at that and you say oh,

20 well, we need to move up these other professors, right?

21    A.   Move up one or more.

22    Q.   Right.  In a subsequent year?

23    A.   Yes.

24    Q.   Okay.  So then for that year it seems like

25 these professors are not being paid equally and the

1 university knows it?

2          MR. GIBSON:  Objection, calls for

3 speculation.

4     A.   They're not being paid the same, that's true.

5 They're being paid different salaries.

6     Q.   (By Mr. Walsh)  Right.

7     A.   And they're not being paid equally.

8     Q.   Okay.  I guess then why move them up ever?

9          MR. GIBSON:  Objection, calls for

10 speculation.

11    A.   Well, when we move them up it's always based on

12 that year's performance.  But when we do it at the end

13 of the process and we look at that scatter shot and we

14 see that somebody for whatever reason is sort of out of

15 line, then we say, well, in terms of scholarship,

16 teaching, and service we think this person or that

17 person ought to be up a little more.  And it's a

18 judgment -- it's a judgment call based on what we learn

19 that year on scholarship, teaching, and service.

20    Q.   (By Mr. Walsh)  But again, it seems like

21 there's at least a year in which U.T. Law is not paying

22 these certain professors what they value those

23 professors at?

24          MR. GIBSON:  Objection, misstates prior

25 testimony.

1      A.   No, that's what I was saying.  I think that

2   that isn't the case.  When somebody comes in in the fall

3   with an offer from another school, I think that's what

4   we're talking about here, right, they come in with an

5   offer, that's going to be for the next fall, okay.  So

6   in the spring -- so we may say, okay, you have this

7   range to work with or we recommend this range, Dean.  He

8   makes that recommendation to Richard Albert or whoever,

9   and in the spring we'll know that and we'll take that

10   into account as we're looking at other people's salary.

11   So Richard never got that higher salary until that fall

12   when all these others are going to be getting whatever

13   salaries we recommend and the dean accepts for that

14   fall.

15              So they're all going to be evaluated

16   equivalently.  It's not equally but they'll be evaluated

17   for the same time period.

18      Q.   (By Mr. Walsh)  What is an equity raise?

19      A.   That was something we did -- I don't know that

20   we've done it recently, but there was a time after the

21   Sager years where when we looked at the -- at the

22   information like that scatter chart that we said these

23   people are out of line here for.  And then I guess -- so

24   maybe I should amend my testimony somewhat.  Then I

25   think we did go look back over a few years.

1                    At the time we did several equity raises

2  right after the end of the Sager years when we had an

3  acting dean and maybe even a year or so into the

4  Farnsworth era.  I can't say for sure about that.

5  But -- and mostly then we were looking at female faculty

6  members and adjusting their pay upward for what we

7  regarded on the budget committee as equity reasons

8  because it seemed like over the past they had not

9  received what we now think they were entitled to.

10     Q.   What does that mean, they weren't receiving

11  what you think they were entitled to?  How did you

12  determine what they were -- that they weren't receiving

13  that?

14     A.   I don't recall all the considerations that went

15  into it at that point.  It's been a while.

16     Q.   And -- okay.  So is it your testimony that you

17  guys have not -- that the budget committee has not

18  proposed equity raises recently?

19              MR. GIBSON:  Objection, misstates prior

20  testimony.

21     A.   No, I just -- I recall them, particularly with

22  respect to that time period.  I think we have talked

23  about -- we may have talked about equity raises since

24  then.  I think to some extent these faculty incentive

25  programs that were -- came from the university, faculty

1  development incentives.  I think to some extent when we

2  were making recommendations about who should be awarded

3  or be placed into that category, equity may have been a

4  consideration.  I think that the dean thought or said

5  that the university thought that equity ought to be a

6  consideration.  It was mostly about retention, as I

7  recall, but I think we may have used equity as a

8  consideration there as well.  So that would have been

9  more recently.

10     Q.   (By Mr. Walsh)  Okay.  Let's see.  Okay.  So

11  now I want to talk about how the budget committee

12  evaluates professors for their annual review.  Which is

13  the main function of the budget committee, correct?

14     A.   That's correct.

15     Q.   Okay.  So --

16     A.   Let me modify that.  We have two basic

17  functions.  One is to make that evaluation with respect

18  to compensation to the dean, but at the same time we are

19  performing an equally important service to the

20  university by providing an evaluation, an annual

21  evaluation, to the university.

22     Q.   Okay.  Now, the university evaluation is just a

23  number rating, right, 1, 2, or 3?

24     A.   4.

25     Q.   Or 4.  What do those correspond to?

1    A.    I was trying to -- if you got that memo, that

2 would remind me.  But a 1 is above expectations, 2 is

3 meets expectations, 3 is below expectations.  And 4, I

4 can't remember the name of it but it's not performing

5 adequately or something along those lines.

6    Q.    And in your time on the budget committee have

7 you ever rated anybody a 1, or exceeds expectations?

8    A.    No, never done that.

9    Q.    Why is that?

10    A.    I think when this was -- first came down from

11 the university, I think it was in -- really it came down

12 from the legislature.  And so when it came down from the

13 university we thought about it, said, well, we have high

14 expectations for all of the faculty; if we get into

15 rating somebody as above expectations, we're going to

16 have a whole lot of complaints from people who just met

17 expectations that weren't above expectations.  And so

18 our thinking is that we'll just leave it at more of

19 pass-fail basis, if you want to call it that.  But we'll

20 see if people meet expectations.

21            And what we're more concerned with is

22 their below expectations or below that even where

23 improvement is needed, where I think our focus is more

24 on the need for improvement than on rewarding somebody

25 by calling them above expectations and then inviting

1  complaints from faculty members who weren't evaluated

2  above expectations.

3      Q.   Okay.  And the committee rates tenured faculty

4  with a different system, not with a number system,

5  correct?

6      A.   Yeah, that's correct.  In terms of advising the

7  dean?

8      Q.   Yeah.

9      A.   For salaries?  Yes.

10     Q.   Okay.  How does that work?

11     A.   Well, in recent years it's been -- we have

12  something we call -- the dean will come in with kind of

13  baseline raises.  And that, again, varies on where on

14  the chart you are in terms of what that baseline raise

15  might be, and that of course depends on whether there's

16  going to be raises available to the law school, and most

17  years there are.

18          So we have this sort of nomenclature that

19  we've used for several years.  We look at the overall

20  scholarship, teaching, and service and say, well, is

21  this baseline, is this person performing about where

22  they deserve the baseline raise for their cohort and/or

23  should it be above baseline or below baseline.  We've

24  even graded -- as a further gradation we talk about,

25  well, baseline plus or baseline minus, baseline plus

1 being between baseline and above baseline and baseline

2 minus between baseline and below baseline.  And so we

3 use that nomenclature these days.

4     Q.   In terms of setting the baseline, you said that

5 it varies depending on where somebody is at U.T. Law.

6 Is that what this chart is here?  Or I guess it's

7 divided --

8     A.   I think it -- I think that chart roughly gets

9 at it, yeah.

10     Q.   Okay.  So it's based on like how many years of

11 teaching you've been doing in terms of like where the

12 baseline is, or is it based on amount -- or is it based

13 on salary amount?

14     A.   No, no, it's based on where you are in teaching

15 or in -- I don't remember whether it's teaching or years

16 out or some combination of the two.  But the dean does

17 that.

18     Q.   Okay.  Now, do you know what the raises -- the

19 baseline raises are going to be before you recommend

20 somebody as baseline, baseline above or below?

21     A.   No, generally not, because those don't come in

22 from the university until like May and we're pretty much

23 done with our work by the end of May or by the beginning

24 of May.

25     Q.   You said there's different baselines.  Does the

1  cohort for each different baseline change every year or

2  is it constant?  I guess maybe that was a terrible

3  question.  Let me sort of put it this way.  Are they the

4  same -- let's say that there's like three or four

5  different baselines.  Are the same professors in each

6  baseline category every year or is there movement?

7      A.   No, there's movement I think.  As you get

8  further out, then you're in a different baseline

9  category.

10     Q.   Well, so do you know who's within each baseline

11 cohort when you're recommending a baseline?

12     A.   When we come in with baseline, baseline plus,

13 baseline minus, no, I don't think we know.  We know when

14 the -- at one point we probably approved the dean's

15 allocation of who was in what cohort or area, but I

16 don't think we do that every year.  I know we haven't

17 done it this year.

18     Q.   Now, you said the dean comes back with

19 particular dollar amounts, the baseline raises.  Is that

20 right?

21     A.   That's right.

22     Q.   Okay.  So the budget committee does not

23 recommend particular dollar amounts?

24             MR. GIBSON:  Objection, misstates the

25 record.

1    A.    No.  At that point when he comes in with

2  these $4,000 is baseline for this group, 3,000 for this

3  group, 2,000 for this group, we don't know when we're

4  making those recommendations where -- where he's going

5  to wind up with his salaries, no.

6    Q.    (By Mr. Walsh)  But you are told eventually

7  what baseline is, what baseline -- or below baseline and

8  what above baseline corresponds to in dollar amounts?

9    A.    Yeah, we do get -- finally we have a meeting

10  where we sit down with actual dollar amounts for

11  everyone other than the members of the committee and

12  we -- and that's where we look at that and we look at

13  the scatter chart and we make any adjustments or

14  recommendations for adjustments that we think we would

15  like to recommend.

16    Q.    Now, you said that you would have particular

17  budget meetings for -- or you would have meetings where

18  you would evaluate specific professors' background,

19  correct?

20    A.    Yes.

21    Q.    Tell me about how those meetings take place and

22  what happens there.

23              MR. GIBSON:  Objection, vague and

24  ambiguous.

25    A.    Well, they typically are two hours, maybe three

1 hours, and the chairman circulates a list of these are

2 the people we're going to take up this meeting and we

3 may get to all of them, we may not, but here's the list.

4 And we proceed seriatim down the list.

5      Q.   (By Mr. Walsh)  Well, so when you first call

6 the meeting, does the chair speak, does Dean Farnsworth

7 attend these meetings?

8      A.   Oh, yes.  He's pretty much there all the time.

9 Once --

10     Q.   Does he --

11               [Simultaneous speaking]

12     A.   -- in a while he has to leave --

13     Q.   -- [indiscernible] introductory remarks?

14     A.   I'm sorry?

15     Q.   Does Dean Farnsworth make any introductory

16 remarks?

17     A.   When I was chairman I always invited him to.

18 He would sometimes, most of the time not when I was the

19 chairman of the committee, and so I was the one that ran

20 the meeting.

21     Q.   You said he was there all the time?

22     A.   Yes, it's important that the dean be there to

23 hear our deliberations.  Sometimes he's had to absent

24 himself because some emergency comes up or something,

25 but no, the effort is made.  I don't schedule a meeting

1  if the dean can't be there.  In fact, again, I'm talking

2  in the past tense here when I was the chairman, but I

3  would deliberate with his assistant who ran his calendar

4  and we would see the times that he was available and

5  that's the times we'd offer to the faculty members on

6  the committee.

7      Q.  Okay.  Does Dean Farnsworth ever offer his

8  opinion on the professors that are being discussed?

9      A.  Very rarely.

10     Q.  What professors has he offered opinions on?

11     A.  I can't remember one.

12     Q.  You said very rarely which indicates that he's

13  done it, right?

14     A.  Well, that's -- again, that's me being cautious

15  because I don't ever say never because then somebody

16  will say, well, you did it this time.  But if it

17  happens, it happens fairly rarely, very rarely, as we're

18  doing our deliberations.  Now, he of course talks about

19  specific professors when he asks us to advise him with

20  respect to some offer that's being made from some other

21  school or something.  That happens, but in our -- you're

22  asking me about the general meetings.  In the general

23  meetings the dean is usually pretty quiet and he takes

24  notes and the chairman takes notes.

25     Q.  You said once again he's usually pretty quiet

1 indicating that he does contribute.  Who has he talked

2 about?

3          MR. GIBSON:  Objection, misstates the

4 record.

5     A.   Just individual people that he's talked about?

6     Q.   (By Mr. Walsh)  Yes, please.

7     A.   Again, during our deliberations, not -- you

8 mean just in any meeting of a general meeting?

9     Q.   Well, I'm asking just about deliberations, but

10 then my very next question is going to be just in

11 general meetings.

12          MR. GIBSON:  Objection, compound question.

13          MR. WALSH:  No, I was just foreshadowing,

14 Darren.

15    A.   All right, that's fine.  I'm just trying to

16 recall.  Once in a while he fills us in with information

17 that we're unaware of.  I'm thinking, for example, David

18 Adelman, his wife has some position somewhere like at

19 the law school -- I mean at the LBJ School and that's

20 something that the law school has contributed to and so

21 we are to consider that.  I just remembered that one.

22          I think there's something with Michael

23 Sturley perhaps as well and I'm not sure about that.

24 But once in a while he fills us in with information that

25 we're unaware of or that he deems us to be unaware of.

1 I don't know, I was unaware of.  He told the committee

2 about this lawsuit, for example.

3     Q.  (By Mr. Walsh)  What did he say about this

4 lawsuit?

5     A.  That it -- that it existed but that is about

6 it.

7     Q.  Did he say anything else about it?

8     A.  Not that I can recall.

9     Q.  Why did he tell the committee or why do you

10 think he told the committee about this lawsuit?

11           MR. GIBSON:  Objection, calls for

12 speculation.

13     A.  I think he just wanted us to be informed.  I do

14 recall something he said.  He said, And this should not

15 affect your deliberations at all.

16     Q.  (By Mr. Walsh)  Did the committee discuss the

17 lawsuit?

18     A.  No.

19     Q.  So he just came there and he said there's a

20 lawsuit and that was the last time it was mentioned?

21           MR. GIBSON:  Objection, misstates prior

22 testimony.

23     Q.  (By Mr. Walsh)  Is that correct?

24     A.  No, he said that we've been -- that we're

25 supposed to preserve our records and not be throwing

1 away things.

2      Q.   Did you preserve your records?

3      A.   Yes.

4      Q.   Why did he need to tell you to preserve your

5 records?

6           MR. GIBSON:   Objection, calls for

7 speculation.

8      A.   I don't know why he felt like he needed to tell

9 me to do that.

10     Q.   (By Mr. Walsh)  Does the budget committee

11 normally destroy its records after it meets?

12     A.   Some records are destroyed, yeah.

13     Q.   Which records?

14     A.   I think like the -- well, I don't know.  He

15 distributes things to the committee or sometimes the

16 chair does.  No, mostly from the -- the dean does.  I

17 think it's his recommended salary raises, that when it

18 comes in toward the end and we look at them and then he

19 asks us to give them back because those are preliminary.

20 And then I think we may have another meeting where he

21 gives us the final ones, so I think those may get

22 destroyed.  I don't know what happens to them.  Well, we

23 turn them back in.  That's about it, though.  I mean,

24 the big binders we get, that's all turned back in.  I

25 don't know whether they get destroyed or preserved or

1 whatever.  Once I got notice about this lawsuit I saved

2 everything.

3    Q.   Did Dean Farnsworth say why he wants you to

4 turn back in his proposed raises?

5    A.   No, I don't think so.

6    Q.   Why do you think he asks for you to turn those

7 sheets of paper back in?

8             MR. GIBSON:  Objection, calls for

9 speculation.

10    A.   Again, we're right back to that why do I think

11 he thinks something.  I think that since they are not

12 the final determination, that they're pretty much

13 irrelevant and I guess he -- he wants it to remain

14 confidential as part of the committee's deliberations.

15    Q.   (By Mr. Walsh)  Does Dean Farnsworth during

16 these deliberations ever express his opinion of the

17 professor being discussed?

18             MR. GIBSON:  Objection, asked and

19 answered.

20    A.   As I said, very rarely.

21    Q.   (By Mr. Walsh)  Can you think of anyone

22 besides -- well, yeah, besides Adelman and Sturley?

23    A.   And that wasn't his opinion, so I want to

24 correct the record there.

25    Q.   Oh, no, excellent point.  Let me ask you then

1 this.  Who has he expressed an opinion on?

2           MR. GIBSON:  Objection, vague and

3 ambiguous.

4     A.   I guess I can think of maybe -- I'm thinking an

5 opinion with respect to scholarship, service or -- you

6 know, I'm trying to think.

7     Q.   (By Mr. Walsh)  Yeah, we can do that.

8     A.   I think Susan Klein.

9     Q.   And what did he say?

10    A.   I'm trying to remember.  We had a discussion

11 about her teaching, called a special meeting at the

12 beginning of last year.  I don't know if it was

13 [indiscernible].  She had a bad experience and he was

14 asking our advice as to whether he should remove her

15 from the course that she was teaching.

16    Q.   And what was his opinion?

17           MR. GIBSON:  Objection, calls for

18 speculation.

19    A.   My impression was that that's what he was

20 considering doing, but he wanted to hear what we thought

21 before he did it.

22    Q.   (By Mr. Walsh)  And what was the opinion of the

23 budget committee?

24           MR. GIBSON:  Objection, calls for

25 speculation.

1      A.    Of those members that were there, I think it

2  was -- this was in the -- of the people that were there

3  in the room, I'm trying to remember.  I don't think the

4  whole committee was able to make it because it was an

5  emergency meeting.  I think there was disagreement and I

6  don't think it was resolved.  I don't think the

7  committee -- I think we just each expressed our view and

8  left it at that.

9      Q.    (By Mr. Walsh)  What was your view?

10      A.    My view was that he should remove her.

11      Q.    And why was that?

12      A.    Well, he actually played a tape of the class

13  that had been recorded.  It didn't seem --

14      Q.    And what happened?

15      A.    I can't remember all the details of it.  It

16  seemed unprofessional.

17      Q.    Any other professors about whom Dean Farnsworth

18  has expressed an opinion?

19      A.    Yeah, now that I think about it, when we talk

20  about service, often the dean is the one in the best

21  position to know about service presented -- or I'm just

22  thinking of one example.  John Dzienkowski serves on the

23  appointments committee and the dean told us that John's

24  service was good, I don't know the precise words he

25  used, but he flies all over the country helping with the

1 appointments committee. And that's something we

2 probably wouldn't know, but I think it was an opinion of

3 John when he said that. So it would be occasions like

4 that where he, again, is filling in the committee on

5 something that we might otherwise not know about the

6 faculty member.

7      Q.   Anyone else?

8      A.   I remember he was very praiseworthy of Steve

9 Goode the year that Steve served on the university

10 committee that dealt with whether we're going to have

11 guns on campus or how we were going to deal with that.

12 These are just discussions now I'm just drawing on my

13 memory.

14      Q.   When was that?

15      A.   That was probably about three or four years

16 ago, whenever that committee was meeting.

17      Q.   Anyone else?

18      A.   I'm just thinking of things -- I'm just trying

19 to -- there's probably -- there probably have been more

20 than that, but I'm just not immediately calling them to

21 mind. Let me just think again.

22      Q.   Do --

23      A.   I'll tell you another thing that -- where he

24 might chime in. Mostly this is Bobby Chesney, who's the

25 associate dean, would make this kind of comment, but

1 when we talk about a teacher who teaches a lot of

2 students and would be hard to replace -- now, that's

3 mostly Bobby, though, that makes those kind of

4 assessments, not so much the dean. So -- but it may be

5 that the dean once in a while would say yeah, I agree

6 with Bobby that this person would be hard to replace.

7     Q. Has Dean Farnsworth ever expressed an opinion

8 about Professor Mullenix during budget committee

9 deliberations?

10     A. Not that I can recall.

11     Q. Has Dean Farnsworth ever expressed an opinion

12 about Professor Bone during deliberations?

13     A. Well, Professor Bone is on the committee and he

14 may have, in the kind of banter that goes on, have said

15 something about him, but I don't recall any particular

16 instance of it, no.

17     Q. And what about Professor Westbrook?

18     A. Not that I can recall.

19     Q. What about Professor Rabban?

20     A. No, not that I can recall.

21     Q. What about Professor Levinson?

22     A. I think at one point with respect to Sandy he

23 explained, and he may have done this more than once,

24 Sandy's deal with Harvard. So he may have actually

25 mentioned Sandy specifically in that connection in

1 explaining the nature of that arrangement that Sandy has

2 with Harvard, which is still unclear in my mind.  I've

3 never been real clear about that.

4     Q.   Anything else?

5     A.   No, not that I can. . .

6     Q.   What about Professor Hu -- or Hu

7 [pronunciation]?

8     A.   A lot of this is based on my most recent

9 recollections.  We've just been through a bunch of these

10 folks and I don't recall him saying anything about

11 Professor Hu either.

12     Q.   So let me -- because I'm noticing a pattern

13 here, let me go ahead and ask.  What about have you ever

14 heard Dean Farnsworth express an opinion about

15 Professors Powe, Peroni, Forbath, Steiker, Silver, or

16 Wickelgren?

17          MR. GIBSON:  Objection, compound question.

18     A.   Run through those again.  I'm trying to be as

19 perfectly honest as I can here.

20     Q.   (By Mr. Walsh)  Professor Powe -- I'm sorry,

21 Powe?

22     A.   Powe?

23     Q.   I'm sorry, Professor Powe.

24     A.   He mentioned -- I think this is in connection

25 with a budget committee meeting.  I know he communicated

1  this to me.  I can't absolutely swear that it was in a

2  budget committee meeting, but I heard him say that he

3  had arranged -- because Scott just hadn't been

4  publishing much and that was a concern to the committee

5  and the dean told us he had arranged to -- with Scott,

6  he said I'll bring in a bunch of professors, however

7  many you want to come in to talk about your idea for a

8  book about the Texas constitution, that so many lawsuits

9  involving the United States constitution originated in

10 Texas.  Because I think Dean Farnsworth -- again, I

11 can't know what's going on in his head, but I got the

12 impression that he wanted to get Scott back active

13 again.

14             And so he did that, he brought in three or

15 four law professors to talk over this idea.  And he told

16 us that Scott was -- had agreed and he was working on a

17 book.  So I do remember him talking about Scott.

18     Q.   What about Professor Peroni?

19     A.   No, I can't recall anything with respect to --

20 anything particular the dean said about -- regarding --

21     Q.   This arrangement that Dean Farnsworth made with

22 Professor Powe, has he done that for any other

23 professors?

24             MR. GIBSON:  Objection, calls for

25 speculation.

1    A.    I don't know.  I can tell you that he offered

2  to do it for me if I wanted to and I haven't done it,

3  but I think he would probably offer to do that for any

4  faculty member that -- if it would get them stimulated

5  and think about writing a book.

6    Q.    (By Mr. Walsh)  So how would -- did he come up

7  to you with that idea or did you go to Dean Farnsworth

8  with that idea?

9    A.    I had a meeting with -- this isn't anything to

10  do with the budget committee meeting, but I had a

11  meeting with Dean Farnsworth over breakfast one time

12  where we were talking about what my -- I don't remember

13  all we were talking about, but I told him about this

14  book that I had in mind, it's actually the one I'm

15  working on right now, and said if you want me to bring

16  in some folks to talk about the book, if that would help

17  you get started with it or get some ideas about it I can

18  do that.  And I didn't take him up on it, but he did

19  make that offer.

20    Q.    And has he told the committee or told you about

21  any other professors he's made that offer to?

22    A.    That's what I can't remember, whether he's -- I

23  have this -- well, that's kind of a -- I have an

24  impression that he -- well, but he's never told me

25  specifically that he has.  I wouldn't be surprised if he

1 hadn't. I mean, it wouldn't surprise me to know that he

2 hadn't done -- made similar overtures to people.

3    Q.   What about Professor Forbath, has Dean

4 Farnsworth ever expressed an opinion to you or the

5 budget committee about this --

6    A.   Yeah.  Yeah, with respect to Dean Forbath or

7 Associate Dean Forbath, when we evaluate his service, of

8 course, part of his service is that he's the associate

9 dean for research and the dean will give us his

10 impression of what Willie has been doing with respect

11 to -- and here's where we have nontenured faculty

12 members.  One of Willie's responsibilities is to work

13 with those nontenured faculty members to make sure that

14 they're -- they feel comfortable, they're getting all

15 the support they need for their research.  So the dean

16 will report to us on his impression of how Willie's been

17 performing in that capacity.

18    Q.   And what is the dean's impression of how

19 Professor Forbath has been performing in that capacity?

20         MR. GIBSON:  Objection, calls for

21 speculation.

22    A.   Let's see, there was a couple of years where we

23 didn't have untenured faculty members, but I guess

24 generally my recollection is that it's been favorable,

25 that Willie has done a good job.

1    Q.   (By Mr. Walsh)  What about Professor Steiker?

2    A.   No, not anything that I can recall.

3    Q.   What about Professor Silver?

4    A.   No, not anything I can recall.

5    Q.   What about Professor Wickelgren?

6    A.   No, that I can recall.

7              THE WITNESS:  I think I'm about ready for

8    another break.

9              MR. WALSH:  I was just going to suggest

10   why don't we go off the record.

11             MR. GIBSON:  Sounds great.  One hour for

12   lunch?

13             MR. WALSH:  Yeah, let's do one hour for

14   lunch, 1:17.

15             THE VIDEOGRAPHER:  We are off the record

16   at 12:17 p.m.

17             (Recess taken from 12:18 p.m. to

18   1:20 p.m.)

19             THE VIDEOGRAPHER:  We are back on the

20   record.  The time is 1:20 p.m.

21   Q.   (By Mr. Walsh)  All right.  We're back after

22   lunch.  Before lunch we had been talking about the

23   budget committee process and whether or not Dean

24   Farnsworth had mentioned anything specific about a

25   number of different tenured faculty.  So that was during

1  deliberations.  So now I want to ask, the people that we

2  talked about was Bone, McGarity, Westbrook, Rabban,

3  Levinson, Hu, Powe, Peroni, Forbath, Steiker, Silver,

4  and Wickelgren.  Is there anyone besides those that Dean

5  Farnsworth has mentioned during deliberations of the

6  budget committee?

7          MR. GIBSON:  Objection, misstates the

8  testimony.

9     A.   Let me think.  He lets us know when somebody

10 has entered into a retirement agreement.  So to that

11 extent I'm trying to think of who that might have been.

12 I think there's one with Lynn Blais, for example, and he

13 would tell us that that had happened.

14    Q.   (By Mr. Walsh)  Why would the budget committee

15 need to know whether somebody has entered into a

16 retirement agreement?

17    A.   Well, we don't really need to evaluate their --

18 I'm trying to think of whether we actually do the

19 full-scale evaluation or not on them.  I think that's

20 the reason, that we don't need to do the full evaluation

21 because they are -- they will be retiring or are

22 retiring.

23    Q.   Does that mean somebody who is retiring just

24 the next year or would it be somebody who has like a

25 five-year phased retirement?

1          MR. GIBSON:  Objection, calls for

2  speculation.

3     A.   I'm not sure whether he mentions the phased

4  retirements or not.  It seems to me like it was just --

5  that we won't need to consider this person because

6  they -- there's an agreement as to what their pay is

7  going to be.

8     Q.   (By Mr. Walsh)  An agreement with Dean

9  Farnsworth?

10    A.   I guess.  I'm not sure.

11    Q.   Are there any other circumstances under which

12 the budget committee does not evaluate someone's

13 performance?

14    A.   No, we don't evaluate the librarian, Barbara

15 Bintliff.

16    Q.   Any other circumstances?

17    A.   Other than that they're leaving the faculty,

18 they're going to some other faculty, I can't think of

19 anything.

20    Q.   Okay.  What about faculty members who have the

21 faculty investment initiative funding?

22          MR. GIBSON:  I'm sorry, what's the

23 question?  There's no question.

24          MR. WALSH:  There was a question, Darren.

25 He was about to answer until you stopped him.

1          MR. GIBSON:  The question was what about

2  the faculty investment initiative.  If that's the

3  question, objection, vague and ambiguous.

4      Q.   (By Mr. Walsh)  You can go ahead, Professor

5  McGarity.  You know what I was talking about, right?

6      A.   You're wondering if --

7          MR. GIBSON:  Objection, calls for

8  speculation.

9      A.   I think you asked me about do we -- are there

10  situations which we don't evaluate someone and you

11  said -- and I take it the question is do we evaluate

12  people who are in the faculty investment initiative, and

13  the answer is yes.

14      Q.   (By Mr. Walsh)  Does that affect their pay

15  raises?

16      A.   No, because those are determined by the --

17  whatever the initiative provided for.

18      Q.   Okay.  Do you provide ratings for the people

19  who receive funds under the faculty investment

20  initiative?

21      A.   Yes.

22      Q.   Why provide a rating if it doesn't affect their

23  raise?

24      A.   Well, there are other -- one, there's other

25  reasons for keeping abreast of people's scholarship --

1 scholarship, service, and teaching.

2      Q.   What are the other reasons?

3      A.   The university needs the annual evaluation, and

4 there will be a six-year evaluation so it's nice to have

5 a running five-year measure as we do the six-year

6 evaluations.

7      Q.   Any other reason?

8      A.   I'm trying to think.  No, I think that's

9 basically it.

10      Q.   Okay.  So for the purposes of budget committee

11 deliberations, in 2020 what were the cohorts of

12 professors?

13           MR. GIBSON:  Objection, vague and

14 ambiguous.

15      A.   For what purpose are we talking about?

16      Q.   (By Mr. Walsh)  Determining salary or raises.

17 And of course I'm talking about the baseline

18 determination.

19      A.   I -- I don't recall.  I couldn't tell you.

20      Q.   Well, let me ask it this way.  Would professors

21 Bone, Westbrook, Rabban, and McGarity all be in the same

22 cohort?

23      A.   Certainly McGarity, Rabban, and Westbrook I

24 think would be in the same category.  I'm not sure what

25 side of the whatever line gets drawn there Bone would be

1 on, but perhaps.

2  Q. Well, what does that mean?  So which one would

3 McGarity, Westbrook, and Rabban be in?  Would that be

4 the top cohort?

5  A. We would probably be in that last category that

6 gets the lowest presumptive raises.

7  Q. Lowest presumptive raises.  How many different

8 categories are there?

9  A. I -- I can't recall.

10  Q. Well, how about -- you're on the budget

11 committee this year, right?

12  A. Yes.

13  Q. When was your last budget committee meeting?

14  A. Last Friday.

15  Q. So three days ago?

16  A. Yeah, three days ago.

17  Q. Did you evaluate any professors during that

18 meeting?

19  A. Yes.

20  Q. And do you know what cohort those professors

21 were in in determining --

22  A. No.

23  Q. No?  Did you make any baseline determinations

24 for them?

25  A. Yes, we made the baseline, above baseline,

1 baseline plus. We made those determinations, yes.

2     Q. Okay. But you don't know where they're going

3 to fall in the salary --

4     A. Not -- not till that comes in later in the year

5 when he brings in the cohorts with the baselines

6 assigned to them.

7     Q. Do you know how Dean Farnsworth decides to do

8 that?

9     A. No, I don't for sure. I have a vague

10 recollection that at one point we advised with respect

11 to the cohorts, but I'm not sure how that's done. It

12 may be that before he does that he asks us about where

13 he should be drawing the line. I just don't remember.

14     Q. Has he asked you this year where he should draw

15 the line?

16     A. No.

17     Q. All right. If I show you a list of faculty, do

18 you think you could tell me which cohort each person is

19 in?

20     A. I doubt seriously that I could.

21     Q. Why not?

22     A. I just don't remember where the lines are

23 drawn.

24     Q. What did you review to prepare for this

25 deposition?

1    A.    Not very much.  I went over a couple of my

2  files.

3    Q.    What files?

4    A.    My budget committee files, ones that I --

5    Q.    Oh, wouldn't that be one you would know, which

6  cohort somebody is in?

7    A.    Oh, no, I didn't look in that much detail.  I

8  basically looked at my -- read my evaluations that I had

9  done over a couple of years, just a couple of years, and

10  my -- and the memos that I wrote to the dean.

11    Q.    Oh, how did you decide what to go over?

12    A.    Just wanted to -- my own curiosity really.

13  Nobody told me to go over them or anything.

14    Q.    Do you keep notes?

15    A.    As the chairman?

16    Q.    Yeah.

17    A.    Yes.  I don't when I'm just a member of the

18  committee.

19    Q.    Did you go over your notes to prepare for this

20  deposition?

21    A.    No.

22    Q.    Is it because your memory is so good that you

23  didn't need to look over any notes?

24    A.    No, it's because I didn't have time.  I'm

25  trying to get a book out by the end of May.

1    Q.    Oh, I see.  I mean, you knew what this lawsuit

2  was about, correct?

3    A.    Just roughly, yes.

4    Q.    Have you ever looked at the lawsuit?

5    A.    No.

6    Q.    Why not?

7    A.    I have a lot to do and that just wasn't one of

8  the things that was at the top of my priority.

9    Q.    Even when you were noticed for a deposition it

10  wasn't a priority for you?

11    A.    No, not in terms of my scholarship and teaching

12  and other things that I do.

13    Q.    All right.  So what else besides your notes?

14    A.    By way of preparation?

15    Q.    Yeah.

16    A.    I had a meeting with the two lawyers that are

17  here in the room last, when was it, Saturday, a Zoom

18  meeting.

19    Q.    Did you meet with Dean Farnsworth?

20    A.    No.

21    Q.    Did you meet with any other budget committee

22  members?

23    A.    Dean Farnsworth was -- in that Saturday meeting

24  he was on briefly.  He entered the meeting on Zoom.

25    Q.    All right.  Did you meet with any other members

1  of the budget committee?

2     A.   No.

3     Q.   Did you talk with any other faculty members

4  about this deposition?

5     A.   No.

6     Q.   What professors were evaluated at the budget

7  committee on Friday?

8     A.   Now you're getting into my short-term memory.

9  Which ones were evaluated on Friday.  One of them I can

10  remember, it was me because I had to leave the meeting

11  for that evaluation.  Let's see, let me think a bit.

12  Either in this last meeting or the meeting before we

13  evaluated Professor Mullenix.  It may have been in this

14  last meeting.  We -- I'm trying to think of other

15  people.  I mean, these things I don't keep in my head.

16  I've got the e-mail from -- from the chairman of the

17  committee somewhere in my e-mails.  It said the ones

18  we --

19     Q.   When you go to a meeting you evaluate the

20  professors' scholarship, service, and teaching and then

21  you just forget about it immediately?

22          MR. GIBSON:  Objection, misstates the

23  record.

24     A.   Well, yeah, maybe not immediately, but by three

25  days later after I've been doing a lot of other things.

1    Q.   (By Mr. Walsh)  What have you been doing?

2    A.   Huh?

3    Q.   What have you been doing since the meeting on

4 Friday?

5    A.   Let's see.  Friday afternoon and Friday evening

6 I worked.  My wife and I watched a television show.

7 Saturday morning --

8    Q.   What television show did you watch?

9    A.   It was -- my daughter gave me a -- DVDs of

10 mysteries.  I can't recall the name of the mysteries.  I

11 do recall.  It was a Crossword Mysteries and we watched

12 half of those.  I couldn't tell you what happened

13 particularly on that particular episode.  Then Saturday

14 morning, most of the morning I work -- I mean, I work

15 early in the morning till my wife gets up and then I --

16 we have breakfast and read newspapers.  I read the -- do

17 you want to know the newspapers or. . .

18    Q.   Do you remember the newspapers?

19    A.   I know the newspapers because I read them every

20 morning.

21    Q.   Do you remember any articles you read?

22    A.   No, I'm sure I don't remember any articles.  I

23 clip the ones that I think I'll use in my research, and

24 I couldn't even tell you whether I clipped any over the

25 weekend but I probably clipped one or two or three.  I

1  read the New York Times, Wall Street Journal, and the

2  Austin paper.

3            Then I had a workout.  We work out for

4  about two hours on Saturday.  I had lunch, usually take

5  a nap on Saturday.  After that I worked some more on the

6  book.  The book is due at the end of May and I'm behind,

7  so I spend most of my time --

8      Q.   What did you do --

9      A.   -- working on the book.

10     Q.   -- yesterday, Professor McGarity?

11     A.   Huh?

12     Q.   What did you do yesterday, Professor McGarity?

13     A.   Yesterday, that was Sunday.  Worked on the book

14 in the morning, had breakfast, worked on the book some

15 more, listened to -- yeah, I guess it was listen -- my

16 grandson's baseball game, which apparently this is

17 amazing to me that they do play-by-plays of 10 and under

18 baseball players of baseball leagues in Washington, D.C.

19 and he is in the 10 and under league.  So my wife had it

20 on something and they actually broadcast it.  So I think

21 it's computer that does it, so I listened to that.  I

22 went to church via video.  In the afternoon I worked

23 some more and I think we got groceries delivered.  And

24 you want the evening?

25     Q.   Well, I guess I'm just kind of surprised that,

1 given that, you can't remember what happened in a

2 meeting on Friday. How many meetings on Friday did you

3 have?

4     A.   I think just -- no, I met with a student, one

5 of my tort students, but I couldn't tell you the name,

6 which tort student it was. And then we had the budget

7 committee meeting. I mean, if I sit back and think a

8 while I may be able to come up with someone else who we

9 evaluated, but these just aren't things that I -- to the

10 extent that I needed to talk about the person I had my

11 notes about my evaluation of the scholarship.

12               I do recall that in the last meeting there

13 weren't any of them that came up that I needed to

14 address, which is kind of rare because usually in the

15 meeting there would be one or two that you've done the

16 scholarly -- the scholar reads on, but last time there

17 were none of them. That might be why I'm not

18 remembering as well.

19     Q.   Well, wait. So you made a baseline

20 determination about how many -- about these professors

21 at the Friday meeting?

22     A.   Yes.

23     Q.   Were any of them below baseline?

24     A.   (No response.)

25     Q.   Were any of them above -- I'm sorry, did you

1 say no?

2    A.   No, I didn't say anything.  I don't think we

3 had any below baseline, but I can't remember that well.

4 If you give me a minute or two I just -- let me think.

5 No, I am really trying and --

6    Q.   So I just want to make sure I understand.  So

7 you had a meeting on Friday and you talked about people

8 and you determined what you would recommend to Dean

9 Farnsworth, but you can't remember who you talked about

10 and what you recommended?

11         MR. GIBSON:  Objection, misstates prior

12 testimony.

13    A.   Yeah, that's what I'm saying at this particular

14 moment.

15    Q.   (By Mr. Walsh)  And you knew that you were

16 coming to a deposition to talk about your involvement in

17 the budget committee, right?

18    A.   That would have been maybe in the back of my

19 mind, but that wasn't what I was thinking about when I

20 was at the budget committee meeting.

21    Q.   I know, but you could have reviewed your notes

22 before you came here today, right?

23    A.   I didn't make any --

24         MR. GIBSON:  Calls for speculation.

25    A.   I did not make notes.  I make notes when I'm

1  the chairman but not when I'm not the chairman.

2      Q.   (By Mr. Walsh) Let me think.  So do you

3  remember if anybody was above baseline?

4      A.   No.  I'm sorry.  If I saw the list of people I

5  might remember how we rated them, but --

6      Q.   Well, I can show you a list of all faculty

7  members.  Do you think maybe seeing their name would

8  help?

9      A.   No, I think I need to see the e-mail that I got

10  from Derek Jinks at the beginning of last week.  It had

11  the names of the people that we were presumptively going

12  to evaluate.

13      Q.   Is that because they're all so similar that you

14  can't differentiate between them?

15      A.   I think it's because my memory is that bad.

16      Q.   Do you think that -- I mean, if your memory is

17  that bad is it fair that you are evaluating colleagues

18  for raises?

19      A.   Of course.  When we have the deliberation I

20  don't have to have a memory of what happened three days

21  ago to deliberate if somebody summarizes their

22  scholarship, and we have two or three evaluations to

23  their scholarship and we talk about their service and we

24  talk about -- and there's documents in front of us.  I

25  have -- when I'm in these meetings, the Zoom meetings, I

1 have the submission of the faculty member to the

2 committee, so I'm looking at their scholarship.

3            I have before me their teaching

4 evaluations and I have a bar graph that has their

5 teaching evaluations going back about five years.  I

6 have, to the extent I want to see it, the scatter plot

7 there.  I have a summary of the -- or the mean of the

8 teaching evaluations that I can look at and have the

9 faculty rank by top to bottom of that.

10            So I have a great deal of information

11 before me in addition to hearing the members of the

12 committee who have read the material tell me what they

13 think about the material.  So I don't have to remember

14 anything particularly unless I'm talking about an

15 article that I read in which case I do have notes on the

16 articles that I read and I do sometimes before the

17 meeting go over -- I always go over those notes and I

18 sometimes actually go over the actual document itself

19 that was submitted, the article or the book or whatever.

20 So I don't think it depends on my memory what happened

21 three days ago to do that evaluation.

22    Q.   Okay.  So you just do the evaluation in the

23 moment, right?

24            MR. GIBSON:  Objection, misstates prior

25 testimony.

1    A.   Would you repeat it again?  I do the

2 evaluation --

3    Q.   (By Mr. Walsh)  You just do the evaluation in

4 the moment?

5    A.   In the moment, yeah.

6            MR. GIBSON:  Objection, misstates prior

7 testimony.

8    Q.   (By Mr. Walsh)  So how do you evaluate the

9 scholarship of somebody whose scholarship is not

10 [indiscernible], like all the people you talked about on

11 Friday?

12    A.   I just didn't hear you.  Say it again.

13    Q.   How do you evaluate the scholarship of a

14 colleague you haven't read?

15    A.   I listen to the evaluations of the other

16 members of the committee, the members who have read that

17 scholarship.

18    Q.   Well, how do you know that that's an accurate

19 description of what's going on?

20    A.   That's how the committee works.  We -- I assume

21 that their evaluations are accurate and done in good

22 faith.

23    Q.   Why do you assume that?

24    A.   Because I don't have time to read all of the

25 articles of every member of the faculty to judge

1 otherwise.

2    Q.   Well, what standards are applied to evaluating

3 scholarship?

4    A.   We look at the quality of the scholarship

5 primarily.

6    Q.   Do you think you have the same view of quality

7 as every other professor on the budget committee?

8    A.   I'm sure it's not identical, but I think that

9 we have similar views.

10    Q.   What is that view?

11            MR. GIBSON:  Objection, vague and

12 ambiguous.

13    A.   And I said views, so there's more than one

14 view.

15    Q.   (By Mr. Walsh)  What are the various --

16    A.   I think we look for whether it shows analysis

17 or whether the writing is clear, whether the -- it's --

18    Q.   Is it possible that you might --

19    A.   -- well organized.

20    Q.   -- might have a different view of what analysis

21 is?

22            MR. GIBSON:  Objection, interrupted the

23 witness.  For the record, the witness was not allowed to

24 finish his answer.

25    A.   Would you repeat the question?

1    Q.   (By Mr. Walsh)  Is it possible you have a

2  different view of analysis than another person on the

3  budget committee?

4            MR. GIBSON:  Objection, calls for

5  speculation.

6    A.   Oh, I think it's possible, sure.

7    Q.   (By Mr. Walsh)  Okay.  So how is that a fair

8  way to evaluate?  If you have two different views of

9  what is analytical, then it sounds subjective to me.

10  Would you agree?

11            MR. GIBSON:  Objection, calls for

12  speculation.

13    A.   No, I don't know that there are two different

14  views of what's analytical.  If I have a question about

15  the -- what the budget committee member said by way of

16  analysis, I'll ask the question.  And that happens --

17    Q.   (By Mr. Walsh)  Did you --

18            [Simultaneous speaking]

19    A.   -- that happens frequently.  I'm sorry?

20    Q.   Did you have any questions on Friday?

21    A.   Not that I can recall.

22    Q.   But you can't recall anything about that

23  meeting, right?

24            MR. GIBSON:  Objection, misstates prior

25  testimony.

1    A.    I in the moment have not been able to recall

2  who we talked about in that meeting.  I'll keep

3  thinking.  If I think of someone I will let you know.

4    Q.    (By Mr. Walsh)  What was said about Professor

5  Mullenix?

6    A.    There was a review of her scholarship and my

7  recollection is it was a -- it was a plus.

8    Q.    Was she rated baseline, above baseline, below

9  baseline?

10   A.    My recollection, and again, it's not -- I don't

11  have that great of a recollection.  I'm fairly confident

12  it was not below baseline or baseline minus.  My guess

13  is it was -- or my recollection is it was baseline.

14   Q.    Do you remember anything else about the

15  discussion regarding Professor Mullenix?

16   A.    I just remember the description of an article

17  she wrote that there were -- yeah, and this did happen

18  last Friday because now it's coming back to me.  A piece

19  that she wrote in I think Jotwell and a -- one or more

20  of her Supreme Court previews.

21   Q.    What was discussed about them?

22   A.    The article, as I said, was a positive, said it

23  had -- maybe it was a chapter in a book.  It was either

24  an article or a chapter in a book, was that it contained

25  mostly description but some analysis.  The Supreme Court

1  previews were just description and I think the Jotwell

2  article was the same.

3     Q.   Was all of that counted as scholarship?

4     A.   Yes, although I think there may have been some

5  discussion about whether the Supreme Court previews

6  should be regarded as service as opposed to scholarship,

7  but I viewed it at least as scholarship.

8     Q.   Why did you view it as scholarship?

9     A.   It's something.  It's -- it doesn't require a

10  lot of analysis, but I think it's definitely service in

11  the sense that it's useful to the legal community to

12  have someone who's knowledgeable about cases going

13  before the Supreme Court and has looked at the briefs,

14  to condense that and describe it carefully and maybe

15  present some kind of prediction or if it's after the

16  Supreme Court decided some take on the Supreme Court's

17  decision.  I think that's useful to the -- to the

18  profession.

19            In terms of scholarship, it's modest

20  scholarship but there was scholarly effort that went

21  into it to interpret the cases, to put them in place.

22  But as I say, it's not a whole lot of analysis.  It's

23  also rather short, so there's not much that can be there

24  in the con- -- and she's working within, I take it, a

25  paradigm that she needs to fit the -- whatever the

1  requirements of the publication are.

2      Q.   Do you know what the requirements of the

3  publication are?

4      A.   Not for the Supreme Court previews, no.

5      Q.   Have you ever written a Supreme Court preview?

6      A.   No.

7      Q.   Do any other faculty members write Supreme

8  Court previews?

9      A.   I don't know.  I don't recall.

10      Q.   You don't know?  Aren't you --

11      A.   I --

12           MR. GIBSON:  Objection.  Is the question

13  are you on the budget committee?

14      Q.   (By Mr. Walsh)  How do you not know if other

15  professors write Supreme Court previews if you're on the

16  budget committee?

17      A.   I think I've seen Supreme Court previews as a

18  member of the budget committee.  Not every faculty

19  member that writes things like that submit them to the

20  budget committee.  I certainly don't.

21      Q.   Do you write Supreme Court previews?

22      A.   No.

23      Q.   What don't you submit to the budget committee?

24      A.   Articles that I write, op-eds, white papers

25  that I work on for the Center For Progressive Reform

1  that I'm an author on.  I guess I have submitted

2  articles in American Prospect that I've written if

3  they're long, but not short, two- or three- or four-page

4  things.

5      Q.   Do you know the kind of work that goes into

6  writing a Supreme Court preview?

7      A.   I have an idea of how much went into by reading

8  it, yes, but I don't know in terms of number of hours or

9  something like that.

10     Q.   Do you know how well they are received outside

11  the law school?

12     A.   No, I don't think I've heard how well they're

13  received outside the law school.

14     Q.   Well, would it matter to the budget committee

15  if these Supreme Court previews were highly thought of

16  outside the law school?

17            MR. GIBSON:  Objection, calls for

18  speculation.

19     A.   Matter to the budget committee.  I don't think

20  it would matter a lot, no.

21     Q.   (By Mr. Walsh)  What if other professors at

22  other law schools valued these Supreme Court previews?

23            MR. GIBSON:  Objection, vague and

24  ambiguous question.

25     Q.   (By Mr. Walsh)  Would that matter at all?

1    A.   No, not a lot.

2    Q.   Why not?

3    A.   Because I think we feel like we're capable of

4  reading them and evaluating them.

5    Q.   Well, why is your judgment better than the

6  judgment of other professors outside of U.T. Law?

7            MR. GIBSON:  Objection, misstates prior

8  testimony.

9    A.   I suppose if we had some sort of submission

10  from somebody from outside the law school saying that

11  this is a terrific Supreme Court preview and it came

12  before us, we would consider that.

13    Q.   (By Mr. Walsh)  What about if Supreme Court

14  justices read the Supreme Court previews, would that

15  matter to the budget committee?

16            MR. GIBSON:  Objection, calls for

17  speculation.

18    A.   I can speak for myself and I would say it

19  wouldn't matter a lot.

20    Q.   (By Mr. Walsh)  Why not?

21            MR. GIBSON:  Objection, calls for

22  speculation.

23    A.   Well, because I know the Supreme Court justices

24  read lots of things and some are high quality, some are

25  less high quality, and the fact that a Supreme Court

1 justice read it doesn't mean that it's of high quality.

2    Q.   (By Mr. Walsh)  What if a Supreme Court justice

3 had praised it?

4              MR. GIBSON:  Objection, calls for

5 speculation.

6    A.   And that came before the budget committee?

7    Q.   (By Mr. Walsh)  Uh-huh.

8              MR. GIBSON:  Objection, calls for

9 speculation.

10    A.   So that we had some note from the Supreme Court

11 praising -- from a Supreme Court justice praising it

12 that came before the budget committee?  I think we would

13 consider that.  We would still evaluate the article on

14 its merits.

15    Q.   (By Mr. Walsh)  But how do you -- I guess what

16 my issue is, though, is it sounds like there could be a

17 difference of opinion on whether something has merit or

18 not.  Do you agree?

19              MR. GIBSON:  Objection, calls for

20 speculation.

21    A.   You say there could be.  Yeah, I think there

22 could be.  There's differences of opinion about lots of

23 things, but certainly on that as well.

24    Q.   (By Mr. Walsh)  I mean, so then would you say

25 that evaluation of scholarship is subjective?

1                    MR. GIBSON:  Objection, vague and

2  ambiguous.

3      A.   It involves judgment.  There's a certain

4  subjectivity to that I suppose.

5      Q.   (By Mr. Walsh)  So when -- why doesn't the

6  budget committee consider outside reception of a

7  professor's scholarship in evaluating scholarship?

8                    MR. GIBSON:  Objection, misstates prior

9  testimony.

10     A.   Well, as I said, if we have some document or

11 something rather than just hearsay as to what some

12 particular scholar has to say about an article, we would

13 consider that.

14     Q.   (By Mr. Walsh)  So if you remember, in the

15 morning session we went through a whole bunch of indicia

16 of scholarship and whether it's highly regarded outside

17 the law school.  You remember that?

18     A.   Yes.

19                   MR. GIBSON:  Colin, I apologize, I'm

20 having technical [indiscernible] --

21                   MR. WALSH:  I see him talking, but I can't

22 hear what he's saying.

23                   THE WITNESS:  He's saying he has a

24 technical issue and he'd like to pause for a couple of

25 minutes until he figures it out.

1          MR. WALSH:  Oh, yeah, let's go off the

2  record.

3          THE VIDEOGRAPHER:  Off the record at

4  1:58 p.m.

5          (Recess taken from 1:59 p.m. to 2:04 p.m.)

6          THE VIDEOGRAPHER:  We are back on the

7  record.  The time is 2:03 p.m.

8      Q.  (By Mr. Walsh)  Okay.  So before we took that

9  short break we were talking about Supreme Court previews

10  and outside evaluation on scholarship.  Professor

11  McGarity, you said that the budget committee would

12  consider outside evaluations of professor scholarship.

13  Is that correct?

14      A.   If we had some document or something like that.

15  We do not solicit outside evaluations as a normal

16  matter, but if --

17      Q.  Do you tell professors that they can submit

18  outside evaluations?

19      A.   We tell professors to submit anything they

20  think would be relevant.

21      Q.  Do you tell them that they can submit outside

22  evaluations of their scholarship?

23      A.   I think that's included in anything that they

24  think is -- if they think it's relevant they can submit

25  it.

1    Q.   Well, I mean, I guess the reason I'm asking

2  is -- well, I'm asking specifically, is that mentioned?

3            MR. GIBSON:  Objection, vague and

4  ambiguous.

5    A.   No.  As I said, we don't ask for outside

6  evaluations in the context of our normal budget

7  committee deliberations.  I don't know that we say on

8  the -- in the memo that solicits the contribution for

9  the past year from the faculty member, I don't think it

10 says please submit outside evaluations, but they're

11 certainly -- certainly welcome to do so.

12   Q.   (By Mr. Walsh)  Did you read any of Professor

13 Mullenix's scholarship this year?

14   A.   This year, no.

15   Q.   How do you know it was descriptive?

16   A.   That was as it was described to the committee

17 by the people who read it.

18   Q.   Who read it?

19   A.   Who read -- the article that I remember, or

20 chapter, whatever it was, was not the Supreme Court

21 review.  And Jotwell was Lynn Baker, I think.  The

22 others, I don't recall who read them.

23   Q.   Okay.  And Professor Baker said that the

24 article was mostly descriptive, is that --

25   A.   That it was descriptive, but it had some

1 analytical heft to it as well. That was my word, heft.

2 I don't know that she used it, but that's what I know.

3     Q. So who else was talked about at this meeting?

4          MR. GIBSON: Objection, asked and

5 answered.

6     A. You did ask me that before and I'm still trying

7 to remember other people. I think we may have talked

8 about Bob Bone. I'm thinking about that, but I'm not

9 sure.

10     Q. (By Mr. Walsh) What was said about Bob Bone?

11     A. I don't recall. I'm not even sure that we did.

12 Again, I'm just trying to probe my memory here.

13     Q. How come you remember that Professor Mullenix

14 was talked about? You even remember the description of

15 three different pieces of scholarship, but you can't

16 remember a single other person?

17     A. Well, I'm still thinking about it, so I can

18 probably think of some other people. I wasn't even sure

19 when I started talking about it whether it was this last

20 meeting. Now in talking about it, it brought that to

21 mind. Maybe if we go down the list of faculty members,

22 maybe I could tell you which ones we --

23     Q. Professor Bob Bone?

24     A. I'm sorry?

25     Q. Professor Bob Bone, what was discussed about

1 him?

2    A.   I don't recall.

3    Q.   Do you remember whether he was rated baseline,

4 above baseline, below baseline?

5    A.   I don't even recall that we did talk about him

6 now that I'm thinking about it.  No, not -- just off the

7 top of my head, no.

8    Q.   Will you agree with me that it is suspicious

9 that you can only remember one faculty member that the

10 budget committee discussed?

11           MR. GIBSON:  Objection.  Colin, that's an

12 abusive and harassing question.  I would ask that you

13 not harass the witness, and I would ask that you move on

14 and ask a different question.

15    Q.  (By Mr. Walsh)  You can answer.

16    A.   I don't think it's suspicious.  We're here in a

17 Mullenix deposition so that came to mind.  Let's go down

18 the list and I can probably think of some people we

19 talked about.

20    Q.   Well, I mean, you know that, for example,

21 you're named as one of her comparatives, correct?

22    A.   Right, and I do know that I was discussed

23 Friday because I had to leave the meeting for that.

24    Q.   And you know that Professor Bob Bone was named

25 as one of her comparatives, correct?

1    A.   Yes.

2    Q.   And you know that Professor Jay Westbrook was

3 named as one of her comparatives, right?

4    A.   Yes.  And I can tell you we did not talk about

5 Jay on Friday.

6    Q.   Well, how can you be sure that you didn't talk

7 about Jay but not sure whether or not you talked about

8 Bob Bone?

9    A.   Because I have read something from Jay and it

10 hasn't -- he hasn't come up yet.  We still have more

11 meetings and I haven't presented what I've read about

12 Jay.  I did not read anything about Bob, so I don't

13 know -- I can't recall that.

14    Q.   All right.  Before we talk about Bob Bone, I

15 did want to just show you what I've marked as

16 Exhibit No. 4.  It's in the chat.  Here's an e-mail from

17 Professor Rich Freer.  Do you know who that is?

18    A.   Rich Freer.  No, I don't.

19    Q.   Do you know any prominent professors in civil

20 procedure?

21    A.   I don't know whether I do or don't.

22    Q.   You don't know whether you do or don't.  What

23 does that mean?

24    A.   Because I don't know -- some professors I know,

25 I don't know what they teach.  The professors who I know

1  who I know what they teach don't teach civil procedure

2  that I can think of.

3      Q.   Okay.  So, I mean, that even -- I guess that

4  then begs the question why you're even passing judgment

5  on a civil procedure scholarship; if you don't know

6  prominent professors, you don't read the scholarship,

7  why should you be allowed to evaluate it?

8      A.   When I read the scholarship, and I have read

9  scholarship on civil procedure, then I have my sense of

10 the quality of the scholarship.  When I don't read it I

11 depend on the committee members' sense of the

12 scholarship.

13     Q.   So it's possible that if the committee members

14 mischaracterize scholarship, that just gets adopted by

15 the committee, correct?

16             MR. GIBSON:  Objection, calls for

17 speculation.

18     A.   It's possible, yes.

19     Q.   (By Mr. Walsh)  There would be no way to know

20 because most budget committee members don't read all of

21 the scholarship by every professor?

22             MR. GIBSON:  Objection; compound question,

23 calls for speculation.

24     A.   The second half of the question I can answer

25 very definitively is that yes, every member of the

1 committee does not read all of the scholarship.

2     Q.  (By Mr. Walsh)  Okay.  So I want to ask you

3 about this Rich Freer e-mail.  So here he says, "Linda:

4 I forgot completely about the Previews."  And then in

5 the next line he says, "I find it astonishing that they

6 don't 'count' things like the Preview and blogs.  Those

7 Preview pieces are terrific, and I thought we wanted to

8 be cutting-edge so blog stuff should 'count'."  And then

9 he described what happens at Emory.  Are you able to

10 read it?

11     A.  Can you make it a little bigger?

12     Q.  How is that?

13     A.  Yeah, I think I can read that.  Let's see.

14     Q.  So I'm really only interested in this stuff

15 right here.  What do you think about the way Emory does

16 it?

17           MR. GIBSON:  Objection, calls for

18 speculation.

19     A.  I think that -- do you want my just firsthand

20 impression of that?  If that's in fact what they do,

21 then they must have a whole lot of time to be reading

22 everybody's blogs.  When it comes to the previews, our

23 committee does consider the previews.  We don't

24 generally consider blogs.  Sometimes people submit them.

25 I write many blogs and I never submit blogs to the

1 committee; but when people do, it has to be a very

2 substantial blog before we would give it much weight.

3 And that's something that I think is -- in academia

4 right now is something that's kind of subject to

5 discussion and debate as the extent to which somebody

6 who is just all the time blogging.

7          My view of blogs even though I write them

8 frequently is that they're not scholarship at all;

9 they're service, they're opinion.  They don't

10 necessarily make an effort to be neutral, objective,

11 scholarly, academic about it.  They're often used to

12 persuade, so they're more in the nature of briefs, and

13 therefore I personally don't give much weight or don't

14 give any weight to blogs.

15     Q.    (By Mr. Walsh)  Well, wait a second, Professor

16 McGarity.  I thought a lot of law review articles argued

17 for a certain position.

18     A.    Oh, they do, but I'm talking about more in the

19 lines of a partisan position or something like that.

20 But in any event, even though they do they're well

21 developed.  They answer the objections or anticipate and

22 answer objections.  Blogs don't do that or not all do.

23 I'm sure some do so I hate to characterize all blogs.

24          But I can tell you that generally our

25 feeling is that we don't want faculty members submitting

1 every blog they wrote. And if they did and the question

2 came up, well, do we read them all, I think we'd have to

3 have a big discussion about that because the members of

4 the committee have limited amount of time too. They're

5 active scholars and they're trying to get work done and

6 their teaching done and so it would be a question --

7 it's a question maybe at some point we would change our

8 minds, but at this point we don't really consider blogs.

9 We do consider the Supreme Court previews and we do

10 consider Jotwell.

11     Q.   What does it mean for a professor to be rated

12 baseline?

13     A.   It means that they're performing and they're --

14 the quality and the quantity of the research is good,

15 their service is good or on balance, and their teaching.

16 It's a balancing of all -- some people, they don't have

17 quite as good of teaching performance that year. If

18 they have great scholarship, we balance that. In some

19 instances service can outweigh a bad teaching evaluation

20 or below average teaching evaluations or scholarship.

21 So it's a balance, and baseline means that you're

22 doing -- doing fine.

23     Q.   Now, if two professors are both rated baseline,

24 what does that mean?

25     A.   It means they're both doing fine. We're happy

1 with their performance.

2     Q.   Equally happy with their performance?

3     A.   I don't know what you mean by equal.  We're

4 happy.

5     Q.   If you have five professors rated baseline are

6 they all at the same level?

7     A.   Yeah, in terms of our evaluation this year of

8 their performance, they're performing at about the same

9 level, yeah, but that's an overall evaluation.

10     Q.   What do you mean?

11     A.   Somebody might not be teaching as well as

12 someone else rated baseline but they might have better

13 scholarship or a better year scholarship-wise.

14     Q.   But overall if somebody is rated -- but if

15 somebody is rated baseline, that means overall they're

16 all about the same, all the baseline people?

17               MR. GIBSON:  Objection, misstates prior

18 testimony.

19     A.   They're all performing adequately.

20     Q.   (By Mr. Walsh)  Would you be in the same cohort

21 in terms of baseline evaluation as Professor Mullenix?

22     A.   In terms of base- -- in the same cohort?  Oh,

23 in terms of who would evaluate?

24     Q.   In terms of like baseline raise.

25     A.   In terms of how much that would be?  Probably.

1  I'm not positive about that, but probably.  She's --

2  well, we looked at the chart.  She's a few years fewer

3  than me, although in terms of our -- I guess in JD or

4  whatever, but I'm -- I can't be for sure but it's

5  possible.  She may be in one where the baseline would be

6  a higher -- slightly higher amount, but I don't know.

7  Probably.

8      Q.   What about Professor Bone and Professor

9  Mullenix?

10     A.   Who was the first one?

11     Q.   Professor Bone.

12     A.   I think they would be in the same category for

13  sure.

14     Q.   What about Professor Westbrook and Professor

15  Mullenix?

16     A.   Westbrook would be more like me.  In fact, he's

17  more years out than I am.

18     Q.   What about Professor Rabban?

19     A.   He'd be with me.  We're very close, my

20  recollection is, in terms of years past the JD at least.

21     Q.   So Rabban would not be with Professor Mullenix

22  or Professor Bone?

23              MR. GIBSON:  Objection, misstates prior

24  testimony.

25     A.   No, it's conceivable that we'd all four be in

1  the same category, but there may be a line -- I don't

2  know where the dean draws the line each year.  There may

3  be a line between Rabban and Bone and Mullenix, but it's

4  quite likely we're all in the same category.  You can

5  ask the dean that.

6      Q.  (By Mr. Walsh)  What about Professor Levinson

7  and Professor Mullenix?

8      A.  Levinson would be in my category for sure, and

9  possibly or maybe even probably in Mullenix's category.

10     Q.  What about Professor Hu?

11     A.  Hu, if you've got that chart and you can show

12 me where he is on the chart.  I think he's behind

13 Mullenix in terms of years out or years in teaching.

14     Q.  Now, are you sure that cohorts are drawn by

15 years of teaching as opposed to salary level?

16     A.  Yeah, I'm real clear about that.  Like, for

17 example, look at SMJ out there, he's the most years out.

18 That's Stanley.  And we evaluate him in my cohort, I'm

19 sure of that.

20     Q.  And so that means that he would get a lower

21 baseline raise --

22     A.  Generally, yeah.

23     Q.  -- or is that a higher baseline raise?

24     A.  Lower.

25     Q.  Okay.  So the longer you've been out, the lower

1 your baseline raises?

2     A.   That's -- the practice has been to try to

3 reward the younger folks more and equal things out a

4 little bit, I guess -- not equal, that's not it, but get

5 them up so then we don't lose them.

6     Q.   That makes sense. All right.

7     A.   I didn't answer your question about Henry yet.

8     Q.   Oh, you're right. Are you able to see it?

9     A.   No. Can you make it a little bigger? Now,

10 let's find Linda. She's here. And then where is Henry

11 Hu? Oh, there it is, Henry T. Hu. So he probably would

12 be in the same category as Linda, be my guess.

13     Q.   Oh, I see it right here.

14     A.   Yeah, right up there.

15     Q.   So probably -- so safe to -- how many different

16 cohorts are there; do you know?

17     A.   Seems like maybe about -- my recollection is

18 like there's three different sort of low or -- low in

19 terms of years out and medium and high. But again,

20 that's something you should ask the dean about unless

21 you've got one of these memos that he sent that has the

22 recommendations. That would make it clear.

23     Q.   And then over here it looks like EE,

24 Encamacion, he would be in the cohort that gets the

25 highest baseline raises?

1      A.    Yeah.

2      Q.    Do you know, are these cohorts generally equal

3  in terms of the number of people in them, or not?

4      A.    I don't know, but I think probably not because

5  obviously the older ones, we fade away and then people

6  retired and there tends to be fewer out there, although

7  people migrate over like I have.

8      Q.    So earlier you talked about you served on the

9  budget committee under Dean Sager?

10     A.    Yes.

11     Q.    And were you on the budget committee in spring

12  of 2010?

13     A.    I can't say for sure.  I don't know.  Oh, no, I

14  would say almost certainly I was on the budget

15  committee.  I don't know whether I was the chairman that

16  year, but if that's the Sager year, I think I was on the

17  budget committee all the Sager years.

18     Q.    Now, did you -- do you remember meeting with

19  Professor Mullenix in 2010 about the Equal Pay Act?

20     A.    No.

21     Q.    Can you remember ever meeting with Professor

22  Mullenix about the Equal Pay Act?

23     A.    No, not particularly about that subject.  I met

24  with Professor Mullenix, but not that I can recall about

25  that subject.

1     Q.   What about about pay in general?

2     A.   Recently she visited my office back before

3 COVID asking whether I thought she was the -- should be

4 the most poorly paid member of the faculty.  I remember

5 that meeting.  That had to do with pay.  I don't know if

6 it had to do with equal pay, but it had to do with pay.

7     Q.   Any other time?

8     A.   Talking just about pay?  Just -- just about pay

9 particularly?

10    Q.   Yes.

11    A.   And not other emoluments of scholarship or

12 teaching or service.  No, I can't remember --

13    Q.   I'm asking you about pay.

14    A.   No, I can't think of any other time or I don't

15 recall it.

16    Q.   Oh, no, now you've piqued my interest.  What

17 other emoluments of service has she come and talked to

18 you about?

19    A.   At one point she didn't -- the budget committee

20 awarded a chair to Inga Markovits and she in the hallway

21 in front of the elevator sort of confronted me about

22 that.  That was a long time ago, but it stuck in my head

23 because there was students there and I asked her can we

24 go to my office and talk about it.  It wasn't

25 particularly about pay, but she thought she deserved a

1  chair and I think at some point she did in fact get a

2  chair.

3      Q.    Okay.  Do you know whether Professor Mullenix

4  made an Equal Pay Act complaint in 2010?

5      A.    I know there was a complaint made that she

6  filed or I'd heard that there was a complaint made and I

7  don't remember whether it was 2010 precisely.  It would

8  have been somewhere around that time.

9      Q.    During your time on the budget committee have

10  you ever discussed the Equal Pay Act during budget

11  committee deliberations?

12     A.    I think at some point we talked about -- we've

13  talked about equal pay in terms of gender or sex and

14  also we've talked about -- I don't know if the Equal Pay

15  Act, I'm just not familiar with it to know whether it

16  deals with age discrimination.  I think that may be

17  different, Age Discrimination Employment Act, and we've

18  talked about that as well just as a matter of

19  information and. . .

20     Q.    So what does the budget committee discuss when

21  they talk about the Equal Pay Act?

22     A.    Just I think that we're obliged to by law treat

23  people equally when they're equally situated.

24     Q.    So how does the budget committee determine

25  whether that is happening?

1      A.   We don't have a particular evaluation.  I think

2   we just understand among ourselves that that's -- that

3   that is one of the legal requirements that govern what

4   we do.

5      Q.   Okay.  But you don't make any kind of active

6   effort to ensure that that's happening?

7                MR. GIBSON:  Objection, misstates prior

8   testimony.

9      A.   Not in the sense like the university asks us or

10  in fact compels us to undergo the training.  We don't do

11  training.  We all undergo the university's training,

12  though.  I take it.  I mean, I can't speak for the other

13  members of the committee.  I know that I do.

14     Q.   (By Mr. Walsh)  So is it possible that there

15  are tenured law faculty who are not paid equally under

16  the Equal Pay Act --

17                MR. GIBSON:  Objection, calls for a

18  legal --

19     Q.   (By Mr. Walsh)  -- to their male or female

20  competitors?

21                MR. GIBSON:  Objection; calls for a legal

22  conclusion, calls for speculation.

23     A.   I hope not.  We do our best.  And I can't speak

24  for the dean.  The dean makes the ultimate decision

25  about salaries.

1    Q.   (By Mr. Walsh)  All right.  So is it possible

2  that that is occurring, though?

3            MR. GIBSON:  Objection, calls for a legal

4  conclusion.  Objection, calls for speculation.

5    A.   That question is like -- is zero risk.  There's

6  always some possibility I suppose.  I hope that it

7  doesn't happen.  I've never seen it happen.

8    Q.   (By Mr. Walsh)  Well, what are you looking for?

9            MR. GIBSON:  Objection, vague and

10  ambiguous.

11    A.   Evidence that somebody is discriminating.

12  Somebody saying, well, no, we shouldn't give her as big

13  a raise as him because she's a woman.  I mean, that's

14  one --

15    Q.   (By Mr. Walsh)  Any other kind of evidence --

16    A.   That's not all I would look for, but that's --

17  obviously if I heard that I would think that was a

18  problem.

19    Q.   I guess I'll just ask it.  Have you ever heard

20  that?

21    A.   No.

22    Q.   All right.  So what other types of evidence

23  would you look for to determine whether or not somebody

24  was being discriminated against in terms of pay?

25            MR. GIBSON:  Objection, calls for

1 speculation.

2      A.    I just think I'd be looking for evidence

3 that -- if I was looking for it -- I mean, I would be

4 looking for it, it would be that somebody wasn't being

5 treated fairly because of their sex, whether --

6      Q.    How would you determine that?

7                MR. GIBSON:  Objection, calls for

8 speculation.

9      A.    Well, you would look at whatever indicia of

10 scholarship, service, teaching that you have, and if you

11 see someone that's -- looks to be equivalent with

12 respect to that, that they were treated differently.

13                THE WITNESS:  Excuse me just a second.

14 I'm just seeing a little piece of the screen here.  Can

15 you make it so that I can see the whole screen, please?

16                MR. GIBSON:  Hold on just a second,

17 please.

18                (Brief interruption.)

19      A.    Go ahead, I'm back.

20      Q.    (By Mr. Walsh)  So I want to show you Exhibit

21 No. 5.  So here we have -- here's a chart comparing

22 Professor Mullenix and Professor Robert Bone, and I

23 believe you just testified that you would look at

24 teaching, you would look at scholarship, you would look

25 at service.  Is that correct?

1    A.   That's correct.

2    Q.   So if we go through this, you see that

3 Professor Mullenix and Professor Bone are about the same

4 age?

5    A.   Uh-huh.  Yes.

6    Q.   Professor Mullenix has had many more years of

7 teaching, 45 years to 36.  Do you see that?

8    A.   Uh-huh.

9    Q.   Is there any reason to think that that's not

10 accurate?

11         MR. GIBSON:  Objection, calls for

12 speculation.

13    A.   We were talking about where we start teaching.

14 Is that teaching since -- is that law school teaching or

15 is that -- does that include the undergrad teaching?

16    Q.   (By Mr. Walsh)  That would include undergrad

17 teaching.

18    A.   So, but I --

19    Q.   But we took them out earlier and we still saw

20 that Professor Mullenix has more teaching than Professor

21 Bone, correct?

22    A.   That's -- that's correct.

23    Q.   Before we move on from that I do want to ask,

24 Sandy Levinson used to teach undergrad, correct?

25    A.   Yes.

1    Q.   And that counts towards his teaching

2  experience, correct?

3    A.   Not that I know of.

4    Q.   If it did, then would it be appropriate to

5  count Professor Mullenix's undergrad teaching?

6    A.   If it did for Professor Levinson?

7    Q.   Yeah.

8             MR. GIBSON:  Objection, calls for

9  speculation.

10   A.   Yeah, I think we should treat them

11 equivalently.  If we're doing it -- whatever we do, we

12 should do it for everyone when it comes to that.  I just

13 don't recall how we resolved that issue when we created

14 those charts.

15   Q.   (By Mr. Walsh)  So then we have educational

16 degrees.  Would visiting professorships at T14 schools

17 be something that you could compare two faculty members

18 on?

19            MR. GIBSON:  Objection, calls for

20 speculation.

21   A.   As I mentioned earlier, it would depend on the

22 nature of the visit.

23   Q.   (By Mr. Walsh)  Well, let me specify.  A

24 look-and-see visit?

25   A.   Then yeah, that would be something I think

1  that's -- we're just making this in terms of just a

2  general comparison.  Would that affect my judgment, is

3  that what you're saying?  Because we're not looking at a

4  year's worth of scholarship here; we're just looking --

5  we're looking at the whole career, right?

6      Q.   Uh-huh, to determine whether or not these

7  people are competitors or should be paid equally.

8      A.   If they were look-see visits, yeah, I think

9  that would make some -- is of interest.

10     Q.   And what's a look-see visit?

11     A.   That is we're thinking about hiring you, come

12 visit and teach here and we'll make a decision.  It's

13 not nearly as I think relevant as an offer from that

14 institution to come teach here, but a look-see visit I

15 think is -- in terms of just my comparing people would

16 be something I'd consider.

17     Q.   What about professional honors?

18     A.   It depends on the honors.

19          MR. GIBSON:  Objection, vague and

20 ambiguous.

21     Q.   (By Mr. Walsh)  Well, what about these honors

22 listed right here on this chart?

23          MR. GIBSON:  Objection, vague and

24 ambiguous.

25     A.   Again, what you're asking me to compare now is

1 not what we do on the budget committee.  But just my

2 opinion of the comparisons, I think all of those honors

3 are impressive to me on both sides.

4      Q.   I agree.  And then we have career publication

5 record.  This would be a relevant consideration in

6 determining whether or not these are comparators,

7 correct?

8           MR. GIBSON:  Objection, calls for a legal

9 conclusion.  It calls for speculation.

10     A.   This is, again, not for any individual year

11 where the budget committee is making determination.

12 You're asking me if looking at these two, would it

13 affect my determination of I guess equality or

14 something.  I'd like to know what those 321 publications

15 or those 62 publications were --

16           [Simultaneous speaking]

17     Q.   Well, if you look it says 22 books, 80

18 articles, 10 chapters, 15 treatise updates, 194 short

19 commentary.  And if you go under Professor Bone's it

20 describes it in similar fashion.

21     A.   The short commentary wouldn't make a great deal

22 of difference to me.  Treatise update --

23     Q.   We could eliminate that entire line and

24 Professor Mullenix would still have more.

25           MR. GIBSON:  Mr. Walsh, you're

1 interrupting the witness before he's finished answering

2 questions, for the record.  I would request that you let

3 him finishing answering questions.  And is there a

4 question on the table?  We could eliminate that entire

5 line I think is what you said last.  Could you ask a

6 question?

7     Q.   (By Mr. Walsh)  Yeah, and Professor Mullenix

8 would still have more, correct?

9     A.   Well, I wasn't finished answering your

10 question, the first -- the earlier question.  Because I

11 wouldn't treat the treatise updates as having a great

12 deal of significance either.  I would want to know --

13 the chapters I think I would regard as roughly

14 equivalent.  The articles I would regard as roughly

15 equivalent, again wanting to know what sort of articles

16 they were.

17           The books I think are roughly -- I'm not

18 saying these are equivalent, but I would regard -- I

19 would regard books in my judgment.  I'd want to know

20 what the 22 books were.  Case books, first edition of a

21 case book I give a good deal of credence to.  There's a

22 lot of work that goes into that and a lot of thought and

23 analysis.  The update of a case book, the second edition

24 or the third edition I wouldn't give a great deal of

25 weight to.  But I certainly give a great deal of weight

1  to books generally.  I think that's what I would give

2  the highest weight to.

3      Q.   Okay.  And then if we look at citations, is

4  that a relevant consideration?

5      A.   In one year or two maybe our committee did look

6  at citations, but it became very difficult to know where

7  they were coming from.  They're very different --

8  different entities produce these, SSRN and that sort of

9  thing.  Some people are more sophisticated about getting

10  their work on to these lists that prepare these lists of

11  citations.  So as a matter of -- for the budget

12  committee we haven't looked at them in many years.

13            From my personal, because I guess you

14  asked for my personal judgment here when we're making

15  these comparisons, they don't count for a lot.  They

16  count for something.  Different disciplines get more

17  citations and court opinions, for example, than others,

18  but that was just total citations you were mentioning.

19  Is that -- if I'm not mistaken.  Citations, I take it,

20  in judicial opinions and articles and that sort of

21  thing?

22      Q.   Uh-huh.  So citations don't matter?

23      A.   We've not looked at citation lists in the last

24  few years.

25      Q.   Well, isn't there a way to measure scholarly

1 impact?

2          MR. GIBSON:  Objection, calls for -- vague

3 and ambiguous.

4     A.   Is it a way to measure scholarly impact?

5     Q.   (By Mr. Walsh)  Yes.

6     A.   It probably has some relevance to scholarly

7 impact.  There's just a lot of problems with just raw

8 lists of citations because, among other things, one can

9 cite one's own work a lot and up one's citation count.

10 If you're just asking me a personal look at it and apart

11 from the budget committee, I would say it has some

12 impact, yeah.  It has some -- it is some measure of the

13 impact of the scholar's work.

14     Q.   How would you determine scholarly impact of a

15 law professor?

16     A.   I would look to the peers that are people

17 working in the same field and I would ask them I think

18 would be my first place to go.

19     Q.   So you would look outside the law school to

20 determine scholarly impact?

21     A.   Yeah, you're just asking for me personally.

22 Yeah, I would -- if you're talking about impact, and

23 that's not one of our criteria, is scholarship, not

24 scholarly impact, though I think -- I wouldn't exclude

25 scholarly impact as being relevant.  I think it would go

1 to the people in the field and I think you would look at

2 citations. They'd have some relevance. As I say, the

3 committee looked at them a couple of years but found out

4 it was just -- it was very difficult to -- there was

5 just a lot of disagreement, as I recall, among these

6 various sources of citations.

7           And I guess when it comes to blogs or

8 whatever they call it, hits and that sort of thing, how

9 many people download the article from SSRN or how many

10 people looked at it in SSRN, those tended to me to be

11 kind of difficult to evaluate. I think just straight

12 citations is easier and probably more relevant.

13     Q.   Okay. Then what about teaching, cumulative

14 teaching average, that would be another way to compare,

15 correct?

16     A.   Yes, I think that would be, on their teaching

17 evaluations.

18     Q.   All right. So looking at this chart, does it

19 seem like these two people should be paid the same?

20           MR. GIBSON: Objection, calls for a legal

21 conclusion.

22     A.   What a person is paid is cumulative over a

23 number of years, so I couldn't tell you in this year

24 whether they should be paid the same based on that.

25           I'll also mention that I don't know the

1  ins and outs of this, but when we're just talking about

2  Bob Bone, there was some kind of deal he struck with

3  Larry when he came on having to do, as I've heard but

4  this is just secondhand, that he didn't get his -- his

5  whole pension didn't transfer from wherever he was prior

6  to coming to U.T. and there was some rough effort, I

7  think, to make up for that.  I'm not saying I agree with

8  that.  I'm just saying I think that's what accounts for

9  that -- his high salary to some extent.  So in that

10  comparative situation that may account for the

11  differences in salary.

12      Q.   (By Mr. Walsh)  So let me just come out

13  straight and ask it.  Should Professor Bone be paid more

14  than Professor Mullenix?

15      A.   I don't know the ins and outs of that --

16      Q.   Professor McGarity, in your opinion, should --

17      A.   -- that agreement.

18      Q.   -- Bob Bone be paid more than Professor

19  Mullenix?

20      A.   I've asked the same question about myself,

21  should Professor Bone be paid more than me, and the

22  answer I've come to is that something about that

23  agreement accounts for it.  In terms of if we took that

24  agreement out of it, it would also depend not just on

25  the number of articles but on the quality of the

1 articles, not just on the number of books but on the

2 quality of the books, and the citations I think you can

3 go with the numbers.  I'm not going to suggest that

4 there's a different quality, although there may be.  I

5 mean, even there, a Supreme Court citation probably is

6 worth more than a citation in a county judge opinion.

7 So there's qualities involved in this as well as just

8 quantity.

9      Q.   Professor McGarity, you've been on the budget

10 committee for decades?

11      A.   Yeah.

12      Q.   So to evaluate all of these professors you vote

13 on these professors.  You've been voting on whether or

14 not Professor Mullenix is baseline, above baseline, or

15 below baseline, again for decades.  In your opinion

16 should Professor Bone be paid more than Professor

17 Mullenix?

18      A.   Again, on the merits apart from the deal that

19 they cut, I would say --

20      Q.   Based on the merits apart from the deal.

21      A.   Apart from the deal, probably somewhat more,

22 maybe not as much more as he is being paid but somewhat

23 more, yes, based on the quality of his scholarship.

24      Q.   Have you read Professor Bone's scholarship?

25      A.   Over the years I think I've read a piece or two

1  of his, but again, I'm depending mostly on the reviews

2  of the people on the budget committee who have read his

3  scholarship.

4       Q.   So what does somewhat more mean?

5       A.   I don't know.  I can't tell you in numbers.  I

6  think his scholarship is generally better than Linda's.

7  I think that -- but that's an over-time evaluation of

8  higher quality; I won't way necessarily better.

9       Q.   How do you determine that his scholarship is

10  better than Linda's?

11       A.   Based on the reviews that -- over the years of

12  the committee.  His teaching, I'd say that they're

13  roughly equivalent when it comes to teaching is my --

14  that's again my general impression.  Service, Bob Bone

15  is probably high -- I would rate the quality of his

16  service above Linda's.

17       Q.   And why is that?

18       A.   He has -- until the COVID, again, we have to --

19  all bets are off when it comes to COVID.  But up until

20  then he is at all or virtually all of the colloquia, all

21  of the drawing board luncheons, comes to lots of

22  conferences, at least the ones that I've been to, and I

23  try to go all of the colloquia and drawing board

24  luncheons or I did pre-COVID, and service on big,

25  important -- or just service generally on committees.

1              I don't know in terms of between the two

2  of them how I would evaluate them in terms of service to

3  the -- to the profession.  I would say when it comes to

4  service to the profession I would put Linda above Bob on

5  that.  And in terms of service to the students, I know

6  that Linda is actively involved with the students

7  because I've shared students with her and they've

8  mentioned her.  So I think she -- and in that service

9  capacity she's -- I don't know about Bob, so at least

10 equivalent to Bob and perhaps higher quality.

11     Q.   So based on what you just said, Professor

12 Mullenix might be higher in terms of service, they're

13 equal in terms of teaching, and Professor Bone is higher

14 in terms of scholarship?

15             MR. GIBSON:  Misstates prior testimony,

16 objection.

17     Q.   (By Mr. Walsh)  Is that a fair summary of what

18 you said?

19     A.   No, the service part of it, I don't know the

20 extent to which Bob does work with the bar and the

21 profession.  So I would rank Linda ahead of Bob of what

22 I know when it comes to service to the profession.  When

23 it comes to service on committees and things and service

24 around the law school I would rank Bob ahead of Linda.

25 I've seen her at -- she comes to some of these

1 functions, but colloquia and drawing board luncheons,

2 two of the important ones I think, particularly the

3 drawing board --

4   Q.   You testified earlier that service outside of

5 U.T. and service within U.T. are equal?

6            MR. GIBSON:  Objection, misstates prior

7 testimony.  Objection, you interrupted the witness

8 before he could finish his prior answer so that the

9 record is incomplete.

10   A.   I think service to the law school if I said

11 that they were equal, I don't think I said that, to

12 service to the profession, I don't think they're equal.

13 I think service to the profession counts, but service to

14 the law school is in my mind slightly more important

15 than service to the --

16   Q.   (By Mr. Walsh)  Is that stated anywhere in the

17 rules?

18   A.   No, that's just -- that I think is my sort of

19 how I weigh things, like -- I think they're all --

20 they're both important.

21   Q.   So you said that Professor Bone should be paid

22 somewhat more than Professor Mullenix but not perhaps as

23 much as he is paid more than her.  Does that mean that

24 you agree Professor Mullenix is paid less than she

25 should be paid?

1           MR. GIBSON:  Objection, misstates prior

2   testimony.

3       A.   No.  If anything, depending on the arrangement

4   that was made, Bob may be paid more than he should be

5   paid, but again, I need to know more about the

6   arrangements.  I hesitate to make a judgment on that.

7   But if it turns out that the reason that his salary is

8   what it is is because he's had -- we were having to make

9   up for the fact that he wasn't able to bring over his

10  pension, maybe he deserves that because I've had my --

11  my pension has been accumulating since I started

12  teaching at U.T.

13      Q.   (By Mr. Walsh)  Well --

14      A.   But I don't know the ins and outs of that but

15  that would be the -- my assessment, but I need to know

16  before I draw a strong conclusion about that.

17      Q.   So you don't know what his special deal is?

18      A.   No, or why it came about.  These are all back

19  in the Sager years.

20           THE WITNESS:  Want to take a quick break?

21           MR. WALSH:  Sure, if you'd like to we can

22  definitely do that.  How about ten minutes?

23           THE WITNESS:  That's fine.

24           MR. GIBSON:  Sounds great.  Thank you.

25           THE VIDEOGRAPHER:  We're off the record at

1 2:57 p.m.

2          (Recess taken from 2:58 p.m. to 3:09 p.m.)

3          THE VIDEOGRAPHER:  We are back on the

4 record.  The time is 3:09 p.m.

5     Q.  (By Mr. Walsh)  All right.  So we were talking

6 about why Professor Bone should be paid more than

7 Professor Mullenix and we were talking about service.

8 Professor McGarity, is Professor Mullenix and Professor

9 Bone equal in service or not?

10     A.  I would say that based on the participation at

11 colloquia, drawing boards, and generally things at the

12 law school, that I would rank Professor Bone slightly

13 ahead of Professor Mullenix.

14     Q.  But you also agree that that is not stated in

15 the policies as being more important service than what

16 Professor Mullenix does, correct?

17     A.  My recollection of the policies is that we list

18 the number of things that are service, so --

19     Q.  The policies doesn't rank them as more

20 important, less important, weighted more heavily?

21     A.  I don't recall from having read them, but I

22 don't think they do.

23     Q.  And what if Professor Mullenix couldn't attend

24 things like drawing board because of classes?

25          MR. GIBSON:  Objection, calls for

1 speculation.

2     A.   Well, then she can't attend so it would be -- I

3 wouldn't expect her to be there.

4     Q.   (By Mr. Walsh)  Well, does the committee

5 discuss that fact when evaluating her service?

6     A.   No, we -- no, it's a more general thing than

7 that.  So we don't discuss what people's teaching

8 schedules are.

9     Q.   All right.  Professor McGarity, should you be

10 paid more than Professor Mullenix?

11     A.   I think so, yes.

12     Q.   Why is that?

13     A.   I would talk about the -- mostly based on

14 quality of my scholarship.  I think maybe my teaching is

15 slightly ahead of hers but not enough to make a great

16 deal of difference.  I think for the same reason my

17 service is slightly ahead of hers.  Mostly based on

18 scholarship.  But you're asking -- this is a hard

19 question asking someone to evaluate their own

20 scholarship.

21     Q.   Well, how do you know your scholarship is

22 better than Professor Mullenix's scholarship?

23     A.   Well, my book, I've written several books that

24 have been published with major academic presses, two at

25 Harvard University Press, two at Yale University Press,

1  one at Cambridge University Press.

2     Q.   But what does that have to do with the quality

3  of the book?

4     A.   Well, those presses tend not to take books at

5  least based on the prospectus and they go through peer

6  review, the prospectus does, and even the manuscript

7  on -- yeah, I think virtually all of those, the ones

8  that I mentioned, the manuscript goes through a review

9  that they pay for.  And again, this has to do with how

10  other people regard them, and I think people regard

11  Harvard University Press and Yale University Press and

12  Cambridge University Press as very prestigious places

13  for an academic to publish.

14          One of the books published by Harvard

15  University Press with Wendy Wagner as co-author won the

16  Hamilton Award and the Hamilton Award is given out by

17  the co-op.  There's a committee of university scholars

18  that's put together to evaluate all of the books

19  published in the past year that are submitted at least

20  by University of Texas professors and it's -- they

21  select the best book and the best -- I think best

22  article over that period of time, and for at least the

23  year 2008 our book Bending Science won the overall --

24  the award and they were --

25          [Simultaneous speaking]

1    Q.   Well, so if you're talking about the way a lot

2 of people outside of U.T. Law --

3               MR. GIBSON:  Colin, if you could let

4 the -- if you could let Professor McGarity finish his

5 answer.  He had not finished his answer.  Objection for

6 the record.  Mr. Walsh is interrupting the witness and

7 not letting him finish his answer so that the record is

8 intentionally incomplete and in my view Mr. Walsh is

9 trying to intentionally create a misrepresentation on

10 the record.

11               MR. WALSH:  What a tiresome person you

12 are, Darren.

13    Q.   (By Mr. Walsh)  Professor McGarity, it sounds

14 like you're talking about the way it's perceived outside

15 of U.T. Law, your scholarship.

16    A.   I can't tell you because I've not been present

17 at any meeting in which the committee has evaluated my

18 scholarship.  So I can't tell you how the committee at

19 the law school regards my scholarship.

20               I would continue, though, that in terms of

21 my articles, I'm sure that it's somewhere of higher

22 quality than others.  But at least twice my articles,

23 one book and one article, received the award from the

24 American Bar Association administrative law section for

25 the best scholarship published by an administrative law

1 scholar during the previous year, and only four other

2 people have received that award twice. One teaches at

3 Yale, one teaches at Stanford, one teaches at Harvard,

4 and the other teaches at Columbia.

5    Q.   I think that sounds incredibly impressive.  The

6 problem I'm having, though, is earlier you said that the

7 budget committee doesn't consider any of that, right?

8    A.   Yes, and I don't think that the budget

9 committee did consider that.  They certainly didn't

10 consider the Hamilton Award because they would have

11 determined my salary before I received the award.  They

12 wouldn't have known that and I doubt they ever learned

13 about the ABA administrative law section award unless

14 they just -- I think maybe they put it on the law school

15 website or something like that, but I don't think they

16 would have considered that.

17    Q.   And it's possible even if they knew about all

18 that they would have a completely different opinion of

19 your scholarship, right?

20             MR. GIBSON:  Objection, calls for

21 speculation.

22    A.   It's possible if they knew about it they would

23 have a different opinion?  I hope not.

24    Q.   (By Mr. Walsh)  Well, I mean, but they could,

25 right?

1          MR. GIBSON:  Objection, calls for

2 speculation.

3     A.   I don't know.

4     Q.   (By Mr. Walsh)  I mean, let me think about this

5 for one second.  Let me figure out how I want to ask

6 this question.

7          All right.  So I want to take you to the

8 notes -- this is Exhibit 3, I believe -- from 2020.  So

9 if you look here, this is a summary that you sent to

10 Dean Farnsworth regarding Professor Mullenix's

11 scholarship in 2020, in May of 2020.

12     A.   Now, wait a minute.  This is a memo I sent in

13 May of 2020?  It would have been the scholarship in 2019

14 we're evaluating.

15     Q.   Right.  So May 15, 2020 you sent this to

16 Farnsworth.

17     A.   Uh-huh.

18     Q.   All right.  So here, I want to go down to this

19 section.  Did you read any of her scholarship this year

20 for this memo?

21     A.   Let me -- can you scroll up a bit?  Now scroll

22 down.  I probably read the five-page preview of the Home

23 Depot case.  No, I didn't because I put those quotes --

24 I rarely quote myself when I do that so I probably

25 didn't do that one.  Let's see.  Likewise, one of the --

1  the quotes with prevailing trope or whatever.  Oh, I did

2  look at the box full of releases because I tend to

3  not -- that's a huge, big box that gets submitted and I

4  don't try to fork that over to some other faculty

5  member.  So I reviewed that I'm sure.

6           Scroll up again.  Let me see.  I may have.

7  That chapter is familiar to me or it seems familiar to

8  me, so I may have reviewed that one.

9  Q.  Okay.  Wait, which one?  The chapter you said?

10  A.  The 27-page chapter on regulatory and judicial

11  consumer protection.

12  Q.  How long have you worked with Professor

13  Mullenix?

14  A.  You mean been on the same faculty?

15  Q.  Yeah.

16  A.  Well, for as long as she's been there.  I was

17  there before she came, so many years.

18  Q.  Are you aware that you spelled her name wrong

19  here?

20  A.  I probably did.  It does look wrong so I may

21  have done that, although with these crazy spelling

22  checkers they sometimes correct you when you don't want

23  to be corrected.  There's one member of the faculty --

24  Q.  Is Mullenix something that's usually auto

25  corrected?

1    A.    I don't know, but I certainly wouldn't put it

2   past me to have misspelled her name without checking to

3   be sure.

4              I got something on my glasses here so I'm

5   going to take a second to clean them off.  So. . .

6    Q.    Do you think it's important to spell somebody's

7   name correctly?

8    A.    Well, yeah, I suppose it's important, but it

9   gets --

10   Q.    Why would it be important?

11             MR. GIBSON:  I would ask, Colin, could you

12  please stop interrupting the witness in the middle of

13  his answer.  I would request the witness to feel free to

14  finish your answer.

15   A.    I was saying it's important because you don't

16  want to offend the person whose name you misspelled and

17  I apologize if I offended Linda.

18   Q.    (By Mr. Walsh)  It's a sign of respect.  Would

19  you agree?

20   A.    Yeah, but I don't think it indicates that I

21  disrespect Linda because I misspelled it in this

22  particular document.

23   Q.    So here I want to -- so the whole reason I

24  brought this up, I want to point out this 39-page

25  article on the Arc of Procedure over Eran Chemerinski's

1  "Closing the Courthouse Door."  Is that supposed to be

2  Erwin?

3      A.    Probably.

4      Q.    Have you ever heard of this guy?

5      A.    Yeah, I've heard of Chemerinsky and I think it

6  is Erwin and I'm sure that's just -- again, I'm taking

7  these off my handwritten notes and I could have checked

8  them against the big binder that we get.  But as I'm

9  trying to put this thing together, and it takes a long

10  time to put these memos together, I don't check every

11  spelling.  I must say I'm embarrassed that I misspelled

12  Linda's last name, but I'm not particularly embarrassed

13  that I got Erwin Chemerinsky's first name wrong.

14      Q.    So here do you remember who read this article?

15      A.    No.

16      Q.    The reader says, "The article provides lots of

17  examples and cases to support its thesis.  Linda may

18  have been stretching to make a strong point.  The reader

19  thought that it was 'a really horribly written piece' in

20  that it was overly critical of the Chemerinsky camp."  I

21  guess my question is, why is that included in this

22  description of her --

23      A.    Because that's what the reader -- that was the

24  reader's evaluation.  We asked the reader or we -- yeah,

25  we asked the reader to give us the sort of bottom line

1  and that was that reader's bottom line and I quoted it.

2  I mean, I obviously wrote that down in my notes when I

3  was there.

4      Q.   Well, what's striking to me about that is it's

5  not actually a comment on the substance of the article,

6  is it?

7              MR. GIBSON:  Objection, misstates the

8  record.

9      Q.   (By Mr. Walsh)  Or the quality of the article.

10  It's saying it's horribly written because it takes a

11  critical view of a certain position.

12      A.   Well, it said it was an overly critical review.

13  I'm just reporting.  I was the -- reporting what was

14  said about that piece.

15      Q.   Right.  Do you even know whether this was a

16  review of Chemerinsky's book?

17      A.   I know that the person who reported said it

18  was.

19      Q.   And you didn't read this so you don't know if

20  that's accurate?

21      A.   No, I do not know if that's accurate.

22      Q.   Are there a lot of reviews of scholarship that

23  describe things as really horrible because of a position

24  they take?

25              MR. GIBSON:  Objection, calls for

1 speculation.

2      A.   No, I don't.

3      Q.   (By Mr. Walsh)  What --

4      A.   I don't -- oh, go ahead.

5      Q.   What makes something overly critical?

6           MR. GIBSON:  Objection, calls for

7 speculation.

8      A.   The person who made the evaluation would best

9 know that.  I read that to say that you weren't

10 considering arguments on the other side, that you were

11 writing more of a polemic than an article.  But that's

12 how I would read overly critical.

13      Q.   (By Mr. Walsh)  So here I want to now show you

14 the way this article was viewed by a law professor at

15 Georgetown.  Is Georgetown a T14 school?

16      A.   I'm sorry, is Georgetown a what?

17      Q.   A T14 school.

18      A.   Sometimes.  Often I think.

19      Q.   So here Professor Abernathy at Georgetown

20 University Law Center talks about what a great article

21 that was.  Do you see that?

22      A.   Uh-huh.

23      Q.   It says, "I treasure your independent voice in

24 an era when most law professors seem like Stepford wives

25 of conformity."  So here we have --

1    A.   It looks like he must have been a mentor of

2 Linda.

3    Q.   So here we have two strikingly different views

4 of the same article.  One says it's really horrible

5 because it's overly critical of the Chemerinsky camp and

6 then the other one says it's great because it's an

7 independent voice.

8    A.   Uh-huh.  Yeah.

9         MR. GIBSON:  Colin, I'd ask just as you've

10 asked previously, have you produced this document?

11        MR. WALSH:  I've not produced it yet, no.

12 But it will be part of discovery supplementation.

13    Q.   (By Mr. Walsh)  But who's right, Professor

14 McGarity?

15    A.   It sounds like it's a fairly divided camp and

16 someone who is on Chemerinsky's part of the camp thought

17 that her criticism -- somebody who was not in

18 Chemerinsky's camp thought that Linda's criticism was

19 good, and I don't know who -- whether the writer of

20 the -- or the person who I summarized here was in

21 another camp or this was just that person's impression,

22 given the read of the piece.

23    Q.   Well, so how does the budget committee deal

24 with the fact that you could have polar opposite views

25 on the same piece of scholarship?

1     A.   We deal with the information that we have

2   available to us and we do the best we can.

3     Q.   Well, what does that mean, do the best you can?

4           MR. GIBSON:   Objection, asked and

5   answered.

6     A.   We evaluate, we depend on the members of

7   committee who are assigned the particular articles to

8   give their judgment on the quality of the article to

9   tell us what the article said and to give us a judgment

10  on it.

11    Q.   (By Mr. Walsh)  Well, would you say that this

12  review from the budget committee, whoever read this, was

13  an unbiased view?

14    A.   Yeah.  I have no reason to --

15    Q.   How can you possibly say that in good faith,

16  Professor McGarity?  A really horribly written piece in

17  that it was overly critical of the Chemerinsky camp.  It

18  describes it as a review of a book which is not what the

19  article is.

20          MR. GIBSON:   So what's the question?

21    Q.   (By Mr. Walsh)  How can you say this wasn't a

22  biased review of her scholarship?

23          MR. GIBSON:   Objection, asked and

24  answered.

25    A.   It's just a review.  I have no reason to

1 conclude that it was biased. It looks -- it's critical.

2 It's definitely critical of Linda's piece as apparently

3 Linda's was of the Chemerinsky book or whatever,

4 whatever "Closing the Courthouse Door" is, if that's not

5 a book.

6 Q. (By Mr. Walsh) All right. So here it

7 describes it as a review of the book.

8 (Pause.)

9 All right. So given that, you talked

10 about how your scholarship was viewed very highly

11 outside of U.T. As we've just seen, Professor

12 Mullenix's scholarship can be viewed very highly outside

13 of U.T. but not well received within U.T. Do you agree?

14 MR. GIBSON: Objection --

15 A. I can't agree with that. I think there was

16 two -- two questions you asked me. Did you want to --

17 MR. GIBSON: Objection, compound question.

18 Objection, calls for speculation.

19 A. I could certainly agree that someone outside

20 U.T. could regard Linda's scholarship as of a higher

21 quality than someone at U.T. I will say that with

22 regard to the first half your question, the Hamilton

23 Award was inside U.T. That was made by a committee of

24 the University of Texas.

25 Q. (By Mr. Walsh) So why -- you said you can

1 certainly see why Professor Mullenix's scholarship could

2 be viewed more highly outside of U.T.  Why is that?

3     A.    I think there can be differences of opinion

4 about the quality of scholarship.  I think we just saw

5 that.

6     Q.    All right.  Is that because any evaluation of

7 scholarship is going to be subjective?

8     A.    As I mentioned, it's a matter of judgment and

9 judgment involves a certain amount of subjectivity, yes.

10    Q.    All right.  Should Professor Mullenix be paid

11 as much as Professor Westbrook?

12    A.    In my opinion?

13    Q.    Yes.

14    A.    I think it's the judgment of the committee that

15 she shouldn't.  In my opinion that's the same, I think

16 no.

17    Q.    Why is that?

18    A.    That's based mostly on scholarship, but

19 generally just the cumulative judgment of the committee.

20 I have not read much of Jay's scholarship, so I have

21 read some of Linda's, and so I don't have a lot to base

22 a personal judgment on.  But I think I've agreed with

23 the committee's evaluations over the years, sometimes

24 that have ranked Jay above baseline or baseline plus

25 when they ranked Linda baseline, and I don't know if she

1  ever got a baseline minus. I don't think she's ever

2  gotten a below baseline, but -- so based on that I guess

3  I would say Jay should be paid more. His teaching is

4  outstanding. I don't know quite, without seeing the

5  numbers, how it compares with Linda, but she's a very

6  good teacher too.

7      Q. Should Professor Mullenix be paid the same as

8  Professor Rabban?

9      A. Paid the same, I don't know. Again, that's a

10 kind of judgment that is cumulative over the years as

11 each individual year we make that judgment. I don't

12 know whether she is paid more than -- or less than. If

13 you could show me the chart again I could see that.

14     Q. Professor McGarity, you've been on the budget

15 committee for over a decade. You must have an opinion

16 on whether or not Professor Mullenix should be paid the

17 same as Professor Rabban.

18           MR. GIBSON: Objection, that's harassing

19 the witness. It's not a question. You just said -- you

20 just made a statement. If you'd like to ask the witness

21 a question, please ask the witness a question.

22     Q. (By Mr. Walsh) Professor McGarity, is it your

23 testimony that in your decades on the budget committee

24 you do not have an opinion as to whether Professor

25 Mullenix should be paid the same as Professor Rabban?

1    A.    No, I do have an opinion based on my decades.

2    Q.    What is your opinion?

3    A.    That I'd like to see the numbers.  I think that

4  if Professor Rabban is paid more than Professor Mullenix

5  in that -- on that chart, then my opinion would be that

6  that reflects the judgment of the committee and that

7  would -- I would generally agree with the judgment of

8  the committee.  I'm not sure that Professor Rabban is

9  paid more than Professor Mullenix.

10   Q.    So I just want to ask you real quick to point

11 out how it's not circular to say I think Professor

12 Mullenix should not be paid as much as Professor Rabban

13 because she's not paid as much as Professor Rabban.

14   A.    I did not --

15         MR. GIBSON:  I'm sorry.  Objection.  I'm

16 not sure that's a question.  What's the question?

17         MR. WALSH:  It was a question, Darren.

18         MR. GIBSON:  Objection, vague and

19 ambiguous.  And the witness can try to answer what

20 appeared to be a statement to me.

21   A.    Your original question was should she be paid

22 equal to Professor Rabban and I would be -- and I don't

23 think that's my judgment.  I would like to know whether

24 she is or is not paid more or less than Professor

25 Rabban.

1       Q.   (By Mr. Walsh)  Professor Rabban is paid more.

2       A.   He is paid more?  Then that reflects the

3   judgment of the committee that over the years that

4   his -- some aspect of that overall evaluation exceeded

5   that of Professor Mullenix.  I'm not --

6       Q.   In your opinion which aspect --

7            MR. GIBSON:  Could you please let the

8   witness finish his answer?  Objection on the basis of

9   the fact that Mr. Walsh interrupted the witness before

10  he was finished.

11      A.   As I was saying -- I've lost my train of

12  thought what I was going to say.  I'll I guess stick

13  with what I said, that based on the cumulative judgment

14  of the committee over the years that's how things have

15  worked out if that's how the -- if that's what the

16  numbers show on that chart.

17      Q.   (By Mr. Walsh)  But it's not a reason, though;

18  do you agree?  Like saying because he's paid more he

19  should be paid more doesn't explain why he's paid more.

20           MR. GIBSON:  Objection.  Go ahead.

21      A.   That's not what I said.  I didn't say because

22  he's paid more he should be paid more.  I said because

23  on that chart -- because he's paid more on that chart,

24  or that's what the chart says, that that reflected the

25  judgment of the committee over the years.  And based on

1 that judgment of the committee, I am inclined to say

2 that he should be paid more than Linda at this

3 particular juncture.

4     Q.   (By Mr. Walsh)  All right.  Professor McGarity,

5 I need you to justify that answer.  Why should she not

6 be paid as much as Professor Rabban?

7          MR. GIBSON:  Objection, asked and

8 answered.  Objection, misstates prior testimony.

9     A.   Over the years we've made judgments and made

10 recommendations to the dean about the quality of

11 scholarship, service, and teaching, and over the years,

12 at least as of this particular juncture, this stage,

13 that cumulative judgment has wound up with David being

14 paid more than Linda.

15     Q.   (By Mr. Walsh)  Which one of -- which one of

16 those factors or do all of them point towards Professor

17 Rabban getting paid more than Professor Mullenix?

18     A.   It may have been different factors in different

19 years.  I don't know.  I mean, I. . .

20     Q.   Well, sitting here right now, this year you're

21 on the budget committee, should Professor Mullenix be

22 paid the same as Professor Rabban?

23     A.   Should she get the same raise or are you saying

24 should she be paid the same?  You said be paid the same

25 and the answer is I wouldn't say that based on one

1 year's performance on either of them. That's what we're

2 looking at this year on the budget committee.

3    Q.   So should she get the same raise?

4    A.   We have not come to David Rabban yet so I can't

5 say.

6    Q.   All right.  So you don't know.  So it could be

7 any of these factors, teaching, scholarship, service,

8 that in any given year you think Professor Rabban is

9 better than Professor Mullenix?

10          MR. GIBSON:  Objection; misstates prior

11 testimony, asked and answered.

12    A.   Yes, I think that's true.  In any given year it

13 could be any one or all three factors.

14    Q.   (By Mr. Walsh)  So why was Professor Rabban

15 paid more initially than Professor Mullenix?

16          MR. GIBSON:  Objection, misstates prior

17 testimony.

18    A.   What do you mean by initially?

19    Q.   (By Mr. Walsh)  Well, I mean, if they

20 receive -- if they're both rated baseline or you say

21 that over the years they should be receiving the same

22 pay or that they're -- one of the factors is more

23 important than the other, at some point Professor Rabban

24 moved ahead of Professor Mullenix.  Is that right?

25          MR. GIBSON:  Objection, misstates prior

1 testimony.

2    A.   I don't know that to be the case.  I'm trying

3 to remember when --

4    Q.  (By Mr. Walsh)  He's always been paid more than

5 Professor Mullenix.

6    A.   I can't remember when he joined the faculty.

7 Did he join the faculty before Linda?

8    Q.   I don't have an answer for you.

9    A.   I don't know.

10    Q.   It doesn't matter.

11    A.   If we start with that first starting salary and

12 then things move from there.  My starting salary at the

13 University of Texas was $30,000.  I thought it was

14 terrific.  It was a great raise over what I was getting

15 at the University of Kansas, but that's kind of the

16 starting point from which judgments are made to bump my

17 salary up or leave it the same.  I don't think we've

18 ever made a judgment that somebody's salary should be

19 bumped down.  That's never happened.

20    Q.   So then why shouldn't Professor Mullenix's

21 salary be bumped up?

22           MR. GIBSON:  Objection, vague and

23 ambiguous.

24    A.   It may well be in any given year based on the

25 judgment.  It will go up if there's money to be paid and

1 she's evaluated at baseline, then her salary will be

2 bumped up.

3      Q.   (By Mr. Walsh)  What about Professor Levinson,

4 should Professor Mullenix be paid as much as Professor

5 Levinson?

6      A.   Again, based on the cumulative judgment of the

7 committee, if he turns out above her in salary on that

8 chart, then I would say my answer is exactly the same,

9 that if he's above her he should -- based on the

10 judgment of the committee he should be paid more.

11      Q.   What reason should Professor Mullenix be paid

12 less than Professor Levinson?

13              MR. GIBSON:  Objection, asked --

14      Q.   (By Mr. Walsh)  What reason?

15              MR. GIBSON:  Objection, asked and

16 answered.

17      A.   That over the years her -- she was not

18 evaluated or the budget committee didn't recommend as

19 high a raise for her in some years so that the total

20 over all of the years is that Professor Levinson wound

21 up being paid more.

22      Q.   (By Mr. Walsh)  All right.  See, once again you

23 just did that thing where you say because he's paid

24 more -- because we determined that he should be paid

25 more he's paid more.  That doesn't tell me why, though.

1      A.   Oh.

2            MR. GIBSON:  Objection.  There's no

3   question on the table.  Colin, if you could ask

4   objection -- I mean ask a question.

5      Q.   (By Mr. Walsh)  So why does the budget

6   committee determine that Professor Levinson should be

7   paid more than Professor Mullenix?

8            MR. GIBSON:  Objection, misstates his

9   prior testimony.

10     A.   In any given year the budget committee will

11  make a recommendation based on their evaluation in that

12  particular year.  So in any particular year if they

13  evaluate Professor Levinson more highly than Professor

14  Mullenix, they will -- that represents the judgment of

15  the committee that he should be paid more.  In any given

16  year it may well be that they would evaluate the work of

17  Professor Levinson and Professor Mullenix and determine

18  that Professor Mullenix should get a greater bump-up or

19  increase in salary.  Over the years as those average out

20  Professor Levinson has apparently gotten more bump-ups

21  or at least bump-ups in greater amounts than Professor

22  Mullenix.  And I --

23     Q.   (By Mr. Walsh)  Professor McGarity, as you sit

24  here today, in your opinion should Professor Mullenix be

25  paid the same as Professor Levinson?

1          MR. GIBSON:  Objection, asked and

2  answered.

3      Q.   (By Mr. Walsh)  I'm not asking about the budget

4  committee determination.  I'm asking in your view if it

5  was just you making this decision, would you pay

6  Professor Mullenix as much as --

7      A.   I haven't --

8          MR. GIBSON:  Objection, asked and

9  answered.

10     A.   We've not come to Sandy Levinson yet so I can't

11 tell you what I think.

12     Q.   (By Mr. Walsh)  Professor McGarity, how can you

13 possibly know that you haven't come to Sandy Levinson

14 yet?  You couldn't even remember who you talked about on

15 Friday.

16         MR. GIBSON:  Excuse me.  Colin, that is

17 becoming harassing and abusive and it's really

18 disrespectful to this witness.  I would ask that you

19 withdraw your question and ask a respectful question of

20 the witness.  It's really unbecoming.

21     Q.   (By Mr. Walsh)  Professor McGarity, if you

22 can't remember who you even talked about on Friday how

23 can you possibly know who's already been evaluated?

24     A.   Because I know that we tend to evaluate people

25 in terms of the years out of law school and Sandy is way

1 out there in terms of years out, and I am pretty

2 confident that we haven't -- I haven't read something

3 from Sandy this year so I can't say with dead absolute

4 certainty, but I'm pretty sure that we haven't looked at

5 Professor Levinson.  If we have looked at Professor

6 Levinson I don't remember that evaluation well enough

7 because it would have been far enough in the past so

8 that I couldn't tell you, but I'm pretty sure we have

9 not looked at Professor Levinson yet.

10     Q.   Well, so you were just evaluated on Friday and

11 Professor Levinson doesn't have that many more years on

12 you.

13     A.   But it was --

14     Q.   So does that mean he's coming up this week?

15     A.   It probably means we'll get to him the next

16 meeting.  It almost certainly means.  We've only got

17 about six or seven more to go.

18     Q.   And you didn't read any of his scholarship?

19     A.   Not this year.

20     Q.   All right.  So I forget, what was your answer

21 to the question, is you sitting here if you were the

22 only one to decide salary at U.T. Law why would you pay

23 Professor Levinson more than Professor Mullenix?

24               MR. GIBSON:  Objection, misstates prior

25 testimony.  Objection, asked and answered.  Objection,

1  calls for speculation.

2     A.   We're talking about overall pay and not the

3  raise for this past year?

4     Q.   (By Mr. Walsh)  Right.

5     A.   For 2020.  Again, my answer is exactly the

6  same.  Over the years cumulatively our evaluations of

7  Professor Levinson have exceeded our evaluations of

8  Professor Mullenix to the extent that those salaries are

9  different.

10    Q.   Do you remember why that was?

11    A.   No, not -- again, it's cumulative.

12    Q.   So if you don't remember why Professor Levinson

13 is being paid more or evaluated higher, could it be

14 because Professor Mullenix is a woman and Professor

15 Levinson is a man?

16            MR. GIBSON:  Objection, calls for

17 speculation.

18    A.   I feel very confident that it's not because of

19 that because I've been on the budget committee nearly

20 all of those years and that has not been a reason for

21 evaluating the scholarship, service, and teaching.

22    Q.   (By Mr. Walsh)  Well, do you think they would

23 have said it out loud if it was?

24            MR. GIBSON:  Objection, calls for

25 speculation.

1    A.    I don't know if somebody was discriminating

2 based on sex whether they would say it out loud or not.

3    Q.    (By Mr. Walsh)  Have you ever heard any

4 misogynistic comments from faculty members at U.T. Law

5 in your 40 years?

6    A.    I'm trying to think.  Not that I can think of.

7    Q.    All right.  Have you ever seen any sexism at

8 U.T. Law in your 40 years?

9    A.    We have to go back probably slightly before my

10 40 years or it may be part of when I was teaching.

11 Yeah, there was something I would characterize as

12 sexism.  There was not an equivalent access to restrooms

13 for men and women.  I do recall that.  That was back in

14 the early years and it may have been when I was a

15 student, but I think it may not have been that different

16 when I first started.

17    Q.    Should Professor Mullenix be paid as much as

18 Professor Hu?

19    A.    Again, my answer is exactly the same, is if

20 the --

21    Q.    Well, let me stop you right there and ask a

22 follow-up question, which --

23         MR. GIBSON:  I would object to the extent

24 that the witness was interrupted from answering his

25 question so the record is incomplete and intentionally

1 incomplete based on Mr. Walsh interrupting the witness.

2     Q.  (By Mr. Walsh)  Professor McGarity, you said it

3 was going to be the same answer so I thought I would

4 head this off and ask my follow-up question instead of

5 just letting you repeat yourself over and over.

6            So let me follow up then.  Which of the

7 factors would entitle Professor Hu to more pay than

8 Professor Mullenix?

9     A.  Well, it could be different factors in

10 different years as they accumulated over the years.  I'm

11 trying to think if there's anything in particular.

12 Again, it's the judgment of the committee in each year

13 and that aggregates and accumulates over the years.  So

14 it may well be, in fact almost certainly was, the case

15 in a few years that Professor Mullenix was regarded more

16 highly than Professor Hu when it came to recommending

17 salary increases because there were some fallow years

18 early on in Professor Hu's scholarship but then he

19 published some outstanding articles in other years.  So,

20 again, it would be a cumulative thing, so my answer is

21 again pretty much the same.

22     Q.  Have you ever recommended an equity raise for

23 Professor Mullenix?

24     A.  Me personally?  No.

25     Q.  Yeah.  Has anyone on the budget committee --

1    A.   I am --

2    Q.   -- ever recommended an equity raise for

3 Professor Mullenix?

4    A.   You know what, I may have to take that back,

5 what I just said.  No, if you're asking just an equity

6 raise for equity -- for purposes of adjusting things for

7 equity, I don't think I have made a recommendation for

8 Linda Mullenix nor have I for any other faculty member.

9 Now, you ask anybody else.  Not that I know of.

10   Q.   So what were you thinking of that made you

11 originally think you might have to change your answer?

12   A.   I think at one point when we were asked about

13 the faculty development initiative I may have.  I just

14 don't recall for sure.  But I remember thinking that

15 I -- thinking if she should be included, but I don't

16 know that I went forward with that or not.  Probably

17 did.  This would have just been a kind of ballot that

18 the -- that the dean asked us to give a list of six

19 people or eight people, I can't remember, that we

20 thought should be on the -- in the faculty development

21 initiative.  That was supposed to be a secret vote so I

22 just told you what my vote was I guess.

23   Q.   Do you remember anybody else that you voted for

24 for that?

25   A.   Oh, I think I -- I think there were two of

1  them, two rounds of this.  I'm sure I can't remember all

2  of them.

3     Q.   Well, can you remember any of them besides

4  Professor Mullenix?

5     A.   Sure, sure.  I can remember Cary Franklin,

6  Wendy Wagner, I think Joey.  And again, we're probably

7  accumulating across two of these.  The first time I

8  think we were looking at younger people, the retention

9  risks, so that would include Wendy, probably David

10 Rabban, definitely Jay Westbrook.  Let me think of

11 others.  Lynn Baker, Jennifer Laurin.  Probably Michele

12 Dickerson.  If you want to put the list I can maybe

13 think of others.  I think it was just eight or nine over

14 the years, maybe 10 or 11.  I don't know how many I just

15 listed but those come to mind.

16    Q.   Actually that's a really good idea.  Give me

17 one second.

18              (Pause.)

19    A.   I thought of another one.  I think Melissa

20 Wasserman was on that -- would have been on one of

21 those.  This is probably the earlier one.  Angela

22 Littwin, that's who I was trying to think of.

23    Q.   You said Littwin and Wasserman?

24    A.   Yeah, I think.  I'm not sure about Melissa

25 because she wasn't around I think when we did the first

1 round, so you might take her off the list. I'm not

2 positive about that. Angela Littwin, though, I'm pretty

3 confident would have been on my list.

4 Q. So here's the list of the people who were

5 awarded that. Let me ask you --

6 MR. GIBSON: Colin, I'm sorry to

7 interrupt, but I feel like you have previously labeled

8 Exhibit 5 and I think this should be Exhibit 6. I just

9 don't want us to have a messed-up record.

10 MR. WALSH: Hold on. Oh, I did. Good

11 catch. Okay.

12 Q. (By Mr. Walsh) All right. It should be

13 properly labeled now in the screen. Here's all the

14 people that did receive FII funds the second round, but

15 it also includes everybody who got it the first round.

16 A. Okay. That's helpful.

17 Q. Because all the people that got it the first

18 round also got it the second round.

19 A. Okay. Are you asking me who -- if he was

20 around when we were making the recommendations, I

21 definitely would have put Steve Vladeck on my list.

22 Q. So let me ask it this way. Is there anybody on

23 this list that you voted for -- or is there anybody

24 who's not on this list that you voted for? So we know

25 that Professor Mullenix was one. Is there anybody else

1 like that?

2     A.   I got to look at the list real carefully then.

3 Can you make it a little bigger for me?

4     Q.   Yeah, I'm going to make the names bigger.

5     A.   Yeah, that's what I want -- oh, that's good.

6 That's good.  The only one that I might -- and again, I

7 don't remember who I put on that list, it might have

8 been on my list that didn't wind up here, would be Sean

9 Williams.  I'm very impressed with -- he doesn't write a

10 lot of articles but the articles he writes I think are

11 of high quality, so I -- and his service is terrific and

12 his teaching is regarded better than average.  I might

13 have included Sean Williams on my list that didn't make

14 this list of the -- this is based on our -- the

15 cumulative sort of rankings of all of the members of the

16 committee.

17     Q.   Oh, just because you expressed curiosity, I'm

18 going to go ahead and point out here's the special deal

19 that Bone got.  12,125 is the portion of -- that BU

20 would contribute to his retirement account each year, or

21 the difference between what U.T. does and what BU does.

22     A.   Oh, that's interesting.  I didn't know what the

23 deal was.  I'm not -- I mean, I take your word for it.

24 I don't know that that's the case or not, but it does

25 say additional compensation.

1    Q.   So if you look down here, you're paid 359 and

2  if you don't take the $12,000 for Professor Bone out you

3  get 365.  So he's still paid a little bit more.  Does

4  that seem right?

5    A.   Oh, I'm not in the best position to judge that.

6  Other people evaluated my scholarship and Bob's

7  scholarship and that's how they came out.  And again,

8  you take the 12,000 out, he's paid more than me, I guess

9  that represents the judgment of the committee over the

10  years.

11    Q.   And you agree with it, you think that's right?

12             MR. GIBSON:  Objection, asked and

13  answered.

14    A.   I said it's not for me to say.  If that's the

15  way the committee came out, I can accept that.

16    Q.   (By Mr. Walsh)  So you said that this was done

17  by secret ballot.  What happened to the ballots after

18  you cast them?

19             MR. GIBSON:  Objection, calls for

20  speculation.

21    A.   I just turned mine in on a piece of note paper

22  off a legal pad.  I just gave them to the dean.  I don't

23  know what the dean did with them.

24    Q.   (By Mr. Walsh)  Okay.  So it was all done by

25  paper?

1          MR. GIBSON:  Objection, calls for

2 speculation.

3     A.   Yes, we were asked to turn in to him a piece of

4 paper with those -- with our rankings on them.  And as I

5 recall, he said in rank order so we did it that way.

6     Q.   (By Mr. Walsh)  And it was paper both times,

7 both rounds?

8     A.   I don't have a strong enough memory of the

9 first round.  I do have a pretty strong memory of the

10 second round.

11    Q.   Since we're talking about this, there was a

12 decision made by the budget committee not to reveal that

13 a second round of faculty investment initiative funding

14 had been released by the university.  Is that right?

15         MR. GIBSON:  Objection, misstates prior

16 testimony.

17    A.   I don't recall a decision made to that effect.

18    Q.   (By Mr. Walsh)  Well, was there a letter or

19 memo ever sent to the faculty listing all of these

20 people as receiving faculty investment initiative

21 funding in 2018?

22    A.   I didn't write one.  I don't recall having seen

23 one.

24    Q.   All right.  Did Dean Farnsworth talk to you and

25 the budget committee about whether to reveal that there

1 was a second round of faculty investment initiative

2 funding?

3    A.   Let me think about that.  I don't remember him

4 saying don't reveal that there's been a second round.

5    Q.   You don't remember if the budget committee --

6 well, let me ask it this way.  Do you remember if the

7 budget committee decided that this might make the

8 faculty upset and so it decided not to reveal it?

9    A.   I don't recall making that decision at all.

10    Q.   Do you think that if the faculty knew about

11 this they would be upset?

12            MR. GIBSON:  Objection, calls for

13 speculation.

14    A.   Well, that also states faculty in the plural.

15 My answer would be probably some people on the faculty

16 would be upset.  I think lots of people on the faculty

17 wouldn't have been upset.  But that's -- again, I'm

18 speculating about that.  That's just my impression.

19    Q.   (By Mr. Walsh)  Who do you think would have

20 been upset on the faculty?

21            MR. GIBSON:  Objection, calls for

22 speculation.

23    A.   I can't say for sure.  I think the only people

24 who didn't get the raise, some of them might have been

25 upset.  I can't name names.  It's just pure speculation,

1 really.

2    Q.   (By Mr. Walsh)  Go ahead and speculate away.

3 Name names.  Who do you think would be upset by

4 discovering they were not a recipient of the FII funds?

5              MR. GIBSON:  Objection, calls for

6 speculation.

7    A.   I hate to even speculate.  That might be doing

8 somebody a disservice.

9    Q.   (By Mr. Walsh)  All right.  So if Dean

10 Farnsworth testified that the budget committee was

11 consulted about whether to reveal these funds and the

12 determination was not to, is there any reason to think

13 he would be misremembering?

14             MR. GIBSON:  Objection, calls for

15 speculation.

16    A.   Are you saying would I have any basis for

17 saying he was misremembering?

18    Q.   (By Mr. Walsh)  Yeah.

19             MR. GIBSON:  Objection, calls for

20 speculation.

21    A.   No, I don't have any basis for saying he would

22 be misremembering.

23    Q.   (By Mr. Walsh)  Okay.  Now, you testified that

24 when there's dislocation due to raises or money given

25 for retention bonuses that sometimes the budget

1 committee talks about making equity raises.  Has the

2 budget committee discussed any equity raises due to

3 dislocation because of the faculty investment

4 initiative?

5           MR. GIBSON:  Objection, misstates prior

6 testimony.

7      A.   Yes.

8      Q.   (By Mr. Walsh)  All right.  What has the

9 faculty -- what has the budget committee discussed?

10      A.   In the years subsequent to the first time this

11 went into effect we talked about people who didn't get

12 this that were good-performing faculty members as

13 they -- now these raises tended to separate folks that

14 we should -- we thought about, well, when we bump

15 somebody up we should bump them up a little more, given

16 our annual amount of budget that we have to work with.

17 So yeah, we did talk about that.

18      Q.   And who specifically was talked about in

19 connection with that?

20      A.   I don't recall anyone in particular.  I think

21 that we just sort of made it a general thing, and we

22 probably did talk about it in particular with particular

23 people but I don't recall who those were.

24      Q.   Was it more than one person?

25      A.   Yes, I think it was more than one.

1    Q.   Should Professor Powe be paid more than

2  Professor Mullenix?

3    A.   Again, based on the cumulative judgment of the

4  committee over the years, perhaps so.  But on any given

5  year, possibly not.

6    Q.   Why possibly not?

7    A.   Because he has --

8           MR. GIBSON:  Objection, calls for

9  speculation.

10   A.   There are years where Professor Powe hasn't

11 published.  He has a kind of way that he writes these

12 really spectacular books every six or seven years and we

13 to some extent take that into account.  But if there's

14 been two or three relatively fallow years, that's going

15 to count against him and he's going to wind up with a

16 below -- maybe not below baseline but a baseline minus

17 evaluation, whereas Linda might in those years be

18 getting a baseline or a baseline plus or above baseline

19 evaluation in that year and therefore would do better in

20 any particular year.  But over the years if his salary

21 is above hers at the moment, it's a cumulative thing and

22 not based on any given year.

23   Q.   (By Mr. Walsh)  All right.  Should Professor

24 Mullenix be paid the same as Professor Peroni?

25           MR. GIBSON:  Calls for speculation.

1    A.   The answer is basically the same.  Depending on

2  the evaluations over the years, she should if

3  cumulatively that's where she came out or he came out as

4  of this year.

5    Q.   (By Mr. Walsh)  Why is that?

6    A.   Because I think people should be paid what as

7  their -- their pay should reflect the evaluations of the

8  budget committee over the years.

9    Q.   All right.  So it sounds like you really trust

10  the system quite a bit.  Is that correct?

11    A.   That's correct.

12    Q.   Why?  I'm sorry, that's a why.

13    A.   That's the question, why?  Well, over at least

14  20 years that I've been on the budget committee I've

15  seen it operate and I think it works very well.

16    Q.   Is that because you're on the committee?

17    A.   It's because I'm on the committee that I was

18  able to observe it over a 20-year period, yes.

19    Q.   How has the budget committee changed between

20  Farnsworth and Sager besides the number of committee

21  members?

22    A.   Farnsworth comes to us for virtually any pay

23  kind of issue that comes before him, be it retention

24  because somebody made an offer to one of our faculty

25  members, or bringing in the laterals, as we mentioned,

1 and Sager never did that.

2    Q.   Is that a good thing, bad thing?

3    A.   Yes, I can unequivocally answer that yes in my

4 view.

5    Q.   What --

6              [Simultaneous speaking]

7    A.   I'm sorry?

8    Q.   So one of the issues with Dean Sager --

9              MR. GIBSON:  I think -- can we just

10 clarify what you think, whether that was a good thing or

11 a bad thing?  You guys were talking over each other.

12 Just ask Professor McGarity, can you clarify whether you

13 think that was a good thing or a bad thing?

14    A.   I think it was a good thing the way we changed

15 the -- or the way the dean changed between Sager and

16 Farnsworth when it comes to requesting the advice of the

17 budget committee with respect to lateral hires and with

18 respect to retention of faculty.

19    Q.   (By Mr. Walsh)  Now, with lateral hires why

20 does he go to the budget committee instead of the

21 appointments committee?

22              MR. GIBSON:  Objection, calls for

23 speculation.

24    A.   Because it has -- he just comes to us with

25 respect to salary, not with respect to whether we should

1 hire or not. That decision has already been made by the

2 time it comes to us, the faculty has voted on it.

3     Q. (By Mr. Walsh) Okay. So one of the issues

4 with Dean Sager was that he was giving out large sums of

5 money without informing the faculty, correct?

6     A. That's my understanding, yes.

7     Q. Now, it seems to me that Dean Farnsworth is

8 doing the same thing except he confers with the budget

9 committee before giving out large sums of money. Would

10 you agree with that?

11     A. No, I wouldn't. We're not talking large sums

12 of money like we were with Sager, forgivable loans --

13     Q. Well, does Sager come to the budget committee

14 regarding housing allowances?

15     A. No, he does not come to the budget committee.

16     Q. What about relocation allowances?

17     A. No. Those are all set where the faculty voted

18 on ranges for the -- that the dean could use for those.

19     Q. What about big raises, like $43,000 to

20 Professor Albert?

21     A. He did come to the budget committee to meet the

22 salary offered by whatever university was offering --

23 offering Richard that money and over -- and cumulatively

24 that's a lot of money, but it's not like it's this

25 200,000 forgivable loan kind of thing that was going on

1  in the Sager administration, as I understand it.  I

2  wasn't involved in it.  I definitely, as a member of the

3  budget committee and the chairman of the budget

4  committee, wasn't consulted about those.

5      Q.   Okay.  So do you think that Dean Farnsworth is

6  more transparent than Dean Sager?

7      A.   Yes.

8      Q.   Why is that?

9      A.   Because he comes to the budget committee,

10  because he makes available every faculty member's salary

11  to anybody on the faculty.  For a few years we actually

12  sent it out as a memo to be transparent about it.  In

13  more recent years it's just if you want to know, come to

14  the dean's office and you can see it.  But that's much

15  more transparent.

16      Q.   How can you say that, Professor McGarity?

17  Because I just showed you something about Bob Bone's

18  salary that you didn't know, so how can you say that he

19  makes everybody's salary available?

20      A.   Well, I've never gone to look.  That

21  particular -- I mean, the whole -- when we -- after the

22  Sager years we decided to -- I'm trying to remember what

23  word it is.  It wasn't disaggregated.  What's the word

24  you use for combining them all in and then playing it

25  out on an annual basis.  We annualized some of these

1 forgivable loans, right, and I never was clear on

2 exactly what the -- how that worked and the numbers on

3 it.

4          So when you showed me that piece of

5 information, I'm on the budget committee and I don't

6 recall having seen that -- that number for Bob and I

7 still don't know that that reflects what he didn't get

8 from BU when he came over.  That's what you tell me and

9 I don't know it not to be true either.

10    Q.   Should Professor Forbath be paid more than

11 Professor Mullenix?

12    A.   My answer is the same.  If that issue --

13    Q.   I'm asking your opinion.

14          MR. GIBSON:  Objection.

15    Q.  (By Mr. Walsh)  I'm not asking what the budget

16 committee's determination is.  I'm asking in your

17 opinion, Professor McGarity, should Professor Forbath be

18 paid more than Professor Mullenix?

19          MR. GIBSON:  Objection, asked and

20 answered.  Objection, the witness was interrupted when

21 he was trying to provide his answer.

22    A.   If that reflects the cumulative judgment of the

23 budget committee over --

24    Q.  (By Mr. Walsh)  Professor McGarity, I'm asking

25 about your opinion.  I'm not asking what the budget

1 committee's cumulative judgment --

2    A.   That would be my opinion because --

3    Q.   [Indiscernible] who has been working at the law

4 school alongside Professor Forbath for years to answer

5 this question as well as working alongside Professor

6 Mullenix for years to answer this question.  Do you

7 think that Professor Forbath, based on your observations

8 in working with him, should be paid more than Professor

9 Mullenix?

10           MR. GIBSON:  Objection, asked and

11 answered.  I would again request for the sake of the

12 record and for our court reporter that Mr. Walsh stop

13 interrupting the witness when he is trying to answer the

14 question and when he doesn't like the answer he's

15 receiving.

16    A.   I lost my train of thought.  Apart from my

17 experience on the budget committee, I have no basis for

18 having an opinion or I haven't tried to form an opinion

19 about whether Professor Forbath should be paid more than

20 Professor Mullenix.

21    Q.   (By Mr. Walsh)  And what about Professor

22 Steiker, should he be paid more than Professor Mullenix?

23    A.   Professor who?

24    Q.   Steiker.

25    A.   Steiker.  My answer is the same.  If that

1 reflects the cumulative judgment of the budget committee

2 over the years, then I think he should.

3    Q.   Why is that?  What have you seen from Jordan

4 Steiker that makes him worth more than Professor

5 Mullenix?

6         MR. GIBSON:  Objection, misstates prior

7 testimony.

8    A.   What I have told you before, if that reflects

9 the -- I don't know that he is or isn't, so I -- because

10 I have to see the numbers to know that for sure because

11 I know Professor Mullenix is paid well.  But if that --

12 to the extent that that reflects, and it does.  To the

13 extent that it's higher than her salary, it reflects the

14 cumulative judgment of the budget committee, which as I

15 told you on a number of occasions I trust and therefore

16 I would agree.

17    Q.   (By Mr. Walsh)  Should Professor Mullenix and

18 Professor Silver be paid the same?

19    A.   Same answer.

20    Q.   And what about Professor Wickelgren and

21 Professor Mullenix, should they be paid the same?

22    A.   That one actually may be a little different

23 because Abe came in with this spectacular deal that had

24 him very high up, and he hasn't been on the faculty long

25 enough to necessarily reflect the collective judgment of

1 the budget committee.  So on that one I would have to

2 say I -- I don't have a clear opinion about.  I will say

3 that I think that Professor Wickelgren started at a very

4 high salary that was above his cohort by a considerable

5 distance, and whereas I don't think the budget committee

6 has penalized him for that as we make these baseline,

7 above baseline, minus baseline.  I think his current

8 salary reflects that initial huge beginning salary.

9      Q.   So to your knowledge, do tenured law faculty

10 create course syllabi each year?

11      A.   We're supposed to.  That's what the university

12 regulations require us to do.

13      Q.   Actually you know what, this might be better.

14 Let me just do this.  So I want to show you paragraph

15 No. 8.  It starts with "Professor Mullenix's academic

16 responsibilities include."  Do you see where?

17      A.   Yes.

18      Q.   All right.  Would this be a good description of

19 all tenured law faculty?

20      A.   Let me read it.

21              (Witness reviews document.)

22              Not all of those are something that I

23 would consider a responsibility of the faculty.

24      Q.   Which ones would you take out?

25      A.   Engaging in continuing legal education.  If

1  you're talking about taking CLE courses, if you're a

2  member the bar you need to do that, but you don't have

3  to be a member of the bar to be on the faculty.

4      Q.   Oh, okay.

5      A.   Let me see, there's another one.  Participating

6  as a speaker or conference at academic and professional

7  meetings, I think that's something that's highly

8  recommended but not necessarily required.  The rest of

9  them I think is something that we expect to see in our

10  tenured professors.

11          MR. WALSH:  Well, if nobody objects I'd

12  like to go ahead and take a short ten-minute break.

13          THE WITNESS:  I would like that.

14          MR. WALSH:  Let's go off the record.

15          (Recess taken from 4:32 p.m. to 4:49 p.m.)

16          THE VIDEOGRAPHER:  We are back on the

17  record at 4:49 p.m.

18      Q.   (By Mr. Walsh)  All right.  Thanks for coming

19  back after a short break, Professor McGarity.  What I

20  want to talk about now is the budget committee that took

21  place in spring of 2018.  You were not chair of that

22  committee.  Is that right?

23      A.   When you say 2018, is that 2018-19, or '17 to

24  '18?

25      Q.   '17 to '18, the one that Linda --

1      A.    I think I was not -- I was not the chairman

2  that year is my recollection, that's right.

3      Q.    All right.  Was it Professor Baker?

4      A.    I think it was.

5      Q.    All right.  So I want to just ask -- so here is

6  something.  So this is going to be Exhibit No. 7.  I'll

7  show you what it is.  I just want to make sure we're

8  talking about the same thing.  So this is the 2017 to

9  2018 Guidelines for Annual Review of Faculty.

10     A.    Okay.

11     Q.    So would this be the guidelines that would be

12  used to set the fall 2018 salaries?

13     A.    No, this is the one for the university.  So it

14  would be the guidelines for determining --

15     Q.    Well, this is the same sort of thing from

16  before, so 2017 to 2018?

17     A.    That would be where we made the determination

18  whether they met expectations, exceeded expectations, or

19  didn't meet expectations.  That's what that memo is

20  about.

21     Q.    Right.  So here I just want to show you.  This

22  looks like all the submissions from the faculty members.

23  Let's see if we can get through all of these.  These are

24  all student evaluations.

25     A.    Oh, okay.

1    Q.   So then you have like this.  Does this look

2  like the binder that's provided to you?

3    A.   Uh-huh.

4    Q.   Who provides this binder?

5    A.   Sylvia Hendricks when I was chairman.  I think

6  every year I was chairman it was Sylvia Hendricks.

7    Q.   All right.  So do you remember -- so now I want

8  to show you what I'm going to mark as Exhibit No. 8.  Do

9  you remember who you read -- what scholarship you read

10 in 2017?

11   A.   No.

12   Q.   2018?

13   A.   I don't remember off the top of my head.  I

14 would at least --

15   Q.   What was your opinion of Professor Baker --

16            [Simultaneous speaking]

17   A.   You would have -- I'm sorry, you would have in

18 that production my what they call "Tom reads" and that

19 would be the ones that I evaluated.

20   Q.   What was your opinion of Professor Baker as the

21 chair of the budget committee?

22   A.   I thought she did a decent job.

23   Q.   How come she hasn't been chair since?

24            MR. GIBSON:  Objection, calls for

25 speculation.

1      A.    I have no idea.

2      Q.    (By Mr. Walsh)  Does Dean Farnsworth just

3  select the chairs?

4      A.    That's my understanding.

5      Q.    I mean, is that how you've been selected?

6      A.    As far as I know, perhaps in conjunction with

7  Bobby Chesney.  He may consult with Bobby, but he

8  doesn't -- he makes the selection.

9      Q.    All right.  So this is the summary that was

10  sent to Dean Farnsworth of the committee of the raise

11  recommendations and committee comments.  Do you ever see

12  this document if you're not the chair?

13      A.    First time I've seen it as far as I can recall.

14      Q.    Okay.  All right.  So now I want to show you

15  Exhibit No. 9.  All right.  It's going to be Exhibit

16  No. 9.  All right.  So this is the salary range from

17  2017 with the increase for the 2018 salaries.  So if you

18  look here, you see Professor Bone got $10,000, so did

19  you, so did Professor Westbrook, Sager got 3, Rabban got

20  10.  And then you come down here to Mullenix who got

21  1,500.  Do you remember the year that Professor Mullenix

22  got a $1,500 salary increase?

23      A.    I don't remember that.  It looks like at least

24  that was the case in 2017-18.

25      Q.    Right.  For the 2018-2019 year?

1    A.    The raise for that year, yes.  It was based on
2  the 2017 performance.

3    Q.    Right.  Do you remember anything about
4  Professor Mullenix's performance from 2017 that would
5  indicate that she would get a $1,500 raise?

6    A.    No.

7    Q.    So it might take you a second or two but look
8  through these numbers.  Do you see any other $1,500
9  raises?

10    A.    No, none.  Any 15 -- no, none other at 1,500.
11  Keep going.

12    Q.    The next lowest is 2,000, right?

13    A.    There's a 2,500 I see and a 2,000.

14    Q.    All right.  So Professor Mullenix got the
15  lowest raise of anybody?

16    A.    Some people didn't get any raise at all.

17    Q.    All right.  So Professor Mullenix got the
18  lowest raise of the people who got raises?

19    A.    It looks that way.

20    Q.    All right.  So then let's go back to the
21  comments and see why that would be true.  So if you go
22  down here to Professor Mullenix, which is line 41, do
23  you see what I'm talking about?

24    A.    Uh-huh.

25    Q.    It says below average, continued strong

1 teaching but publications were all case notes and

2 updates, no substantial articles.

3     A.    Uh-huh.

4     Q.    Does that justify in your mind the $1,500

5 raise?

6     A.    I think that that's deserving of a raise for

7 sure because of continued strong teaching.  There's

8 nothing said here about the service so I don't know what

9 the service component was.  I take it Professor Baker

10 doesn't write quite as much as I tended to write,

11 but. . .

12     Q.    Right.  So here she's related -- or she's rated

13 below average?

14     A.    Which I take it is below baseline is what we --

15     Q.    Right, that's what it's saying?

16     A.    -- what we use.  Yeah, I think that's what it's

17 saying.

18     Q.    Now, she also met expectations for the

19 university, correct?

20     A.    Right.

21     Q.    All right.  So why would publications that are

22 all case notes and updates get her a below average

23 rating?

24     A.    Well, I think it would be that there wasn't any

25 real scholarship there.  There was case notes and

1 updates or -- the updates are more in the nature of

2 service. Case notes are sort of borderline between

3 service and scholarship, depending on how much analysis

4 there is in a case note, but in any event not like a

5 substantial article.

6 Q. Well, I think that's kind of interesting

7 because that's not consistently applied. For example,

8 if you go up to Professor Dickerson, she has continued

9 excellent teaching and she had no scholarship that year,

10 but she was rated average?

11 MR. GIBSON: Objection, misstates the

12 record.

13 Q. (By Mr. Walsh) Does that misstate the record,

14 Professor McGarity, what I just said?

15 A. You said she had excellent teaching and a book

16 contract. Well, that's what it says, book contract with

17 Harvard Press, and average --

18 Q. So what makes --

19 [Simultaneous speaking]

20 A. So it's not the case that -- I mean, she had

21 a -- she had a book that she's working on and that --

22 Q. Well, she has a book contract.

23 A. That's not a publication, but people who are

24 involved in writing books, sometimes in a year where

25 they're working on the book, it may take two years to

1  work on the book, and we would not dock them for that.

2  But yeah, I mean, there aren't any publications in that

3  year.

4      Q.   All right.  I mean, so why was Professor

5  Mullenix dinged for it but Professor Dickerson wasn't?

6              MR. GIBSON:  Objection, misstates prior

7  testimony.

8      A.   In Professor Mullenix's it doesn't say anything

9  about a book contract with Harvard University Press or

10  that she's working on a book.  Again, that's not a --

11  that's not a huge factor, but --

12      Q.   (By Mr. Walsh)  Well, so, I mean, if somebody

13  just says they're working on a book --

14              MR. GIBSON:  Could you please let the

15  witness finish his answer, please?

16      Q.   (By Mr. Walsh)  -- why is that better than

17  producing what Professor Mullenix did?

18              MR. GIBSON:  Objection, the question

19  interrupted the witness prior to his finishing his

20  answer.

21      A.   I don't know that that's the only basis.  These

22  are pretty terse notes that Lynn has provided.  Neither

23  of them say anything about service, so I don't know how

24  service played out between those two.

25      Q.   So here's Professor Dickerson.  It says 2017

1 and then she's got a forthcoming Harvard University book

2 but she has nothing reported there.

3    A.   Yeah.

4    Q.   The year before she's got fairly short works

5 here as well.  Do you see?

6    A.   They're not fairly short.  The Arizona Law

7 Review one is 35 pages, something like that.  The other

8 one's more than 30 pages.  Those aren't short.  They're

9 too --

10    Q.   Do you think she was evaluated on her 2016

11 production?

12    A.   No, she wouldn't have been into 2017, the

13 evaluation of the 2017 year.  We do look -- the reason

14 this is in the binder is we look at the overall flow of

15 publications in deciding whether when somebody says they

16 have something on the way, whether to give it credence I

17 suppose.

18    Q.   So now I want to show you Professor Mullenix's

19 publications for 2017 that was considered by Professor

20 Baker in the 2017-2018 budget committee.  Here we have

21 mass tort litigation cases and material, a completely

22 revised third edition from something that was originally

23 published in 2018.  Would you agree that's significant

24 scholarship?

25    A.   Published in 2008.

1    Q.   That was the second edition.  The third

2  edition --

3    A.   It's a modest -- a third edition of a case book

4  is a modest scholarship, but it is scholarship but

5  modest.  If it is a brand-new case book --

6    Q.   Professor McGarity, how do you know this is

7  modest scholarship?

8    A.   Because that's my general assessment.  On this

9  particular one I would have to depend on the evaluation

10  of the person who read it, but having read many third or

11  updated editions of case books I can tell you that they

12  rarely reflect a great deal of scholarship.

13    Q.   So your knee-jerk reaction, Professor McGarity,

14  is to just discount Professor Mullenix's scholarship?

15    A.   Not to discount.

16              MR. GIBSON:  Objection, misstates the

17  prior testimony.  And I would ask that you not

18  negatively characterize the witness's statements with

19  your own commentary and ask questions, please.

20              MR. WALSH:  Objection, sidebar.

21    Q.   (By Mr. Walsh)  Professor McGarity, you just

22  talked about how Michele Dickerson's failure to do a

23  single publication in 2017 but promised to do a book at

24  some point in the future was worth a lot more than a

25  completely revised third edition of a book that was

1 published nine years ago?

2              MR. GIBSON:  Objection, misstates prior

3 testimony.

4      A.   I didn't say it was --

5      Q.   (By Mr. Walsh)  Are you sure you want to stand

6 by that?

7      A.   I didn't say it was a lot better.  I didn't say

8 it was any better.  I just said that it was --

9      Q.   Well, what do you think?  Is it?  Is it at

10 least equal to the promise to do a book in the future?

11      A.   It depends on the history of the past

12 publications, but --

13      Q.   I'm sorry, you're going to have to explain what

14 that means.

15      A.   Well, when we saw Michele's we saw like three

16 articles the year before.  You can have a fallow year

17 because of things are tied up in publication or you've

18 got a book you're working on, but it's not as good as

19 having something out there.  And Linda did have these

20 case book revisions out there and that takes work and I

21 understand that.

22      Q.   Hold on one second.

23              So you're saying that because Professor

24 Dickerson had a few articles the year before, that the

25 fact that she didn't have anything in 2017 was okay?

1          MR. GIBSON:  Objection, misstates prior

2 testimony.

3     A.    I definitely didn't say it was okay.  I said

4 that it, along with other factors like teaching and

5 service, could account for an evaluation of baseline.

6     Q.    (By Mr. Walsh)  Well, I mean, so she was rated

7 baseline, Professor Mullenix was rated below baseline.

8 Here's Professor Mullenix's 2017 publications that we

9 just talked about.  She did another revision to Leading

10 Cases in Civil Procedure; she did a chapter, a

11 completely revised chapter which was 64 pages for A

12 Practitioner's Guide to Class Action Litigation; she did

13 several Moore's Federal Practice and Procedure releases;

14 she did a Jotwell, which you said counted; she did

15 several pre- -- a bunch of previews as well as another

16 Jotwell.

17          And then if you look in 2016 she's got a

18 bunch of stuff as well.  So, for example, she's got a

19 Law Review article, she's got a Symposium article, she's

20 got another Law Review article from a class action

21 litigation, and then she's got a preview.  So why was

22 this -- why was her history discounted but Dickerson's

23 not?

24     A.    I didn't say --

25          MR. GIBSON:  Objection, misstates prior

1 testimony.

2     A.   I didn't say that her previous was discounted.

3 Had 2017 been a fallow year we would have -- and she

4 said that I've got this book that I'm writing for

5 Harvard University Press, we would have considered the

6 2016. I don't think we needed to consider the 2016 in

7 evaluating Linda in 2017.

8     Q.   (By Mr. Walsh) But my question, Professor

9 McGarity, is why was that enough to rate Professor

10 Mullenix below average or below baseline but not enough

11 to rate Professor Dickerson below average?

12     A.   As I say, depending on all the factors. I

13 don't have before me the reviews that were given of

14 Professor Mullenix's work. Why -- apparently they

15 weren't reviewed well. I don't know. I did mention

16 that just revising a case book gets you a little credit

17 but not a whole lot of credit and it is more than zero

18 credit. So all I can say is that the committee in its

19 judgment decided that Linda was below baseline that year

20 and that Michele was baseline.

21     Q.   Hold on one second. Let me look for something.

22          (Pause.)

23          So here is another person who met

24 expectations, Professor Powe, but he only had a short

25 and okay piece. He does say he's got a book forthcoming

1 in 2018 but he was rated average.  What's the difference

2 between Professor Powe and Professor Mullenix?

3     A.   With Powe, I can state with even more

4 confidence than with Michele Dickerson that Powe is --

5 he writes big books and so it may take him five or six

6 years to write a big book and during which time he does

7 not have a lot in the way of articles or publications.

8 And the fact that the book was forthcoming in 2018 and

9 he published books in the past, I take it, along with

10 teaching and service, persuaded the committee that he

11 was -- he deserved an above -- a baseline or average

12 raise.

13     Q.   So what's a big book?  What is considered a big

14 book?

15     A.   It's a book with a good academic press.  And

16 again, Lynn is very terse here.  I probably would have

17 said more if I were summarizing the committee's

18 deliberations.  I think this is the book that we spoke

19 of earlier where the dean brought in some folks and they

20 commiserated with Scott about this book he had in mind

21 for Texas, the Texas Constitution I think it was called.

22 One of his big books in the past won the Hamilton Award

23 that I spoke of earlier that won [indiscernible].  So

24 that's I think what probably Lynn was talking about as a

25 shorthand for a major publication with a major

1 publisher.

2    Q.  Okay.  Well, what about -- let's go back.  What

3 about Professor Rabban?  He had excellent teaching and

4 he only had a six-page book review.  Why was he rated

5 average?

6    A.  I'd have to see his forthcoming because I

7 thought he was working on a book.

8    Q.  Interesting that you mention that.

9    A.  But then I don't. . .

10    Q.  Here is David Rabban.

11    A.  Okay.

12    Q.  And then if you go down to -- here we go.

13 Here's his scholarship.  It doesn't list anything

14 forthcoming.

15    A.  Some people don't.  They don't put in their

16 forthcoming work.  So I don't know how we --

17           [Simultaneous speaking]

18    Q.  [Indiscernible] excuses here.

19    A.  -- how we knew.  So I don't know.  I would

20 agree with you that a six-page article -- of course, he

21 had very -- he had very high teaching evaluations.  I

22 don't know on the service side how they compared, but a

23 six-page book review is not more than revising several

24 case books and treatise work.

25    Q.  So would you agree, then, that the standards

1 are inconsistently applied?

2    A.    No, I think we try our best to be consistent,

3 and it's conceivable that sometimes we make mistakes but

4 we do the very best we can.  We're not perfect.

5    Q.    So here Professor Franklin was rated average

6 minus and she had continued excellent teaching but has a

7 lack of service and participation in the intellectual

8 life of the law school.  This was also the same year

9 that she was voted to receive the faculty investment

10 initiative funds, right?

11    A.    I don't know that for a fact, but I'm willing

12 to accept that it was.  I don't remember.

13    Q.    So why does she just get average minus when she

14 has excellent teaching but Professor Mullenix has

15 excellent teaching and gets below average?

16    A.    Can you show me her scholarship, her form she

17 filled out on scholarship?  I don't know whether she

18 submitted forthcoming or not.  She's one that produces a

19 blockbuster article every two or three years and she's

20 got forthcoming.

21    Q.    But she's got a one-page article in the New

22 York Times for 2017.

23    A.    Right, that's not -- that would -- what is it,

24 it's a Jotwell thing.  That would account for very

25 little and it didn't even show up on Lynn's thing, but

1  we do have the forthcoming.  We also have a strong

2  history of -- well, let's see, going back to 2016 we

3  have a book review, we have the Yale Law Journal.  No,

4  that's the Journal for Form so that's -- so I'm not sure

5  why based just on Lynn's terse summary, why one is

6  baseline minus and one is below baseline.  I couldn't --

7      Q.   Would you agree it seems like the standards are

8  being inconsistently applied?

9           MR. GIBSON:  Objection, misstates his

10  testimony.

11      A.   I think the standards are being applied as

12  consistently as we can and we're not perfect.

13      Q.   (By Mr. Walsh)  All right.  So now I'll show

14  you what's going to be Exhibit 10.  I just put it in the

15  chat.  Let me see if I can find it to share.  I find

16  this really interesting.  So here we go.  These are the

17  proposed default raises and the proposed actual raises.

18  So this would be that baseline, above baseline, below

19  baseline thing, right?

20      A.   Uh-huh.

21      Q.   And so these numbers would be put together by

22  you or Dean Farnsworth, the budget committee or Dean

23  Farnsworth?

24      A.   This is Dean Farnsworth.  He brings this in to

25  show it to the committee.

1    Q.   So the thing that's really interesting here
2  is -- so he brought this in to show and it looks like
3  baseline is $4,000.
4    A.   In that range of the faculty, yes, it does look
5  like that.
6    Q.   Why -- so why would like Jordan Steiker get a
7  $4,500 baseline, Wendy Wagner get a $4,500 baseline,
8  whereas most of these top earners are only getting 4?
9    A.   I'd have to look at their evaluations.  It
10 would come out as a baseline plus for them.  That's what
11 it looks like.
12   Q.   Okay.  Well, let's actually -- let me see.  We
13 might be able to figure that out right away.  So I think
14 I've got it.  Are you seeing two screens?
15   A.   Well, I'm seeing one screen over the other so
16 I'm not seeing both of them at the same time, but I am
17 seeing two documents.
18   Q.   So here we've got Jordan Steiker right here and
19 I have him highlighted in the other one.
20   A.   Baseline and --
21   Q.   It looks like average and Jordan Steiker here
22 gets a $4,500 baseline raise.
23   A.   Yeah, I don't -- I don't know why that was
24 higher.  That's the default rate it said?
25   Q.   That's what that looks like to me.  Does that

1  look like that to you?  That's what they call it.

2      A.    Actually I can't remember what we thought --

3  what a default raise was, but I would think it was --

4  you know, that as you see the numbers go, that that

5  4,000 was the baseline.  So I don't know why -- I don't

6  know why it came out that way.

7      Q.    So here's the one I wanted to talk about,

8  though, is Professor Mullenix.  So then the default

9  raise was going to be $4,000, then the proposed raise

10 was $3,000.  So this is the document that was presented

11 to the budget committee to discuss regarding Professor

12 Mullenix's raise for academic year 2018-2019.  But as we

13 already know, that was not the raise that she got.

14     A.    Uh-huh.

15     Q.    So if we go back to Exhibit No. 9, which I seem

16 to have misplaced, I think you're seeing it.  Exhibit

17 No. 9 we know that Professor Mullenix got a $1,500 raise

18 or half of what Dean Farnsworth proposed.

19     A.    Yeah.

20     Q.    So what happened there?

21            MR. GIBSON:  Objection, misstates prior

22 testimony and misstates the record.

23     A.    The answer to your question is I don't know.

24     Q.    (By Mr. Walsh)  Do you agree that it's strange?

25     A.    I'm trying to remember what -- I'm trying to

1  think of a reason for it, and at the moment I can't

2  think of a reason for it.

3     Q.   I will maintain to you that it is -- if you

4  took the time you would discover that that is the only

5  one that has been drastically reduced in that manner.

6     A.   From the proposal that -- from that final to

7  what actually was paid?

8     Q.   Yeah.  Let's see, I might be able to -- I might

9  be able to show you both.  Let's see if I can do this.

10    A.   It says actual raises here in the far right

11  corner.

12    Q.   I'm sorry, I'm trying to make this as easy for

13  you to see as possible and I think I might be just

14  messing everything up.  There we go.  So you did see

15  some reductions for like, for example, Sager was listed

16  at 4,000 but he gets 3,000 here.

17    A.   4,000 would be the -- oh, I see, listed as

18  4,000 --

19          MR. GIBSON:  If I could ask the -- if I

20  could ask the witness to wait for his question and then

21  answer the question once he asks you a question.

22          THE WITNESS:  Sure.

23    Q.   (By Mr. Walsh)  Right, so I'm talking about

24  some other reductions that you see.  So, for example,

25  Professor Sager, the proposed actual raise was $4,000

1  but what he actually got once the salary started was a

2  $3,000 raise.  You can see the same thing with like,

3  say, Professor Goode.  He was proposed a $4,000 raise

4  and he got a $3,000 raise instead.  But the only one

5  that's been reduced by half is Professor Mullenix.

6            MR. GIBSON:  Is there a question on the

7  table?

8      Q.  (By Mr. Walsh)  So what would explain that?

9            MR. GIBSON:  Objection, asked and

10  answered.

11     A.  I don't know.

12     Q.  (By Mr. Walsh)  I mean, and here's the other

13  thing.  So here Professor Weinberg -- if you recall,

14  maybe not -- she was rated as below expectations on

15  Professor Baker's comments sheet and she was proposed

16  for a $2,000 raise and that is what she got, a $2,000

17  raise, even though she was below expectations.

18     A.  Well, the baseline for her would have been it

19  looks like 4,500, right, so that was much below baseline

20  for her.

21     Q.  Well, but it was the same proposed raise is

22  what I'm pointing out here.  I'm saying that for the

23  below expectations folks the proposed raise was the same

24  except for Mullenix.  And I believe that's true

25  throughout the entire thing.

1    A.   I don't know without having looked at all of

2 them.

3    Q.   But can you think of a reason that that would

4 have happened in 20- -- for the 2018 pay?

5            MR. GIBSON:  Objection, asked and

6 answered.

7    A.   I can't recall any reason that would have

8 happened.  Not that I can remember.

9    Q.   (By Mr. Walsh)  Now, after this happened

10 Professor Mullenix came and spoke to you, right?

11    A.   She came and spoke to me one of those years in

12 the recent past before COVID, I know it was that,

13 because she came to my office.

14    Q.   Okay.  You don't think it had to do with this

15 or you don't remember?

16    A.   I just don't know.  Her question to me when she

17 came into the office was did she deserve to be the

18 lowest paid faculty member.

19    Q.   And what did you say to her?

20    A.   That I didn't think so.

21    Q.   And why didn't you think so?

22    A.   Because I thought she should be paid well.

23    Q.   Okay.  Is this -- does this sound like a

24 question she asked you?

25    A.   Let me see.  Which one of these questions?

1    Q.   Well, all of them.

2    A.   I don't think she asked me if I sat on the

3 budget committee.  I think she knew that.  I don't

4 recall all these questions being answered.  I just

5 recall her asking whether she deserved the lowest raise.

6 Oh, there it is, it's question 5.  I do recall her

7 asking that question.  Did you authorize or instruct,

8 and I said no.  I mean, I'm not saying she didn't ask

9 these questions, other than the first one.  I'd be

10 surprised if she asked me if I was on the budget

11 committee but she might have.

12    Q.   So here's her summary and she wrote this, a

13 summary of what you told her.

14    A.   Uh-huh, let's have a look at that.

15    Q.   Do you remember telling her these things?

16    A.   Let's see.  The first paragraph sounds right.

17 Yeah, she certainly would never have wound up in the

18 does not meet expectations category.  And apparently I

19 said I'd look into the matter.

20    Q.   Did you look into it?

21    A.   I can't recall.

22    Q.   What would you have done to look into it?

23    A.   I would have --

24         MR. GIBSON:  Objection, calls for

25 speculation.

1    A.   I would have looked at the budget committee,

2 the big binder, and I'm not sure what else I would have

3 done.

4    Q.   (By Mr. Walsh)  What else could you have done?

5         MR. GIBSON:  Objection, calls for

6 speculation.

7    A.   I don't know.  I mean, I could have called a

8 budget committee meeting and if I -- I guess I wasn't

9 the chairman that year so I couldn't have done that.  I

10 could have asked for a budget committee meeting or

11 something like that, but I don't think I thought it was

12 worth that.

13    Q.   (By Mr. Walsh)  So I want to ask you about

14 another page in this document.  This is the summary of a

15 discussion Professor Mullenix had with Professor

16 Littwin.  So you can see it's the same seven questions

17 for you.  It's got handwritten notes underneath.

18    A.   Can you make them a little bit bigger?

19    Q.   What?

20    A.   Can you make them a little bit bigger?  Yeah,

21 that's good.  A little less than that.  There, somewhere

22 about there.

23    Q.   Perfect.  So what I wanted to ask you about is

24 the second paragraph here where it says, "She,"

25 Professor Littwin, "said the committee took into account

1  the likelihood of a faculty member being lured to

2  another school.  She said that at my age the committee

3  decided I was noncompetitive and 120,000" -- I'm sorry,

4  "not likely to get an offer from another law school.

5  She said the law school was under pressure from the

6  provost office to deal with market competitiveness."

7            And then I also want to go down here and

8  say, "Littwin also said that some committee members were

9  put off by my complaining when Michele Dickerson

10 received a teaching award."  Do you remember talking

11 about whether or not Professor Mullenix was likely to be

12 lured to another law school?

13    A.   No, I don't.

14    Q.   Do you remember discussing Professor Mullenix's

15 age?

16    A.   No, definitely not.

17    Q.   Do you think this is an appropriate thing to

18 talk about in terms of setting salary?

19    A.   I think some people think that the possibility

20 that someone would be lured away is a -- or should be a

21 relevant consideration.  I do not.  I strongly do not

22 feel that way.

23    Q.   All right.  So you don't remember if this was

24 discussed?

25    A.   I don't.

1    Q.   Is there any reason to think that Professor

2  Littwin would make that up?

3    A.   No, I don't have any reason to think she'd make

4  it up.  I don't remember that, but as we've established,

5  sometimes my memory of what happened in the past is not

6  perfect.

7    Q.   What about the next area that I talked about,

8  that committee members were put off by Professor

9  Mullenix complaining when Michele Dickerson received a

10  teaching award?

11            MR. GIBSON:  Objection, misstates the

12  document.  Is there a question?

13    Q.   (By Mr. Walsh)  Was that discussed?

14    A.   I don't recall.  At some point I heard that --

15  that Professor Mullenix complained when Michele received

16  a teaching award or that Michele was nominated for the

17  teaching award, but I'm not sure in what context I heard

18  or learned that.  I don't think I heard it from Linda.

19  I'm not sure where I heard it.  It could have been at a

20  budget committee meeting.

21    Q.   Do you think that's an appropriate thing to

22  talk about?

23    A.   We do talk about -- when we talk about service,

24  I'm trying to think if we -- we normally don't talk

25  about whether people complain or not, no.  I don't

1 consider it personally a consideration that you go into

2 the evaluation for purposes of the budget committee. So

3 if other people did, I would disagree with them.

4    Q.   So it doesn't often happen, it doesn't happen

5 that much. So it has happened before, though?

6    A.   Has it happened?

7           MR. GIBSON:  Objection, calls for

8 speculation.

9    A.   What is it you're referring to?

10   Q.   (By Mr. Walsh)  Discussion of faculty members

11 complaining about other faculty.

12   A.   I'm thinking back. I guess I -- I don't know.

13 I don't know if I did this in the budget committee

14 meeting but I think I may have. If I did so -- I'm

15 trying to remember. I complained once about another

16 faculty member. I regret it now but I did.

17          MR. GIBSON:  May I ask how long we've been

18 on the record?

19          MR. WALSH:  Yeah, actually, let's go ahead

20 and go off the record and take a five-minute break.

21          THE VIDEOGRAPHER:  Off the record at

22 5:38 p.m.

23          (Recess taken from 5:39 p.m. to 5:50 p.m.)

24          THE VIDEOGRAPHER:  We are back on the

25 record. The time is 5:49 p.m.

1     Q.   (By Mr. Walsh)  All right.  Professor McGarity,

2  you said you remembered two people that you talked about

3  on Friday.  Who were they?

4     A.   Jane Cohen and Willie Forbath.

5     Q.   Were they both baseline?

6     A.   I think Willie was baseline but Jane was below

7  baseline.

8     Q.   All right.  So who sets salaries at U.T. Law?

9     A.   Ultimately the dean.

10    Q.   Okay.  So before the break when we were going

11 through those charts and we saw that the proposed salary

12 for Professor Mullenix was $3,000 but then the actual

13 salary that she got, the raise that she got was 1,500,

14 does that mean that Dean Farnsworth must have been the

15 one to go in and lower that number?

16            MR. GIBSON:  Objection, calls for

17 speculation.

18    A.   Yes, unless that reflected a -- that final

19 meeting where he -- that chart you showed me, that's

20 what he presents to the committee.  And it could have

21 been that year that someone or more than one person on

22 the committee said they thought that that was too much

23 for Linda and it would have been -- so I don't know that

24 he did it unilaterally.  He may have consulted the

25 committee.  I just -- I just don't recall.

1    Q.   (By Mr. Walsh)  Well, you didn't mention that

2  to Professor Mullenix when she came and talked to you

3  about this, though, did you?

4    A.   Mention that -- yeah, I didn't mention any --

5  as far as I can recall about what I said to Linda

6  Mullenix --

7    Q.   So that would have been the kind of thing --

8            MR. GIBSON:  Can you please let him finish

9  answering the question?  I'm sorry, could you let him

10  finish answering the question?

11    Q.   (By Mr. Walsh)  That would have been the kind

12  of thing you would have told her at the time, right?

13            MR. GIBSON:  Objection, calls for

14  speculation.

15    A.   If I had remembered it at the time.

16    Q.   (By Mr. Walsh)  Well, your memory would be

17  better at the time than today, right?

18    A.   Right.

19            MR. GIBSON:  Objection, calls for

20  speculation.

21    A.   I think that's generally the case.  I do have

22  some stark memories of things that happened long ago

23  that are much better than my memory of what happened

24  last Friday.

25    Q.   (By Mr. Walsh)  Well, I mean, you did say and

1  you've said repeatedly throughout today and it is

2  confirmed by Exhibit 11, which is up on your screen

3  right now, that you didn't think Professor Mullenix

4  should get the lowest raise.

5      A.  That's true, I didn't.

6      Q.  And so if somebody at that budget committee --

7  I'm sorry, is that right?

8      A.  That is what I recall telling her, yes.

9      Q.  And so if somebody at that budget committee had

10 said we should give Professor Mullenix a $1,500 raise,

11 that probably would have stuck out in your head, right?

12              MR. GIBSON:  I apologize, we're having a

13 fire alarm.  Hold on a minute.  Sorry about that.

14 They're testing the fire alarms.  We do not have to

15 leave.  You can proceed.  Sorry about that, Colin.

16              MR. WALSH:  Sure.

17     A.  And I missed the question.

18     Q.  (By Mr. Walsh)  That would have stuck out,

19 right?

20     A.  I'm sorry?

21     Q.  If somebody said we should give Professor

22 Mullenix the lowest raise, that would have stuck out in

23 your mind?

24              MR. GIBSON:  Objection, calls for

25 speculation.

1      A.   It might have stuck out in my mind.

2      Q.   (By Mr. Walsh)  Well, would it surprise you to

3  learn that not a single person mentioned that the budget

4  committee proposed that Professor Mullenix get a $1,500

5  raise in these charts that I'm now scrolling through?

6      A.   No, it wouldn't surprise me.

7      Q.   Would it be safe to assume, then, that it's

8  because Dean Farnsworth is the one who ultimately

9  lowered it to $1,500?

10              MR. GIBSON:  Objection, calls for

11  speculation.

12      A.   I wouldn't necessarily assume that.  It may be

13  that none of us remembered that meeting that well.

14      Q.   (By Mr. Walsh)  Well, it does seem like the

15  budget committee has a lot of trouble remembering.

16  You're not the only person who doesn't seem to remember

17  budget committees days after they happened.

18              MR. GIBSON:  Is that a question?

19      Q.   (By Mr. Walsh)  Is it something in the water?

20      A.   I'm sorry?

21      Q.   Is it something in the water?

22      A.   I don't know even that it's a something.

23      Q.   Yeah.  I mean, I have a theory, but I --

24              [Fire alarm interruption]

25              So Dean Sager gave a whole bunch of

1 forgivable loans to professors, correct?

2          MR. GIBSON:  Objection, mischaracterizes

3 the record.  Can you hold on just a second?  I'm sorry,

4 we'll give you a couple of minutes, add them back.

5 Sorry.

6          [Fire alarm interruption]

7          MR. GIBSON:  Okay, it appears to be over

8 for now.

9    Q.  (By Mr. Walsh)  All right.  So Dean Sager gave

10 a bunch of forgivable loans to law professors, correct?

11    A.  That's my understanding, yes.

12    Q.  All right.  Well, I mean, you were on the

13 budget committee.  You don't know about that?

14    A.  I certainly didn't.

15    Q.  Well, I mean, the reason I'm asking is because

16 all that stuff got amortized after Dean Sager left,

17 right?

18    A.  Yes.  After the fact I learned about it, yes.

19    Q.  So you did know that he did that.  Do you also

20 know that Professor Mullenix has a settlement with Dean

21 Sager?

22    A.  I knew that there was a settlement.  I guess it

23 was during Dean Sager's years, yes.

24    Q.  Do you know what that settlement was for?

25    A.  My understanding was because of a lawsuit that

1 was either pending or threatened or something along

2 those lines.

3     Q.  All right. And so these forgivable loans that

4 Dean Sager provided to these professors, they were not

5 in settlement of any claims, correct?

6            MR. GIBSON: Objection, calls for

7 speculation.

8     A.  My answer is I don't know.

9            MR. WALSH: What a delightful fire alarm.

10            THE WITNESS: I don't know if you're

11 hearing this, but I think we're done now. I think he

12 said testing is complete now.

13     A.  And I'm sorry, I'm going to have to ask you to

14 ask the question again.

15     Q.  (By Mr. Walsh) So were any of the forgivable

16 loans that Dean Sager gave to other professors to settle

17 claims?

18     A.  Not to my knowledge.

19     Q.  Okay. So then you would agree that the

20 forgivable loan given to Professor Mullenix in

21 settlement of her claims is different than the

22 forgivable loans given to the other professors?

23            MR. GIBSON: Objection, calls for

24 speculation.

25     A.  It sounds like it.

1    Q.   (By Mr. Walsh)  So then why -- so why is

2  Professor Mullenix's settlement amortized?

3    A.   I have no idea.

4    Q.   Well, you were on the budget committee when it

5  was decided to do that.

6    A.   I did not -- the committee never decided to

7  amortize.  As far as I know, the committee didn't make

8  that decision.

9    Q.   Are you sure that that's going to be your

10  testimony, that the committee did not make that

11  determination?

12    A.   We decided to amortize the forgivable loans.

13  If her settlement was characterized as a forgivable

14  loan, then we decided to amortize it, but I don't know

15  that --

16    Q.   Why not treat her settlement differently since

17  it's not the same?

18    A.   I guess my question would be why treat it

19  differently.

20    Q.   Well, because it's not the same because it's

21  different.  It's settling a discrimination claim as

22  opposed to just a bonus for coming to work at U.T.

23          MR. GIBSON:  What's your question?

24    Q.   (By Mr. Walsh)  So why not treat it

25  differently?

1          MR. GIBSON:  Objection, asked and

2   answered.

3       A.   Why not treat it differently?  I just don't

4   know.  I don't think the budget committee made any

5   decision about Linda Mullenix's forgivable loan per se

6   as Linda Mullenix's.  I think we made a decision with

7   respect to forgivable loans.

8       Q.   (By Mr. Walsh)  Did Professor Peroni ever

9   object to amortizing Professor Mullenix's settlement?

10      A.   I don't recall him ever objecting.

11      Q.   Did Dean Farnsworth ever tell the budget

12  committee that Professor Mullenix objected to her

13  settlement being amortized?

14      A.   Not to my recollection.

15      Q.   Has Dean Farnsworth ever asked you who to

16  nominate for teaching awards?

17      A.   Asked the committee or me personally?

18      Q.   Both.  First you personally.

19      A.   Me personally, not that I can recall.  And I

20  can't recall him asking the budget committee about that.

21  I mean, he nominated me for a teaching award and he

22  consulted with me about that.  He probably asked if I

23  wanted to be nominated, so I guess with respect to me he

24  asked me personally.

25      Q.   But he never asked you if you would recommend

1 anyone else?

2     A.   No.  I think there's a committee that does --

3 for the Massey Award there's a committee that does that.

4 With respect to the university teaching award, there's a

5 big university teaching award which he nominated me for

6 but I didn't get.  He consulted me, but he's not

7 consulted me about nominating somebody else.

8     Q.   All right.  So I've asked a bunch of questions

9 and I know that your counsel will think that I talked

10 over you and stopped you from answering some of them.

11 Are there any of my questions that you'd like to add to

12 your answers on?

13     A.   Not at the moment.  No, I can't think of

14 anything.

15     Q.   Is there anything that you think I should know

16 or wish I had asked during this deposition?

17     A.   Not that I can think of at the moment.

18             MR. WALSH:  All right.  Pass the witness.

19                  EXAMINATION

20 BY MR. GIBSON:

21     Q.   Professor McGarity, I just have a few

22 questions.  First off, during the course of your

23 testimony you referred to the faculty development

24 initiative or other terms referring to what I think you

25 meant to refer to the faculty investment initiative.

1  Does that sound correct?

2      A.    Yes, that does sound correct.

3      Q.    So when you refer to the faculty development

4  initiative or other similar terms, were you intending to

5  refer to the faculty investment initiative?

6      A.    Yes.

7      Q.    There was some prior testimony regarding

8  whether or not the budget committee affects -- or

9  whether or not the budget committee deliberations

10 affects pay raises for those who receive the faculty

11 investment initiative.  Do you recall that testimony?

12     A.    Yes.

13     Q.    Is it true that certain individuals who

14 received an initial faculty investment initiative then

15 received a second amount of faculty investment

16 initiative in the second round?  Is that correct?

17     A.    Yes, that's correct.

18     Q.    And did the budget committee make those

19 recommendations to the dean?

20     A.    Yes, that was part of our recommendation.

21     Q.    In some of the charts we saw some of those

22 individuals were identified as receiving, for example,

23 $12,000 raises or $13,000 raises per year.  Is that

24 correct?

25     A.    I think that's right.

1    Q.   And those individuals would be individuals who

2  received both the first round of the FII as well as a

3  supplemental second round?

4    A.   Yeah, I think that's correct.

5    Q.   If you could, I'm going to pull up Exhibit

6  No. 10 that was used today and ask you just a few

7  questions about that.  Do you see Exhibit No. 10 on the

8  screen which at the top left-hand corner is labeled

9  Exhibit 10 D-36840?

10    A.   Exhibit 3, yes, I see that.

11    Q.   I'm sorry, at the very top left-hand of the

12  screen you should see --

13    A.   Oh, way up there.  Exhibit 10 D, yeah, I see

14  it.

15    Q.   I just want to make sure for the record we're

16  all on the same page here.

17    A.   Yes.

18    Q.   This document lists all the tenured -- tenure

19  track professors, correct?

20    A.   I think that's right.

21    Q.   And we see that the first -- the first group of

22  individuals who have a -- what's called the default

23  raises, those equal $4,000.  Is that correct?

24    A.   That's correct.

25    Q.   And then there start to be people in the list

1 that have default raises of $4,500, correct?

2     A.   Yes, I see that.

3     Q.   Then we see many of those individuals in the

4 list. I'm going to go down this list. Correct?

5     A.   That's correct.

6     Q.   And then we start to see individuals with a

7 default raise of $5,000. Is that correct?

8     A.   That's correct.

9     Q.   And we see many of those individuals. Is that

10 correct?

11     A.   That's correct.

12     Q.   And then we start to see individuals with a

13 default raise of $5,500. Is that correct?

14     A.   That's correct.

15     Q.   And we see many of those individuals with

16 raises of $5,500 in the default raise column. Is that

17 correct?

18     A.   That's correct.

19     Q.   Is this consistent with your prior testimony

20 that there are approximately three to four cohorts of

21 individuals for whom the default raise is the same for

22 that cohort?

23     A.   Yes, I think I said three, but it looks now

24 from looking at this like it's four.

25     Q.   And is that also consistent with your prior

1 testimony that the faculty members who are paid the

2 highest generally have the lowest default raises and

3 those that are paid the lowest generally have the

4 highest default raises?

5    A.   I think in general that's the case, yes.

6    Q.   And then if you look at the next right-hand

7 column, the column that says actual raises, many of

8 those individuals have amounts that are $10,000 or over.

9 Is it your recollection that for most of those

10 individuals, that reflects that those individuals had

11 previously been awarded faculty investment awards?

12    A.   Yes, I think that's what accounts for that.

13    Q.   And do you -- for those individuals who are in

14 the default raise of $4,000, does that appear to be the

15 cohort in which Professor Mullenix is in?  And I'll

16 highlight Professor Mullenix.  Does that appear that

17 she --

18    A.   Yes, it does appear to be that cohort.

19    Q.   And that is the cohort of the highest or the

20 most senior faculty.  Is that correct?

21    A.   I think that's right, yes.

22    Q.   And --

23    A.   Well, you've got Abe Wickelgren there, so it

24 may have more to do with pay than seniority.

25    Q.   So going to Professor Mullenix, do you know if

1 she -- if anyone else in her cohort was described as

2 below baseline or below average in the chart we looked

3 at before?

4     A.   I just don't recall.

5     Q.   Do you know if anyone else in her cohort

6 received -- let me just pull that up very quickly.  And

7 does it appear that you are looking at Exhibit 8?  At

8 the very top of your screen does it say Exhibit 8, at

9 the very, very top in the green bar?  Maybe I can make

10 it a little smaller.

11     A.   Oh, I see it now.  Yes, sir, Exhibit 8, it's in

12 the middle now.  Yes, I see it.

13     Q.   Exhibit 8, document number 36733.  Is that

14 correct?

15     A.   That is correct.

16     Q.   Let me try and make this a little bigger so we

17 can --

18     A.   That's big enough.  I can. . .

19     Q.   Okay.  What I'm going to do is I'm going to

20 filter on this document so we can just see just those

21 individuals who received a below baseline or below

22 average.  So I'm going to turn on the filter for below

23 average or average minus.  Okay?

24     A.   Okay.

25     Q.   So for those in -- do you see anyone here --

1 let me -- I did this a second ago. Hold on just a

2 second. Oh, we were going to look at the other chart.

3 Never mind. We can look at -- the other chart has the

4 actual raises they received, and I will admit it's a

5 little bit complicated to try to put the charts next to

6 each other. But I will say let's just go to one person.

7 Do you see Hersel Perry on this chart, he's marked below

8 average?

9      A.   Yes.

10      Q.   Okay.  And you see Michael Churgin.  Is he also

11 marked below average?

12      A.   Yes.

13      Q.   And I'm going to go -- these are just two

14 examples of individuals who are marked below average.

15 Is Lino Graglia, is he also marked below average on

16 here?

17      A.   Yes.

18      Q.   Is that a male?

19      A.   Yes.

20      Q.   I'm going to stop that screen and then shift

21 quickly to this document.  This is the list of actual

22 raises that individuals received that year that we

23 looked at previously.  Are you seeing what's marked as

24 Exhibit 9 at the top?

25      A.   Yes.  I see Exhibit 9, yes.

1    Q.   And you see that Hersel Perry got a zero raise

2  that year.  Is that correct?  You see at the bottom of

3  that page?

4    A.   Oh, way down there, yeah.  I see it, yes.

5  Zero, yes.

6    Q.   He actually received less than Linda Mullenix.

7  Is that correct?

8    A.   That is correct.

9    Q.   You see Michael Churgin also received a zero

10 raise?

11   A.   Yes.

12   Q.   And you also see Lino Graglia also received a

13 zero raise.  Is that correct?

14   A.   That is correct.

15            MR. GIBSON:  No further questions at this

16 time.

17            MR. WALSH:  I have no further questions at

18 this time either.  We'll reserve our questions for

19 trial.  I will note your memory got better when

20 Mr. Gibson was questioning you, but that's it.

21            MR. GIBSON:  We'd like to read and sign,

22 please.

23            THE REPORTER:  Thank you.  And Darren, do

24 you know if you-all have a standard order with us or

25 preferences on file or would you like to state that now

1  since we're doing this remotely?

2            MR. GIBSON:  If you could call my

3  assistant, probably better than if I screwed up.

4            THE REPORTER:  Okay, got it.  Thank

5  you-all.

6            MR. GIBSON:  Thank you.

7            THE VIDEOGRAPHER:  Off the record at

8  6:12 p.m.

9            (Deposition concluded at 6:13 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CHANGES AND CORRECTIONS

2  DEPONENT:  THOMAS O. McGARITY          DATE:  MAY 3, 2021

3  Reason Codes:  (1) to clarify the record; (2) to conform
   to the facts; (3) to correct a transcription error; (4)
4  other (please explain).

5

6  PAGE   LINE   CHANGE                 REASON CODE

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

1                         SIGNATURE

2

3      I, THOMAS O. McGARITY, have read the foregoing

4   deposition and hereby affix my signature that same is

5   true and correct, except as noted on the previous page.

6

7                    _____

                    THOMAS O. McGARITY
8

9   STATE OF _____

10  COUNTY OF _____

11          Before me, _____, on this day

12  personally appeared THOMAS O. McGARITY, known to me (or

13  proved to me under oath or through _____)

14  (description of identity card or other document) to be

15  the person whose name is subscribed to the foregoing

16  instrument and acknowledged to me that they executed the

17  same for the purposes and consideration therein

18  expressed.

19          Given under my hand and seal of office this

20  _____ day of _____, 2021.

21

22

23                  _____

                    NOTARY PUBLIC IN AND FOR
24                  THE STATE OF _____

25                  COMMISSION EXPIRES: _____

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                    AUSTIN DIVISION

3
LINDA SUSAN MULLENIX,          §
4                              §
          Plaintiff,           §
5                              §
-v-                            §  Civil No. 1:19-cv-1203-LY
6                              §
UNIVERSITY OF TEXAS AT         §
7  AUSTIN,                     §
                              §
8          Defendant.          §

9                   REPORTER'S CERTIFICATION
               ORAL AND VIDEOTAPED DEPOSITION OF
10                    THOMAS O. McGARITY
                        MAY 3, 2021
11                    (Reported Remotely)

12          I, Cynthia Warren, Certified Shorthand Reporter

13  in and for the State of Texas, hereby certify to the

14  following:

15          That the witness, THOMAS O. McGARITY, was duly

16  sworn by the officer and that the transcript of the oral

17  deposition is a true record of the testimony given by

18  the witness;

19          That pursuant to FRCP Rule 30(f)(1), that the

20  signature of the deponent:

21              (X) was requested by the deponent or a party

22  at the completion of the deposition and returned within

23  30 days from date of receipt of the transcript.  If

24  returned, the attached Changes and Signature Page

25  contains any changes and the reasons therefor;

1          ( ) was waived by the deponent and/or

2   attorneys at the completion of the deposition;

3          That the amount of time used by each party at

4   the deposition is as follows:

5          Mr. Colin Walsh - 6 hours, 54 minutes
            Mr. Darren Gibson - 9 minutes
6

7          That $_____ is the deposition officer's

8   charges to the Plaintiff for preparing the original

9   deposition transcript and any copies of exhibits;

10          I further certify that I am neither counsel

11   for, related to, nor employed by any party in this

12   cause, and further that I am not financially or

13   otherwise interested in the outcome of the action.

14

15          Certified to by me this 19th day of May, 2021.

16

17

18          _____
                  CYNTHIA WARREN, Texas CSR 4597
19                Expiration Date:  7/31/2022
                  The Legal Connection
20                8656 W. Highway 71
                  Building F, Suite 200
21                Austin, Texas 78735
                  Firm Registration No. 656
22                P: 512.892.5700; F: 512.892.5703

23

24

25

## $

**$1,500** 223:22
224:5,8 225:4
238:17 249:10
250:4,9
**$10,000**
223:18 259:8
**$12,000** 206:2
256:23
**$13,000**
256:23
**$2,000** 240:16
**$20,000** 47:21
**$3,000** 238:10
240:2,4
247:12
**$30,000**
194:13
**$4,000** 100:2
237:3 238:9
239:25 240:3
257:23 259:14
**$4,500** 237:7,
22 258:1
**$43,000**
214:19
**$43,250** 52:14
**$5,000** 258:7
**$5,500** 258:13,
16

## 0

**0037409** 52:22

## 1

**1** 27:9 95:23
96:2,7

**1,500** 223:21
224:10 247:13
**10** 126:17,19
163:18 203:14
223:20 236:14
257:6,7,9,13
**10:17** 49:19
**10:18** 49:20
**10:29** 49:23
**10:30** 49:21
**10th** 7:16
**11** 203:14
249:2
**12,000** 206:8
**12,125** 205:19
**120,000** 244:3
**12:17** 115:16
**12:18** 115:17
**15** 45:21 49:12
163:18 179:15
224:10
**17** 220:23,25
**18** 25:15
220:24,25
**18-'19** 25:14
**19** 25:15,16
**19-** 86:23
**19-'20** 25:13
**194** 163:18
**1974** 85:14
**1977** 7:5
**1980** 6:21 7:6
**1982** 84:9,10,
24 86:8
**1983** 86:15
**1:17** 115:14
**1:20** 115:18,20
**1:58** 141:4
**1:59** 141:5

## 2

**2** 51:10,14,16
95:23 96:2
**2,000** 100:3
224:12,13
**2,500** 224:13
**20** 25:16
212:14
**20-** 241:4
**20-year**
212:18
**200,000**
214:25
**2008** 176:23
228:25
**2010** 154:12,
19 156:4,7
**2016** 228:10
231:17 232:6
236:2
**2017** 221:8,16
222:10 223:17
224:2,4
227:25
228:12,13,19
229:23 230:25
231:8 232:3,7
235:22
**2017-18**
223:24
**2017-2018**
228:20
**2018** 26:15
207:21
220:21,23
221:9,12,16
222:12 223:17
228:23 233:1,
8 241:4

**2018-19** 26:18
220:23
**2018-2019**
223:25 238:12
**2019** 25:7,8,19
26:1,13,16,17,
20 27:14 52:3
84:10 179:13
**2019-20** 28:2
**2019-2020**
28:1,11
**2020** 25:5,6,
19,23 26:3,4,
14 27:1,4,7,14
28:7,11 51:12
52:3,5,10
84:11,24
119:11 179:8,
11,13,15
199:5
**2020-2021**
26:25 27:5
**2020-21** 26:3
**2021** 5:5 26:5,
25 27:8 52:5,
10
**22** 163:17
164:20
**250** 12:6
**27-page**
180:10
**270** 55:14
**2:03** 141:7
**2:04** 141:5
**2:57** 174:1
**2:58** 174:2

## 3

**3** 5:4 95:23
96:3 179:8

223:19 257:10
**3,000** 100:2
239:16
**30** 46:24 228:8
**321** 163:14
**35** 46:24 228:7
**359** 206:1
**36** 83:15 160:7
**365** 206:3
**36733** 260:13
**37** 83:15
84:10,18
**38** 84:12,18,24
**39-page**
181:24
**3:00** 12:19
**3:09** 174:2,4

## 4

**4** 95:24,25
96:3 145:16
237:8
**4,000** 238:5
239:16,17,18
**4,500** 240:19
**40** 10:14 12:15
200:5,8,10
**41** 224:22
**43** 10:16
**45** 160:7
**4597** 5:10
**4:32** 220:15
**4:49** 220:15,17

## 5

**5** 159:21 204:8
242:6
**5:38** 246:22

**5:39** 246:23
**5:49** 246:25
**5:50** 246:23

---

**6**

**6** 204:8
**62** 163:15
**64** 231:11
**6:12** 263:8
**6:13** 263:9

---

**7**

**7** 221:6
**700** 12:5
**70s** 86:23
**77** 7:5

---

**8**

**8** 219:15 222:8
260:7,8,11,13
**80** 163:17

---

**9**

**9** 223:15,16
238:15,17
261:24,25
**9:00** 12:19
**9:08** 5:3,5

---

**A**

**A-R-I-T-Y** 6:13
**a.m.** 5:3,5
49:19,20,21,
23
**ABA** 178:13
**Abe** 218:23

259:23
**Abernathy**
184:19
**abreast**
118:25
**absent** 101:23
**absolute**
198:3
**absolutely**
112:1
**abusive**
144:12 197:17
**academia**
9:15,18,23
148:3
**academic**
25:19 26:4
66:7,16,21
148:11 175:24
176:13 219:15
220:6 233:15
238:12
**Academy**
69:12,14
**accept** 206:15
235:12
**acceptable**
33:18
**accepts** 93:13
**access** 82:22,
24 83:1
200:12
**accordance**
5:7
**account** 93:10
168:10 205:20
211:13 231:5
235:24 243:25
**accounts**
168:8,23
259:12

**accumulated**
201:10
**accumulates**
201:13
**accumulating**
173:11 203:7
**accurate** 81:5,
7,8,13 83:23,
24 84:3,4,14,
15 87:2
131:18,21
160:10
183:20,21
**accurately**
87:3
**Act** 154:19,22
156:4,10,15,
17,21 157:16
**acting** 94:3
**action** 231:12,
20
**actions** 36:21
**active** 112:12
149:5 157:5
**actively** 171:6
**activities**
19:13
**actual** 100:10
130:18 236:17
239:10,25
247:12 259:7
261:4,21
**add** 251:4
255:11
**added** 12:8
**addition** 38:1
130:11
**additional**
205:25
**address**
127:14

**addressing**
79:21
**Adelman**
103:18 106:22
**adequately**
96:5 150:19
**adjunct** 72:13
**adjuncts**
72:11
**adjusting** 94:6
202:6
**adjustments**
100:13,14
**administering**
5:11
**administration**
215:1
**administrative**
10:18 177:24,
25 178:13
**admit** 261:4
**adopt** 70:21
**adopted**
146:14
**advice** 30:2
33:25 34:18
35:7 41:15,16,
19,24 42:3
107:14 213:16
**advices** 50:3
**advise** 102:19
**advised**
121:10
**advising** 16:6,
21 17:23 18:2,
8,9 22:10 97:6
**affect** 87:11
104:15
118:14,22
162:2 163:13

**affects** 256:8,
10
**afternoon**
125:5 126:22
**age** 156:16,17
160:4 244:2,
15
**Agency** 7:8
**aggregates**
201:13
**agree** 5:25
6:3,5 28:4
35:9 39:8,12
41:2 70:22
71:2 81:2
84:12,18 86:9
91:5 110:5
133:10 139:18
144:8 163:4
168:7 172:24
174:14 181:19
187:13,15,19
190:7 191:18
206:11 214:10
218:16 228:23
234:20,25
236:7 238:24
252:19
**agreed** 112:16
188:22
**agreement**
116:10,16
117:6,8
168:17,23,24
**ahead** 6:10
9:1,3,8 27:10
30:4 34:16
50:12 74:25
111:13 118:4
159:19
171:21,24
174:13

175:15,17
184:4 191:20
193:24 205:18
209:2 220:12
246:19
**Alan** 63:5,8
65:18,22,25
66:3
**alarm** 249:13
250:24 251:6
252:9
**alarms** 249:14
**Albert** 43:10
50:7,9 51:22
52:13,24
53:25 56:11
58:15 59:19
60:25 78:4,20
93:8 214:20
**Albert's** 78:9
**ALI** 65:2
**alive** 63:7
**allocation**
99:15
**allowances**
214:14,16
**allowed** 80:17
82:16 132:23
146:7
**alongside**
217:4,5
**alumni** 17:25
18:8
**amazing**
126:17
**ambiguity**
25:10 27:4
**ambiguous**
15:2 16:14
17:7 19:2,19
30:12 38:1
40:24 43:21

44:10 61:2
64:2 66:18
67:10,16 68:1
69:1 100:24
107:3 118:3
119:14 132:12
137:24 140:2
142:4 158:10
162:20,24
166:3 190:19
194:23
**amend** 57:16
93:24
**American**
61:17 62:7,11,
20,25 63:6,10,
12 64:7,15
65:8,13 85:3
137:2 177:24
**amortize**
253:7,12,14
**amortized**
251:16 253:2
254:13
**amortizing**
254:9
**amount** 12:21
24:23 42:20
50:24 98:12,
13 149:4
151:6 188:9
210:16 256:15
**amounts**
99:19,23
100:8,10
196:21 259:8
**analysis**
79:11,21
132:16,20
133:2,16
134:25
135:10,22

164:23 226:3
**analytical**
57:24,25 58:2
79:6,9 133:9,
14 143:1
**and/or** 97:22
**Angela** 203:21
204:2
**Angeles** 84:9
**annual** 18:6
22:9 27:15
95:12,20
119:3 210:16
215:25 221:9
**annualized**
215:25
**answering**
8:23 65:4
164:1,3,9
200:24 248:9,
10 255:10
**answers** 35:12
255:12
**anticipate**
148:21
**apologize**
140:19 181:17
249:12
**apparently**
126:16 187:2
196:20 232:14
242:18
**appeals** 7:16
27:23
**appearance**
66:2
**appearances**
5:16
**appeared**
190:20
**appears** 251:7

**applied** 38:8
132:2 226:7
235:1 236:8,
11
**apply** 39:5,7
**applying**
31:12
**appoint** 62:13
**appointed**
20:17,24 21:1
62:6
**appointment**
61:16,23 62:3
67:7,18,20
68:13
**appointments**
21:22 22:16,
19,23 23:11,
20,21 31:3
71:12 108:23
109:1 213:21
**appoints**
63:12 65:13
**appraisals**
27:22
**appreciation**
66:3
**approved**
99:14
**approximately**
5:3,5 49:12
258:20
**April** 18:6
**Arc** 181:25
**area** 47:22
78:3 99:15
245:7
**argued** 148:16
**argument** 86:7
**arguments**
79:17,18,20,

21 184:10
**Arizona** 228:6
**arrange** 13:16
**arranged**
112:3,5
**arrangement**
111:1 112:21
173:3
**arrangements**
173:6
**article** 9:20,22
70:10 77:17,
20 78:14 79:3,
14 130:15,19
134:16,22,24
135:2 139:13
140:12
142:19,24
167:9 176:22
177:23 181:25
182:14,16
183:5,9
184:11,14,20
185:4 186:8,9,
19 226:5
231:19,20
234:20
235:19,21
**articles** 9:16
77:5,12,14,17
78:15,17
125:21,22
130:16 131:25
136:24 137:2
148:16 163:18
164:14,15
165:20 168:25
169:1 177:21,
22 186:7
201:19 205:10
225:2 230:16,
24 233:7

**asks** 35:13,21
40:8,16
102:19 105:19
106:6 121:12
157:9 239:21
**aspect** 11:3
20:22 38:7
191:4,6
**assessment**
48:24 75:10
173:15 229:8
**assessments**
110:4
**assigned**
121:6 186:7
**assistant**
86:15 102:3
263:3
**associate**
61:16 62:6,14
63:13 109:25
114:7,8
**Association**
177:24
**assume** 83:24
131:20,23
250:7,12
**astonishing**
147:5
**atmosphere**
12:13
**attend** 13:11,
17,18 14:10,
11,25 15:5
17:18,19 18:3
101:7 174:23
175:2
**attendance**
16:19
**attended**
15:22

**attenders**
14:23
**attention**
91:16
**Austin** 5:19
126:2
**author** 70:2
137:1
**authorize**
242:7
**auto** 180:24
**average**
149:20 167:14
196:19 205:12
224:25
225:13,22
226:10,17
232:10,11
233:1,11
234:5 235:5,
13,15 237:21
260:2,22,23
261:8,11,14,
15
**award** 176:16,
24 177:23
178:2,10,11,
13 187:23
233:22 244:10
245:10,16,17
254:21 255:3,
4,5
**awarded**
52:14 95:2
155:20 204:5
259:11
**awards** 254:16
259:11
**aware** 180:18

---

# B

**back** 10:8
12:17 20:8
23:17,19 24:4
25:1 27:22
29:7,16,23
32:7 43:14
49:22 80:5
85:4 86:18
93:25 99:18
105:19,23,24
106:4,7,10
112:12
115:19,21
127:7 128:18
130:5 134:18
141:6 155:2
159:19 173:18
174:3 200:9,
13 202:4
220:16,19
224:20 234:2
236:2 238:15
246:12,24
251:4
**background**
100:18
**bad** 107:13
129:15,17
149:19 213:2,
11,13
**Baker** 24:20
142:21,23
203:11 221:3
222:15,20
225:9 228:20
**Baker's**
240:15
**balance**
149:15,18,21

**balancing**
149:16
**ballot** 202:17
206:17
**ballots** 206:17
**ballpark** 53:6,
9
**banter** 110:14
**bar** 7:21,22
130:4 171:20
177:24 220:2,
3 260:9
**Barbara**
117:14
**base** 84:1
188:21
**base-** 150:22
**baseball**
126:16,18
**based** 44:11,
24 45:2 47:11
56:2 63:5 64:5
65:14 66:21
83:19 88:8,10,
25 89:17 90:2
92:11,18
98:10,12,14
111:8 167:24
169:20,23
170:11 171:11
174:10
175:13,17
176:5 188:18
189:2 190:1
191:13,25
192:25 194:24
195:6,9
196:11 200:2
201:1 205:14
211:3,22
217:7 224:1
236:5

**baseline**
97:13,14,21,
22,23,25 98:1,
2,4,12,19,20
99:1,6,8,10,
11,12,13,19
100:2,7,8
119:17
120:23,25
121:1 127:19,
23 128:3
129:3 134:8,9,
12,13 144:3,4
149:12,21,23
150:5,12,15,
16,21,24
151:5 152:21,
23 153:1,25
169:14,15
188:24,25
189:1,2
193:20 195:1
211:16,18
219:6,7
225:14 231:5,
7 232:10,19,
20 233:11
236:6,18,19
237:3,7,10,20,
22 238:5
240:18,19
247:5,6,7
260:2,21
**baselines**
98:25 99:5
121:5
**basic** 95:16
**basically**
119:9 122:8
212:1
**basis** 84:13
96:19 191:8
209:16,21

215:25 217:17
227:21

**Bates** 52:16

**beating** 26:11

**beginning**
98:23 107:12
129:10 219:8

**begs** 146:4

**Bellagio** 68:9,
10,14

**Bending**
176:23

**beneath** 17:5

**bets** 170:19

**biased** 186:22
187:1

**big** 12:8 86:19
105:24 149:3
158:12 170:24
180:3 182:8
214:19 233:5,
6,13,22 243:2
255:5 260:18

**bigger** 30:1
89:19 147:11
153:9 205:3,4
243:18,20
260:16

**biggest** 12:7

**Bill** 13:4

**binder** 182:8
222:2,4
228:14 243:2

**binders**
105:24

**binding** 70:17

**Bintliff** 117:15

**bit** 14:13 30:1,
4 60:10 83:3
124:11 153:4
179:21 206:3

212:10
243:18,20
261:5

**blackballed**
14:15 15:11

**Blais** 116:12

**blank** 11:21

**blockbuster**
235:19

**blog** 147:8
148:2 149:1

**blogging**
148:6

**blogs** 147:6,
22,24,25
148:7,14,22,
23 149:8
167:7

**board** 13:11,
21 16:20
170:21,23
172:1,3
174:24

**boards** 14:11
17:15 174:11

**Bob** 143:8,10,
23,25 144:24
145:8,12,14
168:2,18
170:14 171:4,
9,10,20,21,24
173:4 215:17
216:6

**Bob's** 206:6

**Bobby** 109:24
110:3,6 223:7

**Bone** 83:18
86:13,20
110:12,13
116:2 119:21,
25 143:8,10,
23,25 144:24

145:8,14
151:8,11,22
152:3 159:22
160:3,21
168:2,13,18,
21 169:16
170:14 171:13
172:21 174:6,
9,12 205:19
206:2 223:18

**Bone's** 86:13
163:19 169:24
215:17

**bonus** 52:25
54:8,9,12
253:22

**bonuses**
209:25

**book** 67:1
78:14,18
112:8,17
113:5,14,16
122:25 126:6,
9,13,14
130:19
134:23,24
164:21,23
175:23 176:3,
21,23 177:23
183:16 186:18
187:3,5,7
226:15,16,21,
22,25 227:1,9,
10,13 228:1
229:3,5,23,25
230:10,18,20
232:4,16,25
233:6,8,13,14,
15,18,20
234:4,7,23
236:3

**books** 58:4
163:17

164:17,19,20
165:1 169:1,2
175:23 176:4,
14,18 211:12
226:24 229:11
233:5,9,22
234:24

**borderline**
226:2

**bottom** 83:14,
20 85:1 130:9
182:25 183:1
262:2

**box** 27:11
180:2,3

**brain** 38:9

**brand-new**
229:5

**break** 9:1,4
49:14 115:8
141:9 173:20
220:12,19
246:20 247:10

**breakfast**
113:11 125:16
126:14

**briefly** 7:23
123:24

**briefs** 135:13
148:12

**bring** 112:6
113:15 173:9

**bringing**
212:25

**brings** 121:5
236:24

**broadcast**
126:20

**brought**
112:14 143:20
181:24 233:19
237:2

**BU** 205:19,21
216:8

**budget** 15:18
19:20,22,24
20:1,5,7,10,
16,20 21:2,4,
8,10,12,21
22:7,9 23:8,25
24:2,17 25:2,
5,14,20 26:5,
7,13,15,18,19,
21,22,25 27:5
29:18 30:6,10,
18,23,25 31:3
33:15,16 41:7,
14,23 48:20
49:25 50:2,5,
21,24 52:7
53:22 54:25
55:3 77:20
80:3,7,10,12
81:4,6,12,23
82:3 85:20,21
87:8 88:12,20
91:10 94:7,17
95:11,13 96:6
99:22 100:17
105:10 107:23
110:8 111:25
112:2 113:10
114:5 115:23
116:6,14
117:12 119:10
120:10,13
122:4 123:21
124:1,6 127:6
128:17,20
132:7 133:3,
15 136:13,16,
18,20,23
137:14,19
138:15 139:6,
12 140:6

141:11 142:6
144:10 146:20
154:9,11,14,
17 155:19
156:9,10,20,
24 163:1,11
165:11 166:11
169:9 170:2
178:7,8
185:23 186:12
189:14,23
192:21 193:2
195:18 196:5,
10 197:3
199:19 201:25
207:12,25
208:5,7
209:10,25
210:2,9,16
212:8,14,19
213:17,20
214:8,13,15,
21 215:3,9
216:5,15,23,
25 217:17
218:1,14
219:1,5
220:20 222:21
228:20 236:22
238:11 242:3,
10 243:1,8,10
245:20 246:2,
13 249:6,9
250:3,15,17
251:13 253:4
254:4,11,20
256:8,9,18
**budgetary**
90:18
**buildings**
12:10
**bump** 194:16
210:14,15

**bump-up**
196:18
**bump-ups**
196:20,21
**bumped**
194:19,21
195:2
**bunch** 20:1
47:13 49:13
61:15 69:4
111:9 112:6
140:15
231:15,18
250:25 251:10
255:8
**bunched**
47:13

———————

**C**

**calendar**
102:3
**call** 16:4
26:23,24
28:23 38:21
48:5,18,21
54:11 69:6
71:19 82:24
92:18 96:19
97:12 101:5
167:8 222:18
238:1 263:2
**called** 54:9
107:11 233:21
243:7 257:22
**calling** 96:25
109:20
**calls** 15:15
33:10,22 34:7,
14,23 35:24
36:4,9,19,20
37:8 38:1,5,6,

12,19 39:2,9,
20,24,25
40:12,13,23
41:17 42:21
47:2,23 48:3,
9,23 50:14
55:15 60:2
62:8,17 63:16
64:2,10,17,24
65:9,16 66:18
67:2,9,16,25
68:17 69:24
70:6,18,23
71:8,15 72:19
76:18 77:10
80:14,21
81:14 82:19
84:19 85:10
92:2,9 104:11
105:6 106:8
107:17,24
112:24 114:20
117:1 118:7
128:24 133:4,
11 137:17
138:16,21
139:4,8,19
146:16,23
147:17
157:17,21,22
158:3,4,25
159:7 160:11
161:8,19
163:8,9 166:2
167:20 174:25
178:20 179:1
183:25 184:6
187:18 199:1,
16,24 206:19
207:1 208:12,
21 209:5,14,
19 211:8,25
213:22 222:24

242:24 243:5
246:7 247:16
248:13,19
249:24 250:10
252:6,23
**Cambridge**
176:1,12
**camp** 182:20
185:5,15,16,
18,21 186:17
**campus**
109:11
**capable** 138:3
**capacity** 80:10
114:17,19
171:9
**capital** 6:13
**career** 77:24
162:5 163:4
**careers** 88:18,
22
**carefully**
135:14 205:2
**Cary** 43:10
50:7 54:14,21
56:10,16 57:9,
19,20 58:15
60:1,22 78:2,6
203:5
**Cary's** 57:22
**case** 24:15
39:16 43:6,8
56:2 79:8 93:2
130:15
164:20,21,23
179:23 194:2
201:14 205:24
223:24 225:1,
22,25 226:2,4,
20 229:3,5,11
230:20 232:16
234:24 248:21

259:5
**cases** 8:7 79:7
135:12,21
182:17 228:21
231:10
**cast** 206:18
**catch** 204:11
**categories**
31:21 47:7,11
120:8
**categorizes**
58:1 79:7
**categorizing**
79:8
**category**
31:15 74:3
95:3 99:6,9
119:24 120:5
151:12 152:1,
4,8,9 153:12
242:18
**catered** 13:14
**Cato** 69:8
**cautious**
102:14
**Center** 12:9
68:15 136:25
184:20
**certainty**
36:24 37:1,7,
16 38:4 198:4
**chair** 25:2,5,
13,14,20 26:7,
9,10 33:16
52:8 85:20
101:6 105:16
155:20 156:1,
2 220:21
222:21,23
223:12
**chairman**
20:13,14

101:1,17,19
102:2,24
122:15 124:16
129:1 154:15
215:3 221:1
222:5,6 243:9
**chairs** 22:12
69:7 223:3
**chance** 48:14
51:15
**change** 12:7,8
48:2 99:1
149:7 202:11
**changed** 12:1,
2,10,15 24:2,
12 212:19
213:14,15
**chapter** 67:1
134:23,24
142:20 180:7,
9,10 231:10,
11
**chapters** 58:4
78:16,18
163:18 164:13
**characterizatio
n** 77:4
**characterize**
74:20 77:5,6,
23 148:23
200:11 229:18
**characterized**
253:13
**Charles** 63:5,8
65:18,22,25
66:3
**chart** 47:11,20
49:8 80:5,6,
13,20,25
82:13,17,23,
24 83:1,20
84:10,12,21

86:18,24
87:13 89:9
90:6 93:22
97:14 98:6,8
100:13 151:2
152:11,12
159:21 162:22
167:18 189:13
190:5 191:16,
23,24 195:8
247:19 260:2
261:2,3,7
**charts** 45:15
50:1 161:14
247:11 250:5
256:21 261:5
**chat** 27:9,11
51:10 145:16
236:15
**check** 24:14
182:10
**checked** 182:7
**checkers**
180:22
**checking**
181:2
**Chemerinski's**
181:25
**Chemerinsky**
182:5,20
185:5 186:17
187:3
**Chemerinsky'
s** 182:13
183:16
185:16,18
**Chesney**
109:24 223:7
**chime** 109:24
**church** 126:22
**Churgin**
261:10 262:9

**Circuit** 7:16
**circular**
190:11
**circulates**
101:1
**circumstances**
38:16 40:5
45:19 117:11,
16
**citation** 70:4,
21 165:23
166:9 169:5,6
**citations**
70:14 165:3,6,
11,17,18,19,
22 166:8
167:2,6,12
169:2
**cite** 166:9
**civil** 145:19
146:1,5,9
231:10
**claim** 253:21
**claims** 252:5,
17,21
**clarify** 213:10,
12
**class** 12:5
108:12
231:12,20
**classes** 12:5
174:24
**classify** 74:19
**CLE** 220:1
**clean** 181:5
**clear** 35:6,10,
16 79:14
111:3 132:17
152:16 153:22
216:1 219:2
**clerk** 70:9,12

71:1
**clerk's** 70:21
**clerked** 7:15,
21
**clerks** 70:15
**clerkship**
9:19,20 45:25
**clip** 125:23
**clipped**
125:24,25
**close** 151:19
**closer** 11:7
**Closing** 182:1
187:4
**co-author**
176:15
**co-equals**
22:3
**co-op** 176:17
**coffee** 12:19
14:9 49:13
**coffees** 14:10
**Cohen** 73:24
247:4
**cohort** 44:21
47:12 87:14,
19,22 89:6
90:5 91:14
97:22 99:1,11,
15 119:22
120:4,20
121:18 122:6
150:20,22
152:18 153:24
219:4 258:22
259:15,18,19
260:1,5
**cohorts** 44:20
47:9 91:10
119:11 121:5,
11 152:14

153:16 154:2
258:20
**Colin** 5:17
49:11 51:13
140:19 144:11
177:3 181:11
185:9 196:3
197:16 204:6
249:15
**colleague**
131:14
**colleagues**
21:13 23:1,4
43:25 129:17
**collective**
218:25
**collegial** 14:4,
5
**collegiality**
12:13,22
**colloquia**
13:5,15,20
14:12 15:21
16:20 17:15
170:20,23
172:1 174:11
**Colorado** 7:22
**Columbia**
178:4
**column**
258:16 259:7
**columns** 52:4
**combination**
45:15 60:15
98:16
**combining**
215:24
**comfortable**
114:14
**comment**
109:25 183:5

**commentary**
163:19,21
229:19

**comments**
200:4 223:11
224:21 240:15

**commiserated**
233:20

**commit** 35:21

**committee**
15:18 16:25
17:4 19:20,22,
24 20:1,5,8,
10,16,20 21:2,
4,10,12,17,22,
23 22:7,9,16,
17,20,23 23:2,
9,10,11,14,18,
25 24:2,17
25:3,5,14,15,
20 26:5,7,14,
15,18,19,21,
22,25 27:6
29:18 30:6,10,
19,23,25 31:3
32:19 33:15,
16 41:7,14,23
43:12,18
48:20 49:5,25
50:2,5,21,24
52:7 53:22
54:25 55:3
56:8,20,22,24
58:25 61:14
62:21 77:20
80:3,8,10,12
81:4,6,13,21,
23 82:3 85:20,
21 86:3 87:8
88:12,20
91:10 94:7,17
95:11,13 96:6
97:3 99:22

100:11 101:19
102:6 104:1,9,
10,16 105:10,
15 107:23
108:4,7,23
109:1,4,10,16
110:8,13
111:25 112:2,
4 113:10,20
114:5 115:23
116:6,14
117:12 119:10
120:11,13
122:4,18
123:21 124:1,
7,17 127:7
128:17,20
130:2,12
131:16,20
132:7 133:3,
15 136:13,16,
18,20,23
137:14,19
138:15 139:6,
12 140:6
141:11 142:7,
16 144:10
146:11,13,15,
20 147:1,23
148:1 149:4
154:9,11,15,
17 155:19
156:9,11,20,
24 157:13
163:1,11
165:5,12
166:11 167:3
169:10 170:2,
12 175:4
176:17
177:17,18
178:7,9
185:23 186:7,

12 187:23
188:14,19
189:15,23
190:6,8 191:3,
14,25 192:1,
21 193:2
195:7,10,18
196:6,10,15
197:4 199:19
201:12,25
205:16 206:9,
15 207:12,25
208:5,7
209:10 210:1,
2,9 211:4
212:8,14,16,
17,19,20
213:17,20,21
214:9,13,15,
21 215:3,4,9
216:5,23
217:17 218:1,
14 219:1,5
220:20,22
222:21
223:10,11
228:20 232:18
233:10
236:22,25
238:11 242:3,
11 243:1,8,10,
25 244:2,8
245:8,20
246:2,13
247:20,22,25
249:6,9 250:4,
15 251:13
253:4,6,7,10
254:4,12,17,
20 255:2,3
256:8,9,18

**committee's**
106:14 188:23

216:16 217:1
233:17

**committees**
16:3,18 18:19
21:6,7,14,20,
21,25 23:6
31:1 170:25
171:23 250:17

**Commons**
12:9

**communicated**
19:9,12
111:25

**community**
135:11

**comparative**
58:19 168:10

**comparatives**
144:21,25
145:3

**comparators**
163:6

**compare**
56:14 58:5,13
78:9 79:24
161:17 162:25
167:14

**compared**
234:22

**compares**
189:5

**comparing**
58:14 159:21
162:15

**comparison**
44:19 56:23
58:9 162:2

**comparisons**
163:2 165:15

**compels**
157:10

**compensation**
28:1 95:18
205:25

**compensation
-wise** 29:2

**compensation
s** 52:11

**competitivene
ss** 244:6

**competitors**
157:20 162:7

**complain**
245:25

**complained**
245:15 246:15

**complaining**
244:9 245:9
246:11

**complaint**
156:4,5,6

**complaints**
96:16 97:1

**complete**
252:12

**completed**
32:24

**completely**
34:12 147:4
178:18 228:21
229:25 231:11

**complicated**
261:5

**component**
225:9

**composition**
24:2,10

**compound**
30:22 34:15
39:10 61:1
67:15 73:4
103:12 111:17

146:22 187:17
**computer**
126:21
**con** 79:17
**con-** 135:24
**conceivable**
151:25 235:3
**concern** 112:4
**concerned**
96:21
**conclude**
187:1
**concluded**
263:9
**conclusion**
36:20 37:9
38:6,13,20
39:3,10,21,25
40:13 70:19
157:22 158:4
163:9 167:21
173:16
**concrete**
77:12
**condense**
135:14
**conducted** 5:7
**conference**
66:16 68:14
220:6
**conferences**
17:16,17,19,
20 58:21,22,
23 66:7
170:22
**confers** 214:8
**confidence**
233:4
**confidences**
82:10

**confident**
134:11 198:2
199:18 204:3
**confidential**
82:14 106:14
**confidentiality**
81:20
**confirmed**
249:2
**conformity**
184:25
**confronted**
155:21
**confusing**
25:19
**conjunction**
223:6
**connection**
5:11 8:8 85:25
110:25 111:24
210:19
**considerable**
219:4
**consideration**
49:10 59:2,18
95:4,6,8 163:5
165:4 244:21
246:1
**consideration
s** 81:17 90:19
94:14
**considered**
18:24 31:23
59:19 61:14
178:16 228:19
232:5 233:13
**consistent**
235:2 258:19,
25
**consistently**
226:7 236:12

**constant** 99:2
257:8
**constitution**
112:8,9
233:21
**constitutional**
58:19 78:7
**constitutions**
79:8
**consult** 223:7
**consulted**
209:11 215:4
247:24 254:22
255:6,7
**consumer**
180:11
**contained**
134:24
**contest** 8:25
**context** 19:20
142:6 245:17
**continue**
177:20
**continued**
224:25 225:7
226:8 235:6
**continuing**
219:25
**contract**
226:16,22
227:9
**contribute**
67:1 103:1
205:20
**contributed**
103:20
**contribution**
142:8
**conversation**
12:21 53:18
**conversations**
44:11

**corner** 239:11
257:8
**correct** 34:9
54:22,23
59:21 72:14
80:3,4,19
82:8,18 87:15
95:13,14 97:5,
6 100:19
104:23 106:24
123:2 141:13
144:21,25
146:15 159:25
160:1,21,22,
24 161:2
163:7 164:8
167:15 174:16
180:22
212:10,11
214:5 225:19
251:1,10
252:5 256:1,2,
16,17,24
257:4,19,23,
24 258:1,4,5,
7,8,10,11,13,
14,17,18
259:20
260:14,15
262:2,7,8,13,
14
**corrected** 87:7
180:23,25
**correctly**
45:13 181:7
**correspond**
95:25
**corresponden
ce** 69:20
**corresponds**
100:8
**costs** 48:15,17

**counsel** 5:15
7:10 255:9
**count** 18:15
147:6 161:5
165:15,16
166:9 211:15
**count'** 147:8
**counted** 18:20
19:4 135:3
231:14
**country** 58:3
108:25
**counts** 18:16
19:8 161:1
172:13
**county** 5:13
169:6
**couple** 24:8
43:9 44:23
45:25 71:18
81:16 87:17
114:22 122:1,
9 140:24
167:3 251:4
**courses** 220:1
**court** 7:16
8:20 134:20,
25 135:5,13,
16 136:4,5,8,
15,17,21
137:6,15,22
138:11,13,14,
23,25 139:2,
10,11 141:9
142:20 149:9
165:17 169:5
217:12
**Court's**
135:16
**Courthouse**
182:1 187:4

**COVID** 13:10, 19 51:8 155:3 170:18,19 241:12
**COVID-19** 5:8
**crappy** 71:3
**crazy** 180:21
**create** 82:23 177:9 219:10
**created** 28:24, 25 84:11,22 161:13
**credence** 164:21 228:16
**credit** 232:16, 17,18
**criteria** 31:12 48:11 65:2 76:12 166:23
**critical** 18:8 182:20 183:11,12 184:5,12 185:5 186:17 187:1,2
**criticism** 185:17,18
**criticisms** 63:9
**Crossword** 125:11
**CSR** 5:10
**cumulative** 167:13,22 188:19 189:10 191:13 192:13 195:6 199:11 201:20 205:15 211:3,21 216:22 217:1 218:1,14

**cumulatively** 199:6 212:3 214:23
**curiosity** 122:12 205:17
**current** 5:7 6:14 219:7
**curser** 83:10 87:1
**cut** 169:19
**cutting-edge** 147:8
**Cynthia** 5:10

---

**D**

**D-36840** 257:9
**D.C.** 7:11 126:18
**Dammann** 86:1
**Darren** 5:18, 24 37:24 103:14 117:24 177:12 190:17 262:23
**date** 5:4
**daughter** 125:9
**David** 103:17 192:13 193:4 203:9 234:10
**day** 13:10
**days** 12:17,20 14:8 37:20,22 98:3 120:15, 16 124:25 129:20 130:21 250:17
**dead** 26:11 198:3

**deal** 24:24 109:11 110:24 130:10 163:21 164:12,21,24, 25 168:2 169:18,20,21 173:17 175:16 185:23 186:1 205:18,23 218:23 229:12 244:6
**deals** 156:16
**dealt** 109:10
**dean** 11:9,19 13:3 18:4 20:17,23,24 21:4 22:11 23:17 24:3 29:7,23 30:2 31:2 32:10,11, 15,19,20 33:6, 8,12,16 35:21, 25 40:7 41:6, 14,23 42:3,11, 18,19,23,24 43:1,5,14,15, 19 44:12 47:19 48:5 50:1,5 53:2,22 54:2,6,10 55:23 57:7,8 93:7,13 94:3 95:4,18 97:7, 12 98:16 99:18 101:6, 15,22 102:1,7, 23 105:16 106:3,15 108:17,20,23 109:25 110:4, 5,7,11 111:14 112:5,10,20, 21 113:7,11

114:3,6,7,9,15 115:23 116:4 117:8 121:7 122:10 123:19,23 128:8 152:2,5 153:20 154:9 157:24 179:10 192:10 202:18 206:22,23 207:24 209:9 213:8,15 214:4,7,18 215:5,6 223:2, 10 233:19 236:22,24 238:18 247:9, 14 250:8,25 251:9,16,20, 23 252:4,16 254:11,15 256:19
**dean's** 99:14 114:18 215:14
**deans** 11:13 12:2 24:1
**debate** 85:16 148:5
**decade** 8:15 23:15,20 189:15
**decades** 169:10,15 189:23 190:1
**decent** 222:22
**decide** 9:14 10:21 37:2,18, 19 89:23 90:6 122:11 198:22
**decided** 135:16 208:7, 8 215:22

232:19 244:3 253:5,6,12,14
**decides** 121:7
**deciding** 23:3 59:24 228:15
**decision** 10:23 85:24 90:13 135:17 157:24 162:12 197:5 207:12, 17 208:9 214:1 253:8 254:5,6
**decision-maker** 39:16
**decisions** 84:1 87:11
**deems** 30:3 103:25
**default** 236:17 237:24 238:3, 8 257:22 258:1,7,13,16, 21 259:2,4,14
**definitively** 146:25
**degree** 44:25
**degrees** 161:16
**deliberate** 29:4 43:19 102:3 129:21
**deliberated** 29:6
**deliberates** 43:12
**deliberating** 44:15
**deliberation** 129:19
**deliberations**

49:5 81:20,25
87:8 101:23
102:18 103:7,
9 104:15
106:14,16
110:9,12
116:1,5
119:11 142:7
156:11 233:18
256:9

**delightful**
252:9

**delivered**
126:23

**delivering** 8:9

**Denver** 7:16,
21

**departing**
90:20

**depend** 40:5
75:3 146:11
161:21 168:24
186:6 229:9

**depending**
84:21 98:5
170:1 173:3
212:1 226:3
232:12

**depends**
45:19 49:6
71:17 74:16
97:15 130:20
162:18 230:11

**deposition**
5:6,12 8:1,6,
10,14 121:25
122:20 123:9
124:4 128:16
144:17 255:16
263:9

**depositions**
6:1

**Depot** 179:23

**Derek** 26:10
129:10

**describe**
35:10 39:13
75:7 77:3
135:14 183:23

**describes**
163:20 186:18
187:7

**describing**
79:5

**description**
73:18 131:19
134:16,25
135:1 143:14
182:22 219:18

**descriptive**
79:5 142:15,
24,25

**deserve** 97:22
241:17

**deserved**
155:25 233:11
242:5

**deserves**
89:11 173:10

**deserving**
225:6

**desire** 36:23

**destroy**
105:11

**destroyed**
105:12,22,25

**detail** 87:5
122:7

**detailed** 31:18

**details** 108:15

**determination**
29:14 86:2,4
106:12 119:18

127:20
163:11,13
197:4 209:12
216:16 221:17
253:11

**determinations** 57:14 87:21
120:23 121:1

**determinative**
59:11

**determine**
25:23,24 28:7
36:7 37:6,14
39:16,23
40:10 44:7,21
45:14 46:15
47:7,10 48:2
52:10 59:7
85:21 88:4,25
94:12 156:24
158:23 159:6
162:6 166:14,
20 170:9
196:6,17

**determined**
118:16 128:8
178:11 195:24

**determines**
87:12,14

**determining**
22:23 26:14,
15 49:2 55:23
119:16 120:21
163:6 221:14

**developed**
148:21

**development**
95:1 202:13,
20 255:23
256:3

**dialogue**
10:11

**Dickerson**
203:12 226:8
227:5,25
230:24 232:11
233:4 244:9
245:9

**Dickerson's**
229:22 231:22

**differ** 41:1

**difference**
87:18 139:17
163:22 175:16
205:21 233:1

**differences**
139:22 168:11
188:3

**differentiate**
129:14

**differently**
159:12
253:16,19,25
254:3

**differing** 40:25

**difficult** 58:12
165:6 167:4,
11

**difficulty**
60:10

**dim** 20:15

**dinged** 227:5

**disaggregated**
215:23

**disagree**
17:23 19:11
40:18,21
246:3

**disagreement**
108:5 167:5

**Disaster** 5:9

**disciplines**
79:12 165:16

**discount**
86:22 229:14,
15

**discounted**
231:22 232:2

**discover**
239:4

**discovering**
209:4

**discovery**
185:12

**discriminated**
158:24

**discriminating**
158:11 200:1

**discrimination**
78:7 156:16,
17 253:21

**discuss** 30:2
56:22 104:16
156:20 175:5,
7 238:11

**discussed**
102:8 106:17
134:21 143:25
144:10,22
156:10 210:2,
9 244:24
245:13

**discussing**
244:14

**discussion**
107:10 134:15
135:5 148:5
149:3 243:15
246:10

**discussions**
109:12

**dislocate** 90:8

**dislocation**
88:5 209:24
210:3

disrespect
181:21

disrespectful
197:18

disservice
209:8

distance
219:5

distributes
105:15

divided 46:23
98:7 185:15

DMR 83:19

dock 227:1

document
31:22 52:3,16,
18,19,22
130:18 140:10
141:14 181:22
185:10 219:21
223:12 238:10
243:14 245:12
257:18
260:13,20
261:21

documentary
42:13,16

documents
28:14 129:24
237:17

dollar 99:19,
23 100:8,10

Door 182:1
187:4

doubt 121:20
178:12

download
51:15 167:9

Doyle 7:15

drastically
239:5

draw 121:14
173:16

drawing 11:21
13:11,21
14:11 16:20
17:15 61:5
109:12 121:13
170:21,23
172:1,3
174:11,24

drawn 119:25
121:23 152:14

draws 152:2

dress 65:15

dressed 65:19

due 88:5 126:6
209:24 210:2

duly 5:21

duties 49:25

DVDS 125:9

Dzienkowski
108:22

---

**E**

e-mail 42:19
124:16 129:9
145:16 147:3

e-mails 124:17

earlier 17:17
29:16 55:25
57:12 154:8
160:19 161:21
164:10 172:4
178:6 203:21
233:19,23

early 23:19
24:9 31:2
125:15 200:14
201:18

earners 237:8

easier 58:7
167:12

easy 10:23
58:5 79:25
239:12

economic
79:11

edition
164:20,23,24
228:22 229:1,
2,3,25

editions
229:11

editor 9:16

education
219:25

educational
161:15

EE 153:23

effect 207:17
210:11

effort 101:25
135:20 148:10
157:6 168:6

electronically
53:17,18

elevator
155:21

eliminate
163:23 164:4

else's 36:3
59:25

embarrassed
182:11,12

emergency
5:8 101:24
108:5

emoluments
155:11,17

Emory 147:9,
15

employed
75:6,14

Employment
156:17

Encamacion
153:24

end 12:25
29:5,22 47:12
92:12 94:2
98:23 105:18
122:25 126:6

ended 12:24

endurance
8:25

Engaging
219:25

enjoy 9:24
10:3,4

enjoyable
10:12

enjoyed 9:17
10:24

ensure 157:6

enter 59:17

entered
116:10,15
123:24

entire 20:9
88:18,22
163:23 164:4
240:25

entities 165:8

entitle 201:7

entitled 94:9,
11

entity 66:12,
23

environment
12:12

environmental
7:8 10:16,17

EPA 9:21,22

episode
125:13

equal 16:12,16
18:24 150:3
153:3,4 154:2,
19,22 155:6
156:4,10,13,
14,21 157:16
171:13 172:5,
11,12 174:9
190:22 230:10
257:23

equality
163:13

equally 22:4
44:6,8 91:2,3,
13,25 92:7
93:16 95:19
150:2 156:23
157:15 162:7

equity 52:14
93:18 94:1,7,
18,23 95:3,5,7
201:22 202:2,
5,6,7 210:1,2

equivalent
159:11
164:14,15,18
170:13 171:10
200:12

equivalently
93:16 161:11

era 12:17 13:1,
3 20:9 33:2
94:4 184:24

Eran 181:25

errors 80:19,
25

Erwin 182:2,6,
13

escaped 13:2
established 245:4
evaluate 42:2 78:24 81:4,8, 22 100:18 114:7 116:17 117:12,14 118:10,11 120:17 124:19 129:12 131:8, 13 133:8 139:13 146:7 150:23 152:18 167:11 169:12 171:2 175:19 176:18 186:6 196:13,16 197:24
evaluated 93:15,16 97:1 124:6,9,13 127:9 177:17 195:1,18 197:23 198:10 199:13 206:6 222:19 228:10
evaluates 15:18 95:12
evaluating 26:1 27:3 59:4 87:18 129:17 132:2 138:4 140:7 175:5 179:14 199:21 232:7
evaluation 22:10 29:16, 22 31:10 89:21 95:17, 20,21,22 116:19,20 119:3,4

124:11 127:11 130:21,22 131:2,3 139:25 141:10 149:19 150:7, 9,21 157:1 170:7 182:24 184:8 188:6 191:4 196:11 198:6 211:17, 19 228:13 229:9 231:5 246:2
evaluations 30:14 31:7 58:8,11 59:15 61:10 82:4 90:15,25 119:6 122:8 129:22 130:4, 5,8 131:15,21 141:12,15,18, 22 142:6,10 149:20 167:17 188:23 199:6, 7 212:2,7 221:24 234:21 237:9
evening 125:5 126:24
event 148:20 226:4
events 17:25
eventually 100:6
everybody's 147:22 215:19
everyday 37:18
evidence 42:13,16 79:9 80:22 158:11,

15,22 159:2
exact 39:7
EXAMINATION 6:8 255:19
examples 182:17 261:14
exceeded 191:4 199:7 221:18
exceeds 96:7
excellent 61:8 106:25 226:9, 15 234:3 235:6,14,15
exclude 166:24
exclusively 31:12
Excuse 19:2 159:13 197:16
excuses 234:18
exercise 64:6 66:4
Exhibit 27:9 51:10,14,16 145:16 159:20 179:8 204:8 221:6 222:8 223:15 236:14 238:15,16 249:2 257:5,7, 9,10,13 260:7, 8,11,13 261:24,25
existed 104:5
expect 175:3 220:9
expectation 14:9,11,13
expectations

31:13,14 96:2, 3,7,14,15,17, 20,22,25 97:2 221:18,19 225:18 232:24 240:14,17,23 242:18
expected 12:18 17:18 18:12
expecting 7:23
experience 64:5 66:1 83:21 86:7,14, 21 107:13 161:2 217:17
expert 8:8,11, 19
explain 191:19 230:13 240:8
explained 110:23
explaining 53:15 111:1
express 36:22 106:16 111:14
expressed 107:1 108:7, 18 110:7,11 114:4 205:17
extent 12:16, 18 13:18 30:3 62:5 78:10 79:22 82:10 87:16 94:24 95:1 116:11 127:10 130:6 148:5 168:9 171:20 199:8 200:23 211:13 218:12,13

external 18:14,16

**F**

face 90:10
fact 8:11 20:12 22:5 57:10 84:16 102:1 138:25 147:20 151:16 156:1 157:10 173:9 175:5 185:24 191:9 201:14 230:25 233:8 235:11 251:18
factor 38:18 61:14 227:11
factors 38:11, 14 39:19 40:2 48:19 55:22 91:17 192:16, 18 193:7,13, 22 201:7,9 231:4 232:12
facts 80:22
faculty 10:25 12:17 13:13, 23 14:5,11,12, 16,18,22 17:9 18:12 20:18 21:24 22:10, 14,25 23:3 27:15 29:1,6, 19,21 31:8,22 41:11,24 42:10,17 43:4, 14,22 44:4,22 45:20,23,24 48:12,14,16, 17 53:23 54:20 55:3 66:13 67:20,

22 71:23
72:13 73:1,2,
5,11,15,17
74:2,4,10,11,
20,21,25 75:5,
12 80:7,11,19
81:2,11,18,24
82:7,16,21,23
88:13,15,19,
21 91:6 94:5,
24,25 96:14
97:1,3 102:5
109:6 113:4
114:11,13,23
115:25
117:17,18,20,
21 118:2,12,
19 121:17
124:3 129:6
130:1,9
131:25 136:7,
18 142:9
143:21 144:9
148:25 155:4
157:15 161:17
180:4,14,23
194:6,7 200:4
202:8,13,20
207:13,19,20
208:1,8,10,14,
15,16,20
210:3,9,12
212:24 213:18
214:2,5,17
215:10,11
218:24 219:9,
19,23 220:3
221:9,22
235:9 237:4
241:18 244:1
246:10,11,16
255:23,25
256:3,5,10,14,

15 259:1,11,
20
**fade** 154:5
**failure** 229:22
**fair** 12:21
24:23 129:17
133:7 171:17
**fairly** 23:23
57:25 61:10
102:17 134:11
159:5 185:15
228:4,6
**faith** 131:22
186:15
**fall** 6:21 7:5
25:12,15 26:2
27:1,8 28:7,11
30:24 31:4,17
33:2,4 41:7
50:2 93:2,5,
11,14 121:3
221:12
**fallow** 201:17
211:14 230:16
232:3
**familiar** 21:13
28:15,19,20,
21 156:15
180:7
**Farnsworth**
11:19 12:17
13:7,13 20:9
23:18 24:3,4,
10,11,13 33:2
35:21 40:7
41:6,14,23
42:3 47:19
50:1,5 53:3,22
54:2,6 55:23
57:7,8 94:4
101:6,15
102:7 106:3,

15 108:17
110:7,11
111:14
112:10,21
113:7,11
114:4 115:24
116:5 117:9
121:7 123:19,
23 128:9
179:10,16
207:24 209:10
212:20,22
213:16 214:7
215:5 223:2,
10 236:22,23,
24 238:18
247:14 250:8
254:11,15
**Farnsworth's**
20:18 36:1
**fashion** 19:15
163:20
**favorable**
114:24
**federal** 70:5
231:13
**feel** 9:1 114:14
138:3 181:13
199:18 204:7
244:22
**feeling** 148:25
**fellow** 85:5
**felt** 13:25 14:2,
4 105:8
**female** 94:5
157:19
**females** 24:13
**fewer** 151:2
154:6
**field** 166:17
167:1

**figure** 37:17
179:5 237:13
**figures** 140:25
**FII** 204:14
209:4 257:2
**file** 262:25
**filed** 156:6
**files** 122:2,3,4
**fill** 71:20
**filled** 235:17
**filling** 109:4
**fills** 103:16,24
**filter** 260:20,
22
**final** 105:21
106:12 239:6
247:18
**finally** 100:9
**find** 10:11
30:18,23,25
42:25 75:13
147:5 153:10
236:15
**fine** 103:15
149:22,25
173:23
**finish** 132:24
172:8 177:4,7
181:14 191:8
227:15 248:8,
10
**finished** 9:21
164:1,9 177:5
191:10
**finishing**
164:3 227:19
**fire** 249:13,14
250:24 251:6
252:9
**firm** 7:21

**firsthand**
147:19
**Fishkin** 60:11,
17,24 61:6
**Fishkin's**
60:20
**fit** 135:25
**five-minute**
246:20
**five-page**
179:22
**five-year**
46:23 116:25
119:5
**flies** 108:25
**flow** 228:14
**focus** 96:23
**fogy** 24:18
**folks** 24:16
90:8 111:10
113:16 153:3
210:13 233:19
240:23
**follow** 201:6
**follow-up**
200:22 201:4
**food** 10:20
**Forbath**
111:15 114:3,
6,7,19 116:3
216:10,17
217:4,7,19
247:4
**Fordham** 85:4
**foreshadowin
g** 103:13
**forget** 124:21
198:20
**forgetting**
32:9

**forgivable** 214:12,25 216:1 251:1, 10 252:3,15, 20,22 253:12, 13 254:5,7

**forgot** 147:4

**fork** 180:4

**form** 6:4 51:25 217:18 235:16 236:4

**format** 28:19, 21

**forthcoming** 228:1 232:25 233:8 234:6, 14,16 235:18, 20 236:1

**Fortunately** 53:24

**forward** 31:24 32:11 202:16

**found** 57:24 167:3

**foundation** 68:8,14,20 69:8

**foundations** 68:21

**four-page** 137:3

**fourth** 31:14

**Franklin** 43:10 50:7 54:15,21 55:24 56:11 57:9 58:15 60:1,24 78:2, 3,11,22 203:5 235:5

**Franklin's** 78:10

**free** 9:1 13:17 181:13

**Freer** 145:17, 18 147:3

**frequent** 14:22

**frequently** 14:24 24:20, 22 33:5 133:19 148:8

**fresh** 10:9

**Friday** 120:14 124:7,9 125:4, 5 127:2,21 128:7 131:11 133:20 134:18 144:23 145:5 197:15,22 198:10 247:3 248:24

**friend** 63:6

**front** 129:24 155:21

**full** 116:20 180:2

**full-scale** 116:19

**function** 95:13

**functions** 17:9 95:17 172:1

**funding** 117:21 207:13,21 208:2

**funds** 68:11 118:19 204:14 209:4,11 235:10

**future** 22:6,8, 24,25 44:5 72:5 87:8 229:24 230:10

---

**G**

**game** 126:16

**gave** 47:21 66:5 125:9 206:22 250:25 251:9 252:16

**gender** 156:13

**general** 7:10 14:5 17:8 32:7 48:24 58:6 77:8,11 78:13 102:22 103:8, 11 155:1 162:2 170:14 175:6 210:21 229:8 259:5

**generally** 55:11 98:21 114:24 147:24 148:24 152:22 154:2 165:1 170:6,25 174:11 188:19 190:7 248:21 259:2,3

**genre** 58:16, 18,19 79:22, 23

**genres** 79:24

**George** 85:3

**Georgetown** 85:3,5 184:15, 16,19

**get along** 12:14 14:6

**Gibson** 5:18 6:2,5 9:6 15:1, 15 16:13 17:6 19:1,18 28:9 30:7,11,22

32:5 33:10,21 34:7,14,23 35:18,23 36:4, 9,19 37:8,21, 25 38:5,12,19 39:2,9,20,24 40:4,12,23 41:17 42:21 43:20 44:9 47:2,23 48:3, 9,22 49:11,17 50:14 51:13 52:15,21 53:13 54:3 55:15 57:2 60:2 61:1,19 62:8,17 63:16 64:1,10,17,24 65:9,16,23 66:17 67:2,9, 15,25 68:17, 25 69:24 70:6, 18,23 71:8,15 72:19 73:4 75:8,15 76:18 77:9 79:1 80:14,21 81:14 82:19 84:19,23 85:10 87:24 89:3,7,25 91:8 92:2,9,24 94:19 99:24 100:23 103:3, 12 104:11,21 105:6 106:8, 18 107:2,17, 24 111:17 112:24 114:20 115:11 116:7 117:1,22 118:1,7 119:13 124:22

128:11,24 130:24 131:6 132:11,22 133:4,11,24 136:12 137:17,23 138:7,16,21 139:4,8,19 140:1,8,19 142:3 143:4 144:11 146:16,22 147:17 150:17 151:23 157:7, 17,21 158:3,9, 25 159:7,16 160:11 161:8, 19 162:19,23 163:8,25 166:2 167:20 171:15 172:6 173:1,24 174:25 177:3 178:20 179:1 181:11 183:7, 25 184:6 185:9 186:4, 20,23 187:14, 17 189:18 190:15,18 191:7,20 192:7 193:10, 16,25 194:22 195:13,15 196:2,8 197:1, 8,16 198:24 199:16,24 200:23 204:6 206:12,19 207:1,15 208:12,21 209:5,14,19 210:5 211:8,

25 213:9,22
216:14,19
217:10 218:6
222:24 226:11
227:6,14,18
229:16 230:2
231:1,25
236:9 238:21
239:19 240:6,
9 241:5
242:24 243:5
245:11 246:7,
17 247:16
248:8,13,19
249:12,24
250:10,18
251:2,7 252:6,
23 253:23
254:1 255:20
262:15,20,21
263:2,6
**give** 42:3 47:1,
4 49:8 51:15
66:9 68:5
105:19 114:9
128:4 148:2,
13,14 158:12
164:21,24,25
165:1 182:25
186:8,9
202:18 203:16
228:16
249:10,21
251:4
**giving** 50:21
54:7 214:4,9
**glasses** 181:4
**going-home**
11:3
**Gonzales** 11:5
**good** 18:8
24:24 48:14
49:12,14 58:8

60:24 61:6,18
63:4,6 69:2,4
74:18 75:19
77:17 78:25
108:24 114:25
122:22 131:21
149:14,15,17
164:21 185:19
186:15 189:6
203:16 204:10
205:5,6 213:2,
10,13,14
219:18 230:18
233:15 243:21
**good-
performing**
210:12
**Goode** 24:19
109:9 240:3
**goodness**
12:3 14:19
**govern** 157:3
**gradation**
97:24
**graded** 97:24
**graduate** 11:2
**graduated**
11:3 45:21
**graduation**
45:12 46:2
**Graglia** 261:15
262:12
**grandchildren**
11:6
**grandson's**
126:16
**graph** 130:4
**great** 11:1
15:4 49:17
115:11 130:10
134:11 149:18
163:21

164:11,24,25
173:24 175:15
184:20 185:6
194:14 229:12
**greater** 29:10
196:18,21
**greatly** 10:4
**green** 260:9
**groceries**
126:23
**group** 18:10
88:15 91:13
100:2,3
257:21
**grouped** 46:6,
10 91:6
**groups** 16:5
**guess** 11:17
15:8 16:21
17:8 21:6 23:9
24:18 30:5
33:23 53:9,10
55:13 62:4
69:15 74:24
78:17 80:18
82:25 86:2
87:20 90:19
92:8 93:23
98:6 99:2
106:13 107:4
114:23 117:10
126:15,25
134:12 137:1
139:15 142:1
146:3 151:3
153:4,12
158:19 163:13
165:13 167:7
182:21 189:2
191:12 202:22
206:8 243:8
246:12 251:22

253:18 254:23
**Guide** 231:12
**guidelines**
27:15,23
32:17,18
221:9,11,14
**guns** 109:11
**guy** 182:4
**guys** 44:15
47:15 94:17
213:11

---

**H**

**half** 125:12
146:24 187:22
238:18 240:5
**hallway**
155:20
**hallways** 14:6
**Hamilton**
176:16 178:10
187:22 233:22
**handwritten**
182:7 243:17
**Hansen** 73:21
**happen** 24:18
54:17 134:17
158:7 246:4
**happened**
51:2 53:11,12,
18 56:25
108:14 116:13
125:12 127:1
129:20 130:20
194:19 206:17
238:20 241:4,
8,9 245:5
246:5,6
248:22,23
250:17

**happening**
13:22 156:25
157:6
**happy** 65:24
149:25 150:2,
4
**harass** 144:13
**harassing**
144:12 189:18
197:17
**hard** 10:2
21:19 65:4
110:2,6
175:18
**Harvard**
110:24 111:2
175:25
176:11,14
178:3 226:17
227:9 228:1
232:5
**hate** 14:20
74:19 148:23
209:7
**he'll** 34:2
**head** 26:13
63:5 112:11
124:15 144:7
155:22 201:4
222:13 249:11
**headline**
27:14
**hear** 60:14
101:23 107:20
131:12 140:22
**heard** 111:14
112:2 137:12
156:6 158:17,
19 168:3
182:4,5 200:3
245:14,17,18,
19

hearing 130:11 252:11

hearsay 63:5 140:11

heavily 19:5,6 174:20

hedging 35:11

heft 143:1

helpful 204:16

helping 108:25

Hendricks 222:5,6

Henry 153:7, 10,11

Heritage 69:8

Hersel 261:7 262:1

hesitate 15:3, 6 173:6

hey 33:17

high 61:10 65:24 66:5 69:13 96:13 138:24,25 139:1 153:19 168:9 170:15 195:19 205:11 218:24 219:4 234:21

higher 46:4 56:16,19 89:11,14 90:7, 11 93:11 151:6 152:23 170:8 171:10, 12,13 177:21 187:20 199:13 218:13 237:24

highest 153:25 165:2 259:2,4,19

highlight 259:16

highlighted 237:19

highly 56:2,12 57:20 58:2,10, 17,20,24 59:19 60:4,5 61:6 62:12,13, 15,22,23 63:1, 2,8,10,14,18, 20,24,25 64:16,20 65:8 66:12 68:15, 19 69:6,18 70:9,12 72:1 89:16,17 137:15 140:16 187:10,12 188:2 196:13 201:16 220:7

hire 72:4,8,10 214:1

hired 48:13 72:17,24

hires 34:1,3 41:8 213:17, 19

hiring 162:11

history 230:11 231:22 236:2

hit 75:24 76:1

hits 167:8

hold 35:18 159:16 204:10 230:22 232:21 249:13 251:3 261:1

holistic 88:8, 13,17,21

Home 179:22

honest 12:23 111:19

honestly 81:22

honors 162:17,18,21 163:2

hope 37:5 157:23 158:6 178:23

hoping 84:5

horrible 183:23 185:4

horribly 182:19 183:10 186:16

horse 26:12

hour 11:5 12:19 13:17 49:12 115:11, 13

hours 100:25 101:1 126:4 137:8

housing 214:14

Hu 111:6,11 116:3 152:10, 11 153:11 200:18 201:7, 16

Hu's 201:18

huge 180:3 219:8 227:11

hypothetical 30:16 75:22 77:13

hypothetically 47:18

**I**

idea 33:18 112:7,15 113:7,8 137:7 203:16 223:1 253:3

ideas 113:17

identical 132:8

identified 256:22

immediately 90:17,21 109:20 124:21,24

impact 166:1, 4,7,12,13,14, 20,22,24,25

importance 22:3

important 16:18,21 17:1, 3 19:8 21:15, 17,21,24 22:4, 22 23:1 25:17 29:3 70:17 95:19 101:22 170:25 172:2, 14,20 174:15, 20 181:6,8,10, 15 193:23

importantly 11:4

impressed 205:9

impression 41:19 58:6 60:4 63:3 78:15 107:19 112:12 113:24

114:10,16,18 147:20 170:14 185:21 208:18

impressive 68:24 163:3 178:5

improvement 96:23,24

inaccurate 86:25

incentive 94:24

incentives 95:1

inclined 192:1

include 160:15,16 203:9 219:16

included 141:23 182:21 202:15 205:13

includes 204:15

incomplete 172:9 177:8 200:25 201:1

inconsistently 235:1 236:8

increase 46:18 196:19 223:17,22

increased 13:6

increases 201:17

incredibly 178:5

independent 184:23 185:7

indicating 103:1

indication 61:18,24,25 62:1 64:9,12 66:8,10,12,23 67:4 68:15 69:22 70:1,8 71:13,22,25

indicative 66:19,20

indicia 61:15 140:15 159:9

indiscernible 28:17 36:13 39:22 54:23 82:13 101:13 107:13 131:10 140:20 217:3 233:23 234:18

individual 103:5 163:10 189:11

individuals 256:13,22 257:1,22 258:3,6,9,12, 15,21 259:8, 10,13 260:21 261:14,22

information 77:25 81:3,6, 7,12 82:3,10, 17 93:22 103:16,24 130:10 156:19 186:1 216:5

informed 104:13

informing 214:5

Inga 155:20

initial 219:8 256:14

initially 193:15,18

initials 83:7

initiative 117:21 118:2, 12,17,20 202:13,21 207:13,20 208:1 210:4 235:10 255:24,25 256:4,5,11,14, 16

input 59:22

ins 168:1,15 173:14

inside 187:23

instance 48:12 110:16

instances 149:19

Institute 61:17 62:7,11,20 63:1,6,10,12 64:7,15 65:8, 13 69:8

institution 41:21,25 42:4, 8 48:16 50:9 62:13 63:7,23 67:8,11,19,21, 23 68:3 69:17 71:22,25 72:14 162:14

institutions 50:6 68:22 69:15

instruct 242:7

instructor 85:13

intellectual 10:8 14:2

235:7

intending 256:4

intent 36:14, 15,17 37:15 55:7

intentionally 177:8,9 200:25

interacting 10:3,6

interest 155:16 162:9

interested 13:18 147:14

interesting 70:16 205:22 226:6 234:8 236:16 237:1

interpret 36:11 135:21

interrupt 204:7

interrupted 132:22 172:7 191:9 200:24 216:20 227:19

interrupting 164:1 177:6 181:12 201:1 217:13

interruption 159:18 250:24 251:6

intimidated 13:25

introductory 101:13,15

investment 117:21 118:2, 12,19 207:13, 20 208:1

210:3 235:9 255:25 256:5, 11,14,15 259:11

invitation 66:9,11,15,25 67:17

invitation's 67:5

invitations 66:6 71:17

invited 12:18 13:13 14:8 17:18 101:17

invitee's 67:6

inviting 13:24 96:25

involved 65:1 169:7 171:6 215:2 226:24

involvement 128:16

involves 140:3 188:9

involving 112:9

iron 90:22

irrelevant 106:13

issue 79:18 139:16 140:24 161:13 212:23 216:12

issues 213:8 214:3

---

**J**

Jane 73:24 247:4,6

Jay 145:2,5,7,

9,12 188:24 189:3 203:10

Jay's 188:20

JD 45:7 46:1 91:12 151:3, 20

Jennifer 203:11

Jinks 26:10 129:10

job 7:23 22:25 33:3 114:25 222:22

Joey 60:11 61:5 203:6

John 11:11,15 108:22 109:3

John's 108:23

join 67:20,22 194:7

joined 11:9 194:6

Jordan 218:3 237:6,18,21

Jotwell 134:19 135:1 142:21 149:10 231:14,16 235:24

journal 59:16 126:1 236:3,4

journals 58:3

JRF 47:15

judge 7:15 70:9,15,20,21 71:2 131:25 169:6 206:5

judges 69:21 71:6

judgment 48:5,6,8,18,21

63:21,24,25
64:6,20 65:1,7
66:3,4 92:18
138:5,6 140:3
146:4 162:2
164:19 165:14
173:6 186:8,9
188:8,9,14,19,
22 189:10,11
190:6,7,23
191:3,13,25
192:1,13
194:18,25
195:6,10
196:14 201:12
206:9 211:3
216:22 217:1
218:1,14,25
232:19

**judgments**
192:9 194:16

**judicial** 70:5
71:4 165:20
180:10

**juncture**
192:3,12

**jury** 37:2,18,
19 39:16
40:10

**justice** 139:1,
2,11

**justices**
138:14,23

**justify** 192:5
225:4

---

### K

**Kansas** 6:24
7:3,4 10:24
11:7 13:24
194:15

**keeping**
118:25

**keynote** 66:15

**kind** 8:21
18:14,21
19:23 20:22
22:1 27:4
29:14 30:4
31:22 40:6
41:24 42:13,
16 46:25
60:15 63:4
74:18 79:9
91:6 97:12
109:25 110:3,
14 113:23
126:25 127:14
135:15 137:5
148:4 157:5
158:15 167:11
168:2 189:10
194:15 202:17
211:11 212:23
214:25 226:6
248:7,11

**kinds** 16:1
71:18

**Klein** 107:8

**knee-jerk**
229:13

**knew** 123:1
128:15
178:17,22
208:10 234:19
242:3 251:22

**knowing** 65:5
84:13

**knowledge**
81:1 219:9
252:18

**knowledgeable** 135:12

---

### L

**labeled** 204:7,
13 257:8

**lack** 235:7

**large** 214:4,9,
11

**larger** 24:6
52:2

**Larry** 11:18
168:3

**lateral** 34:1,3
41:8 213:17,
19

**laterals**
212:25

**Laurin** 203:11

**law** 6:16,17,
23,25 7:2,3,21
9:16 10:16,17,
18,20 12:1,3,
13 15:19,20
16:2,7,8,9
17:1 18:12,17,
22 19:4,5,7
21:15,18 22:6,
8,24 27:17
36:13 44:22,
24 45:1,6,21
49:1,7 54:11
56:1 58:19
59:1 60:6
61:17 62:1,5,
7,11,20,24,25
63:6,10,12
64:7,15 65:8,
13 67:12 70:9,
11,15 71:12
72:17,18,22,
24 75:6,14
76:11 78:8

**laws** 10:9

**lawsuit** 104:2,
4,10,17,20
106:1 123:1,4
251:25

**lawsuits** 112:8

**lawyers** 69:21
72:6 123:16

**LBJ** 103:19

**Leading** 231:9

**league** 126:19

**leagues**
126:18

**learn** 92:18
250:3

**learned** 90:2
178:12 245:18

251:18

**learning** 10:10

**leave** 54:20
96:18 101:12
124:10 144:23
194:17 249:15

**leaving** 60:17
117:17

**left** 24:8 74:2
108:8 251:16

**left-hand**
257:8,11

**legal** 5:11
36:19 37:8
38:5,12,19
39:2,9,20,24
40:12 63:4
70:18 79:21
85:8 86:7
135:11 157:3,
18,21 158:3
163:8 167:20
206:22 219:25

**legislature**
96:12

**lengthy** 31:21

**lets** 116:9

**letter** 42:18,24
70:2 207:18

**letting** 177:7
201:5

**level** 18:2,9
150:6,9
152:15

**Levinson**
110:21 116:3
152:6,8
160:24 161:6
195:3,5,12,20
196:6,13,17,
20,25 197:10,
13 198:5,6,9,

11,23 199:7, 12,15

**librarian** 117:14

**life** 15:19,20 16:2 37:18 235:8

**likelihood** 244:1

**likewise** 13:6 179:25

**limit** 6:3

**limited** 31:7 149:4

**Linda** 87:17 147:3 153:10, 12 171:4,6,21, 24 181:17,21 182:17 185:2 188:25 189:5 192:2,14 194:7 202:8 211:17 220:25 230:19 232:7, 19 245:18 247:23 248:5 254:5,6 262:6

**Linda's** 170:6, 10,16 182:12 185:18 187:2, 3,20 188:21

**lines** 31:17 47:5 96:5 121:22 148:19 252:2

**Lino** 261:15 262:12

**list** 74:25 76:10 101:1,3, 4 121:17 129:4,6 143:21 144:18

174:17 202:18 203:12 204:1, 3,4,21,23,24 205:2,7,8,13, 14 234:13 257:25 258:4 261:21

**listed** 52:14 85:8 86:20 162:22 203:15 239:15,17

**listen** 126:15 131:15

**listened** 126:15,21

**listing** 207:19

**lists** 83:15 165:10,23 166:8 257:18

**litigation** 228:21 231:12,21

**Littwin** 203:22,23 204:2 243:16, 25 244:8 245:2

**live** 53:19

**lived** 11:5

**loan** 214:25 252:20 253:14 254:5

**loans** 214:12 216:1 251:1, 10 252:3,16, 22 253:12 254:7

**located** 46:20

**long** 6:18 7:4, 12,17 11:24 49:7 137:3 155:22

180:12,16 182:9 218:24 246:17 248:22

**longer** 46:4 152:25

**look-and-see** 161:24

**look-see** 162:8,10,14

**looked** 79:15, 16 93:21 122:8 123:4 135:13 151:2 165:12,23 167:3,10 198:4,5,9 241:1 243:1 260:2 261:23

**Los** 84:9

**lose** 153:5

**losing** 48:14, 16

**lost** 191:11 217:16

**lot** 6:1 12:9,10, 21 13:6 58:1 65:25 77:25 78:17 90:24 96:16 110:1 111:8 123:7 124:25 135:10,22 137:20 138:1, 19 147:21 148:16 164:22 165:15 166:7, 9 167:5 177:1 183:22 188:21 205:10 214:24 229:24 230:7 232:17 233:7 250:15

**lots** 17:16 138:24 139:22 170:21 182:16 208:16

**loud** 199:23 200:2

**low** 153:18

**lower** 89:16 152:20,24,25 247:15

**lowered** 250:9

**lowest** 120:6,7 224:12,15,18 241:18 242:5 249:4,22 259:2,3

**Loyola** 84:9, 14

**LSM** 83:7

**lunch** 13:12, 13,14 115:12, 14,22 126:4

**luncheons** 170:21,24 172:1

**lunches** 13:12,21 14:12

**lured** 244:1, 12,20

**lying** 84:17 86:11

**Lynn** 24:20 116:12 142:21 203:11 227:22 233:16,24

**Lynn's** 235:25 236:5

**M**

**M-C** 6:13

**made** 57:22 65:19 67:5 85:24 86:2,3 87:2 101:25 102:20 112:21 113:21 114:2 120:25 121:1 127:19 156:4, 5,6 173:4 184:8 187:23 189:20 192:9 194:16,18 202:7,10 207:12,17 210:21 212:24 214:1 221:17 254:4,6

**main** 95:13

**maintain** 239:3

**major** 59:2 175:24 233:25

**make** 25:18,25 26:12 29:21 31:16 32:14 33:3 70:16 75:10 77:4 81:22 82:3,25 86:19 87:18 95:17 100:13 101:15 108:4 109:25 113:19 114:13 120:23 128:6,23,25 147:11 148:10 153:9,22 157:5 159:15 162:9,12 163:21 168:7

173:6,8
175:15 182:18
189:11 196:11
205:3,4,13
208:7 219:6
221:7 235:3
239:12
243:18,20
245:2,3 253:7,
10 256:18
257:15 260:9,
16
**makes** 22:4
31:2 32:21
93:8 110:3
153:6 157:24
184:5 215:10,
19 218:4
223:8 226:18
**making** 26:2
27:7 33:25
48:20 57:14
87:21 95:2
100:4 162:1
163:11 165:14
197:5 204:20
208:9 210:1
**male** 157:19
261:18
**man** 199:15
**manifest**
36:16 37:15
**manifests**
36:15
**manner** 39:7
239:5
**manuscript**
176:6,8
**mark** 11:15
222:8
**marked**
145:15 261:7,

11,14,15,23
**market** 244:6
**Markovits**
155:20
**married** 60:11
**Marshall** 16:8
**Maryland**
85:13
**mass** 228:21
**Massey** 255:3
**massive** 31:22
**match** 41:13
55:8 59:24
89:13
**material**
130:12,13
228:21
**matter** 15:12
32:7 54:12
58:25 137:14,
19,20,25
138:15,19
141:16 156:18
165:11,22
188:8 194:10
242:19
**matters** 15:14,
17 59:20,21
63:9
**Mcgarity** 5:6,
20,23 6:10,12,
15 33:15 35:9,
20 37:4 52:24
116:2 118:5
119:21,23
120:3 126:10,
12 141:11
148:16 168:16
169:9 174:8
175:9 177:4,
13 185:14
186:16

189:14,22
192:4 196:23
197:12,21
201:2 213:12
215:16
216:17,24
220:19 226:14
229:6,13,21
232:9 247:1
255:21
**meaning**
61:16
**means** 5:13
37:17 39:4,8
40:17 41:2
62:10 63:14,
18 64:19
149:13,21,25
150:15 152:20
198:15,16
230:14
**meant** 69:18
255:25
**measure** 47:6
119:5 165:25
166:4,12
**medication**
8:21
**mediocre**
74:12,18,20,
22,23 75:1,7,
13,18,20,24
76:4,5,13
77:3,5,6,14,
16,18,21,24
**medium**
153:19
**meet** 23:6
46:17 51:8
73:18 96:20
123:19,21,25
214:21 221:19

242:18
**meeting** 19:24
30:20,21 31:3
33:2 100:9
101:2,6,20,25
103:8 105:20
107:11 108:5
109:16 111:25
112:2 113:9,
10,11 120:13,
18 123:16,18,
23,24 124:10,
12,14,19
125:3 127:2,7,
12,15,21
128:7,20
130:17 133:23
134:2 143:3,
20 144:23
154:18,21
155:5 177:17
198:16 243:8,
10 245:20
246:14 247:19
250:13
**meetings**
19:20,22
30:19 31:5
81:23 100:17,
21 101:7
102:22,23
103:11 127:2
129:25 145:11
220:7
**meets** 31:13
76:12 96:3
105:11
**Melissa**
203:19,24
**member** 29:6,
21 41:25
42:10,17 43:5,
15,22 44:4

45:20,23,24
48:12,14,16,
18 62:19
71:23 72:14
74:20,21 75:6,
13 80:10,19
81:11 82:16,
23 88:20,22
109:6 113:4
122:17 130:1
131:25 133:15
136:18,19
142:9 144:9
146:25 155:4
180:5,23
202:8 215:2
220:2,3
241:18 244:1
246:16
**member's**
66:13 74:21
215:10
**members**
14:16,18,22
21:2 23:3
24:6,8 31:22
44:22 53:23
56:8 75:1
81:18,21,23
82:21 88:13,
15 91:6 94:6
97:1 100:11
102:5 108:1
114:12,13,23
117:20
123:22,25
124:3 129:7
130:1 131:16
136:7 143:21
146:13,20
148:25 149:3
157:13 161:17
186:6 200:4

205:15 210:12
212:21,25
221:22 244:8
245:8 246:10
259:1
**members'**
29:19 82:22
146:11
**memo** 21:6
31:16 32:21
96:1 142:8
179:12,20
207:19 215:12
221:19
**memories**
248:22
**memory** 15:4,
10 55:20 61:5
109:13 122:22
124:8 129:15,
16,20 130:20
143:12 207:8,
9 245:5
248:16,23
262:19
**memos**
122:10 153:21
182:10
**men** 200:13
**mention** 17:17
21:5 61:12
167:25 232:15
234:8 248:1,4
**mentioned**
44:19 48:11
50:4,6 54:14
55:25 60:9
81:17 88:14
104:20 110:25
111:24 115:24
116:5 142:2
161:21 171:8

176:8 188:8
212:25 250:3
**mentioning**
165:18
**mentions**
117:3
**mentor** 185:1
**merit** 59:7,11
139:17
**meritorious**
59:14
**merits** 59:5
139:14
169:18,20
**messed-up**
204:9
**messing**
239:14
**met** 23:12
96:16 127:4
154:23 221:18
225:18 232:23
**Michael**
103:22 261:10
262:9
**Michele**
203:11 229:22
232:20 233:4
244:9 245:9,
15,16
**Michele's**
230:15
**middle** 181:12
260:12
**migrate** 154:7
**Mike** 13:1
**mind** 27:5
36:1,3,8
39:17,23 74:6,
8 109:21
111:2 113:14

128:19 143:21
144:17 172:14
203:15 225:4
233:20 249:23
250:1 261:3
**minds** 41:1
63:4 149:8
**mine** 63:7
206:21
**minus** 97:25
98:2 99:13
134:12 189:1
211:16 219:7
235:6,13
236:6 260:23
**minute** 128:4
179:12 249:13
**minutes** 49:12
140:25 173:22
251:4
**mischaracterize** 146:14
**mischaracterizes** 251:2
**misogynistic**
200:4
**misplaced**
238:16
**misremembering** 209:13,17,
22
**misrepresentation** 177:9
**missed** 11:19
249:17
**missing** 11:18
**misspelled**
181:2,16,21
182:11
**misstate**
226:13

**misstates**
28:9 35:23
53:13 54:3
57:2 61:19
63:17 87:24
89:3,7,25 91:8
92:24 94:19
99:24 103:3
104:21 116:7
124:22 128:11
130:24 131:6
133:24 138:7
140:8 150:17
151:23 157:7
171:15 172:6
173:1 183:7
192:8 193:10,
16,25 196:8
198:24 207:15
210:5 218:6
226:11 227:6
229:16 230:2
231:1,25
236:9 238:21,
22 245:11
**mistaken**
165:19
**mistakenly**
15:12
**mistakes**
235:3
**mix** 60:13
**modest**
135:19 229:3,
4,5,7
**modified** 58:9
**modify** 95:16
**moment** 74:4,
9 128:14
130:23 131:4,
5 134:1
211:21 239:1

255:13,17
**Monday** 13:12
**money** 194:25
209:24 214:5,
9,12,23,24
**Moore's**
231:13
**morning** 5:23
49:14 125:7,
14,15,20
126:14 140:15
**motivating**
35:3
**move** 87:17
91:20,21 92:8,
11 144:13
160:23 194:12
**moved** 87:22
88:5 89:1,24
193:24
**movement**
99:6,7
**Mullenix** 83:8
85:25 86:9,16,
22,25 87:6
110:8 124:13
134:5,15
143:13 144:17
150:21 151:9,
15,21 152:3,7,
13 154:19,22,
24 156:3
159:22 160:3,
6,20 163:24
164:7 168:14,
19 169:14,17
171:12
172:22,24
174:7,8,13,16,
23 175:10
180:13,24
188:10 189:7,

16,25 190:4,9,
12 191:5
192:17,21
193:9,15,24
194:5 195:4,
11 196:7,14,
17,18,22,24
197:6 198:23
199:8,14
200:17 201:8,
15,23 202:3,8
203:4 204:25
211:2,24
216:11,18
217:6,9,20,22
218:5,11,17,
21 223:20,21
224:14,17,22
227:5,17
231:7 232:10
233:2 235:14
238:8,17
240:5,24
241:10 243:15
244:11 245:9,
15 247:12
248:2,6 249:3,
10,22 250:4
251:20 252:20
254:12
259:15,16,25
262:6

**Mullenix's**
84:6,7 142:13
152:9 161:5
175:22 179:10
187:12 188:1
194:20 219:15
224:4 227:8
228:18 229:14
231:8 232:14
238:12 244:14
253:2 254:5,6,

9
**mysteries**
125:10,11

**N**

**named** 16:25
144:21,24
145:3
**names** 15:7,9
69:5 129:11
205:4 208:25
209:3
**naming** 15:9
**nap** 126:5
**National**
69:12,14
**nature** 66:20
71:17 111:1
148:12 161:22
226:1
**necessarily**
46:5 64:13
72:1 148:10
170:8 218:25
220:8 250:12
**needed** 90:8
96:23 105:8
127:10,13
232:6
**negatively**
229:18
**neutral** 148:10
**newspapers**
125:16,17,18,
19
**nice** 13:14
119:4
**nomenclature**
54:13 97:18
98:3

**nominate**
254:16
**nominated**
245:16
254:21,23
255:5
**nominating**
255:7
**non-university**
69:15
**noncompetitiv
e** 244:3
**nontenured**
114:11,13
**noon** 13:17
**normal** 141:15
142:6
**note** 139:10
206:21 226:4
262:19
**notes** 102:24
122:14,19,23
123:13 127:11
128:21,25
130:15,17
179:8 182:7
183:2 225:1,
22,25 226:2
227:22 243:17
**notice** 106:1
**noticed** 14:24
123:9
**noticing**
111:12
**number** 12:4
16:17 31:7
43:4,7,15,17
50:19 53:8
55:5,6 72:11
95:23 97:4
115:25 137:8
154:3 167:23

168:25 169:1
174:18 212:20
216:6 218:15
247:15 260:13
**numbers**
28:20 52:1
169:3 170:5
189:5 190:3
191:16 216:2
218:10 224:8
236:21 238:4

**O**

**O-W-E-N** 6:13
**oath** 5:12
8:18,19
**object** 9:6
52:16 200:23
254:9
**objected**
254:12
**objecting**
254:10
**objection** 6:6
15:1,15 16:13
17:6 19:1,18
28:9 30:7,11,
22 32:5 33:10,
21 34:7,14,23
35:23 36:4,9,
19 37:8,24,25
38:5,6,12,19
39:2,9,10,20,
24,25 40:1,12,
13,23,24
41:17 42:21
43:20 44:9
47:2,23 48:3,
9,22,23 50:14
53:13 54:3
55:15 57:2
60:2 61:1,2,19

62:8,17 63:16
64:1,10,17,24
65:9,16,23
66:17 67:2,9,
15,25 68:1,17,
25 69:24 70:6,
18,23 71:8,15
72:19 73:4
75:8,15 76:18
77:9 79:1
80:14,21
81:14 82:19
84:19,23
85:10 87:24
89:3,7,25 91:8
92:2,9,24
94:19 99:24
100:23 103:3,
12 104:11,21
105:6 106:8,
18 107:2,17,
24 111:17
112:24 114:20
116:7 117:1
118:3,7
119:13 124:22
128:11 130:24
131:6 132:11,
22 133:4,11,
24 136:12
137:17,23
138:7,16,21
139:4,8,19
140:1,8 142:3
143:4 144:11
146:16,22
147:17 150:17
151:23 157:7,
17,21 158:3,4,
9,25 159:7
160:11 161:8,
19 162:19,23
163:8 166:2

167:20 171:16
172:6,7 173:1
174:25 177:5
178:20 179:1
183:7,25
184:6 186:4,
23 187:14,17,
18 189:18
190:15,18
191:8,20
192:7,8
193:10,16,25
194:22
195:13,15
196:2,4,8
197:1,8
198:24,25
199:16,24
206:12,19
207:1,15
208:12,21
209:5,14,19
210:5 211:8
213:22
216:14,19,20
217:10 218:6
222:24 226:11
227:6,18
229:16,20
230:2 231:1,
25 236:9
238:21 240:9
241:5 242:24
243:5 245:11
246:7 247:16
248:13,19
249:24 250:10
251:2 252:6,
23 254:1

**objections**
6:1,3 40:4
148:21,22

**objective**
38:7,11,17,22,
23,25 39:1,4,
8,14 40:9
148:10

**objectively**
39:22

**objects**
220:11

**obliged**
156:22

**observations**
217:7

**observe**
212:18

**occasionally**
10:17,18
75:24

**occasions**
109:3 218:15

**occur** 35:2

**occurring**
158:2

**offend** 181:16

**offended**
181:17

**offer** 11:2 33:3
41:12,13,20,
21,24 42:18
43:1 46:16
50:10 59:25
60:19 89:12,
13 93:3,5
102:5,7,20
113:3,19,21
162:13 212:24
244:4

**offered** 42:5,9,
19 55:20
90:11 102:10
113:1 214:22

**offering** 54:10
90:6 214:22,
23

**offers** 33:25
50:6 53:22
90:19

**office** 7:10
155:2,24
215:14
241:13,17
244:6

**officed** 66:1

**older** 154:5

**one's** 166:9
228:8

**one-page**
235:21

**one-sixth** 31:8

**op-eds** 136:24

**open** 27:10
81:23

**operate**
212:15

**opined** 61:4

**opinion** 60:23
71:4 72:23
102:8 106:16,
23 107:1,5,16,
22 108:18
109:2 110:7,
11 111:14
114:4 139:17,
22 148:9
163:2 168:16
169:6,15
178:18,23
188:3,12,15
189:15,24
190:1,2,5
191:6 196:24
216:13,17,25
217:2,18

219:2 222:15,
20

**opinions** 70:5,
14 102:10
165:17,20

**opportunities**
16:1

**opportunity**
81:3,12,18
87:7

**opposed**
135:6 152:15
253:22

**opposite**
185:24

**oral** 5:6

**order** 5:8
11:17 16:24
21:20 22:1
207:5 262:24

**ordinal** 19:15

**ordinary** 31:6
38:15

**organization**
16:22

**organizations**
16:7 17:24
18:2

**organized**
79:14 132:19

**original**
190:21

**originally**
202:11 228:22

**originated**
112:9

**outs** 168:1,15
173:14

**outstanding**
189:4 201:19

**outweigh**
149:19

**over-time**
170:7

**overly** 182:20
183:12 184:5,
12 185:5
186:17

**overtures**
114:2

**Owen** 6:12

---

**P**

**p.m.** 115:16,
17,18,20
141:4,5,7
174:1,2,4
220:15,17
246:22,23,25
263:8,9

**pad** 206:22

**pages** 228:7,8
231:11

**paid** 28:2,7
91:2,16,25
92:4,5,7 155:4
157:15 162:7
167:19,22,24
168:13,18,21
169:16,22
172:21,23,24,
25 173:4,5
174:6 175:10
188:10 189:3,
7,9,12,16,25
190:4,9,12,13,
21,24 191:1,2,
18,19,22,23
192:2,6,14,17,
22,24 193:15
194:4,25

195:4,10,11,
21,23,24,25
196:7,15,25
199:13 200:17
206:1,3,8
211:1,24
212:6 216:10,
18 217:8,19,
22 218:11,18,
21 239:7
241:18,22
259:1,3

**paper** 20:19
66:11,21,22
106:7 126:2
206:21,25
207:4,6

**papers** 66:10
136:24

**paradigm**
135:25

**paragraph**
219:14 242:16
243:24

**parents** 11:5,8

**park** 75:25
76:1

**part** 15:17,18,
20,22 16:9
17:19 22:14
25:8,9,21,22
41:10 52:18
63:19 64:20,
22 106:14
114:8 171:19
185:12,16
200:10 256:20

**participate**
66:9

**Participating**
220:5

**participation**
15:19 17:8
174:10 235:7

**partisan**
148:19

**Pass** 255:18

**pass-fail**
96:19

**passes** 32:15,
20

**passing** 146:4

**past** 24:24
28:12 57:4
73:13 76:8
91:12 94:8
102:2 142:9
151:20 176:19
181:2 198:7
199:3 230:11
233:9,22
241:12 245:5

**Patricia** 73:21

**pattern** 111:12

**pause** 68:6
140:24 187:8
203:18 232:22

**pay** 22:11 94:6
117:6 118:14
154:19,22
155:1,5,6,8,
13,25 156:4,
10,13,14,21
157:16 158:24
176:9 193:22
197:5 198:22
199:2 201:7
212:7,22
241:4 256:10
259:24

**paying** 92:21

**peer** 176:5

**peer-reviewed**
59:13,16

**peers** 59:14
166:16

**penalized**
219:6

**pending** 9:2
252:1

**pension** 168:5
173:10,11

**people** 12:14
14:1,8 15:11
19:11 20:19
24:5,25 28:2
29:13 37:15
40:18,21 41:3
44:6,8 46:3
47:13,22
58:22,24 60:8,
12,15 62:10
65:3 69:13
72:24 73:5,8,
13,14 74:2,17
79:10,11
81:22 82:1
88:4 90:9
91:11 93:23
96:16,20
101:2 103:5
108:2 114:2
116:1 118:12,
18 124:15
128:7 129:4,
11 131:10
142:17 143:7,
18 144:18
147:24 148:1
149:16 150:16
154:3,5,7
156:23 162:7,
15 165:9
166:16 167:1,
9,10,19 170:2

176:10 177:2
178:2 197:24
202:19 203:8
204:4,14,17
206:6 207:20
208:15,16,23
210:11,23
212:6 224:16,
18 226:23
234:15 244:19
245:25 246:3
247:2 257:25

**people's**
90:14 93:10
118:25 175:7

**perceived**
60:1,5 177:14

**perception**
35:14 61:13

**perfect** 9:14
49:15 235:4
236:12 243:23
245:6

**perfectly**
111:19

**performance**
92:12 117:13
149:17 150:1,
2,8 193:1
224:2,4

**performing**
95:19 96:4
97:21 114:17,
19 149:13
150:8,19

**performs** 22:9

**period** 31:10
46:23 93:17
94:22 176:22
212:18

**permanent**
23:4 73:1,2

**Peroni** 111:15
112:18 116:3
211:24 254:8

**Perry** 261:7
262:1

**person** 29:9
30:1 36:23
37:1,3,15
38:4,14,15,21,
25 41:20
43:24 44:2,14
54:14 62:13,
14,16,23 64:6
77:6,22 89:10,
15,16,17,18,
24 90:9,11
92:16,17
97:21 110:6
117:5 121:18
127:10 133:2
143:16 167:22
177:11 181:16
183:17 184:8
185:20 210:24
229:10 232:23
247:21 250:3,
16 261:6

**person's**
63:19,21
64:19 69:19
70:2 71:25
75:18 77:7,15
185:21

**personal** 17:2
19:10,12
165:13,14
166:10 188:22

**personally**
51:9 69:9
148:13 166:21
201:24 246:1
254:17,18,19,
24

personnel 24:12

persuade 148:12

persuaded 233:10

phased 116:25 117:3

pick 30:17

picking 10:10

picturing 11:21

piece 20:19 74:22 75:3 134:18 159:14 169:25 182:19 183:14 185:22,25 186:16 187:2 206:21 207:3 216:4 232:25

pieces 74:18 143:15 147:7

piqued 155:16

place 89:5 90:14 100:21 135:21 166:18 220:21

places 69:7 176:12

plaintiff 5:17

play-by-plays 126:17

played 108:12 227:24

players 126:18

playing 215:24

pleasure 11:7

plot 28:23 29:5,24 43:23 44:1 45:5 46:11 130:6

plots 44:23 45:3

plural 208:14

podium 71:19, 24 72:9 73:3

point 9:18,23 12:24 21:8 90:22,23 94:15 99:14 100:1 106:25 110:22 121:10 149:7,8 155:19 156:1, 12 181:24 182:18 190:10 192:16 193:23 194:16 202:12 205:18 229:24 245:14

pointing 240:22

polar 185:24

polemic 184:11

policies 174:15,17,19

political 85:14

poorly 155:4

portion 52:2 205:19

position 6:14 69:10,17 79:15,19 103:18 108:21 148:17,19 183:11,23 206:5

positioned 29:10

positive 134:22 151:1 204:2

possibility 90:11 158:6 244:19

possibly 41:9 152:9 186:15 197:13,23 211:5,6

Powe 111:15, 20,21,22,23 112:22 116:3 211:1,10 232:24 233:2, 3,4

Powers 11:16 13:1,4 20:11 23:24

practice 45:22 153:2 231:13

practicing 69:21

Practitioner's 231:12

praised 139:3

praiseworthy 109:8

praising 69:21 139:11

pre- 231:15

pre-covid 170:24

precedent 70:17

precise 108:24

precisely 36:6 40:17 156:7

prediction 135:15

prefer 6:6 15:6

preferences 262:25

preliminary 105:19

preparation 123:14

prepare 121:24 122:19 165:10

present 66:11 135:15 177:16

presented 108:21 145:11 238:10

presents 247:20

preserve 104:25 105:2, 4

preserved 105:25

president 65:20

press 175:25 176:1,11,12, 15 226:17 227:9 232:5 233:15

presses 175:24 176:4

pressure 244:5

prestigious 67:8,11,19,21 68:22 176:12

presumes 80:22

presumptive

120:6,7

presumptively 129:11

pretty 9:23 10:23 19:3 21:24 32:25 35:6,10,15 45:16 86:3 98:22 101:8 102:23,25 106:12 198:1, 4,8 201:21 204:2 207:9 227:22

prevailing 180:1

prevent 8:22

preview 136:5 137:6 138:11 147:6,7 179:22 231:21

previews 134:20 135:1, 5 136:4,8,15, 17,21 137:15, 22 138:14 141:9 147:4, 22,23 149:9 231:15

previous 57:16 66:21 88:9,10 89:1 178:1 232:2

previously 90:4 185:10 204:7 259:11 261:23

primarily 132:5

prior 30:24 87:25 89:3,7, 25 91:8 92:24

94:19 104:21
128:11 130:24
131:6 133:24
138:7 140:8
150:17 151:23
157:7 168:5
171:15 172:6,
8 173:1 192:8
193:10,16,25
196:9 198:24
207:15 210:5
218:6 227:6,
19 229:17
230:2 231:1,
25 238:21
256:7 258:19,
25

**priority** 123:8,
10

**privilege** 6:4

**pro** 79:17

**probe** 143:12

**problem** 15:9
158:18 178:6

**problems**
166:7

**procedure**
145:20 146:1,
5,9 181:25
231:10,13

**proceed** 101:4
249:15

**process** 8:18
21:5 30:6,10,
13 31:6 32:24
41:11 65:5
92:13 115:23

**produce** 165:8

**produced**
185:10,11

**produces**
235:18

**producing**
227:17

**production**
222:18 228:11

**profession**
135:18 171:3,
4,21,22
172:12,13

**professional**
162:17 220:6

**professor**
5:23 6:10,14,
16 7:2 33:14
35:9,20 37:4
44:16 52:23
55:24 60:17,
19,24,25
62:25 63:13
72:4 76:21
78:3,4,9,10,
11,20,22 83:8
84:6,7,17
85:25 86:1,8,
12,13,15,16,
20,21,25 87:6
106:17 110:8,
12,13,17,19,
21 111:6,11,
20,23 112:18,
22 114:3,19
115:1,3,5
118:4 124:13
126:10,12
132:7 134:4,
15 141:10,12
142:12,23
143:13,23,25
144:24 145:2,
17 146:21
148:15 149:11
150:21 151:8,
11,14,18,21,
22 152:6,7,10

154:19,21,24
156:3 159:22
160:3,6,20
161:5,6
163:19,24
164:7 166:15
168:13,14,16,
18,21 169:9,
14,16,24
171:11,13
172:21,22,24
174:6,7,8,12,
13,16,23
175:9,10,22
177:4,13
179:10 180:12
184:14,19
185:13 186:16
187:11 188:1,
10,11 189:7,8,
14,16,17,22,
24,25 190:4,8,
9,11,12,13,22,
24 191:1,5
192:4,6,16,17,
21,22 193:8,9,
14,15,23,24
194:5,20
195:3,4,11,12,
20 196:6,7,13,
17,18,20,21,
23,24,25
197:6,12,21
198:5,9,11,23
199:7,8,12,14
200:17,18
201:2,7,8,15,
16,18,23
202:3 203:4
204:25 206:2
211:1,2,10,23,
24 213:12
214:20 215:16

216:10,11,17,
18,24 217:4,5,
7,8,19,20,21,
22,23 218:4,
11,17,18,20,
21 219:3,15
220:19 221:3
222:15,20
223:18,19,21
224:4,14,17,
22 225:9
226:8,14
227:4,5,8,17,
25 228:18,19
229:6,13,14,
21 230:23
231:7,8 232:8,
9,11,14,24
233:2 234:3
235:5,14
238:8,11,17
239:25 240:3,
5,13,15
241:10
243:15,25
244:11,14
245:1,8,15
247:1,12
248:2 249:3,
10,21 250:4
251:20 252:20
253:2 254:8,9,
12 255:21
259:15,16,25

**professor's**
61:13 63:15
64:9 66:8
68:16 69:22
70:5 71:13
140:7

**professors**
50:4 69:21
72:8,17 74:11

75:21,23 76:4,
11 80:3 91:1,
2,20,25 92:22,
23 95:12 99:5
102:8,10,19
108:17 111:15
112:6,15,23
113:21
119:12,20
120:17,20
124:6 127:20
136:15 137:21
138:6 141:17,
19 145:19,24,
25 146:6
149:23 150:5
169:12,13
176:20 184:24
220:10 251:1,
10 252:4,16,
22 257:19

**professors'**
100:18 124:20

**professorship
s** 73:3 161:16

**programs**
94:25

**progress**
66:22

**Progressive**
136:25

**projects** 64:8
65:14

**prominent**
145:19 146:6

**promise**
230:10

**promised**
229:23

**promotions**
21:23 22:11,
13,14 23:10,

13,22

**pronunciation**
111:7

**properly**
204:13

**proposal**
239:6

**proposed** 40:8
94:18 106:4
236:17 238:9,
18 239:25
240:3,15,21,
23 247:11
250:4

**Prospect**
137:2

**prospectus**
176:5,6

**protection** 7:8
180:11

**provide** 39:15
42:18 67:19,
23 118:18,22
216:21

**provided** 80:7
118:17 222:2
227:22 252:4

**providing** 44:5
95:20

**provost** 244:6

**prudent** 38:15

**publication**
59:13 136:1,3
163:4 226:23
229:23 230:17
233:25

**publications**
27:6 61:7
163:14,15
225:1,21
227:2 228:15,
19 230:12

231:8 233:7

**publish** 66:13
75:24 76:2,4,5
176:13

**published**
27:7 59:16
74:17,18,24
175:24
176:14,19
177:25 201:19
211:11
228:23,25
230:1 233:9

**publisher**
234:1

**publishes**
58:2 75:20

**publishing**
76:13 112:4

**pull** 257:5
260:6

**pure** 208:25

**purpose** 8:6
119:15

**purposes**
22:10 31:11
119:10 202:6
246:2

**put** 8:19,20
16:16,24
19:14 20:19
21:10,11,19
22:1,2 43:24
44:2 53:16
71:3 74:3
76:10 77:25
79:10 89:14
99:3 135:21
171:4 176:18
178:14 179:23
181:1 182:9,
10 203:12

204:21 205:7
234:15
236:14,21
244:9 245:8
261:5

**puts** 58:21

**putting** 17:20
22:25 27:9
51:10 84:16

_____

**Q**

_____

**qualifying**
35:12

**qualities**
169:7

**quality** 56:20
66:8 132:4,6
138:24,25
139:1 146:10
149:14 168:25
169:2,4,23
170:8,15
171:10 175:14
176:2 177:22
183:9 186:8
187:21 188:4
192:10 205:11

**quantitative**
16:17

**quantity**
149:14 169:8

**question** 5:24
9:3 22:15
30:8,22 32:14
34:15 35:15,
18,19 37:12,
13,21,22
39:10 40:2,16
41:12 57:17
61:1,24 65:4
67:15 68:12

69:2,4 73:4
81:9,19 86:2
99:3 103:10,
12 111:17
117:23,24
118:1,3,11
132:25
133:14,16
136:12 137:24
144:12,14
146:4,22,24
149:1,6,7
153:7 158:5
164:4,6,10
168:20 175:19
179:6 182:21
186:20
187:17,22
189:19,21
190:16,17,21
196:3,4
197:19 198:21
200:22,25
201:4 212:13
217:5,6,14
227:18 232:8
238:23
239:20,21
240:6 241:16,
24 242:6,7
245:12 248:9,
10 249:17
250:18 252:14
253:18,23

**questioning**
262:20

**questions**
8:23 9:7,9,11
10:10 76:16
133:20 164:2,
3 187:16
229:19 241:25
242:4,9

243:16 255:8,
11,22 257:7
262:15,17,18

**quick** 173:20
190:10

**quickly** 260:6
261:21

**quiet** 102:23,
25

**quote** 179:24

**quoted** 183:1

**quotes** 179:23
180:1

_____

**R**

_____

**Rabban**
110:19 116:2
119:21,23
120:3 151:18,
21 152:3
189:8,17,25
190:4,8,12,13,
22,25 191:1
192:6,17,22
193:4,8,14,23
203:10 223:19
234:3,10

**raise** 29:11
30:1 50:22
54:1 55:1
60:19 89:11,
19 90:7,8,13
93:18 97:14,
22 118:23
150:24
152:21,23
158:13 192:23
193:3 194:14
195:19 199:3
201:22 202:2,
6 208:24

223:10 224:1,
5,15,16,18
225:5,6
233:12 237:22
238:3,9,12,13,
17 239:25
240:2,3,4,16,
17,21,23
242:5 247:13
249:4,10,22
250:5 258:7,
13,16,21
259:14 262:1,
10,13

**raises** 22:11
29:8,24 44:5,
12 88:6 94:1,
18,23 97:13,
16 98:18,19
99:19 105:17
106:4 118:15
119:16 120:6,
7 129:18
153:1,25
209:24 210:1,
2,13 214:19
224:9,18
236:17 239:10
256:10,23
257:23 258:1,
16 259:2,4,7
261:4,22

**ran** 101:19
102:3

**range** 8:5
33:7,9,17
40:9,15 41:4,
20 43:13,16,
19,25 44:2,6
54:5 55:23
57:5,14 93:7
223:16 237:4

**ranges** 34:3,
18 35:8,22
214:18

**rank** 19:12
22:1 31:20
130:9 171:21,
24 174:12,19
207:5

**ranked** 57:20
188:24,25

**ranking** 21:20

**rankings**
205:15 207:4

**rare** 127:14

**rarely** 102:9,
12,17 106:20
179:24 229:12

**rate** 170:15
232:9,11
237:24

**rated** 96:7
129:5 134:8
144:3 149:11,
23 150:5,12,
14,15 193:20
225:12 226:10
231:6,7 233:1
234:4 235:5
240:14

**rates** 97:3

**rating** 95:23
96:15 118:22
225:23

**ratings** 118:18

**raw** 166:7

**reaction**
229:13

**read** 61:7
78:15 79:3
122:8 125:16,
19,21 126:1
130:12,15,16

131:14,16,24
138:14,24
139:1 142:12,
17,18,19,22
145:9,11,12
146:6,8,10,20
147:1,10,13
149:2 169:24,
25 170:2
174:21
179:19,22
182:14 183:19
184:9,12
185:22 186:12
188:20,21
198:2,18
219:20 222:9
229:10 262:21

**reader** 182:16,
18,23,24,25

**reader's**
182:24 183:1

**reading** 85:7
137:7 138:4
147:21

**reads** 79:13
127:16 222:18

**ready** 115:7

**real** 111:3
152:16 190:10
205:2 225:25

**reason** 11:21
33:23 38:8
57:20 69:3
83:1 92:14
116:20 119:7
142:1 160:9
173:7 175:16
181:23
186:14,25
191:17
195:11,14
199:20 209:12

228:13 239:1,
2 241:3,7
245:1,3
251:15

**reasonable**
36:23 37:1,3,
15 38:4,14,18,
21,25 40:9,15,
17,19,21 41:1

**reasonablenes
s** 38:14 41:4

**reasons** 50:1
94:7 118:25
119:2

**recall** 8:12
11:14 32:9,21
33:13 34:25
40:16 50:11
51:24 53:4,5
55:5 60:21
94:14,21 95:7
103:16 104:8,
14 110:10,15,
18,20 111:10
112:19 115:2,
4,6 119:19
120:9 125:10,
11 127:12
133:21,22
134:1 136:9
142:22 143:11
144:2,5
145:13 154:24
155:15 161:13
167:5 174:21
200:13 202:14
207:5,17,22
208:9 210:20,
23 216:6
223:13 240:13
241:7 242:4,5,
6,21 245:14
247:25 248:5

249:8 254:10,
19,20 256:11
260:4

**receive** 118:19
193:20 204:14
235:9 256:10

**received**
41:21 80:9
94:9 137:10,
13 177:23
178:2,11
187:13 244:10
245:9,15
256:14,15
257:2 260:6,
21 261:4,22
262:6,9,12

**receiving**
94:10,12
193:21 207:20
217:15 256:22

**recent** 43:6,8
78:18 97:11
111:8 215:13
241:12

**recently** 10:19
53:11 93:20
94:18 95:9
155:2

**reception**
140:6

**recess** 49:20
115:17 141:5
174:2 220:15
246:23

**recipient**
209:4

**recognize**
79:16,18

**recognizing**
79:19

recollection
20:15 114:24
121:10 134:7,
10,11,13
151:20 153:17
174:17 221:2
254:14 259:9

recollections
111:9

recommend
29:10,25
43:14,19
44:12 49:3
50:21 54:7,25
55:4,23 57:15
93:7,13 98:19
99:23 100:15
128:8 195:18
254:25

recommendati
on 32:15 57:8
93:8 196:11
202:7 256:20

recommendati
ons 25:25 26:2
27:7 31:16,19
32:1,20,21
95:2 100:4,14
153:22 192:10
204:20 223:11
256:19

recommended
50:25 53:2,4
54:2,5,10
55:17 57:7
105:17 128:10
201:22 202:2
220:8

recommendin
g 99:11 201:16

record 5:2,16,
24 6:3,11
28:10 35:24

49:18,23
52:15,18
53:14 54:4
57:3 61:20
63:17 99:25
103:4 106:24
115:10,15,20
124:23 132:23
141:2,3,7
163:5 164:2
172:9 173:25
174:4 177:6,7,
10 183:8
200:25 204:9
217:12
220:14,17
226:12,13
238:22
246:18,20,21,
25 251:3
257:15 263:7

recorded
108:13

records 24:14
61:3 104:25
105:2,5,11,12,
13

reduced 239:5
240:5

reductions
239:15,24

refer 26:20
255:25 256:3,
5

referred
255:23

referring
246:9 255:24

reflect 212:7
218:25 229:12

reflected
191:24 247:18

reflects 190:6
191:2 216:7,
22 218:1,8,12,
13 219:8
259:10

Reform
136:25

regard 63:2,
14,18,21,24,
25 64:19
65:25 66:5
69:9,13
164:13,14,18,
19 176:10
187:20,22

regarded
57:20 58:10,
17,20 59:1,14
60:4 61:25
62:5,12,22,23
63:1,11 68:15,
19 69:6,23
70:2 71:13,25
94:7 135:6
140:16 201:15
205:12

regret 246:16

regular 16:19
41:11

regulations
219:12

regulatory
180:10

reject 31:25

related 225:12

relation 91:17

relative 29:9

released
207:14

releases 180:2
231:13

relevance
166:6 167:2

relevant
141:20,24
162:13 163:5
165:4 166:25
167:12 244:21

relocation
214:16

remain 106:13

remained
54:11

remarks
101:13,16

remember
11:17,20
21:24 50:4,18
51:1,2 53:17
54:1,5 55:6,7,
10,11 60:16
85:15,19 86:4
96:4 98:15
102:11 107:10
108:3,15
109:8 112:17
113:12,22
121:13,22
124:10
125:18,21,22
127:1 128:3,9
129:3,5
130:13
134:14,16
140:14,17
142:19 143:7,
13,14,16
144:3,9
154:18,21
155:4,12
156:7 182:14
194:3,6
197:14,22
198:6 199:10,

12 202:14,19,
23 203:1,3,5
205:7 208:3,5,
6 215:22
222:7,9,13
223:21,23
224:3 235:12
238:2,25
241:8,15
242:15
244:10,14,23
245:4 246:15
250:16

remembered
45:13 103:21
247:2 248:15
250:13

remembering
127:18 250:15

remind 96:2

remotely 5:7,
12 263:1

remove
107:14 108:10

repeat 22:15
75:17 131:1
132:25 201:5

repeatedly
249:1

rephrase
16:11 68:12

replace 110:2,
6

report 114:16

reported
183:17 228:2

reporter 5:4
61:17 62:6,14
63:13 217:12
262:23 263:4

reporters
65:3,13

**reporting** 5:12
183:13

**represents**
196:14 206:9

**request** 9:2
21:9 164:2
181:13 217:11

**requested**
80:16

**requesting**
213:16

**requests** 21:4

**require** 135:9
219:12

**required** 15:22
42:14,17
220:8

**requirements**
44:17 136:1,2
157:3

**research** 10:4
67:8,11,21,23
68:2,22 69:10,
17 85:8 114:9,
15 125:23
149:14

**resembling**
69:9

**reserve**
262:18

**residence**
5:13

**resigned** 24:8

**resolved**
85:19 86:5
108:6 161:13

**respect** 22:11,
12 29:2,12
34:18 43:24
44:20 65:21
72:5,9,18,25
73:6 94:22

95:17 102:20
107:5 110:22
112:19 114:6,
10 121:10
159:12 181:18
213:17,18,25
254:7,23
255:4

**respectful**
197:19

**respond** 41:13

**response**
32:10 127:24

**responsibilitie
s** 114:12
219:16

**responsibility**
219:23

**rest** 220:8

**restatement**
61:17 62:7,21

**restatements**
64:8 65:14

**restrooms**
200:12

**results** 32:3

**resume** 84:7,
17 85:1 86:10,
13

**retaining**
48:17

**retention**
52:14,25 54:8,
9,12 59:3 95:6
203:8 209:25
212:23 213:18

**retired** 74:2
154:6

**retirement**
116:10,16,25
205:20

**retirements**
117:4

**retiring**
116:21,22,23

**reunion** 18:6

**reveal** 207:12,
25 208:4,8
209:11

**reveals** 82:10

**review** 9:17
16:8 27:15
88:4,8,13,14,
21 95:12
121:24 134:6
142:21 148:16
176:6,8
183:12,16
186:12,18,22,
25 187:7
221:9 228:7
231:19,20
234:4,23
236:3

**reviewed**
128:21 180:5,
8 232:15

**reviews** 41:8
170:1,11
183:22 219:21
232:13

**revised**
228:22 229:25
231:11

**revising**
232:16 234:23

**revision** 231:9

**revisions**
230:20

**reward** 153:3

**rewarding**
96:24

**Rich** 145:17,
18 147:3

**Richard** 43:9
50:7,9 51:21
52:13,24
53:25 56:1,11,
17 57:19 58:4,
11,15,16
59:19 93:8,11
214:23

**Richard's**
57:21,23,24
78:16 79:8

**right-hand**
259:6

**risk** 158:5

**risks** 203:9

**Robert** 83:18
159:22

**Rockefeller**
68:8,11,14

**room** 108:3
123:17

**rough** 168:6

**roughly** 98:8
123:3 164:13,
14,17 170:13

**round** 204:1,
14,15,18
207:9,10,13
208:1,4
256:16 257:2,
3

**rounds** 203:1
207:7

**row** 20:4

**rules** 172:17

**Run** 111:18

**running** 119:5

**S**

**safe** 63:13
80:11 153:15
250:7

**safety** 10:20

**Sager** 11:18
20:9,23 24:3,
4,7,14 93:21
94:2 154:9,16,
17 173:19
212:20 213:1,
8,15 214:4,12,
13 215:1,6,22
223:19
239:15,25
250:25 251:9,
16,21 252:4,
16

**Sager's**
251:23

**sake** 86:6
217:11

**salaries** 25:23,
25 26:2 27:8
41:20 46:4
51:12 81:4
82:22 90:8,14
92:5 93:13
97:9 100:5
157:25 199:8
221:12 223:17
247:8

**salary** 33:7,9,
17 34:3,18
35:8,22 40:9,
15 46:17
54:10 55:17
57:14 59:21
60:20 84:2
87:11 90:11
91:4 93:10,11

98:13 105:17
119:16 121:3
152:15 168:9,
11 173:7
178:11
194:11,12,17,
18,21 195:1,7
196:19 198:22
201:17 211:20
213:25 214:22
215:10,18,19
218:13 219:4,
8 223:16,22
240:1 244:18
247:11,13
**Sandy** 110:22,
25 111:1
160:24
197:10,13,25
198:3
**Sandy's**
110:24
**sartorial** 65:7
66:2
**sat** 242:2
**Saturday**
123:17,23
125:7,13
126:4,5
**saved** 106:1
**scatter** 28:23
29:5,24 43:23
44:1,23 45:2,5
46:11,14 50:1
57:13 80:6
84:11 92:13
93:22 100:13
130:6
**schedule**
13:16 101:25
**schedules**
175:8

**scholar**
127:16 140:12
178:1
**scholar's**
166:13
**scholar-in-
residence**
68:8,13
**scholarly**
127:16 135:20
148:11 165:25
166:4,6,14,20,
24,25
**scholars** 69:6,
7 72:23 149:5
176:17
**scholarship**
29:20 44:12,
16 48:24 56:3,
19 57:22 58:1,
5,13,14 59:4,5
61:8,13,18
62:2 63:15,19
64:9,13,16,20
66:8,13,24
67:6,23 68:16
69:19,22,23
70:3,21 71:2,
14 72:1,5,8,
11,18,25 73:6,
23 74:11,18,
21,23 75:1,3,
6,13,18,20,24
76:4,5,9,13,23
77:3,5,7,16,
18,23 78:10,
12,24 79:12
88:2,17 89:17
92:15,19
97:20 107:5
118:25 119:1
123:11 124:20
127:11

129:22,23
130:2 131:9,
13,17 132:3,4
134:6 135:3,6,
7,8,19,20
139:25 140:7,
16 141:10,12,
22 142:13
143:15 146:5,
6,8,9,10,12,
14,21 147:1
148:8 149:18,
20 150:13
155:11
159:10,24
162:4 166:23
169:23,24
170:3,6,9
171:14
175:14,18,20,
21,22 177:15,
18,19,25
178:19
179:11,13,19
183:22 185:25
186:22
187:10,12,20
188:1,4,7,18,
20 192:11
193:7 198:18
199:21 201:18
206:6,7 222:9
225:25 226:3,
9 228:24
229:4,7,12,14
234:13
235:16,17
**scholarship-
wise** 150:13
**school** 6:17,
23,24 7:3
12:1,3,13
15:19,20 16:2,

7,9 17:1
18:17,22 19:4,
5,7 21:15,18
22:6,24 27:17
41:12 42:19
44:24 45:1,6,
21 46:16 49:2,
7 54:11 56:1
59:1 60:6
62:1,5 72:3,6
84:9 86:24
89:13 93:3
97:16 102:21
103:19,20
137:11,13,16
138:10 140:17
160:14 166:19
171:24
172:10,14
174:12 177:19
178:14
184:15,17
197:25 217:4
235:8 244:2,4,
5,12
**school's** 22:8
**schools** 53:23
60:15 67:12
71:12 85:17,
18 137:22
161:16
**science** 85:14
176:23
**Sciences**
69:12,14
**SCM** 47:15,19,
20
**Scott** 112:3,5,
12,16,17
233:20
**screen** 45:4
51:11,17
159:14,15

204:13 237:15
249:2 257:8,
12 260:8
261:20
**screens**
237:14
**screwed** 263:3
**scroll** 27:21
85:1 179:21
180:6
**scrolling**
250:5
**Sean** 205:8,13
**secondhand**
168:4
**secret** 202:21
206:17
**section**
177:24 178:13
179:19
**secure** 44:3
**seek** 50:3
**seeking** 41:16,
19,23
**select** 176:21
223:3
**selected** 62:21
223:5
**selecting** 65:3
**selection**
223:8
**semester**
13:21 32:25
41:7 50:3
**semi-election**
20:22
**seminar** 10:19
**senior** 259:20
**seniority**
259:24

sense 47:4
57:25 58:8
79:6 135:11
146:9,11
153:6 157:9

separate
210:13

seriatim 29:19
101:4

serve 24:16

served 109:9
154:8

serves 108:22

service 15:17,
19,24 16:1,9,
12,17,25 17:1,
4 18:11,13,14,
17,22,23 19:3,
4,7,13,17,21,
22 22:2 29:21
44:13,16
48:25 56:3
64:12 66:10,
20 67:19 88:2
89:18 92:16,
19 95:19
97:20 107:5
108:20,21,24
114:7,8 119:1
124:20 129:23
135:6,10
148:9 149:15,
19 155:12,17
159:10,25
170:14,16,24,
25 171:2,4,5,
8,12,19,22,23
172:4,5,10,12,
13,15 174:7,9,
15,18 175:5,
17 192:11
193:7 199:21
205:11 225:8,

9 226:2,3
227:23,24
231:5 233:10
234:22 235:7
245:23

serving 16:3
18:18

session 26:22
140:15

set 30:20
214:17 221:12

sets 247:8

setting 59:21
98:4 244:18

settle 252:16

settlement
251:20,22,24
252:5,21
253:2,13,16
254:9,13

settling
253:21

sex 156:13
159:5 200:2

sexism 200:7,
12

share 45:4
51:11 236:15

shared 171:7

shares 43:5

Sharlot 13:1,3,
7 20:12,14
21:1

she'd 245:3

sheet 240:15

sheets 106:7

shift 261:20

short 135:23
137:3 141:9
163:18,21
220:12,19

228:4,6,8
232:24

short-term
124:8

shorthand
233:25

shot 46:14
50:1 80:6
84:12 92:13

shots 57:13

show 38:18
84:6 121:17
125:6,8 129:6
145:15 152:11
159:20 184:13
189:13 191:16
219:14 221:7,
21 222:8
223:14 228:18
235:16,25
236:13,25
237:2 239:9

showed 42:24
215:17 216:4
247:19

showing
42:19

shows 132:16

side 39:6 59:3
79:19,20
119:25 184:10
234:22

sidebar
229:20

sides 79:16
163:3

sign 181:18
262:21

significance
46:22 164:12

significant
87:18 228:23

silly 40:7

Silver 111:15
115:3 116:3
218:18

similar 8:17
38:15 45:16
46:25 86:1
114:2 129:13
132:9 163:20
256:4

Simultaneous
82:12 85:23
101:11 133:18
163:16 176:25
213:6 222:16
226:19 234:17

single 143:16
229:23 250:3

sir 260:11

sit 100:10
127:7 196:23

sitting 75:5
192:20 198:21

situated
156:23

situation 43:3
49:6 168:10

situations
118:10

six-page
234:4,20,23

six-year 31:6,
15 32:17 41:8
88:14 119:4,5

slightly 18:10
19:5 24:5,6
87:12 151:6
172:14 174:12
175:15,17
200:9

smaller 12:3
24:11 260:10

SMJ 152:17

so-and-so
29:11

societies 16:5,
6

Society 16:8

Socratic 10:11

Socratically
10:11

solicit 141:15

solicits 142:8

somebody's
36:8 39:23
63:24,25
181:6 194:18

someone's
38:9 39:17
117:12

sophisticated
165:9

sort 20:21
22:2 29:4
57:14 71:24
78:8 90:22
92:14 97:18
99:3 138:9
153:18 155:21
164:15 165:8,
20 167:8
172:18 182:25
205:15 210:21
221:15 226:2

sorts 69:5

sound 35:10
241:23 256:1,
2

sounds 11:23
17:11 68:11
115:11 133:9
139:16 173:24
177:13 178:5
185:15 212:9

242:16 252:25
**source** 52:17
**sources** 167:6
**speak** 58:24
72:21 101:6
138:18
157:12,23
**speaker** 66:7,
16 220:6
**speaker's**
66:24
**speaking**
47:19 82:12
85:23 101:11
133:18 163:16
176:25 213:6
222:16 226:19
234:17
**special** 107:11
173:17 205:18
**specific**
100:18 102:19
115:24
**specifically**
53:7 110:25
113:25 142:2
210:18
**spectacular**
211:12 218:23
**speculate**
15:3,6 209:2,7
**speculating**
50:11 208:18
**speculation**
15:16 33:11,
22 34:8,15,24
35:24 36:5,10,
20 38:1,6
39:25 40:13,
24 41:18
42:22 47:3,24
48:4,10,23

50:15 55:16
60:3 62:9,18
63:17 64:2,11,
18,25 65:10,
17 66:18 67:3,
10,16 68:1,18
69:25 70:7,24
71:9,16 72:20
76:19 77:10
80:15,22
81:15 82:20
84:20 85:11
92:3,10
104:12 105:7
106:9 107:18,
25 112:25
114:21 117:2
118:8 128:24
133:5,12
137:18
138:17,22
139:5,9,20
146:17,23
147:18 157:22
158:4 159:1,8
160:12 161:9,
20 163:9
175:1 178:21
179:2 184:1,7
187:18 199:1,
17,25 206:20
207:2 208:13,
22,25 209:6,
15,20 211:9,
25 213:23
222:25 242:25
243:6 246:8
247:17
248:14,20
249:25 250:11
252:7,24
**speech** 66:21

**spell** 6:11
181:6
**spelled** 180:18
**spelling**
180:21 182:11
**spend** 126:7
**spent** 45:21,
25
**spoke** 233:18,
23 241:10,11
**spoken** 58:23
60:8
**spread** 46:11
**spring** 7:6
21:7 25:12,13,
15,16 26:25
30:24 31:2
33:5 93:6,9
154:11 220:21
**spring's** 90:25
**SSRN** 165:8
167:9,10
**stack** 19:13
**stage** 192:12
**stamped**
52:17
**stand** 29:1
91:16 230:5
**standard**
262:24
**standards**
14:3 40:9
132:2 234:25
236:7,11
**stands** 87:19
**Stanford**
178:3
**Stanley**
152:18
**stark** 248:22

**start** 10:25
25:12 89:14
160:13 194:11
257:25 258:6,
12
**started** 5:23
9:12,20,22
13:4,5,12,21
27:1 45:22
84:8 86:8,16
113:17 143:19
173:11 200:16
219:3 240:1
**starting** 27:8
194:11,12,16
**starts** 219:15
**state** 5:8,14,15
6:11 70:5
233:3 262:25
**stated** 172:16
174:14
**statement**
189:20 190:20
**statements**
229:18
**states** 112:9
208:14
**stay** 20:14
**stayed** 55:18
**Steiker** 111:15
115:1 116:3
217:22,24,25
218:4 237:6,
18,21
**stenographic**
5:13
**Stepford**
184:24
**Steve** 24:19
109:8,9
204:21

**stick** 191:12
**stimulated**
113:4
**stop** 27:22
181:12 200:21
217:12 261:20
**stopped**
117:25 255:10
**straight** 27:5
167:11 168:13
**straightened**
25:11
**strange** 19:24
238:24
**Street** 126:1
**stretching**
182:18
**striking** 183:4
**strikingly**
185:3
**strong** 61:9
173:16 182:18
207:8,9
224:25 225:7
236:1
**strongly**
244:21
**struck** 168:2
**stuck** 155:22
249:11,18,22
250:1
**student** 16:7,
22 17:23 18:2,
10 58:8 127:4,
6 200:15
221:24
**students** 10:4,
7,9 12:4,5
16:5,6 58:10
110:2 127:5
155:23 171:5,

6,7
**Study** 68:14
**stuff** 61:7
147:8,14
231:18 251:16
**Sturley** 103:23
106:22
**subject** 148:4
154:23,25
**subjective**
133:9 139:25
188:7
**subjectivity**
140:4 188:9
**subjects**
10:13 78:20
**submission**
130:1 138:9
**submissions**
27:3 221:22
**submit**
136:19,23
141:17,19,21,
24 142:10
147:24,25
**submitted**
130:19 137:1
176:19 180:3
235:18
**submitting**
148:25
**subsequent**
90:15,16,21
91:22 210:10
**substance**
183:5
**substantial**
36:24 37:1,7,
16 38:4 54:1
148:2 225:2
226:5

**subtraction**
87:3
**sufficient** 20:8
**suggest** 115:9
169:3
**suggested**
29:8,23
**summarized**
185:20
**summarizes**
129:21
**summarizing**
233:17
**summary**
130:7 171:17
179:9 223:9
236:5 242:12,
13 243:14
**summer** 31:2
**sums** 214:4,9,
11
**Sunday**
126:13
**supplemental**
257:3
**supplementati
on** 185:12
**support**
114:15 182:17
**suppose**
54:12 87:3
138:9 140:4
158:6 181:8
228:17
**supposed**
104:25 182:1
202:21 219:11
**Supreme**
134:20,25
135:5,13,16
136:4,5,7,15,

17,21 137:6,
15,22 138:11,
13,14,23,25
139:2,10,11
141:9 142:20
149:9 169:5
**surprise** 114:1
250:2,6
**surprised** 53:7
113:25 126:25
242:10
**Susan** 107:8
**suspicious**
144:8,16
**Sutton** 11:11
**swear** 112:1
**sworn** 5:21
**syllabi** 219:10
**Sylvia** 222:5,6
**Symposium**
231:19
**system** 97:4
212:10

---

## T

**T-H-O-M-A-S**
6:12
**T14** 71:12
72:3,6 161:16
184:15,17
**table** 30:8
35:19 37:23
164:4 196:3
240:7
**takes** 30:2
32:11 43:15
102:23,24
182:9 183:10
230:20
**taking** 7:21

79:19 182:6
220:1
**talk** 19:21,25
36:14 43:12,
13,22 60:14
77:20 95:11
97:24 108:19
110:1 112:7,
15 113:16
124:3 127:10
128:16
129:23,24
144:5 145:4,6,
14 155:24
156:21 175:13
207:24
210:17,22
220:20 238:7
244:18
245:22,23,24
**talked** 19:16
57:12,19
60:12,21
94:22,23
103:1,5 116:2
128:7,9
131:10 134:2
143:3,7,14
144:19 145:7
154:8 155:17
156:12,13,14,
18 187:9
197:14,22
210:11,18
229:22 231:9
245:7 247:2
248:2 255:9
**talking** 17:2
18:17 19:6
22:21 26:18
29:7 48:13
49:24,25
52:24,25

60:22 67:12
69:11 84:11
93:4 102:1
112:17
113:12,13
115:22 118:5
119:15,17
130:14 140:21
141:9 143:19,
20 148:18
155:8 160:13
166:22 168:1
174:5,7 177:1,
14 199:2
207:11 213:11
214:11 220:1
221:8 224:23
233:24 239:23
244:10
**talks** 102:18
184:20 210:1
**tank** 67:13
**tanks** 68:4
69:5
**tape** 108:12
**taught** 10:14
14:1 85:2,9
**teach** 10:10,
13,16,17,18,
19 71:20,21
72:5,15 78:19
145:25 146:1
160:24
162:12,14
**teacher** 49:8
72:2 110:1
189:6
**teaches** 110:1
178:2,3,4
**teaching** 10:3,
7,15,24 11:1
29:20 44:13,

17 45:2,9,10,
11,22,24 46:1,
4,13,24 48:24
56:3 57:21
58:7,8 61:9,11
83:13,16,21
84:8,14 85:6,
17,21,22 86:8,
21,23,24
87:10,11 88:1
89:18 91:11
92:16,19
97:20 98:11,
14,15 107:11,
15 119:1
123:11 124:20
130:3,5,8
149:6,15,17,
19,20 150:11
152:13,15
155:12
159:10,24
160:7,13,14,
15,17,20
161:1,5
167:13,14,16
170:12,13
171:13 173:12
175:7,14
189:3 192:11
193:7 199:21
200:10 205:12
225:1,7 226:9,
15 231:4
233:10 234:3,
21 235:6,14,
15 244:10
245:10,16,17
254:16,21
255:4,5
**technical**
140:20,24

**television**
125:6,8
**telling** 242:15
249:8
**tells** 9:8 42:11
43:1
**ten** 8:4,16 31:9
47:13 173:22
**ten-minute**
220:12
**tend** 176:4
180:2 197:24
**tended** 167:10
210:13 225:10
**tense** 102:2
**tenure** 21:22,
23 22:13,17,
20 23:2,10,13,
18,22 257:18
**tenured** 18:12
22:14 72:13
80:2 82:7
84:17 97:3
115:25 157:15
219:9,19
220:10 257:18
**terms** 12:4
47:21 48:20
59:4 77:3 82:7
87:18 89:5
92:15 97:6,14
98:4,11
123:11 135:19
137:8 150:7,
21,22,23,24,
25 151:3,20
152:13 153:19
154:3 156:13
158:24 162:1,
15 168:23
171:1,2,5,12,
13,14 177:20

197:25 198:1
244:18 255:24
256:4
**terrible** 99:2
**terrific** 138:11
147:7 194:14
205:11
**terse** 227:22
233:16 236:5
**test** 38:7,11,
21,22,25 39:1,
7,14
**testified** 5:21
90:4 159:23
172:4 209:10,
23
**testimony** 8:8
87:25 89:4,8
90:1 91:9
92:25 93:24
94:16,20
104:22 116:8
128:12 130:25
131:7 133:25
138:8 140:9
150:18 151:24
157:8 171:15
172:7 173:2
189:23 192:8
193:11,17
194:1 196:9
198:25 207:16
210:6 218:7
227:7 229:17
230:3 231:2
232:1 236:10
238:22 253:10
255:23 256:7,
11 258:19
259:1
**testing** 249:14
252:12

**Texas** 5:14,19
6:17,19,23
9:16 10:22
11:2,6,10 16:7
112:8,10
176:20 187:24
194:13 233:21
**theory** 36:18
250:23
**thesis** 182:17
**thing** 18:8
29:15 41:9
78:8 89:11
109:23 165:9,
21 167:8
175:6 182:9
195:23 201:20
210:21 211:21
213:2,10,11,
13,14 214:8,
25 221:8,15
235:24,25
236:19 237:1
240:2,13,25
244:17 245:21
248:7,12
**things** 10:10
13:5,17 14:7
16:4,10,24
17:16 20:22
33:1,6 41:6
58:1 59:4
67:13 69:6
79:7 105:1,15
109:18 123:8,
12 124:15,25
127:9 136:19
137:4 138:24
139:23 147:6
153:3 166:8
171:23 172:19
174:11,18,24
183:23 191:14

194:12 202:6
230:17 242:15
248:22
**thinking**
17:14,22
25:11 33:24
43:6,8 44:3
48:15 59:12
89:14 96:18
103:17 107:4
108:22 109:18
128:19 134:3
143:8,17
144:6 162:11
202:10,14,15
246:12
**thinks** 62:13
106:11
**Thomas** 5:20
6:12
**thought** 9:18
50:12 63:8
66:12 69:18
70:9,12 78:11
79:10 81:8
95:4,5 96:13
107:20 137:15
147:7 148:16
155:3,25
164:22 182:19
185:16,18
191:12 194:13
201:3 202:20
203:19 210:14
217:16 222:22
234:7 238:2
241:22 243:11
247:22
**threatened**
252:1
**three-** 137:3
**three-week**
7:20

throwing 104:25
**Thurgood** 16:8
**Thursdays** 13:15
tied 230:17
till 121:4 125:15
time 5:5 8:13 11:1,24 13:5, 19 14:5 21:8 23:5,10,23 24:3 28:17 29:19 41:10 49:7,13,14,23 57:1 65:4,19 76:22 77:25 90:24 93:17, 20 94:1,22 95:18 96:6 101:8,18,21 102:16 104:20 113:11 115:20 122:24 126:7 127:16 131:24 141:7 147:21 148:6 149:4 155:7,14,22 156:8,9 174:4 176:22 182:10 203:7 210:10 214:2 223:13 233:6 237:16 239:4 246:25 248:12,15,17 262:16,18
times 8:3 19:10 20:1 25:3 56:5 102:4,5 126:1 207:6 235:22

tiresome 177:11
title 52:22
today 8:23 128:22 196:24 248:17 249:1 257:6
**Today's** 5:4
told 69:16 75:2 100:6 104:1,10 108:23 112:5, 15 113:13,20, 24 122:13 202:22 218:8, 15 242:13 248:12
**Tom** 5:6 222:18
top 22:3 58:3 120:4 123:8 130:9 144:7 222:13 237:8 257:8,11 260:8,9 261:24
tort 36:13 127:5,6 228:21
torts 10:14 71:21
total 28:1 45:9,10,11 83:13 85:22 87:11 165:18 195:19
track 257:19
train 191:11 217:16
training 157:10,11

transfer 168:5
transparent 215:6,12,15
treasure 184:23
treat 12:14 91:13 156:22 161:10 164:11 253:16,18,24 254:3
treated 159:5, 12
treatise 163:18,22 164:11 234:24
trial 262:19
trope 180:1
trouble 85:7 250:15
true 20:3 92:4 193:12 216:9 224:21 240:24 249:5 256:13
trust 212:9 218:15
turn 14:21 105:23 106:4, 6 207:3 260:22
turned 105:24 206:21
turnover 24:23,24
turns 173:7 195:7
two- 7:20 137:3
two-year 57:5
type 17:1
types 16:12 158:22

typically 100:25

___

## U

**U.T.** 10:13 11:3,13 18:12 44:22 72:8,17, 18,21,24 75:6, 14 76:11 87:11 90:7 92:21 98:5 138:6 168:6 172:5 173:12 177:2,15 187:11,13,20, 21,23 188:2 198:22 200:4, 8 205:21 247:8 253:22
**UCLA** 54:21 55:8,9,20
uh-huh 28:5, 16,19 47:17 52:6 83:17 139:7 160:5,8 162:6 165:22 179:17 184:22 185:8 222:3 224:24 225:3 236:20 238:14 242:14
ultimate 33:23 157:24
ultimately 32:11 247:9 250:8
unaware 103:17,25 104:1
unbecoming 197:20

unbiased 186:13
unclear 52:19 111:2
undergo 157:10,11
undergrad 86:23 160:15, 16,24 161:5
underneath 243:17
understand 37:13 128:6 157:2 215:1 230:21
understanding 8:22 21:3 54:24 60:18 70:13 214:6 223:4 251:11, 25
undertakes 17:10
unequivocally 213:3
unilaterally 247:24
United 112:9
universities 60:9 68:4,23
university 5:18 6:16,19, 23,24 7:2 18:13,14,18, 19,22,23 27:17,18,23 31:11,12,17, 19,24,25 32:8, 10,12 50:16 59:7,11,17,20 60:5 68:3 69:10 85:3,13

92:1 94:25
95:5,20,21,22
96:11,13
98:22 109:9
119:3 157:9
175:25 176:1,
11,12,15,17,
20 184:20
187:24
194:13,15
207:14 214:22
219:11 221:13
225:19 227:9
228:1 232:5
255:4,5
**university's**
157:11
**unprofessiona
l** 108:16
**untenured**
23:3,5 114:23
**unusual** 31:5
**unwilling**
35:21
**update** 163:22
164:23
**updated**
229:11
**updates**
163:18 164:11
225:2,22
226:1
**upset** 208:8,
11,16,17,20,
25 209:3
**upward** 94:6

---

**V**

**vague** 15:1
16:13 17:6
19:1,18 30:11

37:25 40:24
43:20 44:9
61:2 64:1
66:17 67:10,
16 68:1,25
100:23 107:2
118:3 119:13
121:9 132:11
137:23 140:1
142:3 158:9
162:19,23
166:2 190:18
194:22
**valuable** 44:6,
8,15
**valuation**
56:9,21
**valued** 43:22
56:2,5,6,12,16
137:22
**valuing** 66:23
**varies** 97:13
98:5
**vary** 79:22,23
**verify** 81:3,12
82:17
**verifying** 82:8
**versus** 48:16
**video** 126:22
**view** 17:2,3
19:6,11,12,17
34:10 41:2
56:22 68:4
108:7,9,10
132:6,10,14,
20 133:2
135:8 148:7
177:8 183:11
186:13 197:4
213:4
**viewed** 16:25
135:7 184:14

187:10,12
188:2
**views** 40:25
41:3 132:9,13
133:8,14
185:3,24
**Virginia** 50:17
**virtually**
170:20 176:7
212:22
**visible** 28:25
**visit** 71:17,18,
24 161:22,24
162:10,12,14
**visited** 155:2
**visiting** 71:11
72:4,14 73:2
161:16
**visits** 71:18,19
72:9 73:3
162:8
**vital** 22:5,8
**Vladeck**
204:21
**voice** 184:23
185:7
**vote** 169:12
202:21,22
**voted** 202:23
204:23,24
214:2,17
235:9
**voting** 169:13
**vouch** 83:24

---

**W**

**wages** 26:14,
16
**Wagner** 24:21
176:15 203:6

237:7
**wait** 33:14
127:19 148:15
179:12 180:9
239:20
**Wall** 126:1
**Walsh** 5:17,22
6:7,9 15:8,21
16:23 17:11
19:9,23 28:14
30:9,15 31:18
32:13 33:14
34:2,9,16
35:1,20 36:2,
7,12,25 37:11,
24 38:2,10,17,
24 39:4,13,22
40:3,6,18
41:5,22 42:25
44:14 47:8
48:1,7,19
49:1,15,24
50:18 51:17,
19 52:21,23
53:21 54:7
55:19 57:6
60:7 61:12,22
62:15,24
63:22 64:4,14,
22 65:6,12,21
66:6,25 67:7,
14,18 68:5,21
70:4,11,20
71:1,11 72:3,
23 73:8 75:12,
21 76:24 78:2
79:23 80:18,
24 82:2 83:2
84:21,25
85:12 88:3
89:5,20 90:3
91:15 92:6,20
93:18 95:10

100:6 101:5
103:6,13
104:3,16,23
105:10
106:15,21
107:7,22
108:9 111:20
113:6 115:1,9,
13,21 116:14
117:8,24
118:4,14
119:16 125:1
128:15 129:2
131:3,8
132:15 133:1,
7,17 134:4
136:14
137:21,25
138:13,20
139:2,7,15,24
140:5,14,21
141:1,8
142:12 143:10
144:15 146:19
147:2 148:15
150:20 152:6
157:14,19
158:1,8,15
159:20 160:16
161:15,23
162:21 163:25
164:7 166:5
168:12 171:17
172:16
173:13,21
174:5 175:4
177:6,8,11,13
178:24 179:4
181:18 183:9
184:3,13
185:11,13
186:11,21
187:6,25

189:22 190:17
191:1,9,17
192:4,15
193:14,19
194:4 195:3,
14,22 196:5,
23 197:3,12,
21 199:4,22
200:3 201:1,2
204:10,12
206:16,24
207:6,18
208:19 209:2,
9,18,23 210:8
211:23 212:5
213:19 214:3
216:15,24
217:12,21
218:17
220:11,14,18
223:2 226:13
227:12,16
229:20,21
230:5 231:6
232:8 236:13
238:24 239:23
240:8,12
241:9 243:4,
13 245:13
246:10,19
247:1 248:1,
11,16,25
249:16,18
250:2,14,19
251:9 252:9,
15 253:1,24
254:8 255:18
262:17
**wanted** 9:18,
23 35:7 46:17
104:13 107:20
112:12 113:2
122:12 147:7

238:7 243:23
254:23
**wanting**
164:15
**Warren** 5:10
**Washington**
7:11 85:3
126:18
**Wasserman**
203:20,23
**watch** 85:1
125:8
**watched**
125:6,11
**water** 250:19,
21
**website**
178:15
**Wednesdays**
13:15
**week** 13:10
129:10 198:14
**weekend**
125:25
**weeks** 7:23
**WEF** 83:11
**weigh** 172:19
**weighed** 19:6
**weight** 49:9
148:2,13,14
164:25 165:2
**weighted**
174:20
**weighty** 49:9
**Weinberg**
240:13
**weird** 35:15
**Wendy** 24:21
176:15 203:6,
9 237:7

**Westbrook**
110:17 116:2
119:21,23
120:3 145:2
151:14,16
188:11 203:10
223:19
**white** 136:24
**Wickelgren**
111:16 115:5
116:4 218:20
219:3 259:23
**wife** 7:22
103:18 125:6,
15 126:19
**William** 7:15
**Williams**
205:9,13
**Williamson**
5:14
**Willie** 114:10,
25 247:4,6
**Willie's**
114:12,16
**wind** 89:13
100:5 205:8
211:15
**withdraw**
197:19
**witness's**
229:18
**wives** 184:24
**woman** 158:13
199:14
**women** 200:13
**won** 176:15,23
233:22,23
**wondering** 6:2
35:11 118:6
**word** 62:12
143:1 205:23

215:23
**words** 108:24
**work** 6:22 7:4,
19 9:17 12:9
64:7 67:24
70:5 75:19
79:12 93:7
97:10 98:23
114:12 125:14
126:3 136:25
137:5 149:5
164:22 165:10
166:9,13
171:20 196:16
210:16 227:1
230:20 232:14
234:16,24
253:22
**worked** 9:21
125:6 126:5,
13,14,22
180:12 191:15
216:2
**working** 16:5,
6 112:16
113:15 126:9
135:24 166:17
217:3,5,8
226:21,25
227:10,13
230:18 234:7
**workout** 126:3
**works** 131:20
212:15 228:4
**world** 39:6
58:22
**worried** 14:3
**worry** 11:23
**worth** 48:2
88:17 162:4
169:6 218:4
229:24 243:12

**wound** 192:13
195:20 242:17
**wow** 7:24
**Wright** 63:5,8
65:19,22,25
66:3
**write** 78:3,6,16
136:7,15,21,
24 147:25
148:7 205:9
207:22 225:10
233:6
**writer** 71:3
185:19
**writes** 58:4
78:7,17
136:19 205:10
211:11 233:5
**writing** 9:20
10:5 85:9
113:5 132:17
137:6 184:11
226:24 232:4
**written** 42:18
61:6 66:22
69:4 70:10
136:5 137:2
175:23 182:19
183:10 186:16
**wrong** 40:22
87:9 180:18,
20 182:13
**wrote** 78:18
122:10
134:17,19
149:1 183:2
242:12

---

**Y**

---

**Yale** 175:25
176:11 178:3

236:3

**year** 7:18 10:14 20:7,11, 13,18,22 23:7, 12 24:7,10,17, 24 25:19,21, 22,24 26:1,4, 20,21,25 27:4 28:12,18 29:18 30:16, 17 31:23 41:10 45:7 51:3,4,5,8 52:8 53:12,15, 16,20 54:19, 23 55:17 71:21 74:16, 22 75:4 76:25 77:15,18,22 86:16 88:9,10, 16 89:1,10 90:2,15,16,21 91:22,24 92:19,21 94:3 99:1,6,16,17 107:12 109:9 116:24 120:11 121:4,14 142:9,13,14 149:17 150:7, 13 152:2 154:16 163:10 165:5 167:23 176:19,23 178:1 179:19 189:11 192:20 193:2,8,12 194:24 196:10,12,16 198:3,19 199:3 201:12 205:20 211:5, 19,20,22

212:4 219:10 221:2 222:6 223:21,25 224:1 226:9, 24 227:3 228:4,13 230:16,24 232:3,19 235:8 238:12 243:9 247:21 256:23 261:22 262:2

**year's** 88:1 92:12 162:4 193:1

**year-to-year** 24:12

**years** 7:5,13 8:15,16 10:14, 15,16,17 12:15 13:7,8 20:4,8,11,12 23:2,11,19,24 24:7,11,13,14 25:12 31:11 44:5,24 45:1, 2,6,9,10,11, 21,24,25 46:2, 11,12,24 47:7, 13 49:1 51:4, 6,7 53:20 54:18 57:5 66:4 74:17 76:9 83:13,15 84:10,12,18, 24 85:16,21, 22,24 87:11, 17 88:15 89:21,23 91:11,12 93:21,25 94:2 97:11,17,19 98:10,15

109:15 114:22 122:9 130:5 151:2,17,20 152:13,15,17 153:19 154:17 160:6,7 165:12,24 167:3,23 169:25 170:11 173:19 180:17 188:23 189:10 191:3,14,25 192:9,11,19 193:21 195:17,19,20 196:19 197:25 198:1,11 199:6,20 200:5,8,10,14 201:10,13,15, 17,19 203:14 206:10 210:10 211:4,10,12, 14,17,20 212:2,8,14 215:11,13,22 217:4,6 218:2 226:25 230:1 233:6 235:19 241:11 251:23

**years'** 88:17

**yesterday** 126:10,12,13

**York** 126:1 235:22

**you-all** 262:24 263:5

**young** 10:25

**younger** 153:3 203:8

**Yudof** 11:15, 16 12:25 20:13 21:1

---

**Z**

**Zoom** 123:17, 24 129:25

**zoomed** 83:6

**zooming** 83:2