# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **LINDA SUSAN MULLENIX,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL NO. 1-19-CV-1203-LY** |
| | § | |
| **UNIVERSITY OF TEXAS AT AUSTIN,** | § | |
| *Defendant* | § | |
| | § | |

## ORDER AND REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO: THE HONORABLE LEE YEAKEL**
**UNITED STATES DISTRICT JUDGE**

Before the Court are Defendant's Motion for Summary Judgment (Dkt. 129); Plaintiff's Motion for Summary Judgment on her Equal Pay Act Claim Regarding Professor Bone (Dkt. 130); Plaintiff's Opposed Motion to Strike Defendant's New Summary Judgment Evidence and Argument (Dkt. 147); and the associated response and reply briefs.[1]

## I.   Background

Plaintiff Linda Susan Mullenix has 47 years of teaching experience and has been a tenured law professor at The University of Texas School of Law ("UT Law") since 1991. Plaintiff is the fourteenth-highest-paid of 52 tenured faculty members at UT Law and the fourth-highest-paid female tenured faculty member. Dkt. 129-1 at 5-6. Plaintiff's current annual salary is $349,418; the highest male faculty member's annual salary is $390,276. *Id.*

---

[1] On July 28, 2021, the District Court referred all pending and future motions in this case to the undersigned Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72, and Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Dkt. 106.

Plaintiff alleges that she discovered in 2010 that "she was being severely underpaid for her work compared to her male coworkers." Dkt. 25 ¶ 24. Plaintiff filed a discrimination claim against the UT Law, alleging that it was violating the Equal Pay Act. Plaintiff settled her claim in 2011. *Id.* ¶ 33. On December 19, 2016, Plaintiff signed a "general release of all claims to date." *Id.* ¶ 42.

On December 12, 2019, Plaintiff filed this suit against The University of Texas at Austin (the "University"), alleging sex discrimination and retaliation in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1), and Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e-2, 2000e-3. Dkt. 1. In her Amended Complaint, Plaintiff alleges that "the gender pay gap between Professor Mullenix and her male comparators has grown by thousands of dollars every year." Dkt. 25 ¶ 12. Plaintiff alleges that she is paid less than her male counterparts because of her sex and in retaliation for her complaints of unequal pay. *Id.* ¶ 101.

The District Court dismissed Plaintiff's Title VII and EPA retaliation claims with prejudice. Dkts. 18, 61, 90. On November 19, 2021, the undersigned Magistrate Judge denied Plaintiff leave to file a second amended complaint to reassert her previously dismissed retaliation claims. Dkt. 146.

Both parties now move for summary judgment under Federal Rule of Civil Procedure 56(c). The University seeks summary judgment on both Plaintiff's EPA and Title VII discrimination claims, while Plaintiff seeks summary judgment on her EPA claim as to Professor Robert Bone. The Court addresses each claim in turn.

## II.   Legal Standards

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials, and any affidavits on file show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir.

2

2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports its claim. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

When a movant moves for summary judgment on an affirmative defense, the movant's burden of proof is even higher; the movant must "establish beyond peradventure *all* of the essential

elements of the claim or defense." *Guzman v. Allstate Assurance Co.*, 185 F.4th 157, 160 (5th Cir. 2021) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

### III.   Plaintiff's Motion to Strike

In her Opposed Motion to Strike Defendant's New Summary Judgment Evidence and Argument (Dkt. 147), Plaintiff asks the Court to strike Exhibits L and M (Dkt. 141-1 at 89-104) to the University's Reply brief and the University's related arguments that "the Budget Committee process was approved by the larger Budget Council and fully compliant with internal policy." Plaintiff argues that the University attempts to raise new arguments in a Reply brief.

The Court finds that the University is merely elaborating on its previously raised arguments and responding to Plaintiff's arguments. *See* Dkt. 129 at 9 (noting that the faculty approved the Standards in 2012). Accordingly, Plaintiff's Motion to Strike (Dkt. 147) is **DENIED**.[2]

### IV.   Plaintiff's Equal Pay Act Claim

The Equal Pay Act prohibits discrimination in employment "between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). In short, the EPA implemented "the principle of equal pay for equal work regardless of sex." *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974).

Plaintiff alleges that the University violated the EPA by paying her "less than her male counterparts that were working under substantially equal jobs requiring similar skills, effort, and responsibility as her position." Dkt. 25 ¶ 147. Plaintiff has identified eleven male tenured UT Law professors paid more: Professors Robert Bone, Thomas McGarity, Jay Westbrook, David Rabban,

---

[2] The Court has not relied on any of the "new" evidence in this Report and Recommendation.

Henry Hu, William Forbath, Steven Goode, Sanford Levinson, Robert Peroni, Lucas Powe, and William Sage (collectively, Plaintiff's "Comparators"). Dkt. 129-1 at 750. The University does not dispute that it pays Plaintiff less than her Comparators, but argues that those differences are based on how the UT Law Budget Committee evaluates each faculty member based on factors other than sex, including legitimate merit-based factors.

### A. *McDonnell Douglas* Burden Shifting

The burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs claims under the EPA. *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 466 (5th Cir. 2021). Under this framework, the plaintiff has the initial burden to establish a prima facie case of pay discrimination. *Id.* To establish a prima facie case under the EPA, a plaintiff must show that "(1) her employer is subject to the Act; (2) she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (3) she was paid less than the employee of the opposite sex providing the basis of comparison." *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 617 (5th Cir. 2020) (quoting *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993)).

Once a plaintiff has made her prima facie case, the burden shifts to the defendant to prove that the wage differential is justified under one of the four affirmative defenses set out in the EPA: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor than sex." *Siler-Khodr v. Univ. of Texas Health Sci. Ctr. San Antonio*, 261 F.3d 542, 546 (5th Cir. 2001) (quoting 29 U.S.C. § 206(d)(1)). "The exceptions are affirmative defenses on which the employer has the burden both of production and of persuasion." *Jones v. Flagship Int'l*, 793 F.2d 714, 722 (5th Cir. 1986).

Plaintiff argues that because the University has admitted that it pays her less than Professor Bone "and that both perform equal work under the same working conditions," she is entitled to summary judgment on her EPA claim. This argument ignores the burden-shifting framework applicable to her claim. Even if Plaintiff establishes a prima facie case, her claim nevertheless may fail if the University demonstrates that one of the affirmative defenses applies. In addition, the University disputes that Plaintiff has established a prima facie case, which the Court addresses next.

### B. Prima Facie Case

Plaintiff meets the first element of her prima facie case because it is undisputed that the University is subject to the Equal Pay Act. Plaintiff argues that she has "conclusively established" the rest of her prima facie case because the University has admitted that Plaintiff was paid less than Professor Bone, and also that their jobs require the same skill, effort, and responsibility and are performed under similar working conditions. Dkt. 130 at 7. The University argues that Plaintiff has failed to demonstrate a prima facie case because she relies on just one comparator and disputes that Plaintiff and Professor Bone perform equal work.

#### 1. Comparator Robert Bone

Plaintiff moves for summary judgment only as to Professor Bone, and the University concedes that Plaintiff has established a prima facie case for the purposes of its Motion for Summary Judgment. Accordingly, the Court evaluates Plaintiff's prima facie case only as to Professor Bone.

Professor Bone—the highest paid tenured faculty member at UT Law—earns an annual salary of $390,276; as stated above, Plaintiff's annual salary is $349,418. Dkt. 25 ¶ 67; Dkt. 129-1 at 5-6. The University does not dispute that it pays Professor Bone more than Plaintiff. Dkt. 130-1 at 3. The University argues, however, that "the EPA does not permit a plaintiff to compare herself to

a single man (or even a select few) and ignore the rest." Dkt. 136 at 8. Instead, it contends that Plaintiff must demonstrate that she was paid less than "the average salary of *all* male tenured faculty at the Law School." *Id.* at 9. The University is mistaken.

In support of this argument, the University relies on a Ninth Circuit Court of Appeals decision from 1983 stating that

> the proper test for establishing a prima facie case in a professional setting such as that of a college is whether the plaintiff is receiving lower wages than the average of wages paid to all employees of the opposite sex performing substantially equal work and similarly situated with respect to any other factors, such as seniority, that affect the wage scale.

*Hein v. Oregon Coll. of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983). This Court, however, is bound only by Supreme Court and Fifth Circuit precedent and need not follow the reasoning of the Ninth Circuit. The Fifth Circuit has never held that a plaintiff must show that she was paid less than the average of all male comparators in order to establish a prima facie claim under the EPA, and district courts in this Circuit have specifically rejected this argument. *See Hunt v. Millennium Info. Servs., Inc.*, No. CV H-18-1698, 2020 WL 4340758, at *9 (S.D. Tex. Apr. 21, 2020) (rejecting defendant's argument that the plaintiff could not establish a prima facie case where she relied on single comparator), *R. & R. adopted*, 2020 WL 4335819 (S.D. Tex. July 28, 2020); *Gutierrez v. City of Converse*, No. 5:17-CV-01233-JKP, 2020 WL 156707, at *3 (W.D. Tex. Jan. 10, 2020) (finding that plaintiff "need not prove that she was paid less than every comparable male employee. . . . It is enough for the plaintiff to show that there is discrimination in pay with respect to one employee of the opposite sex.") (quoting *Lenihan v. Boeing Co.*, 994 F. Supp. 776, 799 (S.D. Tex. 1998)).

Moreover, the Fifth Circuit has stated repeatedly that in order to demonstrate a prima facie case under the EPA, a plaintiff need only show that "she was paid less than the employee of the opposite sex providing the basis of comparison." *Badgerow*, 974 F.3d at 617; *Fields v. Stephen F.*

*Austin State Univ.*, 611 F. App'x 830, 832 (5th Cir. 2015); *Chance*, 984 F.2d at 153. Therefore, under Fifth Circuit precedent, a plaintiff need only identify one comparator in a position requiring equal skill, effort, and responsibility under similar working conditions as the plaintiff. *See Weaver v. Basic Energy Servs., L.P.*, 578 F. App'x 449, 451 (5th Cir. 2014) (noting that plaintiff "must identify *someone* with circumstances 'nearly identical' to her own, such that the court can evaluate her claim of unfair treatment") (emphasis added); *Vasquez v. El Paso Cnty. Cmty. Coll. Dist.*, 177 F. App'x 422, 425 (5th Cir. 2006) (holding that plaintiff failed to show a prima facie case where he did not identify "any evidence that suggests *a female* in a similar position earned a higher wage than he did") (emphasis added); *Gillis v. Turner Indus., Ltd.*, 137 F.3d 1349, (5th Cir. 1998) (holding that plaintiff failed to show a prima facie case where plaintiff "did not submit any evidence that she had been treated differently on the basis of gender than any other similarly situated *employee* of the opposite sex") (emphasis added).

For example, in *King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 723 (5th Cir. 2011), the jury determined that the defendant, a university hospital, violated the Equal Pay Act by failing to pay the plaintiff, a female anesthesiologist, as much as one of her male colleagues. On appeal, the defendant argued that the sole comparator was inappropriate because he had additional certifications and qualifications the plaintiff lacked. The Fifth Circuit affirmed the jury's verdict, finding that the plaintiff had "presented evidence adequate to establish a pay differential with an appropriate comparator." *Id.* at 724; *see also Pearce v. Wichita Cnty., City of Wichita Falls, Tex., Hosp. Bd.*, 590 F.2d 128, 133 (5th Cir. 1979) (finding that there was sufficient evidence plaintiff received unequal pay compared to a single male comparator); *Browning v. Sw. Research Inst.*, No. SA-05-CA-0245-FB, 2006 WL 8434061, at *9 (W.D. Tex. Oct. 6, 2006) ("[T]he plaintiff must identify at least one male comparator" to show a prima facie case under EPA); *Perales v. Am. Ret.*

*Corp.*, No. SA-04-CA-0928, 2005 WL 2367772, at \*3 (W.D. Tex. Sept. 26, 2005) (holding that plaintiff made out prima facie case under EPA where she named one comparator); *Saltzman v. San Antonio Indep. Sch. Dist.*, No. SA-95-CA-1131-EP, 1998 WL 1782539, at \*1 (W.D. Tex. Sept. 18, 1998) ("[E]ach plaintiff must establish the job duties of at least one comparator of the opposite sex."). Accordingly, in the Fifth Circuit, a plaintiff can demonstrate a prima facie claim under the Equal Pay Act by relying on a single comparator, as Plaintiff has done here.

### 2.  Equal Work

In order to establish the second element of her prima facie case, Plaintiff must demonstrate that she "performed work in a position requiring equal skill, effort, and responsibility under similar working conditions" as Professor Bone. *Badgerow*, 974 F.3d at 617. "To establish 'equal work,' the employee need not prove that the duties performed are identical, but merely that the 'skill, effort and responsibility' required in the performance of the jobs is 'substantially equal.'" *Pearce*, 590 F.2d at 133; *accord Reznick v. Associated Orthopedics & Sports Med., P.A.*, 104 F. App'x 387, 390 (5th Cir. 2004) (stating that plaintiff "must show that her job requirements and performance were substantially equal, though not necessarily identical, to those of a male employee"). The regulations applicable to the Equal Pay Act further clarify that "[t]he equal work standard does not require that compared jobs be identical, only that they be substantially equal." 29 C.F.R. § 1620.13(a). Application of the equal pay standard "is not dependent on job classifications or titles but depends rather on actual job requirements and performance." *Id.* at § 1620.13(e).

The Court finds that Plaintiff has presented sufficient facts to show she and Professor Bone performed substantially equal work. Plaintiff and Professor Bone are both tenured law professors at UT Law with more than 35 years of teaching experience. Plaintiff currently holds the Rita and

Morris Atlas Chair in Advocacy. Dkt. 25 ¶ 5. Plaintiff has more than 47 years of teaching experience and has been teaching at UT Law since 1991. *Id.* ¶ 6. Plaintiff teaches first-year federal civil procedure, mass tort litigation, and a seminar on transnational class actions. *Id.* ¶ 7. In comparison, Professor Bone holds the G. Rollie White Excellence in Teaching Chair at UT Law. Dkt. 130 at 5. Professor Bone has 38 years of teaching experience and has been teaching at UT Law since 2009. Dkt. 25 ¶ 68. Professor Bone teaches first-year federal civil procedure, intellectual property, trademarks, and class actions. *Id.* ¶ 69.

The Dean of UT Law, Ward Farnsworth, testified at deposition that tenured law professors at UT Law all perform the same common core of tasks, including teaching; writing; research and scholarship; preparing syllabi for classes they teach; preparing and grading exams; meeting with students during office hours; attending faculty meetings; serving on committees; community service; and writing recommendation letters. Farnsworth Dep. 298:1-299:11, Dkt. 137-18 at 298-99. In response to the Plaintiff's First Set of Requests for Admissions, furthermore, the University admitted that Plaintiff's and Professor Bone's jobs (1) "have the same minimum level of skill requirement to perform at an acceptable level;" (2) "require the same minimum level of effort requirement to perform at an acceptable level;" (3) "require the same minimum level of responsibility to perform at an acceptable level;" and (4) have similar working conditions "[t]o the extent this includes work location, supervisor, job duty minimum standards for performing at a given level, and administrative support." Dkt. 130-1 at 4.

The University attempts to distance itself from these admissions by arguing that admitting that Plaintiff's job and Professor Bone's jobs had the same "minimum" level of skill, effort, and responsibility is not the same as admitting that they performed "equal" work. Dkt. 136 at 9. The University then argues that the work performed by Plaintiff and Professor Bone differ in the details

of their scholarship, teaching, and service. These arguments, however, relate to the University's affirmative defenses, not whether Plaintiff has established her prima facie case that her job is substantially similar to Professor Bone's job. *See King*, 645 F.3d at 723-24 (rejecting defendant's argument that plaintiff did not perform similar work as male anesthesiologist comparator because she did not have same certifications and qualifications). Again, Plaintiff need not demonstrate that her job duties and those of her comparator are "identical," but merely that the skill, effort, and responsibility required in the performance of the jobs is "substantially equal." *Pearce*, 590 F.2d at 133.

The Court finds that Plaintiff has presented sufficient evidence to show that she performed substantially the same work as Professor Bone. Accordingly, Plaintiff has established a prima facie case under the Equal Pay Act.

### C. The University's Affirmative Defenses

Because Plaintiff has established her prima facie case, the burden shifts to the University to prove by a preponderance of the evidence that the wage differential between Plaintiff and her Comparators is justified under one of the four affirmative defenses set forth in the EPA: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor than sex. 29 U.S.C. § 206(d)(1); *Siler-Khodr*, 261 F.3d at 546. Thus, "a bona fide job classification program that does not discriminate on the basis of sex will serve as a valid defense to a charge of discrimination." *Corning Glass Works*, 417 U.S. at 201 (quoting 109 CONG. REC. 9209 (1963)). Here, the University argues that Plaintiff's claim fails because her pay differential was determined by a merit-based system and factors other than sex.

The Equal Pay Act "specifically provides that unequal pay for equal work is justified if administered pursuant to a 'merit system.'" *Hodgson v. Brookhaven Gen. Hosp.*, 436 F.2d 719,

726 (5th Cir. 1970). "Under such a merit system, an employer may reward workers for outstanding experience, training, and ability, so long as the resulting salary differential is not based upon sex." *Kaplan v. United States*, 133 Fed. Cl. 235, 244 (2017), *aff'd*, 727 F. App'x 1011 (Fed. Cir. 2018). "This statutory exception, if not strictly construed against the employer, could easily 'swallow the rule.'" *Hodgson*, 436 F.2d at 726 (quoting *Shultz v. First Victoria Nat. Bank*, 420 F.2d 648, 657 (5th Cir. 1969)).

The Fifth Circuit has held that a merit system must be "administered, if not formally, at least systematically and objectively." *Brennan v. Victoria Bank & Tr. Co.*, 493 F.2d 896, 901 (5th Cir. 1974) (quoting *Hodgson*, 436 F.2d at 726);[3] *McQueen v. Licata's Seafood Rest.*, No. Civ. 91-1461, 1992 WL 73322, at *4 (E.D. La. Mar. 30, 1992)).[4] However, the Fifth Circuit also has found that a merit system may be administered systematically and objectively while permitting some level of

---

[3] The University argues that *Hodgson's* statement that a merit system must be "systematically and objectively" administered is no longer good law because the Fifth Circuit included in its opinion a citation to a now repealed Department of Labor regulation and the opinion is over 50 years old. Dkt. 136 at 20. *Hodgson* has not been overturned and the University cites no case stating that the Fifth Circuit no longer requires merit systems to be systematically and objectively administered. The University also ignores more recent Fifth Circuit opinions stating that an employer must demonstrate that its merit system is administered systematically and objectively. *See Thibodeaux-Woody v. Houston Cnty. Coll.*, 593 F. App'x 280, 284 (5th Cir. 2014) (citing *Hodgson*, 475 F.2d at 1047); *Scott v. Dallas Cnty. Hosp. Dist.*, 85 F. App'x 361, 361-62 (5th Cir. 2003) (affirming district court's holding where district court stated that "[t]he employer must show that its merit system is administered systematically and objectively"); *Brennan*, 493 F.2d at 901 (stating that "the employer must show that its 'merit system' is administered, if not formally, at least systematically and objectively"); *McQueen*, 1992 WL 73322, at *4 (quoting *Hodgson* and stating that the Fifth Circuit has held that a merit system must be "administered, if not formally, at least systematically and objectively"). As explained in the body of this Report and Recommendation, however, an employer's "use of subjective criteria does not preclude its merit-based system from constituting an affirmative defense." *Harrison-Pepper v. Miami Univ.*, 103 F. App'x 596, 601 (6th Cir. 2004).

[4] *See also Price v. N. States Power Co.*, 664 F.3d 1186, 1193 (8th Cir. 2011) ("A merit system must be known to employees, must not be based on sex, and must 'be an organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria.'"); *Ryduchowski v. Port Auth. of New York & New Jersey*, 203 F.3d 135, 142-43 (2d Cir. 2000) (holding that "a merit system must be an organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria"); *Fisher v. Conrad*, 985 F.2d 559, 1993 WL 20184, at *8 (6th Cir. 1993) (same); *Maxwell v. City of Tucson*, 803 F.2d 444, 447 (9th Cir. 1986) (same); *EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 725 (4th Cir. 1980) (same) (citing *Brennan*, 493 F.2d at 901, and *Hodgson*, 436 F.2d at 726).

subjectivity as to the weighing of nondiscriminatory factors. *See Scott v. Dallas Cnty. Hosp. Dist.*, 85 F. App'x 361, 361-62 (5th Cir. 2003) (rejecting plaintiff's argument that employer's merit pay system was not objective because it included "the subjective component of employee evaluations").

"Any factor other than sex" is a general, catch-all exception under the EPA. "Factors other than sex include, among other things, employees' 'different job levels, different skill levels, previous training, and experience.'" *Browning v. Sw. Research Inst.*, 288 F. App'x 170, 174 (5th Cir. 2008) (quoting *Pouncy v. Prudential Ins. Co.*, 668 F.2d 795, 803 (5th Cir. 1982)). The "factor other than sex" defense applies only where "pay differentials are based on a bona fide use of 'other factors other than sex.'" *Washington Cnty. v. Gunther*, 452 U.S. 161, 170 (1981). "A practice is not a bona fide 'factor other than sex' if it is discriminatorily applied." *Thibodeaux-Woody v. Houston Cmty. Coll.*, 593 F. App'x 280, 284 (5th Cir. 2014) (citing *Hodgson*, 475 F.2d at 1047).

### 1. Faculty Evaluation System

UT Law sets faculty salaries through a review process by the Dean and the UT Law Budget Committee. Dkt. 129-1 at 156. The Budget Committee consists of seven to nine members of the faculty appointed by the Dean annually. Farnsworth Dep. 226:3-4, Dkt. 137-18 at 226. Since 2017, the Budget Committee has had two to four female members, including a female chair in 2018. Dkt. 129-1 at 125-41. The Budget Committee meets each spring to evaluate the work of each tenured faculty member and is guided by the "Standards For Law School Performance Evaluation of Tenured and Tenure-Track Faculty" (the "Standards"),[5] which the faculty approved in 2012. *Id.* at 156, 160. The Standards provide that the Budget Committee's evaluations of tenured faculty are

---

[5] Dkt. 129-1 at 156-58.

based on three key metrics: research and scholarship, teaching, and service. *Id.* at 156-58. The Standards explain the meaning of those terms and how faculty will be evaluated with respect to each of them. For example, the Standards explain in detail what types of publications are considered scholarship and which are not:

> A faculty member's scholarship is an essential and most significant component of the annual review. All tenured and tenure-track faculty are expected to make regular and important contributions to legal scholarship in their fields. The Budget Committee will consider both the quality and quantity of a faculty member's scholarship, with the emphasis placed on the quality. This scholarship may take many forms, including books (as author or editor), book chapters, articles (printed or on-line) in law reviews or peer-reviewed journals in other disciplines, treatises, and casebooks. Grants sought and obtained may also be considered. Except in extraordinary circumstances, the Budget Committee, as part of its review of a faculty member's scholarship, will not consider CLE materials, legislative testimony, briefs, blogs, brief essays or articles for the popular press, or articles posted on SSRN or similar web sites, although preparation of these materials may be considered as part of the faculty member's service.

> In conducting annual review of faculty performance, the Budget Committee will read and typically consider scholarship published in the previous calendar year only. But the Committee recognizes that some forms of scholarship, such as books and empirical work, ordinarily have a longer gestation period. Moreover, publication of a finished work may be delayed through no fault of the author. Therefore, the Committee invites faculty members to inform it of works in progress and, especially for multiyear projects, to submit a more detailed progress report. Although the review process is an annual one, the Committee does not wish in any way to discourage or disadvantage larger, multiyear projects. The Committee will also review the list of a faculty member's publications over the past five years to place the current year's work in perspective.

*Id.* at 156-57.

As for teaching, the Standards clarify that a faculty member's classroom performance will be evaluated on the basis of student evaluations, how many hours a member teaches, innovative classes or teaching methods, willingness when requested to teach certain classes, and other

contributions the faculty member has made to the law school's teaching mission. *Id.* at 157.

Regarding service, the Standards explain the type of activities that constitute service to the Law

School, the University, and to the greater legal and educational community:

> Contributions to the Law School may include support of its collective collegial enterprise by actively participating in colloquia and job talks, commenting on colleagues' works in draft, and mentoring tenure-track faculty. Other types of contributions to the Law School and the University that the Budget Committee will consider include, but are not limited to: serving on committees; advising student organizations; directing a center, program, or organization; acting as a hearing officer; serving on dissertation committees; working on admissions and alumni outreach; scholarly presentations; and participating in CLE programs. Examples of service to the larger legal and educational community include law-reform efforts, which may encompass legislative testimony, working with the ALI, national or state bar organizations, or legislative groups, or authoring pro bono briefs; serving on the boards of national associations and societies, providing tenure reviews at other universities, participation in conferences at other universities, serving as a peer reviewer for journals, societies, press interviews, and providing pro bono or other philanthropic legal service.

*Id.* at 157-58.

Each spring, the Budget Committee meets "over the course of many hours" to assess the

performance of each faculty member based on their aggregate performance in research, teaching,

and service. Farnsworth Dep. 51:12-52:6, Dkt. 137-18 at 51-52. For example, every piece of

scholarship produced by a faculty member in the prior calendar year is read by at least one member

of the Budget Committee, who reports on it to the entire committee. Dkt. 129-1 at 161. At the end

of the spring semester, the Budget Committee then rates each faculty member's overall

performance as (1) below baseline, (2) baseline minus, (3) baseline plus, or (4) above baseline.

Farnsworth Dep. 51:12-52:6, Dkt. 137-18 at 51-52; Baker Dep. 49:7-19, Dkt. 129-1 at 218. The

Budget Committee then presents its recommendations to the Dean. Farnsworth Dep. 51:12-52:6,

Dkt. 137-18 at 51-52. The Dean proposes raise amounts based on these ratings and faculty

seniority. *Id.* The Dean then meets again with the Budget Committee to reach final decisions as to each faculty member's annual raise. *Id.* at 52:7-53:24.

In addition to evaluating faculty members to determine their normal annual raises, from 2015 through 2018 the Budget Committee made recommendations as to which faculty should be awarded special raises under the University's Faculty Investment Initiative ("FII"). The objective of the FII was to "improve compensation of high-performing faculty" within every University college and school "at levels competitive with peer institutions"; in other words, retention of high-performing faculty. Dkt. 129-1 at 814. In 2015, the University directed each college and school to select 10% of their faculty for FII raises. *Id.* In 2018, the University directed each college and school to select 25-30% of their faculty to receive such raises. *Id.* at 385. The University also advised each college and school "to consider gender equity and diversity as part of your assessment of salary competitiveness," and that the "faculty will normally be senior faculty whose research record and accomplishments serve as indicators of their future productivity." *Id.* at 814.

### 2. Evaluation of Plaintiff and her Comparators

The University has produced summary judgment evidence showing that during each year relevant to this litigation, it evaluated Plaintiff, her Comparators, and all tenured faculty members based on their scholarship, teaching and service to determine their salary and pay raises. Plaintiff and her Comparators[6] were awarded the raises detailed below between 2017 and 2021.

### a. 2017 Pay Raises

In 2017, the Budget Committee rated Plaintiff as "baseline," and she received a $3,000 raise. Dkt. 129-1 at 436. Regarding Plaintiff's scholarship submissions, the Budget Committee noted

---

[6] While Plaintiff has identified eleven Comparators, the parties' briefs primarily focus on Professor Bone's pay raises, with a few references to Professors McGarity, Westbrook, Rabban, and Hu. *See* Dkt. 129 at 17-20; Dkt. 139 at 27-28.

that one of Plaintiff's articles was "largely descriptive, but contains an analytical kernel at the heart of it that she pursues throughout." *Id.* at 435. It also found that Plaintiff's "releases for Moore's Federal Practice and Procedure contained descriptions of cases, many of which came from 2015-16, and a bit of analysis in some cases," and that her Supreme Court Preview pieces were summaries and "count as service." *Id.* at 436. As to teaching and service, the Budget Committee noted that Plaintiff received good student evaluations, in the top third of the faculty; that she served on the Faculty Governance and Tenure Committees; and that she published several Supreme Court previews for the bar. *Id.* at 436.

Of her eleven Comparators, eight were rated similarly and likewise received a $3,000 raise, including Professors Bone, McGarity, and Westbrook. *Id.* at 750. Three of her Comparators—Professors Levinson, Peroni, and Sage—were rated baseline plus or above baseline and were given a $4,000 raise. *Id.* Regarding Professor Sage's scholarship, the Budget Committee noted that his articles were "well-reasoned and convincing," "thorough," "well written," and that one article "shined a revealing spotlight on the UT University Hospital System." *Id.* at 440-41. He was rated in the top of the middle third of faculty in teaching, and was noted to be "fairly active" in terms of service. *Id.* at 441. Regarding Professor Peroni's scholarship, the Budget Committee found his articles to be "important," and "interesting." *Id.* at 436. As to teaching, he was rated in the top third of the faculty; he also had "[g]ood service, including being on the Faculty Advisory Council on Ethics and Leadership, and did a lot of work for the ABA [American Bar Association] and bar." *Id.* As to Professor Levinson, the Budget Committee found his articles to be "thought piece[s] with lots of interesting insights," "beautifully put together," "thought provoking," and "substantial." *Id.* at 432-33. With respect to teaching, Professor Levinson was rated in the bottom third of the faculty,

17

but was noted to be a "very active participant in the intellectual life of the community when he is in Austin." *Id.* at 433.

Three female professors were given $10,000 raises in 2017, which included FII raises. *Id.*

### b. 2018 Pay Raises

In 2018, the Budget Committee rated Plaintiff as "below average [baseline]," and commented that Plaintiff continued to have "strong teaching" but that her "publications were all case notes and updates" and lacked any "substantial articles." *Id.* Dkt. 129-1 at 362. Based on these ratings, Plaintiff was given a $1,500 raise in 2018. *Id.* at 481. Plaintiff was not recommended for a FII raise.

All of Plaintiff's Comparators were rated higher than Plaintiff in 2018, from baseline minus to above baseline, and received raises from $3,000 to $10,000. *Id.* at 362, 750. For example, Professor Bone was rated as "above average[baseline]," and the Budget Committee noted that he had "excellent teaching and strong productivity; essay on forum shopping in patent law was especially nice." *Id.* at 362. The Budget Committee also selected Professor Bone to receive a FII raise. In total, Professor Bone received a $10,000 raise, which included the FII raise. *Id.* at 455.

As to Plaintiff's other Comparators, the Budget Committee noted that Professor Sage had "numerous 2017 publications; good and substantial article on 'fracking health care;'" Professor Peroni had "continued strong teaching and consistent productivity, including multiple articles;" Professor Hu had "no pubs in 2017 (or 2016) but several forthcoming in 2018;" Professor McGarity had "continued strong teaching" and a "terrific article (with [Professor] Wendy [Wagner]) on 'Dynamic Rulemaking' in NYU L. Rev.;" Professor Rabban "had continued excellent teaching" and a "nice 6-page book review;" and Professor Levinson had "continued

prodigious productivity as a scholar and strong contributions to intellectual life of law school." *Id.* at 362.

In 2018, eight female professors received raises higher than Plaintiff or her male comparators and three received FII raises. *Id.* at 450-506, 750.

### c. 2019 Pay Raises

In 2019, the Budget Committee rated Plaintiff as "baseline," and she was given a $6,500 raise. *Id.* at 530, 571. As to Plaintiff's scholarship, the Budget Committee noted that one of her articles was mostly "descriptive" and a "pretty standard symposium piece," while another article was "a translation of a previous article Linda had written." *Id.* at 530. The Budget Committee also noted that Plaintiff had submitted three short Supreme Court Previews and a short piece for the JOTWELL blog. *Id.* Plaintiff again was rated as a "strong teacher," with evaluations in the middle of the top third of the faculty, and she was found to have service "to the profession with her previews and similar contributions." *Id.*

Three of Plaintiff's Comparators received the same "baseline" rating and $6,500 raise as Plaintiff. *Id.* at 750. Three other Comparators received the same baseline rating but also received FII raises. *Id.* Four of her Comparators received higher ratings than Plaintiff, including Professor Bone, who had a "baseline plus" rating in 2019 and was given a $10,000 raise, including a FII raise. *Id.* at 529, 546. In terms of scholarship, the Budget Committee noted that one of Professor Bone's articles presented a "strong analysis" that would be appreciated by IP scholars, and that the reviewer was "enthusiastic." *Id.* at 529. As to teaching, the Budget Committee noted that Professor Bone is a "really good teacher for a large number of students," and that his student evaluations placed him fourth-highest of all faculty. *Id.* Regarding service, the Budget Committee noted that Professor Bone provided "great service" to UT Law, served on the Budget Committee, and "is a

19

constant presence at law school activities of all varieties." *Id.* In his letter to Professor Bone notifying him of his raise, Dean Farnsworth stated that the Budget Committee has "great admiration for the quality of your writing, along with your consistently excellent teaching and generous service to the school. These attributes are rarely combined in a colleague in such impressive proportions." *Id.* at 546.

In 2019, eight female professors received raises higher than Plaintiff or her Comparators, and three of these professors also received FII raises. *Id.* at 542-594, 750.

### d.   2020-21 Pay Raises

Due to budget constraints, neither Plaintiff nor Professor Bone received a pay raise in 2020. *Id.* at 632.

In 2021, Plaintiff was rated "baseline," and received a $12,000 raise. *Id.* at 640, 785. The Budget Committee noted that her ABA Supreme Court Previews were considered "very small plusses," and that some members considered those Previews as "service rather than scholarship." *Id.* at 640. The Budget Committee further commented that Plaintiff's article on federalization of class actions "was favorably reviewed, though our reviewer expressed concern that the target of the argument was a 'straw man.'" *Id.*

Two of Plaintiff's Comparators—Professors Powe and Sage—were rated below Plaintiff and received pay raises less than Plaintiff in 2021. *Id.* at 750. Four of Plaintiff's Comparators also were rated as baseline. Professor Peroni received the same $12,000 raise as Plaintiff. *Id.* at 750. While Professors Forbath, Rabban, and Westbrook received the same rating as Plaintiff, they were also recipients of FII raises, which resulted in total raises of $18,000. *Id.*

Professor Bone was assessed "baseline plus" and received a $15,000 raise. *Id.* at 750, 758. The Budget Committee noted that Professor Bone had a "strong year in scholarship with three well-

received publications," including symposium pieces on class actions and the distinction between trademark infringement and unfair competition, and a revised edition of his co-authored casebook. *Id.* at 638. The Budget Committee further noted that the reviewer found Professor Bone's symposium pieces "well-structured and well-reasoned," and "his argument compelling." *Id.* The Budget Committee also commented that Professor Bone's "teaching was strong, as always, but evals were somewhat lower than usual." *Id.* Finally, the Committee noted that Professor Bone was "very strong" in service and that he was a "regular and active participant in intellectual life of school." *Id.* In his pay raise notification letter, Dean Farnsworth stated that the Budget Committee "appreciated your continued stream of well-reasoned publications, and your outstanding service to the community in all respects. You are a major contributor to the intellectual life of the school, and that is something for which your colleagues (starting here) are always deeply grateful." *Id.* at 758.

In 2021, five female faculty members received larger raises than Plaintiff's Comparators. *Id.* at 752-804.

### 3. Merit-Based System

Numerous federal courts, including the Fifth Circuit, have held that similar merit-based systems used in higher education qualify as a merit system under the Equal Pay Act. For example, in *Suter v. Univ. of Tex. at San Antonio*, 495 F. App'x 506, 511 (5th Cir. 2012), the Fifth Circuit affirmed summary judgment for the university on the plaintiff-professor's EPA claim where the university presented evidence showing that the variances in pay between the female plaintiff and male professors with similar qualifications were "based on merit evaluations, a system under which [plaintiff] had benefitted." *Id.* Like the merit evaluations used by the University, these merit evaluations were "based on a professor's teaching, research, service . . . all of which proves affirmative defenses to a prima facie case under the Equal Pay Act." *Id.*; *see also Scott*, 85 F. App'x

21

at 361-62 (affirming district court's holding that hospital met burden of proof in establishing affirmative defense of merit pay system where employees were evaluated systematically on annual basis and assigned numerical grades according to predetermined criteria). Other courts similarly have held that evidence of pay differentials based on a university's evaluations of faculty on teaching, research, and service establish the affirmative defense of a merit system under the EPA.[7]

Plaintiff makes several arguments why the Budget Committee process is not a merit system under the EPA, which the Court addresses in turn.

### a. Formation of the Budget Committee

Plaintiff first argues that the formation of the Budget Committee violates the University's Handbook of Operating Procedures (the "Handbook"), which requires that the entire faculty of UT Law vote to establish a committee to make salary determinations. Plaintiff contends that this never happened; instead, the Dean appointed the committee members. Plaintiff argues that because the Budget Committee does not comply with University Rules, it cannot be a merit system under the EPA. Plaintiff has provided the Court with no authority to support this argument. In addition, a court in this Circuit has found that a "failure to follow internal promotion and hiring procedures, without more, is not enough to survive Defendant's motion for summary judgment" on an EPA

---

[7] *See Summy-Long v. Pennsylvania State Univ.*, 715 F. App'x 179, 183 (3d Cir. 2017) (affirming summary judgment on university's merit system affirmative defense where university presented evidence showing that professors' salaries were based on merit system and plaintiff's lower pay "resulted from, among other things, her lack of publications and failure to obtain external funding"); *Harrison-Pepper*, 103 F. App'x at 601 (affirming summary judgment on university's merit system affirmative defense where university presented evidence that pay differentials were based on merit-based system of "(1) teaching and advising, (2) scholarship and creative activity, and (3) professional service"); *Willner v. Univ. of Kansas*, 848 F.2d 1023, 1031 (10th Cir. 1988) (affirming judgment for university on professor's EPA claim where university presented evidence that salary increases were determined by evaluation on basis of merit, including quality of their instruction, research, and service); *Brousard-Norcross v. Augustana Coll. Ass'n*, 935 F.2d 974, 979 (8th Cir. 1991) ("Where the plaintiff's salary is marginally smaller than one comparator and marginally larger than another comparator, in a setting such as this where legitimate factors upon which to base salary differentials (e.g., scholarly work and teaching performance) can result in finely calibrated evaluations, a submissible Equal Pay Act claim has not been established.").

claim. *Garrity v. NationsBank of Texas, N.A.*, No. CIV. 3:98CV0437-H, 1999 WL 76785, at *5 (N.D. Tex. Feb. 3, 1999).

### b. Subjectivity

Plaintiff next argues that the Budget Committee process is not a merit system because members do not agree on what constitutes scholarship, teaching, and service, and how to evaluate them; therefore, Plaintiff argues, the Standards are not systematically and objectively applied. For example, Plaintiff contends that the Budget Committee members did not all agree whether Plaintiff's ABA Supreme Court Previews were considered scholarship. Plaintiff further argues that some professors who received below average teaching evaluations still received substantial raises. The Budget Committee process "is nothing more than highly subjective evaluations of employee merit," Plaintiff contends. Dkt. 139 at 25.

Even if application of the Standards by Budget Committee members is "subjective," that does not mean that UT Law's review procedure is not merit-based. "When a large number of factors are considered, it is inherent that a decision (or "judgment call") must eventually be made about whether an individual is offered [a promotion]. That does not mean the decision is subjective." *Wiley v. Am. Elec. Power Serv. Corp.*, 287 F. App'x 335, 342 (5th Cir. 2008); *see also Ambrose v. Summit Polymers, Inc.*, 172 F. App'x 103, 108 n.10 (6th Cir. 2006) ("An element of subjectivity is inevitable in the operation of any pay system that is truly merit-based."); *EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 726 (4th Cir. 1980) ("An element of subjectivity is essentially inevitable in employment decisions; provided that there are demonstrable reasons for the decision, unrelated to sex, subjectivity is permissible."); *Green v. Bd. of Regents of Texas Tech Univ.*, 335 F. Supp. 249, 250 (N.D. Tex. 1971) (finding that university's evaluation of professors' teaching ability, publications and scholarly activity, and service to the community and to the University were

"necessarily judgmental, and the Court will not substitute its judgment for the rational and well-considered judgment of those possessing expertise in the field"), *aff'd*, 474 F.2d 594 (5th Cir. 1973).

Thus, to prove its affirmative defense, the University is not required to show that there was no subjectivity in the Budget Committee's decisions, or that every committee member agrees on how to weigh and evaluate each aspect of every faculty's member's work. Instead, the University must show that the variances in pay between Plaintiff and male professors with similar qualifications were based on merit-based factors and that those factors were not based on sex. Here, the University has provided uncontroverted summary judgment evidence that Plaintiff and her Comparators' pay differentials were based on the Budget Committee's evaluations of their scholarship, teaching, and service.

As stated in the Standards, the Budget Committee views scholarship as the "most significant component of the annual review." Dkt. 129-1 at 156. Plaintiff has admitted that the Budget Committee does not consider some of her publications (*e.g.,* practice guides, Supreme Court Previews, and JOTWELL blog posts) as scholarship and puts more weight on the types of publications produced by her Comparators, such as case books and substantial articles in prestigious law reviews. Plaintiff's Dep. 178:10-180:13, Dkt. 136-4 at 68 ("I've been aware of that for a very long number of years, and I've been told that by past Chairs of the Budget Committee. I was also told that with regard to my Preview publications; they would not consider that as scholarship, but they would consider it as service."). For example, between 2017 and 2020, Plaintiff published three law review articles, one new edition of a casebook, one casebook update, and two articles in international legal journals. Dkt. 136-2 at 443-44; Dkt. 136-3 at 272-73; Dkt. 136-4 at 6-8. In addition, Plaintiff published 17 updates to practice guides (mostly in Moore's

Federal Practice), eleven Supreme Court Previews, and four JOTWELL blog posts. *Id.* In comparison, Professor Bone published seven law review articles, a new edition of his casebook, three case book revisions, and one academic book chapter on the economics of civil procedure. Dkt. 136-2 at 73-80; Dkt. 136-3 at 81-82; Dkt. 136-4 at 2-3.

Regarding teaching, Plaintiff teaches first year Civil Procedure, Tort Litigation, and a Transnational Class Actions seminar. Dkt. 136-4 at 8. Professor Bone teaches first year Civil Procedure, Introductory Intellectual Property, Trademarks, and Arbitration: Theory and Practice. Dkt. 136-2 at 80. From 2015 to 2020, Professor Bone taught 21 classes with a total of 824 students and an average student evaluation score of 4.79, while Plaintiff taught 16 classes with 503 students and an average student evaluation score of 4.71. Dkt. 136-4 at 24-26.

Regarding service, since 2017, Professor Bone has served on the Budget Committee, as the Faculty Advisor to the Texas Law Fellowships organization and the Bradford Society, was an active member of the Austin Intellectual Property Inns of Court, and regularly spoke at legal conferences. Dkt. 136-2 at 75. In comparison, Plaintiff has been a member of the Tenure Committee, the Teaching Committee, speaks at legal conferences, attends dinners and law school events, and publishes JOTWELL posts. *Id.* at 444-47.

It appears that the crux of Plaintiff's dispute with the Budget Committee's evaluation process is that its members do not value her publications as highly as she believes they should.[8] However, "measuring the value of academic work is sticky business." *Travis v. Board of Regents of Univ. of Texas*, 122 F.3d 259, 264 (5th Cir. 1997). The Fifth Circuit has recognized that a decision regarding

---

[8] *See* Plaintiff's Dep. 178:10-18, Dkt. 129-1 at 106 ("By the way, our wonderful Budget Committee, consisting of about a dozen of my colleagues, plus the Dean, who conduct annual compensation review of each of us, does not count towards my publications anything I write in Preview, or in the National Law Journal, or on any blogs, such as SCOTUS blog. I can only conclude they exclude this stuff because none of them—not any of my colleagues—does this.").

a professor's academic performance lends itself poorly to judicial review. *Levi v. Univ. of Tex. at San Antonio*, 840 F.2d 277, 280 (5th Cir. 1988). The fact that the Budget Committee values certain types of publications more than others is a legitimate factor to justify a pay differential. *Merrill v. S. Methodist Univ.*, 806 F.2d 600, 606 (5th Cir. 1986) (affirming finding that low ratings in scholarship were legitimate reasons); *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) (stating that courts "must not ignore the interest of colleges and universities in institutional autonomy" and may value quality of publications over quantity); *Suter*, 2013 WL 6919760, at *6 (finding that university "could choose, for example, to reward a professor who wrote fewer, but more prestigious papers"). In *Merrill*, the professor-plaintiff argued that her publications should have been rated as high as her male comparators because "she published as frequently as her male colleagues." 806 F.3d at 606. The Fifth Circuit rejected this argument, reasoning that "academic scholarship is not measured by volume alone, but by the comprehensiveness and direction of the research." *Id.* The court noted that most of the plaintiff's work was printed in journals with little or no recognition in the academic community, and that her colleagues, including females, overwhelmingly rated her deficient in that area. *Id.*

Even if the Budget Committee was wrong with regard to those decisions, that does not mean that it violated the Equal Pay Act. *See Travis*, 122 F.3d at 264 (noting that dispositive question is not whether university made a mistake in its decision but whether it was based on sex). It is not a federal court's job to second-guess a university's decisions regarding how they should evaluate scholarship, teaching, and service. Universities do "not have to make proper decisions, only non-discriminatory ones." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005); *see also Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir.1991) ("even an incorrect belief that

an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for termination).

### c.  Collegiality

Plaintiff argues that the Budget Committee also relied on unwritten factors to assess a faculty member's institutional service, such as collegiality. Dkt. 130 at 15. Yet the fact that Budget Committee considered collegiality does not demonstrate that its evaluation process was not a merit system. Courts have found that collegiality is a proper factor other than sex to justify pay decisions and adverse employment actions in the university setting. *See Alvarez-Diemer v. Univ. of Texas-El Paso*, 258 F. App'x 689, 691 (5th Cir. 2007) (affirming finding on pretext where collegiality with faculty was legitimate, non-discriminatory reason for rejecting plaintiff for tenure-track professorship); *Suter*, 2013 WL 6919760, at *7 (finding that collegiality was a non-gender-based reason for denying professor pay raise where university determined "that she was inconsiderate and a disruptive influence on the biology department").

### d.  Faculty Investment Initiative Raises

Plaintiff next argues that the FII pay raises demonstrate that the Budget Committee's process was not a true merit system because those raises were not based on established standards and criteria. The Court disagrees. The University directed the Deans of each college to award the FII raises to retain "high-performing faculty . . . whose research record and accomplishments serve as indicators of their future performance." Dkt. 129-1 at 814. In accordance with these guidelines, the Dean and several members of the Budget Committee testified that FII raises were given to retain important faculty members in terms of their publications and contributions, and to those professors "whose departure would be a hurt to the law school." Farnsworth Dep. 119:17-120:19, Dkt. 136-4 at 123; Baker Dep. 206:12-209:21, Dkt 136-4 at 97; Forbath Dep. 28:8-15, Dkt. 136-4

at 149. Thus, the FII raises were based on clear guidelines. Retention of high-performing faculty members based on their publications and contributions to the law school, moreover, is a legitimate reason for pay differentials that are not based on sex.[9]

### e.  Standard Criteria

Finally, Plaintiff argues that the Budget Committee process is not a merit system because the Standards do not describe in sufficient detail what should be considered scholarship, teaching, and service, and those details are not communicated to the faculty. In support of this argument, Plaintiff relies on *Shultz v. First Victoria Nat'l Bank*, 420 F.2d 648 (5th Cir. 1969), in which the Fifth Circuit held that that a pay differential between male and female employees of two banks was not based on a bona fide training program that qualified as a factor other than sex. The training programs "were informal, unwritten, and, if not imaginary, consisted of little more than the recognition of the ability of employees to work their way up the ranks." *Id.* at 654. The training programs were supposed to provide rotation for such employees through various departments of the banks, but the rotation was, in practice "unpredictable, sporadic, and unplanned." *Id.* at 655. The Fifth Circuit found that:

> As structured and operated [the training program] was little more than a post-event justification for disparate pay to men and women from the commencement of employment up through advancement. The training was essentially the acquiring of skills, and experience and knowledge of the business through continued performance of regular tasks. In this sense every job in every type of business would be training, and nothing would be left for the operation of the Interpretative Bulletin Training program. This was not the Secretary's intention.

---

[9] *See Covington v. S. Ill. Univ.*, 816 F.2d 317, 322 (7th Cir. 1987) (holding that university's "salary retention policy qualifies as a factor other than sex"); *Suter v. Univ. of Tex. at San Antonio*, No. SA-12-CV-969-OLG, 2013 WL 6919760, at *5-6 (W.D. Tex. Dec. 20, 2013) (holding that retention raise to professor with very strong performance in scholarship and research was awarded for legitimate reasons other than sex).

*Id.* at 655-56. Most importantly, the Fifth Circuit explained that the training program could not

qualify as a factor other than sex because it had been applied discriminately based on sex:

> [U]nder the training program relied upon as the justification for unequal pay there was lacking 'any factor other than sex', since the work performed and the employment roles of the male and female employees were the same. Thus it was sex itself.
>
> This is borne out also by the discriminatory manner in which these training programs were administered. Since the commencement of this proceeding both banks made female employees officers. Both banks thus obviously recognized that some of their women employees had the capacity and the drive to become officers. Both banks, nevertheless, included none of these women in the "training programs." Thus the system starts with discrimination on sex with no showing yet that any exception would justify it.
>
> &#42;&#42;&#42;
>
> These vague, almost illusory, training programs that were applied in a discriminatory manner may have been "a better reason" than the maleness or femaleness of employees for the inequality in pay. But, they were not "factors other than sex" within the meaning of the Equal Pay Act.

*Id.* at 659.

In contrast to the "informal, unwritten, and, if not imaginary" training program in *Shultz*,

UT Law's merit system is based on written Standards which explain in detail how the Budget

Committee evaluates scholarship, teaching, and service. It is undisputed that these Standards were

applied to all UT Law faculty on an annual basis. *Id.* at 156, 160. In addition, the Standards were

communicated to the faculty every year when the Budget Committee sent each faculty member a

detailed summary of what the Budget Committee would review in terms of scholarship, teaching,

and service, and asked faculty to submit information pertaining to each category. *Id.* at 168-174.

In fact, Plaintiff admitted in her deposition that she was aware as early as 2013 that the Budget

Committee would not consider any of her Supreme Court Previews, blogs, or articles in the

National Law Journal as scholarship. Plaintiff's Dep. 178:10-180:13, Dkt. 136-4 at 68. Accordingly, the merit system was communicated clearly to the faculty.

In addition, unlike in *Shultz*, there is no evidence that these Standards were applied discriminately on the basis of sex. Numerous female professors received higher raises than Plaintiff, and many male professors received the same raises as Plaintiff. Dkt. 129-1 at 450-506, 542-594, 750, 752-804. Also, eight of twenty-one professors who received FII raises were female. *Id.* at 388. Plaintiff has failed to point to any competent evidence in the summary judgment record that creates a fact issue that Plaintiff's pay raises from 2017-2021 were because of her sex.

### f.  Testimony

The only evidence Plaintiff relies on in support of her theory that she did not receive higher raises because of her sex is the deposition testimony of three of her colleagues at UT Law— Professors Bone, Peroni, and Lynn Blais—and a friend of hers at Emory Law School, Professor Richard Freer. Professor Peroni is a friend of Plaintiff's who last served on the Budget Committee in 2013, under then UT Law Dean Lawrence Sager. Peroni Dep. 18:1-4, 68:21-22, Dkt. 139-18 at 19, 68. Professor Peroni testified that he did not think some members of the 2013 Budget Committee "fairly considered her work" because they focused on her publications in previous years, not the current year, and noted that "some people referred to her being kind of a complainer." *Id.* 69:22-25, Dkt. 139-18 at 70. Professor Peroni also testified that the Budget Committee evaluation process was not fair because the members did not spend enough time evaluating each faculty member's work. *Id.* 211:10-23, 212. Professor Peroni also testified, however, that the Budget Committee treated both male and female faculty members unfairly and arbitrarily, and that what really mattered for determining raises was whether the faculty member was in the Budget Committee and Dean's "favored group." *Id.* 210:14-18, 211. In addition, Professor Peroni testified

that Dean Farnsworth has been "hostile" and "antagonistic" to both him and Plaintiff. *Id.* 24:21-25:1, 25-26; 34:2-4, 34.

Professor Peroni's testimony does not show that Plaintiff's pay raises from 2017 to 2021 were based on sex. First, Professor Peroni was last on the Budget Committee in 2013, and thus he has no personal knowledge of the Budget Committee deliberations during the time period relevant in this case. In addition, none of Professor Peroni's comments or opinions indicate that the Budget Committee's recommendations were based on a professor's gender; rather, he opines that the Budget Committee's recommendations were based on whether a professor was favored.

Professor Blais testified that when she joined UT Law in 1991, "the message by my male colleagues was very loudly and clearly conveyed to me to not align myself with her [Plaintiff] and to avoid her basically and that she was crazy and that if I wanted to be taken seriously at tenure time, I would not associate myself with her." Blais Dep. 40:24-41:5, Dkt. 139-34 at 41-42. Again, Professor Blais' testimony does not show that Plaintiff's pay raises from 2017-2018 were based on sex. Professor Blais also does not have any personal knowledge of the Budget Committee negotiations during the relevant time period.

Professor Bone testified that Plaintiff "has a significant reputation in the field" of civil procedure. Bone Dep. 94:19-20, Dkt. 137-16 at 94. However, Professor Bone also testified that "[t]he salaries that people have received I believe come from a fair process . . . but I don't believe that I am equipped or knowledgeable enough about the multiple factors that go into this to be able to make an assessment or be able to answer your question and to determine whether or not Professor Mullenix ought to be paid the same as me." *Id.* 224:22-225:4, 224-25. Accordingly, this testimony does not demonstrate that Plaintiff's pay raises from 2017-2021 were because of her sex.

Finally, Professor Richard Freer, also a friend of Plaintiff's, testified that he has "a very favorable, a very positive impression of Professor Mullenix's reputation and impact on the scholarly side," and believes that she "is a leading civil procedure scholar." Freer Dep. 20:2-5, 22:23, Dkt. 139-12 at 21, 23. While Professor Freer opines that Plaintiff is a leading scholar, he also testified that "I don't know enough about the lawsuit itself to have a sense of the merits of the case." *Id.* 18:5-7, 19. Thus, Professor Freer offered no testimony on whether he believed that Plaintiff was paid less because of sex. Professor Freer also has no personal knowledge of the Budget Committee negotiations during the relevant time period.

The Court finds that none of this deposition testimony creates a fact issue that the UT Law's evaluation process was administered in a discriminatory manner.

Because the University has provided uncontroverted summary judgment evidence that the Budget Committee and the Dean determined faculty members' pay raises on the basis of a merit system, the University has raised a valid affirmative defense under the Equal Pay Act.

### 4. Factors Other Than Sex

The Court further finds that the University's faculty evaluations based on teaching, research, and service also are "factors other than sex" and, therefore, meet the EPA's fourth affirmative defense. *See Schwartz v. Fla. Bd. of Regents*, 954 F.2d 620, 623 (11th Cir. 1991) (holding that discretionary raises given to certain faculty based on outstanding service to the university, administrative duties, publications, research, supervision of doctoral students, and performance were factors "not based on sex and are sufficient to sustain an employer's burden to show that the salary disparity does not result from sex discrimination"); *Wu v. Thomas*, 847 F.2d 1480, 1485 (11th Cir. 1988) (holding that seniority, teaching ability, and scholarly production are factors other than sex).

### D.  Conclusion as to Equal Pay Act Claim

Because the University has raised valid affirmative defenses under the Equal Pay Act, it is entitled to summary judgment on Plaintiff's EPA claim. *See Suter*, 2013 WL 6919760, at *7 (granting summary judgment on Plaintiff's EPA claim where plaintiff offered no evidence showing that university's proffered reasons for pay differential—teaching, committees joined, and publications—were based on sex). "Under the Equal Pay Act, the courts and administrative agencies are not permitted to substitute their judgment for the judgment of the employer who has established and applied a bona fide job rating system, so long as it does not discriminate on the basis of sex." *Gunther*, 452 U.S. at 170-71 (cleaned up).

## V.  Plaintiff's Title VII Claim

Plaintiff also alleges a Title VII claim based on the same facts as her Equal Pay Act claim. In general, "a Title VII claim of wage discrimination parallels that of an EPA violation." *Siler-Khodr*, 261 F.3d at 546.

Under *McDonnell Douglas*, the plaintiff has the initial burden to establish a prima facie case of pay discrimination under Title VII. 411 U.S. at 802. To do so, a plaintiff must show that she was paid less than members of the opposite sex for "work requiring substantially the same responsibility." *Lindsley*, 984 F.3d at 466-67. If a plaintiff establishes a prima facie case, then the burden shifts to the defendant to put forth a legitimate, non-discriminatory reason for the pay disparity. *Id.* If the employer provides such a reason, the burden shifts back to the plaintiff to establish that the employer's stated reason is pretextual. *Id.*

For the purposes of this Motion, the University concedes that Plaintiff has established a prima facie case. Therefore, the Court moves on to the remaining *McDonnell Douglas* factors.

### A. Legitimate, Non-Discriminatory Reasons

"The EPA's affirmative defenses have been incorporated into Title VII by the Bennett Amendment to the Act." *Siler-Khodr*, 261 F.3d at 546. Thus, the University's affirmative defense under the Equal Pay Act—that faculty members' pay differentials were based on a merit-based system which evaluated a professor's scholarship, teaching, and service—also are legitimate, non-discriminatory reasons under Title VII. *See Suter*, 2013 WL 6919760, at *7 (dismissing Title VII claim based on affirmative defenses under EPA); *see also Murungi v. Xavier Univ. of La.*, 313 F. App'x 686, 690 (5th Cir. 2008) (stating that professor's poor student evaluations constituted legitimate, non-discriminatory reason for university's decision not to promote him); *Alvarez-Diemer v. Univ. of Texas-El Paso*, 258 F. App'x 689, 691 (5th Cir. 2007) (holding that university's reasons for not hiring professor including her lack of experience, her potential for publishing, and her "collegiality" with faculty during her employment as a visiting professor); *Merrill*, 806 F.2d 600 (5th Cir. 1986) (holding that university's proffered reasons for denying tenure because professor's publications were weak and printed in journals with little or no recognition in academic community were legitimate, non-discriminatory reasons); *Strong v. Grambling State Univ.*, 159 F. Supp. 3d 697, 708 (W.D. La.) (holding that university's proffered explanations for differences in pay among faculty, including qualifications, experience, course load, market factors, and program needs, were legitimate and non-discriminatory reasons), *aff'd*, 614 F. App'x 776 (5th Cir. 2015); *Yul Chu v. Mississippi State Univ.*, 997 F. Supp. 2d 467, 477 (N.D. Miss.) (holding that deficient research and publication record of professor was legitimate, non-discriminatory reason under Title VII for state university's denial of professor's tenure application), *aff'd*, 592 F. App'x 260 (5th Cir. 2014).

Although it is not entirely clear if the University is relying on lack of collegiality as a factor for pay differentials, the Court also notes that lack of collegiality is a legitimate, non-discriminatory reason for adverse employment actions under Title VII. *Alvarez-Diemer*, 258 F. App'x at 691; *Ward v. Midwestern State Univ.*, 217 F. App'x 325, 328 (5th Cir. 2007); *Fuming Wu v. Texas A & M Univ. Sys.*, No. H-10-3690, 2011 WL 6130921, at *7 (S.D. Tex. Dec. 8, 2011). The summary judgment evidence shows that male and female members of the Budget Committee raised concerns about Plaintiff's lack of collegiality.

For example, Professor Angela Littwin, a member of the 2018 Budget Committee, told Plaintiff that one of the reasons Plaintiff did not receive a higher raise in 2018 was because of a letter Plaintiff wrote in 2014 criticizing a female colleague's teaching accomplishments. Plaintiff's Dep. 145:1-2, Dkt. 136-4 at 66. After Plaintiff discovered that UT Law had nominated Professor Mechele Dickerson to receive the University's highest teaching award, the University's Academy of Distinguished Teachers, Plaintiff wrote a four-page letter to Dean Farnsworth demanding that she be nominated for the award instead of Professor Dickerson. Dkt. 132-1 at 68-71. In that letter, Plaintiff touted her teaching, scholarship, and service accomplishments while severely denigrating Professor Dickerson's teaching accomplishments. *Id.* Plaintiff sent copies of the letter to Professor Dickerson, seven other faculty members, the President of the University, and three federal judges. *Id.* at 71. Professor Goode described Plaintiff's actions in "attacking a fellow faculty member, a fellow woman, because she had been nominated for an honor that Professor Mullenix . . . was not selected for" as "one of the most glaring examples of lack of collegiality that I've experienced in my 40-plus years of teaching." Goode Dep. 108:6-109:10, Dkt. 136-4 at 143.

In addition, Professor Baker, Chair of the 2018 Budget Committee, expressed her concerns to the Budget Committee about Plaintiff's lack of collegiality after she learned that Plaintiff had treated a junior professor unprofessionally. Specifically, Professor Baker testified that she

> felt obligated to report that to the budget committee because when a junior person from another institution tells one that they have been unprofessionally treated by someone at my institution, that strikes me as a disservice to the institution and a disservice to the profession and to what it is to be a legal scholar.

Baker Dep. 163:8-14, Dkt. 130-15 at 163. The foregoing evidence shows that the University could have relied on lack of collegiality as legitimate, non-discriminatory reason for pay differentials.

Because the University has produced legitimate, non-discriminatory reasons for the pay differentials, the burden shifts back to Plaintiff to establish that the University's stated reasons were pretextual. *Id.*

### B.  No Showing of Pretext

To show that the University's reasons for pay differentials were pretextual, Plaintiff must put forward "substantial evidence" to "rebut[ ] each of the nondiscriminatory reasons the employer articulates." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001). The plaintiff may do so by showing that a discriminatory motive is more likely than a nondiscriminatory one, "or that [her employer's] explanation is unworthy of credence." *Id.* Plaintiff has shown neither.

To show pretext, Plaintiff relies on the same theories that she relied on to argue that the University's evaluation system was not a true merit-based system: (1) the Budget Committee's evaluation process is not a true merit-based system; (2) the Budget Committee does not comply with University's Handbook of Operating Procedures; and (3) statements from Professors Bone, Freer, Peroni, and Blais that she says cast doubt on the University's stated reasons for pay differentials. Dkt. 139 at 28-32. Underlying all of these factors is her belief that the Budget Committee should have evaluated her scholarship, teaching, and service more highly than it did.

As discussed in detail above, the Court finds that none of these factors show that Plaintiff's pay raises were motivated because of her sex.

In addition, Plaintiff's opinion that her teaching, service, and scholarship should be rated higher than her Comparators is not "substantial evidence" of pretext. *See Britt v. Grocers Supply Co.*, 978 F.2d 1441, 1451 (5th Cir. 1992) (holding that "speculation and belief" are "insufficient to create a fact issue as to pretext"); *E.E.O.C. v. Exxon Shipping Co.*, 745 F.2d 967, 976 (5th Cir. 1984) ("[P]retext cannot be established by mere 'conclusory statements' of a plaintiff who feels he has been discriminated against."). In cases involving discriminatory promotions, the Fifth Circuit has held that a plaintiff can show pretext by demonstrating that she was "clearly better qualified." *Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002). But the plaintiff's "qualifications must leap from the record and cry out to all who would listen that he was vastly— or even clearly—more qualified for the subject job." *Id.* "Even a plaintiff's better education, work experience, and longer tenure with the company do not establish that he is clearly better qualified." *Mengistu v. Mississippi Valley State Univ.*, 716 F. App'x 331, 335 (5th Cir. 2018). Here, it is "hardly self-evident . . . let alone so clear that it leaps from the record and cries out to [the Court]" that Plaintiff's scholarship, teaching, and service were so superior to her Comparators that she should have received higher pay raises. *Id.*

Plaintiff has failed to produce substantial evidence that the Budget Committee or Dean Farnsworth based pay recommendations and raises on Plaintiff's sex. As discussed herein, the record shows that numerous female faculty members received higher pay raises than Plaintiff. Plaintiff has not sustained her burden to show that the University's proffered reasons for pay disparities were a pretext for sex discrimination. Accordingly, the University is entitled to summary judgment on Plaintiff's EPA claim.

## VI.   Order and Recommendation

Based on the foregoing, the undersigned Magistrate Judge **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Summary Judgment on Her Equal Pay Act Claim Regarding Professor Robert Bone (Dkt. 130), **GRANT** Defendant's Motion for Summary Judgment (Dkt. 129) in its entirety, and enter Judgment on behalf of the University.

**IT IS FURTHER ORDERED** that Plaintiff's Opposed Motion to Strike Defendant's New Summary Judgment Evidence and Argument (Dkt. 147) is **DENIED**.

## VII.   Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on December 13, 2021.

SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE